**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| ARTHUR J. GALLAGHER & CO., | ) |
| Plaintiff, | ) Case No.: ) |
| v. | ) **DEMAND FOR JURY TRIAL** |
| ALLIANT INSURANCE SERVICES, INC., | ) ) |
| Defendant. | ) ) |
| | ) |

## COMPLAINT

Plaintiff Arthur J. Gallagher & Co. ("Gallagher"), for its Complaint against Defendant Alliant Insurance Services, Inc. ("Alliant"), alleges as follows:

## INTRODUCTION

1.　Alliant is presently engaged in a corporate raid of Gallagher's Chicago office. On July 11, 2022, three Gallagher employees who worked closely with one another on several important accounts informed Gallagher that they were resigning. Each of these employees told Gallagher they were resigning "effective immediately," despite having signed an employment agreement requiring them to provide 21-days' written notice of their resignations.

2.　Over the ensuing days, five additional Gallagher employees purported to resign to join Alliant, "effective" the same day as their non-compliant notice to Gallagher.

3.　These abrupt and coordinated resignations were orchestrated by Alliant as part of a scheme to steal Gallagher's clients before Gallagher could take contractually-protected steps to protect its business interests, including its client relationships and confidential information.

4.　In conjunction with the coordinated resignations, Alliant immediately began contacting Gallagher clients that the resigning employees had serviced at Gallagher in order to

induce those clients to terminate their relationships with Gallagher and move their business to Alliant. Within minutes of the resignations, Alliant called a large Gallagher client that was serviced by the resigning employees and told the client that it had to move its business to Alliant because there was no one left at Gallagher to service its account. Alliant then continued to contact other Gallagher clients, asserting the same false claim for the purpose of harming Gallagher and causing reputational damage.

5.      The raid that is currently underway is not an isolated incident. It is part of a concerted course of action by Alliant (which it refers to, ironically, as its "leveraged hire strategy") designed and intended wrongfully to steal business from competitors rather than compete through lawful means.

6.      From at least 2015 through the present, Alliant and its co-conspirators devised and executed a brazen series of schemes to steal confidential business information, employees, client relationships, money, and other property from its competitors, including Gallagher.

7.      Pursuant to its strategy, Alliant intentionally interferes with competitors' contractual relationships by unlawfully inducing employees to leave their employment and join Alliant in a manner that violates the employees' contractual and fiduciary duties. Alliant fraudulently uses these employees as double agents who draw paychecks from their current employers—and with respect to employees of Gallagher, before and during their mandatory 21-day notice period—while really working in the interests of Alliant. During this time period, the departing employees agree with Alliant to remain employed with the competitor for a period of time, and to operate under the fraudulent pretense, representation, and promise that they remain loyal employees of the competitor.

8.     During this period, and after negotiating agreements to join Alliant, the departing employees surreptitiously act for Alliant's benefit while pretending to act for the competitor's benefit. Such actions include soliciting co-employees to leave for Alliant, without the requisite notice, in violation of employment agreements prohibiting such conduct; collecting and misusing trade secrets and confidential information for the benefit of Alliant; and developing promotional materials designed to promote Alliant to clients they currently service on behalf of Alliant's competitor.

9.     The resigning employees conspire with Alliant to remain employed by the competitor until Alliant determines a coordinated time of departure that would inflict the largest damage to the competitor and create the greatest benefits for Alliant.

10.     At the instruction of Alliant, the resigning employees then violate their contractual obligations to work with their current employer to transition work and client responsibilities to others at the company during the notice period, and instead continue to work against their current employer's interests and for Alliant. The resigning employees and Alliant then, as planned, unlawfully "leverage" competitors' confidential business information and client relationships for Alliant's financial benefit.

11.     When conducting these raids, Alliant engages in significant unlawful activity, including but not limited to the following:

a.     Obtaining and misappropriating property and money from competitors (including but not limited to, fees and commissions from insurance policies sold to unlawfully stolen customers, competitors' customer and prospect lists, budgets, business plans, personnel contact lists, trade secrets, and other information that the resigning employees agreed were the property of their current employer and would neither be disclosed to nor used for the benefit of

3

others) through the efforts of resigning employees who falsely pose as loyal employees under fraudulent pretenses, representations, and promises;

      b.    Inducing the resigning employees to submit expense reports or other requests for reimbursement to their employer under the fraudulent pretense, representation, and promise that the expenses were in furtherance of employer-related business, when the expenses actually furthered Alliant's own business interests; and

      c.    Coordinating mass resignations of competitors' employees, without notice, to maximize the misappropriation of competitors' property and money for receipt by Alliant.

12.    Alliant also engages in a variety of activities designed to conceal this series of unlawful conduct, including:

      a.    Instructing resigning employees not to communicate in writing regarding their plans and actions to resign from the competitor;

      b.    Instructing resigning employees to delete emails that discussed their plans and actions to resign their employment;

      c.    Wiping personal electronic devices used by resigning employees prior to the effective date of their resignations, often in violation of agreements with their current employers to allow the employer access to such electronic devices to protect the employer's trade secrets and confidential information;

      d.    Creating deceptive privilege logs in an effort to conceal evidence of the steps taken in furtherance of Alliant's unlawful conduct;

      e.    Creating sham documents, such as documents entitled "Prospective Employee Departure Protocols," to conceal the steps taken in furtherance of Alliant's unlawful

conduct, including the theft of trade secret, proprietary, and/or confidential information from the competitor;

   f. Creating a sham "remediation program" designed to conceal the misappropriation of the competitors' confidential information by falsely representing that all such information in the possession of departing employees had been returned to the competitor or otherwise destroyed; and

   g. Inducing clients of the current employers to cooperate in the improper disclosure to, and misuse of the employer's confidential information by, Alliant and the resigning employees, often in violation of non-disclosure agreements between the current employer and such clients.

13. Alliant's illegal "leveraged hire strategy" is overseen and implemented at the highest levels of Alliant, including its Board of Directors, high-ranking executives, and its outside counsel.

14. Alliant consistently disputes the reality of coordinated schemes. Yet in case after case and jurisdiction after jurisdiction, employees of its competitors resign simultaneously, violate contractual non-solicit provisions, violate contractual notice provisions, show up at an Alliant office on the same day to immediately begin their formal employment with Alliant, and proceed to misuse confidential information to solicit and thereafter service their former employer's clients. This is not coincidence. Alliant is the common thread (or as one court recently termed it, the "puppet master"), driving this tortious conduct across the country.

15. Like many in the industry, Gallagher is a repeated victim of Alliant's conduct. Alliant has executed unlawful raids around the country aimed at Gallagher, including in California, Florida, Massachusetts, Texas, and now in Illinois. To date, Alliant has stolen dozens of employees

and more than 100 clients through these raids. Alliant will continue its unlawful conduct and will continue to inflict irreparable harm upon Gallagher unless enjoined by this Court.

## JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction over this lawsuit pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship among the parties and the amount in controversy exceeds $75,000.

17.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claims occurred in this judicial district.

18.     This Court has personal jurisdiction over Alliant because it has committed tortious acts within the State of Illinois or has directed its tortious conduct toward the State of Illinois. The claims stated herein all arise out of Alliant's contacts with the State of Illinois.

## THE PARTIES AND RELEVANT NON-PARTIES

### I.     PLAINTIFF ARTHUR J. GALLAGHER & COMPANY

19.     Gallagher is a Delaware corporation and maintains its principal place of business at 2850 Golf Road, Rolling Meadows, Illinois 60008. Gallagher is an insurance brokerage and risk management firm that also provides health and welfare consulting services, including employee benefits insurance, retirement plans, and administrative services. Gallagher operates brokerage offices and businesses across the United States.

### II.     DEFENDANT ALLIANT INSURANCE SERVICES, INC.

20.     Alliant is now a California corporation headquartered in Newport Beach, California.[1] Alliant is a competitor of Gallagher, which offers insurance brokerage and risk

---

[1] Until January 2020, Alliant was a Delaware corporation. However, after a privilege waiver in a proceeding in the Delaware Chancery Court allowed the plaintiff and the court to peel back the curtain on Alliant's schemes, the court issued a scathing opinion laying bare Alliant's unlawful conduct, and Alliant fled the jurisdiction.

management services. Alliant is registered to do business in Illinois, maintains offices in the Northern District of Illinois, and transacts business affairs in the Northern District of Illinois.

## III.    NON-DEFENDANT CO-CONSPIRATORS

21.    Kristen Long ("Long") is a former Gallagher employee. Long worked for Gallagher in Chicago, Illinois from on or about November 13, 2014 until her resignation on or about July 11, 2022.

22.    Jordan Laeyendecker ("Laeyendecker") is a former Gallagher employee. Laeyendecker worked for Gallagher in Chicago, Illinois from on or about January 18, 2016 until her resignation on or about July 11, 2022.

23.    Taylor Gunnells ("Gunnells") is a former Gallagher employee. Gunnells worked for Gallagher in Chicago, Illinois from on or about October 11, 2021 until her resignation on or about July 11, 2022.[2]

24.    Janet Schumacher ("Schumacher") is a former Gallagher employee. Schumacher worked for Gallagher in Chicago, Illinois from on or about December 17, 2014 until her resignation on or about July 12, 2022.

25.    Melissa Haggerty ("Haggerty") is a former Gallagher employee. Haggerty worked for Gallagher in Chicago, Illinois from on or about April 30, 2018 until her resignation on or about July 12, 2022.

26.    Rosario Zaragoza ("Zaragoza") is a former Gallagher employee. Zaragoza worked for Gallagher in Chicago, Illinois from on or about July 15, 2013 until her resignation on or about July 12, 2022.

---

[2] Gunnells and Sara Arnold were physically located in other locations, but they reported in to the Chicago office and worked remotely to support Gallagher's team in Chicago.

27.     Sara Arnold ("Arnold") is a former Gallagher employee. Arnold worked for Gallagher in Chicago, Illinois from on or about May 17, 2021 until her resignation on or about July 13, 2022.

28.     Kelly Hogan ("Hogan") is a former Gallagher employee. Hogan worked for Gallagher in Chicago, Illinois from on or about January 12, 2015 until her resignation on or about July 13, 2022.

29.     Long, Laeyendecker, Gunnells, Schumacher, Haggerty, Zaragoza, Arnold, and Hogan are collectively referred to as the "Resigning Employees."

## FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

### I.     BACKGROUND

#### A.     Insurance Brokerages

30.     The insurance brokerage industry is highly competitive. Gallagher and Alliant are direct competitors.

31.     Insurance brokers are intermediaries between their customers and insurers. The role of a broker is to analyze the insurance market and match their customers with insurers capable of meeting the customers' insurance needs. Once a broker has identified appropriate insurers and secured offers for insurance coverage, the broker helps the customer choose from competing offers. This is a complex process—it is not simply a matter of choosing the lowest bid. A broker must help the customer analyze factors such as the breadth of coverage, the risk management services provided by the insurers, the insurer's reputation, and the ability of an insurer to meet the customer's unique needs. A broker's role is not limited to insurance placement. It also provides customers risk of loss management as well as management of employer sponsored benefits programs.

32.     Insurance brokerages typically generate revenue through brokerage fees and commissions from insurers on policies sold. Commissions are typically based on a percentage of the policy premium paid by the customer, and sometimes include contingent commissions based on factors such as the profitability or volume of insurance the broker places with the insurer. Additionally, brokers sometimes have arrangements where they receive a fee from the customer instead of commissions on premiums.

33.     Large insurance brokerages like Gallagher provide brokerage services to a wide variety of businesses and organizations, including commercial, not-for-profit, and public entities. Because customer-specific and industry-specific knowledge is required to provide effective service to customers, insurance brokerage companies are often organized around industry groups. Client-service teams are formed within these industry groups to service particular clients.

34.     Employees of an insurance brokerage who are primarily responsible for developing and maintaining client relationships are referred to in the industry as "Producers." Producers assume the lead, client-facing role and manage other members of their client-service teams. Becoming a successful Producer takes years of experience as well as significant training and information, knowledge and expertise provided to the Producer in confidence by the brokerage firm. Accordingly, insurance brokerages typically invest substantial resources over a period of years to develop successful Producers.

**B.      Gallagher Processes**

35.     Gallagher invests substantial resources into attracting, developing, maintaining, and servicing its clients. Those investments benefit Gallagher's employees and enable them to effectively service a large and diverse client base.

36.     Gallagher invests substantial resources into its personnel. Gallagher often acquires businesses at significant cost to enhance its ability to service clients. Gallagher also invests substantial resources into its existing personnel to develop employees into successful Producers and members of client-service teams.

37.     Gallagher's investment in its Producers and other members of its client-service teams enables Gallagher's employees to learn significant client-specific knowledge. Over a period of years, Gallagher's employees gain experience selling and placing insurance with specific clients, handling claims for specific clients, and developing an understanding of a client's current insurance needs as well as its historical needs and preferences.

38.     Gallagher has, over many years and at great effort and expense, developed, accumulated, maintained, and refined trade secrets and other confidential information, including, among other things, client-specific pricing, key client contacts, client-specific manuals, client-specific marketing and servicing strategies, exposure and rating information in the pricing of clients' insurance/reinsurance products, buying trends, the composition and the unique risks inherent in a clients' operations, details concerning the structure, conditions, and extent of insurance/reinsurance policies, policy expiration dates, premium amounts, commission rates, loss history, timing of renewals, data relating to Gallagher's unique marketing and servicing programs, the criteria and formulae used by Gallagher in pricing its insurance and benefits, and compensation information for Gallagher employees. (Gallagher's confidential and proprietary trade secrets and other confidential information, including the types listed here, are referred to herein as "Confidential Information").

39. Gallagher shares this Confidential Information with its employees, provided they agree that the information remains Gallagher's property, will remain confidential, and will not be misused by its employees for the benefit of another.

40. Gallagher's Confidential Information enables it to maintain the client relationships in which it has invested. If this information were obtained by a competitor, Gallagher's investment in a particular client relationship would be jeopardized. Misappropriation, theft, or use of Gallagher's Confidential Information would allow a competitor to unfairly identify, contact and divert Gallagher's clients, causing substantial loss of revenue to Gallagher and financial gain to the competitor.

41. Gallagher carefully protects its Confidential Information. Among other safeguards, Gallagher requires many of its employees to enter into employment agreements.

            i.     <u>Employment Agreements with Gallagher</u>

42. Each of the Resigning Employees signed employment agreements with Gallagher (the "Employment Agreements"). *See* Exhibit A1-A8.

43. The Resigning Employees were at-will employees at Gallagher, but Gallagher had a reasonable expectancy of entering into and continuing its business relationship with Resigning Employees on a continued basis pursuant to the terms of the Employment Agreements.

44. Through the Employment Agreements, the Resigning Employees explicitly acknowledged that Gallagher's Confidential Information "constitutes valuable property" of Gallagher. *See id.* at § 2B. The Resigning Employees promised to safeguard the Confidential Information while employed by Gallagher and to not "divulge such Confidential Information or make use of it for [their] own purposes or the purposes of another." *See id.*

45.     The Employment Agreements also required the Resigning Employees to devote their "full energies, abilities, attention and business time to the performance of [their] employment obligations and responsibilities." *See id.* at § 2A. The Employment Agreements required that the Resigning Employees refrain from engaging "in any activity which conflicts or interferes with, or in any way compromises" performance of their obligations and responsibilities. *See id.* The Resigning Employees were also required to comply with all applicable Gallagher policies and procedures, and to refrain from any activity that is not in the best interest of Gallagher. *See id.*

46.     Additionally, the Employment Agreements contain restrictive covenants governing an employee's obligations once he or she leaves Gallagher's employment. *See id.* at §§ 7-8. Those covenants include confidentiality, customer non-solicitation, and employee non-solicitation restrictions as well as other restrictions on post-employment conduct. *See id.*

47.     The Resigning Employees agreed to continue to safeguard Gallagher's Confidential Information following the termination of their employment with Gallagher, including by provisions that specifically stated:

> (1) after his employment with [Gallagher] is terminated, he will not directly or indirectly disclose, use or divulge Confidential Information that constitutes a trade secret of [Gallagher] or make use of it for his own purpose or the purpose of another; and
>
> (2) for a period of two (2) years following the termination of his employment with [Gallagher], he will not divulge Confidential Information that does not constitute a trade secret of [Gallagher] or make use of it for his own purpose or the purpose of another.

*See id.* at § 7(B)(1)-(2).

48.     The Resigning Employees also acknowledged in the Employment Agreements that, "an essential element of [Gallagher]'s business is the development and maintenance of personal contacts and relationships with its accounts" and even if the clients ultimately developed a closer relationship with the individual employee, "those accounts remain, at all times and for all purposes,

12

accounts of [Gallagher]." *See id.* at § 2D. Accordingly, the Resigning Employees agreed that for two years following the termination of their employment with Gallagher, they would not solicit, service, or accept business from Gallagher accounts and prospective accounts with which they had contact at Gallagher:

> [F]ollowing the termination of Employee's employment with [Gallagher] for any reason whatsoever Employee will not, directly or indirectly, solicit, transfer, place, market, accept, aid, counsel or consult in the placement, renewal discontinuance or replacement of any insurance (including self-insurance) by, or handle self-insurance programs, insurance claims, risk management services, emergency or disaster prevention or management services, or other insurance administrative or service functions ("insurance services") or provide employee benefit brokerage, consulting, or administrative services; in the area of group insurance, defined benefit and defined contribution pension plans, individual life, disability and capital accumulation products; investment advisory services, wealth management, or group retirement services; defined benefit and defined contribution pension services; human resources consulting services, including, without limitation, compensation consulting, compensation program design, compensation and benefits surveys, and on-site human resources management; and all other employee benefit areas [Gallagher] is involved with ("benefit services"), for: (x) any Account of [Gallagher] for which Employee performed any of the foregoing functions during any part of the two-year period immediately preceding such termination (referred to hereinafter as "Protected Accounts"), or (y) any Prospective Account of [Gallagher].

*See id.* at § 8A(1). This provision of the Employment Agreements is referred to herein as the "Non-Compete Provision."

49. Additionally, the Resigning Employees recognized that Gallagher employees are a "valuable resource" of Gallagher and agreed not to "directly or indirectly solicit, induce, entice or recruit" any Gallagher employee to leave their employment with Gallagher—both during the time period in which the Resigning Employees were employed by Gallagher and for two years following the termination of their employment. *See id.* at § 8E.

50. The Resigning Employees further agreed that, upon termination of employment with Gallagher, they must return to Gallagher all of its property, including business records. *See id.* at § 5C.

13

51.     The Resigning Employees also agreed to provide 21 days' written notice prior to terminating their employment with Gallagher (the "Notice Period"): "[T]he Employee may terminate Employee's employment at any time and for any reason upon twenty-one (21) days' written notice (the 'Notice Period') by the party wishing to terminate the employment[.]" *See id.* at § 5A.

52.      During the Notice Period, the Resigning Employees promised to assist with the orderly transition of client relationships to other employees, specifically agreeing to "cooperate fully with [Gallagher] in all matters relating to the winding up of any pending work and/or the orderly transfer to other [Gallagher] employees of the accounts for which he has been responsible." *See id.* at § 5C. The Employment Agreements further provided that Resigning Employees "specifically covenant[] that during the Notice Period (regardless of whether or not active employment responsibilities are continuing) his duties to [Gallagher], including Employee's fiduciary duty of loyalty, will continue in effect." *See id.* The provision requiring 21 days' written notice prior terminating employment is referred to herein as the "Notice Provision."

53.     The Notice Period is intended to and does protect Gallagher's Confidential Information, property, and money. When departing employees comply with the Notice Provision, Gallagher is typically successful in retaining the vast majority of client business affected by the departures. Those odds drop drastically when the Notice Provision is breached. Alliant intentionally interferes with the Employment Agreements and induces breaches for that reason.

54.     The aforementioned types of restrictive covenants are common in the insurance brokerage industry. Competitors in the industry are aware that employees typically have employment agreements that contain these types of restrictive covenants. Indeed, Alliant requires

nearly identical restrictive covenants in employment agreements signed by employees that it poaches from competitors.

55.     Alliant unquestionably knew that Gallagher's employees agreed to these restrictive covenants. Putting aside that it is common knowledge in the industry, as discussed below, by the time Alliant began conspiring with the Resigning Employees, Alliant was already involved in active litigation with Gallagher in which Gallagher's employment agreements are at issue and had been produced. Moreover, as part of its standard recruiting and onboarding practices, Alliant specifically requests that candidates send Alliant copies of their restrictive covenants. Likewise, the Employment Agreements themselves required the Resigning Employees to provide copies of the Employment Agreements to Alliant. *See id.* at § 5E.

56.     In their Employment Agreements, the Resigning Employees also expressly acknowledged that breaches of their restrictive covenants would cause irreparable injury to Gallagher and agreed to injunctive relief as an appropriate remedy:

> The Employee acknowledges that his services to [Gallagher] are of a unique character which gives them a special value to [Gallagher], the loss of which cannot reasonably or adequately be compensated in damages in an action at law should the Employee breach, or threaten to breach, any post-employment obligations under this Agreement. The Employee realizes that: (a) it would be difficult to measure precisely the damages to [Gallagher] from any breach by Employee of Sections 7 and/or 8 of this Agreement; (b) injury to [Gallagher] from any such breach would be incalculable and irremediable; and (c) money damages would therefore be an inadequate remedy for any such breach. Accordingly, in addition to any other remedy [Gallagher] may have at law or in equity, [Gallagher] will be entitled to enforce this Agreement by obtaining a temporary restraining order and preliminary and permanent injunctive relief to restrain any such breach or further breach by Employee. Employee expressly waives the right to contest whether a breach of Section 7 or 8 of this Agreement would result in irreparable or permanent harm to [Gallagher]. In addition, Employee agrees that [Gallagher] may seek injunctive relief when and if it elects to do so and any delay in seeking injunctive relief will not prejudice or waive [Gallagher]'s right to do so. Employee expressly waives the right to assert that [Gallagher] is not entitled to injunctive relief because of any delay in seeking such relief. Employee agrees that he will be responsible for and pay [Gallager] its reasonable attorneys' fees and other expenses and costs incurred

15

to enforce this Agreement if Gallagher is the prevailing party. Employee further agrees that if Employee breaches any covenant contained in Sections 7 and/or 8 of this Agreement, [Gallagher] will be entitled, in addition to all other legal or equitable remedies it may have, to offset and withhold against any such loss, cost, liability or expense any amount of any kind that may then be owing or payable by [Gallagher] to Employee.

*See id.* at § 6.

ii.     Gallagher's Mobile Device Policy

57.     In addition to their agreement to numerous restrictive covenants, the Resigning Employees also agreed to a Mobile Device Policy (the "Mobile Device Agreement") which provides that Gallagher employees own their personal mobile devices and use them to conduct business for Gallagher.[3] *S*ee Exhibit B1-B7, at ¶ 1. Under the Mobile Device Agreement, the Resigning Employees agree that it was their responsibility to "protect corporate data on my personal mobile device" and that Gallagher "reserves the right to wipe all Gallagher data from the mobile device in the event of employee or contractor separation from [Gallagher]." *See id.* at ¶¶ 1, 6.

## II.     ALLIANT'S HISTORY AND PATTERN OF TORTIOUS CONDUCT

### A.     Alliant Develops a System to Tortiously "Raid" Competitors

58.     Beginning in approximately 2015, Alliant devised and began to execute a "leveraged hire strategy" that revolves around taking employees and clients from its competitors, including Gallagher. Rather than providing superior service or unique products to attract clients, Alliant decided it would engage in a series of schemes to recruit client-service teams and obtain property and money from its competitors. Alliant's litigation history and public documents highlight Alliant's complete disregard for fair competition and the law. Its schemes are calculated and methodical. Each scheme follows a basic pattern with minor variations.

---

[3] Zaragoza did not agree to a Mobile Device Agreement.

59. First, Alliant identifies one or two Producers from a competitor who are perceived as important to client relationships and the generation of revenue. In initial discussions with Producers, Alliant investigates the size of the "book of business" that the Producers manage for the competitor. Alliant then offers the Producers significant bonuses and inflated compensation packages—including equity in the company—to join Alliant based on the book of business that the Producers manage for the competitor. These inflated compensation packages are contingent upon the Producers violating their contractual obligations and other duties to their employer by leaving without notice, poaching clients, soliciting colleagues to join Alliant in coordinated departures, and participating in the other aspects of Alliant's schemes as described herein. Alliant understands that this "leveraged hire strategy" depends upon the violation of fiduciary and contractual obligations owed by employees to Alliant's competitors. Alliant not only encourages and induces these employees to breach their duties, it assumes responsibility for those breaches by agreeing to indemnify the Producers (in writing) against any claims that might arise from the execution of this unlawful strategy.

60. Second, at Alliant's direction, the Producers agree to withhold notice of their decision to join Alliant, commonly in violation of contractual notice requirements

61. Third, after the Producers agree to join Alliant, but while they are still employed by a competitor, the Producers operate under the materially false pretense that they remain a loyal employee of the competitor, when in fact they act in Alliant's interests.

62. Fourth, during the time period between the decision to join Alliant and leaving their employment with an Alliant competitor, the Producers obtain property for Alliant from the competitor, including client contacts, renewal dates, premium amounts, loss history, pricing, and other Confidential Information.

63.     Fifth, during this same window of time—after the Producers agree to join Alliant, but while they are still employed by an Alliant competitor—the Producers assist Alliant's recruitment of additional members of the competitor's client-service teams, in violation of the employees' common law as well as contractual obligations and duties. Alliant can offer inflated salaries and bonuses to lure away employees from its competitors in part because the Producers often provide Alliant with confidential salary information for those other team members, in violation of their contractual and fiduciary obligations.

64.     Once recruited to join Alliant, the other members of the client-service teams operate under the materially false pretense that they remain loyal employees of Alliant's competitors. During this time, the employees coordinate with one another and the Producers to obtain confidential information from their employer for Alliant's benefit. For example, the employees regularly print confidential documents, forward confidential documents to personal email accounts, and download confidential documents to USB devices in the days leading up to mass resignations from an Alliant competitor.

65.     Sixth, Alliant and the employees of its competitors coordinate with one another to resign their employment abruptly and in coordinated fashion. Alliant dictates the timing of the resignations. The coordinated mass resignations of client-service teams are critical to the execution of Alliant's schemes. These coordinated "raids" are Alliant's hallmark, designed to minimize its competitor's opportunity to retain client relationships and revenue stream, while maximizing the benefit of the raids to Alliant.

66.     Seventh, Alliant attempts to conceal, and in some instances successfully conceals, its unlawful conduct. Importantly, Alliant's concealment efforts continue even after it is sued. The lengths to which Alliant and its counsel will go to conceal Alliant's frauds were laid bare in

18

*Mountain W. Series of Lockton Cos., LLC v. Alliant Ins. Servs., Inc.*, 2019 WL 2536104 (Del. Ch. June 20, 2019) ("*Lockton*"), where a privilege waiver allowed the plaintiff and the Court to peel back the curtain on Alliant's scheme. The conduct revealed by the "privileged" communications was so egregious that it led the court to conclude that the crime-fraud exception to privilege likely applied. *Id.* at n.6.[4]

67.     One of the methods that Alliant uses to conceal its unlawful conduct in litigation is to wrongfully withhold documents under baseless claims of attorney-client privilege. As a matter of standard practice, Alliant employees label emails as "privileged" even when the emails do not pertain to legal advice—either sought or actually provided. Alliant instructs its employees to copy attorneys on communications between and among non-lawyers when the substance of the communications neither seeks nor conveys legal advice. Alliant then routinely withholds these communications from discovery as "privileged."

68.     In an attempt to conceal the breach of contractual and fiduciary duties as well as the theft of confidential information from Alliant's competitors, Alliant's attorneys also draft affidavits for the former employees of the competitors which contain false representations that the employees complied with their contractual and fiduciary duties. *See, e.g.*, *Lockton*, 2019 WL 2536104, at *2, *20, & n.11-12 (describing Alliant's affidavits as "lawyer-drafted submissions," repeatedly describing them as "problematic," and ultimately finding that the "affidavits made

---

[4] Even after the *Lockton* litigation was resolved, Alliant fought vigorously to conceal the details of its unlawful conduct and the significant role of its outside counsel. It sought to maintain the details of the court record under seal and hidden behind overly broad and improper redactions— an effort that was rejected by the Chancery Court. The court found that "Alliant has no right to shield tortious strategies from public review," and that "[i]t may be embarrassing for Alliant to have the specifics of its conduct brought to light. But embarrassment is not grounds for confidential treatment." *See* Exhibit C, at ¶¶ 14(c), 19.

expansive, absolutist representations about the absence of any solicitation efforts, which discovery revealed to be inaccurate").

69.     Alliant also concocts sham protocols and processes, namely a "Prospective Employee Departure Protocol" ("PEDP") and a "remediation program" to deceive and attempt to deceive competitors, including Gallagher, and to conceal Alliant's unlawful conduct.

70.     The PEDP is designed to deceive competitors by making it appear that Alliant instructed former employees of competitors to abide by contractual and other obligations to the competitors. In fact, Alliant's unlawful schemes depend on violations of contractual and other obligations that are owed to its competitors, and Alliant anticipates, encourages, and rewards the violations. Repeated, flagrant violations of the PEDP by former employees of Alliant's competitors are not met with any admonishment or discipline from Alliant. To the contrary, the employees are rewarded and indemnified by Alliant. The PEDP is consistently utilized as a tool in litigation to defend against claims from Alliant's competitors.

71.     The sham "remediation program" was designed to conceal the use of confidential information that was stolen from Alliant's competitors for use at Alliant. Through the façade of the "remediation program," Alliant insists that all misappropriated documents have been identified and returned to its competitors or destroyed. In reality, of course, those documents are stolen and utilized by Alliant to solicit clients—thereby damaging competitors by causing loss of revenue— well before the identified documents are purportedly "remediated." Furthermore, "remediating" a document does nothing when that document and its contents have already been printed, copied, or otherwise disseminated to Alliant personnel.

72.     Alliant also uses the façade of the "remediation program" to resist attempts by competitors to discover for themselves what documents were actually taken and utilized by former

employees. For example, Alliant routinely refuses to comply with requests for independent analysis of the departing employees' personal devices, claiming that such analysis is unnecessary and would violate a purported "privilege" covering the remediation process. Alliant takes this baseless position even where the poached employees have signed agreements permitting its targeted competitors to examine the personal devices that are the subject of the "remediation," as is the case here.

73.     Alliant, including through its outside counsel, directs those involved in the unlawful schemes to avoid creating or retaining evidence of unlawful conduct, including by urging Alliant employees and former employees of Alliant's competitors not to communicate about their breaches of contractual and fiduciary duties in writing. For example, in *Lockton*, the court found that Alliant executive Peter Arkley ("Arkley") coordinated one of the Alliant's hallmark "raids" by instructing 20 Lockton employees to resign at the same time and without notice, in violation of the employees' notice requirements. *Lockton*, 2019 WL 2536104, at *7. The court further found that "[t]o conceal this instruction, Alliant's outside counsel told Arkley to pass it along verbally rather than putting it in writing." *Id.* The court's finding was well-founded, and the direction from Alliant's outside counsel was stunning. It made clear that the instruction to the resigning Lockton employees amounted to a breach of their notice provisions, and thus should not be put in writing: "[W]e are no longer instructing employees in writing to resign without notice because they may have notice provisions – Alliant will instead instruct them verbally."

74.     Alliant and its counsel have even directed the destruction of documents and electronic images to conceal unlawful conduct. *See, e.g.*, *Lockton*, 2019 WL 2536104, at *20 ("Alliant also took independently wrongful steps such as directing [a departing Producer] to destroy evidence…."). The *Lockton* court found that "Alliant engaged in extensive efforts to avoid

creating an evidentiary record of its activities, which cross the line on important occasions into the actual destruction of evidence." *See id.* at *17. In another stunning statement by a member of the bar, Alliant's outside counsel called the deletion of incriminating email evidence "a good start."

75.     Moreover, to conceal the theft of confidential information, property, and money, the employees of Alliant's competitors—prior to their resignation—will commonly send confidential information to the competitor's clients with the understanding that the clients will, upon request, send the confidential information back to them once they have joined Alliant, in some instances in violation of non-disclosure agreements prohibiting such actions. The poached employees then misuse that information to solicit and service those clients for the benefit of Alliant, either directly or indirectly through other Alliant employees.

**B.      Alliant's Unlawful Conduct Continues Even After a Multitude of Lawsuits**

76.     As Alliant anticipated, a multitude of claims arose from the execution of Alliant's unlawful strategy. The Delaware Chancery Court recently noted that Alliant is facing at least forty-one (41) lawsuits in at least twenty-five (25) jurisdictions in which competitors have asserted similar claims relating to Alliant's strategy. *See* Exhibit C, at ¶ 20(a). Lawsuits against Alliant in recent years include the following, among many others: *USI, Inc. v. Call*, No. BC678226 (Cal. Super. Ct. Oct. 2, 2017); *Smith Bros. Ins. LLC v. Ellenberg-Gray*, No. CV-15-6060903-S (Conn. Super. Ct. Dec. 7, 2015); *Mountain W. Series of Lockton Cos., LLC v. Alliant Ins. Servs., Inc.*, 2019-0226-JTL (Del. Ch. Mar. 22, 2019); *NFP Corp. v. Ayala*, 2018-0688 (Del. Ch. Sept. 18, 2018); *Wells Fargo Ins. Servs. USA, Inc. v. Alliant Ins. Servs., Inc.*, No. 2017-0540 (Del. Ch. July 26, 2017); *Ascension Ins. Holdings, LLC v. Underwo*od, No. 9897-VCG, 2015 WL 356002 (Del. Ch. Jan 28, 2015); *Willis Ins. Servs. of Ga. v. Alliant Ins. Servs., Inc.*, No. 8:18-cv-1826-T-23AAS, 2018 WL 3586374 (M.D. Fla. Aug. 21, 2018); *Wells Fargo Ins. Servs. USA, Inc. v. Laman*, No.

502016CA009049XXXXMB (Fla. Cir. Ct. April 10, 2017); *Willis of Fla. v. Powell*, No. 2016-CA-007824, 2017 Fla. Cir. LEXIS 6713 (Fla. Cir. Ct. Jan. 25, 2017); *Wells Fargo v. Moreno*, No. 15-25316CA01 (Fla. Cir. Ct. May 11, 2015); *Willis Ins. Servs. of Ga. v. Alliant Ins. Servs., Inc.*, No. 2018cv308132 (Ga. Super. Ct. July 23, 2018); *Aon Risk Services Co. v. Alliant Ins. Servs., Inc., et al.*, No. 1:19-cv-07312 (N.D. Ill. Nov. 5, 2019); *Aon PLC v. Heffernen*, No. 16-cv-1924 (N.D. Ill. Nov. 20, 2017); *Ralph Weiner & Assocs., LLC v. Hancock*, No. 2017-CH-06618 (Ill. Cir. Ct. May 9, 2017); *Willis of Ill. Inc. v. Chapman*, No. 2014-CH-15748 (Ill. Cir. Ct. Nov. 25, 2014); *Willis of Mass. v. Michael G. Feinberg & Alliant Ins. Servs.*, 2016 Mass. Super. LEXIS 1047, 1684CV01497 (Mass. Super. Ct. Oct. 3, 2016); *Arthur J. Gallagher & Co. v. Long*, No. 1:17cv12313 (D. Mass. Dec. 13, 2017); *Willis of Minn. v. Alliant Ins. Servs., Inc.*, No. 27-cv-18-11684 (Minn. Dist. Ct. July 20, 2018); *The Hays Group, Inc. v. Peters, et al.*, No. 0:16-cv-2352 (D. Minn. July 29, 2016); *Regions Insurance, Inc. v. Alliant Ins. Servs., Inc.*, 13-cv-00667 (S.D. Miss. Oct. 25, 2013); *Willis Towers Watson Southeast, Inc. v. Alliant Ins. Servs., Inc.*, 21-cv-00417 (W.D.N.C. Aug. 12, 2021); *Corp. Synergies Grp., LLC v. Andrews*, No. 2:18cv13381 (D.N.J. Aug. 30, 2018); *Cook Maran & Assocs., Inc. v. Scrocca & Alliant Ins. Servs., Inc.*, No. C-209-17 (N.J. Super. Ct., Sept. 13, 2017); *AssuredPartners Northeast, LLC v. Stone and Alliant Ins. Servs., Inc.*, 20-cv-05564 (E.D.N.Y Nov. 16, 2020); *Marsh USA, Inc. v. Moody*, No. 17-651325 (N.Y. Sup. Ct. Aug. 7, 2018); *Marsh USA Inc. v. Alliant Ins. Servs. Inc.*, No. 15-651994, 26 N.Y.S.3d 725 (N.Y. Sup. Ct. Oct. 19, 2015); *Aon Corp. v. Alliant Ins. Servs. Inc.*, No. 14-650700, 2014 WL 2990393 (N.Y. Sup. Ct. June 26, 2014); *Aon Risk Servs. v. Cusack*, No. 651673/2011 (N.Y. Sup. Ct. 2011); *Graham Co. v. Harper*, No. 170202712 (Pa. Ct. Common Pl. Feb. 9, 2017); *Huntington Bancshares Incorporated v. Burke*, 20-cv-01159 (W.D. Pa. Aug. 3, 2020); *Anco Ins. Servs. of Houston v. Barnard*, No. 2011-29054, 2012 WL 2335530 (Tex. Dist. Ct. Feb. 22, 2012); *Alliant*

*Ins. Servs. Inc. v. Wells Fargo Ins. Servs. USA Inc.*, No. 2017-56259 (Tex. Dist. Ct. Aug. 23, 2017);

*Arthur J. Gallagher Risk Mgmt. Servs. Inc. v. Allen*, No. 08-08922-I (Tex. Dist. Ct. Dec. 16, 2008);

*Assured Partners of Washington, LLC v. Acarregui*, 2:20-cv-00290 (W.D. Wash. Feb. 24, 2020).

77.     Courts, including this Court, have enjoined Alliant's unlawful behavior in at least the following matters: *Anco Ins. Servs. of Houston v. Barnard*, No. 2011-29054, 2012 WL 2335530 (Tex. Dist. Ct. Feb. 22, 2012); *Aon Corp. v. Alliant Ins. Servs.*, No. 650700/2014 (N.Y. Sup. Ct. Mar. 04. 2014); *Aon PLC et al. v. Heffernan, et al.*, No. 1:16-cv-01924 (N.D. Ill. Feb. 3, 2016); *Aon Risk Servs. Ne. v. Cusack et al.*, No. 65163/2011 (N.Y. Sup. Ct. Jun. 15, 2011); *Huntington Bancshares Inc. et al. v. Burke et al.*, No. 2:20-cv-01159 (W.D. Pa. Aug. 3, 2020); *Mountain W. Series of Lockton Co. v. Alliant Ins. Servs.*, No. 2019-0226-JTL (Del. Ch. June 13, 2019); *USI Ins. Servs. Nat., Inc. v. Grassi, et al.*, 2017-CA-009742-O (Ninth Judi. Cir. for Orange Cty., Fla. Nov. 3, 2017).

78.     Alliant's unlawful conduct is ongoing and is likely to continue despite numerous lawsuits, injunctions, and even sanctions orders, because Alliant has determined that the costs associated with defending and resolving these lawsuits are lower and the benefits to Alliant's revenues and bottom line are greater than could be achieved through lawful competition. Alliant tracks and reports this economic analysis of the benefits of its illegal "leveraged hire strategy" at the highest levels of the company, including the efficiency with which competitors' client relationships are improperly transitioned to Alliant, in regular reports to its Board of Directors, which continues to orchestrate and approve the implementation of these schemes.

## C.     Alliant's History of Tortious Conduct Toward Gallagher

79.     Despite the overwhelming number of lawsuits filed against Alliant for wrongfully infiltrating its competitors' businesses, Alliant has, in recent years, directed its tortious conduct toward Gallagher in California, Florida, Massachusetts, and Texas.

80.     Alliant has actively recruited former Gallagher employees and conspired with them to illicitly solicit other Gallagher employees and clients and to misappropriate Confidential Information for Alliant's benefit—during and after the former Gallagher employees resigned their employment with Gallagher.

81.     The former Gallagher employees were bound by restrictive covenants in the event they sought to terminate their employment with Gallagher, and they were also contractually obligated to protect and not disclose Gallagher's Confidential Information or misuse it for the benefit of others.

82.     Despite these contractual restrictions, Alliant conspired with the former Gallagher employees to attack Gallagher's business to the significant benefit of Alliant. Alliant has stolen employees, customers, revenue, and Confidential Information, and it used present and former Gallagher employees to accomplish its unlawful goal. Alliant has effectuated its "leveraged hire strategy" consistent with its past unlawful conduct directed at competitors, and Gallagher has unfortunately become a primary target.

83.     Litigation commenced by Gallagher against Alliant is ongoing in California, Florida, Massachusetts, and Texas.

**D.      Alliant's Raid on Gallagher's Chicago Office**

84.     Alliant has now raided Gallagher's Chicago office and it has done so by offering inflated compensation to the Resigning Employees—consistent with its overall scheme. After Gallagher prepared a generous compensation package to retain Hogan, she told a Risk Program

Administrator at Gallagher that the retention offer was "not even close" to what Alliant offered. Moreover, in her departure email, Haggerty explained that "Alliant made me an offer I couldn't refuse and I accepted." On information and belief, Alliant's offers to the Resigning Employees also included indemnification agreements designed to induce the Resigning Employees to breach their contractual and fiduciary obligations.

i. Alliant Coordinated the Resignations of Gallagher's Employees

85.     Alliant began its recruitment efforts as early as January of 2022. On information and belief, the Resigning Employees agreed to join Alliant shortly thereafter. Yet, the Resigning Employees pretended to remain loyal to Gallagher for months, and executed their departures in July of 2022 in a remarkably organized and methodical manner—a strategic move that is lifted directly from Alliant's playbook.

86.     Long, a producer with a substantial book of business, purported to resign from Gallagher "effectively immediately." Just hours later—and within minutes of one another—Gunnells and Laeyendecker, both of whom worked on Long's team at Gallagher, also submitted resignations "effective immediately." The other Resigning Employees resigned "effective" the same day as their notice to Gallagher:

| No. | Name | Date | Time | Departure Date |
|-----|------|------|------|----------------|
| 1 | Kristen Long | 7/11/2022 | 11:19 AM | "effective immediately" |
| 2 | Jordan Laeyendecker | 7/11/2022 | 5:11 PM | "effective immediately" |
| 3 | Taylor Gunnells | 7/11/2022 | 5:15 PM | "effective immediately" |
| 4 | Janet Schumacher | 7/12/2022 | 3:00 PM | "effective immediately" |
| 5 | Melissa Haggerty | 7/12/2022 | 4:57 PM | "effective immediately" |

| 6 | Rosario Zaragoza | 7/12/2022 | 7:02 PM | "effective July 12, 2022" |
| 7 | Sara Arnold | 7/13/2022 | 10:46 AM | "effective 7/13/2022" |
| 8 | Kelly Hogan | 7/13/2022 | unknown[5] | "effective immediately" |

87.    On information and belief, Alliant directed these individuals to resign simultaneously and without notice in order to minimize Gallagher's ability to retain the clients serviced by those employees and maximize the illicit business benefits to Alliant. Alliant directed the Resigning Employees to resign in this manner despite having knowledge of the Resigning Employees' obligations under the Notice Provision.

88.    Upon receiving the notices of resignation, Gallagher, through counsel, promptly sent a letter to each of the Resigning Employees by email—some of which were sent with a copy to Alliant's Chief Legal Officer—to (i) advise the Resigning Employees of their ongoing obligations to Gallagher during their respective Notice Periods (pursuant to the Notice Provision) (ii) remind them of their post-employment obligations (the restrictive covenants), and (iii) demand that they provide Gallagher their mobile devices (pursuant to the Mobile Device Agreement). The letters that were sent to each of the Resigning Employees are referred to herein as the "July Correspondence."

89.    Despite Gallagher's demands, the Resigning Employees refused to comply with their contractual obligations and fiduciary duties. On information and belief, their refusal was induced by Alliant, and indeed demanded by Alliant as a condition of their employment. On information and belief, Alliant incentivized and rewarded the Resigning Employees' unlawful

---

[5] The precise time of resignation is unknown because Hogan resigned verbally.

conduct by providing inflated compensation packages and promising to indemnify them against any claims by Gallagher. These actions are consistent with Alliant's "leveraged hire strategy" employed across the country.

90. Flagrantly disregarding their contractual obligations and fiduciary duties, and at Alliant's direction, the Resigning Employees did not provide their mobile devices to Gallagher. On information and belief, Alliant instructed the Resigning Employees to provide personal electronic devices to Alliant's consultant for the sham "remediation program" instead of providing the mobile devices to Gallagher. The Resigning Employees did not continue to act in Gallagher's best interests, despite Gallagher obligation to continue to pay employees per the terms of their Employment Agreements. The Resigning Employees have refused to assist Gallagher with the transitioning of client accounts. To the contrary, on information and belief, they coordinated with Alliant in an effort to steal those accounts from Gallagher.

ii. Alliant Has Contacted and Made False Statements to Gallagher's Clients

91. Simultaneously with these coordinated and abrupt resignations, Brian Cooper, the head of Gallagher's national construction group, received a phone call from one of the largest construction clients serviced by Long ("Client A"). Client A reported that it received a call from Alliant Executive Vice President Matthew Walsh ("Walsh"),[6] informing the client that Long had joined Alliant. Walsh further stated to the client that, given the resignations of Long and her teammates, Client A should move its business to Alliant because there is nobody left at Gallagher to handle the account.

---

[6] Walsh has previously been a named defendant in connection with Alliant's wrongful schemes, and in fact, has been enjoined by this Court, along with Alliant. *See Aon Risk Services Cos., Inc. v. Alliant Ins. Servs., Inc.*, 415 F.Supp.3d 843 (N.D. Ill. 2019).

92.     On information and belief, Walsh contacted Client A only after agreeing with the Resigning Employees that he would do so and receiving assistance (and being provided access to Gallagher's Confidential Information) from the Resigning Employees. In essence, Walsh acted as an intermediary or "strawman" between the Resigning Employees and Client A in order to create the façade of the Resigning Employees' compliance with their Non-Compete provisions – despite the fact that those provisions prohibit soliciting Gallagher's clients "directly or indirectly."

93.     Client A is an "Account of the Company" of Gallagher, within the definition provided in the Employment Agreements. *See* Exhibit A1-A8, at § 8A(2). The Resigning Employees serviced Client A within the two-year period immediately preceding their resignations from Gallagher.

94.     Alliant has also contacted other Gallagher clients to raise the unjustifiable claim that there is nobody left at Gallagher to handle their accounts.

95.     Without Court intervention, Alliant's illegal conduct will continue.

iii.    While Posing as Loyal Gallagher Employees, the Resigning Employees Agreed to Act, and Did Act, for Alliant's Benefit

96.     Even without the benefit of discovery, Gallagher's investigation to date has revealed that the Resigning Employees—conspiring with Alliant—secreted Gallagher confidential information[7] and engaged in other wrongful conduct in preparation for their resignations. For example, in early 2022, Long requested a Gallagher report on regional accounts for construction clients. On March 31, 2022, Long was provided by email a report that contains detailed and highly sensitive information about every construction client in the Midwest region as well as revenue opportunity. On April 1, 2022, Long emailed the report to Hogan, explaining that "[w]e need to

---

[7] *See infra* Section II.D.iv.

look for opportunities for CIP's and SDI on these lists." This information was gathered in anticipation of a planned move to Alliant and was used for the benefit of Alliant.

97.     On June 4, 2022, Gunnells emailed—to her personal email account—an "Insurance Submission" template that belongs to Gallagher and is used for its clients. Gunnells did not receive authorization from Gallagher to send this document to her personal email account. This information was gathered in anticipation of a planned move to Alliant and, on information and belief, was used for the benefit of Alliant. This is just one example whereby certain of the Resigning Employees sent confidential information to their personal email accounts in the months leading up to their coordinated and improper resignations (with other examples identified below).

98.     In anticipation of a move to Alliant and for the benefit of Alliant, Long extended the insurance renewal date on one of her largest clients ("Client B") without obtaining any compensation for Gallagher. As a result, Client B did not renew its policy in June (when Long was a Gallagher employee and Gallagher would have obtained the revenue for the renewal), and it will instead renew its policy in September (at which time Client B will have been subject to months of solicitation efforts by Long and Alliant, and quite possibly will have moved its business to Alliant, resulting in Alliant receiving revenue that rightly belonged to Gallagher). Long's explanation for delaying the renewal—on June 24, 2022, right before her resignation—was nonsensical: "This account is going through so much transition right now of ownership and their financials are terrible and they will be signing a fee agreement when they renew but I just couldn't charge them $200,000 right now not knowing what size company is coming out of the sale. So I guess it's a freebie but if it's a 91 I'm not sure how it's free because they still pay us this year."

30

99.     Gallagher has a reasonable expectancy of continuing its business relationship with its clients, who renew insurance coverage with Gallagher at various times throughout their relationship.

100.    The situation with Client B demonstrates the continuing nature of Gallagher's harm should it not receive injunctive relief. If Alliant is not enjoined from continuing to tortiously interfere with Gallagher's contracts and business relations, Alliant will have weeks to solicit Client B and other Gallagher accounts, all while the Resigning Employees continue to violate their contractual obligation to help Gallagher transition Client B's business to other Gallagher employees.

      iv.    While Posing as Loyal Gallagher Employees, the Resigning Employees Misappropriated Gallagher's Confidential Information at Alliant's <u>Direction and for Alliant's Benefit</u>

101.    In addition to contacting clients, on information and belief, Alliant induced the Resigning Employees to misappropriate Gallagher's Confidential Information for Alliant's benefit—another page out of its playbook.

102.    As stated previously, Alliant began recruiting the Resigning Employees at least as early as January 2022. This timeline is typical for Alliant – it spends months recruiting and preparing large groups of employees to resign in unison and poach competitors' clients.

103.    In the months following the onset of Alliant's recruiting efforts, the Resigning Employees sent an alarming number of emails containing Gallagher's information to their personal email accounts. The information that was sent to personal email accounts is sensitive and proprietary, and it constitutes Gallagher's Confidential Information.

104. There is no legitimate reason for the Resigning Employees to send Gallagher's Confidential Information to their personal email accounts, and Gallagher certainly did not (and would not) give them such authorization.

105. The Confidential Information that the Resigning Employees sent to their personal email accounts is precisely the kind of information that Gallagher seeks to protect, and it has extreme value to Gallagher and would afford a competitor an unquestionable and unfair competitive advantage in the marketplace—with respect to both employees and clients.

106. For example, on May 31, 2022, Long emailed herself a summary sheet for her 2022 compensation plan, which included her compensation details, including confidential revenue information related to certain clients. Critically, this document also contained the compensation information of Laeyendecker, Gunnells, and Haggerty. As Gallagher has discovered in other litigation, an important part of Alliant's larger scheme is to induce employees to share the confidential compensation information of their colleagues. It allows Alliant to more easily poach the employees by offering inflated compensation packages that provide a substantial raise from the employees' current salaries. On information and belief, Long emailed this information to her personal email account at Alliant's direction and for Alliant's benefit.

107. That was not the first time since the onset of Alliant's recruitment that Long emailed herself sensitive compensation information about her team at Gallagher. Indeed, on February 8, 2022, Long emailed herself compensation information for her team, including total team compensation and bonus information.

108. The data that Long emailed herself also included a highly confidential "Client Revenue Report," which listed every Gallagher client serviced by Long and the associated revenue Gallagher generated from that client. In the hands of Alliant, this document provides a roadmap

for its unlawful solicitation efforts. The timing of this email makes clear that Long was preparing to move her team to Alliant months before she left Gallagher and while she was contractually required to acts in Gallagher's, not Alliant's, best interests.

109.    The Confidential Information that the Resigning Employees sent to their personal email addresses was not limited to compensation details. Indeed, the Resigning Employees sent themselves some of the most sensitive Confidential Information, which would give a competitor a significant competitive advantage over Gallagher.

110.    On February 9, 2022, the day after Long emailed herself highly sensitive compensation information, Gunnells emailed herself a "Producer Renewal Timeline," which detailed Gallagher's highly sensitive and proprietary methodology and processes for retaining the business of existing clients.

111.    Gunnells did not stop there. On March 30, 2022, Gunnells emailed herself a highly confidential compilation of Gallagher construction accounts, which detailed descriptions of insurance coverage, as well as policy effective and expiration dates. This type of compilation is a closely-guarded trade secret that would give a competitor a significant unfair advantage over Gallagher if disclosed. Policy expiration dates are a particularly important piece of confidential information in the insurance industry, because a competitor's knowledge of those dates allows a competitor to solicit the client at an opportune time, when the client would have a higher level of interest in hearing from new brokers.

112.    On February 23, 2022, Hogan emailed herself a confidential PowerPoint containing information on Gallagher's growth strategy for 2022, including lists of Gallagher's "Top 2022 Prospects." The PowerPoint also includes a "3 Year Plan" for Gallagher's construction team. The PowerPoint details highly sensitive and proprietary strategies. Armed with this information,

Alliant can unfairly compete against Gallagher. There is no justification for sending a document with "Prospects" and a "3 Year Plan" to a personal email address.

113.    If that was not enough, Gallagher's "CORE 360" proposals were among other Confidential Information that was sent to personal email accounts. These are among Gallagher's most sensitive documents. Each proposal reflects Gallagher's approach, information, data, analytics, claim information, and pricing information, among other things. The proposals ultimately make a recommendation for coverage to the client, informed not only by the data, but also by Gallagher's industry knowledge and its knowledge of the client's particular history and future needs. Gallagher invests a significant amount of time, effort, expense, and expertise into preparing the proposals, which are one of the most important ways in which Gallagher demonstrates value to clients and potential clients. Notwithstanding the highly sensitive nature of these materials, numerous Resigning Employees emailed them to their personal email accounts— with respect to multiple clients—on the following dates: Gunnells on May 24, 2022, Long on April 6, 2022, Laeyendecker on March 16, 2022, Long on March 14, 2022, Long on March 10, 2022, Laeyendecker to Long's personal email on February 10, 2022, Long on February 9, 2022, and Hogan on February 1, 2022. It would be bad enough for one of the Resigning Employees to misappropriate this highly sensitive information on a single occasion with respect to a single client, but here, Gunnells, Laeyendecker, Long, and Hogan all did so, on multiple occasions and with respect to multiple clients.

114.    The aforementioned Confidential Information is only a portion of the Confidential Information that was misappropriated by the Resigning Employees in the months leading up to their resignations from Gallagher. Indeed, on May 18, 2022, Long emailed herself about a detailed insurance policy recommendation prepared for a client. On March 7, 2022, Long emailed herself

policy information for a client, including premiums and deductibles. On March 6, 2022, Long emailed herself notes from a client meeting, reflecting strategies and planning for a client's renewals. On March 4, 2022, Long emailed herself policy information, which includes claims amounts for a client and other client-specific data.

115. These are just some illustrative examples of documents and content that the Resigning Employees improperly sent to their personal email accounts while employed at Gallagher.

116. The Resigning Employees' conduct mirrors that of Alliant's co-conspirators across the country. In numerous raids of Gallagher and other competitors, the misappropriation of confidential information begins after the departing employees agree to join Alliant and continues up until the day they execute their coordinated resignations at Alliant's direction. Given the similarity of the Resigning Employees' conduct in this case, the only logical inference is that the Resigning Employees forwarded the aforementioned Confidential Information with Alliant's encouragement and for Alliant's benefit.

v.    Long Deleted Thousands of Emails Immediately Before Resigning

117. Since Long's abrupt resignation, Gallagher has discovered that Long deleted thousands of emails immediately before her resignation—including on the day she resigned from Gallagher—presumably to conceal her activity during the time between when Alliant first solicited her and before she resigned "effective immediately" in coordinated fashion with the other Resigning Employees. On information and belief, consistent with Alliant's practice of destroying evidence and attempting to conceal misconduct, Alliant directed and/or encouraged Long to delete these emails.

118.     Gallagher's investigation is continuing with respect to Long's suspect deletion of emails.

## INJUNCTIVE RELIEF IS NEEDED

119.     As detailed above, Alliant and its co-conspirators devised and executed a brazen series of schemes aimed at harming competitors across the country, including Gallagher. The number of lawsuits against Alliant is astonishing, and numerous courts, including this Court, have enjoined Alliant due to its unlawful conduct. Alliant's strategy is no secret—it targets a competitor and strikes in a coordinated fashion with its co-conspirators in an effort to steal as much business as possible before a court intervenes.

120.     Alliant and its co-conspirators have determined that the return on investment from this unlawful conduct outweighs any costs associated with defending and resolving lawsuits brought by its competitors, including Gallagher, and the financial and competitive benefits to Alliant are greater than what Alliant would receive through a formal acquisition or legitimate competition. This strategy is overseen and implemented at the highest levels of Alliant, including its Board of Directors, high-ranking executives, and its outside counsel. Alliant's unlawful conduct follows a pattern and it puts the lie to Alliant's representation that it must be a coincidence that employees of its competitors, including Gallagher, resign simultaneously, violate contractual notice provisions, and show up at Alliant on the same day to immediately work with Alliant to misuse confidential information to solicit and thereafter service their former employer's clients.

121.     Gallagher is not hypothesizing about Alliant's "leveraged hire strategy." Alliant's litigation history and the public record demonstrate that Alliant's strategy is designed and implemented with litigation in mind. As one of the Lockton employees solicited by Arkley testified, Arkley told her that "there would be litigation involved" with Alliant's raid, and that

Alliant "would hope to try to outspend Lockton and hopefully force a settlement." Alliant knows that it is engaging in conduct that will lead to litigation, and that is exactly what has happened for years. Moreover, Alliant understands that it will substantially profit from stealing employees and clients, which it does without hesitation because the profit generated from its "leveraged hire strategy" covers any litigation costs and allows Alliant to "outspend" its competitors.

122.     The unsealed and unredacted *Lockton* documents confirm this strategy and demonstrate that Alliant's outside counsel plays a significant role. In connection with the raid of Lockton, Alliant's outside counsel told Arkley that "[i]f you could encourage the producers to move this along with their lawyers so we can focus on helping them with potential litigation – work we are doing for their benefit – I would appreciate it." Two days later, Alliant's outside counsel emailed Arkley and Alliant's CFO Reshma Dalia ("Dalia"), requesting that they "[p]lease confirm we are telling the new hires to resign on Monday morning (March 11), as opposed to Friday afternoon (March 8). *If the resignations happen Friday, Lockton will have all weekend to prepare litigation strategy before the new hires are able to bring in business…. Please confirm one of you is going to call each of the new hires to tell them when to resign. Kinder's attorney informed me that Kinder was under the impression he would be resigning on Friday, and we don't want any of these folks resigning earlier than intended.*" In response, Dalia stated that "[t]he transition date is definitely 3/11. I will ask [Arkley] to remind them when he speaks with each of them next. Also, one of us will be calling each of them prior to 3/11 to let them know what time to arrive and our office address."

123.     The documents detailed above from Alliant's outside counsel to Arkley and Dalia establish that Alliant strategically identifies when it wants to raid a competitor, in part because it does not want to afford its competitors time to prepare for litigation so Alliant has time to steal the

business. Indeed, Alliant strikes at a strategic time to inflict as much damage as possible upon its competitors.

124.    Alliant and its outside counsel understand that this strategy is unlawful and, at least, tortiously interferes with contracts. That is why Alliant's counsel told Dalia that "we are no longer instructing employees in writing to resign without notice because they may have notice provisions – Alliant will instead instruct them verbally" and also advised Dalia to have Alliant "[b]lock the new hires' email account from being able to receive emails from their personal email accounts for a limited time period after the hire date (during the time period in which new hires are contracting their clients in an effort to obtain business; i.e., during the time period where at TRO/PI is most likely)." Counsel was instructing Alliant to create a façade of protecting its competitors while violating contracts and court orders.

125.    Alliant focuses on inducing breaches of notice provisions in its competitor's employment agreements precisely because it understands that its conduct is likely to result in injunctive relief.

126.    The *Lockton* court found that "[it] is reasonably probable that a trier of fact would find that Alliant induced the Producer Members to breach the notice requirement so that Lockton would not have this opportunity and instead would face immediate competition from the Producer Members. Alliant took other actions to limit Lockton's ability to respond, such as by preparing preemptive litigation and by coordinating the mass resignations for Tuesday, March 12[.]" *Lockton*, 2019 WL 2536104, at *19 n.21.

127.    Alliant understands that time is of the essence for its competitors to protect their business, which is why it coordinates mass resignations and does everything in its power to handcuff competitors. And, if litigation ensues, Alliant simply plans to "outspend" its competitors

and hopefully force a settlement—using profits that it wrongfully obtained at the expense of those exact competitors.

128.     Enjoining Alliant *before* it can steal enough business to make its scheme profitable is the only way to mitigate the unlawful conduct and prevent irreparable harm to Alliant's competitors. Gallagher will be irreparably harmed if the Court does not grant injunctive relief and enjoin Alliant from further harming Gallagher.

## CLAIMS FOR RELIEF

### Count I
### (Tortious Interference With Contract)

129.     Gallagher incorporates by reference paragraphs 1-128 as though fully stated herein.

130.     The Employment Agreements signed by the Resigning Employees are valid and enforceable contracts between Gallagher and the Resigning Employees.

131.     Alliant was aware of the contractual relation between Gallagher and Resigning Employees and the restrictive covenants in the Employment Agreements.

132.     Alliant intentionally and unjustifiably induced a breach of the Employment Agreements by directing the Resigning Employees to stop serving Gallagher and commence employment with Alliant prior to the expiration of 21 days after written notice of impending resignation, in violation of the Notice Provision in the Employment Agreements.

133.     Alliant also intentionally and unjustifiably interfered with and induced a breach of the Employment Agreements by conspiring with Resigning Employees to solicit their Gallagher colleagues to join Alliant, either directly or indirectly through another Alliant employee, and by using other Alliant employees as intermediaries to solicit Gallagher clients, in violation of the Non-Compete provisions of the Employment Agreements.

134.     Alliant intentionally and unjustifiably interfered with and induced a breach of the Mobile Device Agreements, which were agreed to by the Resigning Employees and are valid and enforceable contracts between Gallagher and the Resigning Employees.

135.     Alliant was aware of the contractual relations between Gallagher and Resigning Employees because of its prior litigation with Gallagher in which it learned that Gallagher employees were required to sign the Mobile Device Agreements and because it was notified about the Mobile Device Agreement through the July Correspondence.

136.     Alliant intentionally and unjustifiably induced a breach of the Mobile Device Agreements by instructing the Resigning Employees not to provide their mobile devices to Gallagher upon receiving Gallagher's demand and, on information and belief, by causing the Resigning Employees to instead provide their personal electronic devices to a consultant for purposes of engaging in Alliant's sham "remediation program."

137.     The Resigning Employees did in fact breach the Employment Agreements and the Mobile Device Agreements as a result of, and caused, by Alliant's wrongful conduct.

138.     Gallagher has suffered damages as a result of Alliant's tortious interference with Gallagher's contracts.

### Count II
### (Tortious Interference With Prospective Economic Advantage)

139.     Gallagher incorporates by reference paragraphs 1-128 as though fully stated herein.

140.     Gallagher has and had protectable business relationships with the Resigning Employees and the clients that Alliant solicited and/or attempted to solicit to leave Gallagher (the "Prospective Business Relationships").

141.     Gallagher had a reasonable expectation that (1) its employees would continue their employment with Gallagher and (2) its clients would continue utilizing Gallagher for its services,

and thus had a reasonably expectancy of entering into and continuing valid business relationships with them on an ongoing basis.

142.     Alliant knew of the Prospective Business Relationships and Gallagher's expectancy of entering into and continuing valid business relationships with its employees and clients.

143.     Gallagher would have had a greater prospective business advantage with the Prospective Business Relationships, absent improper interference.

144.     Alliant intentionally and unjustifiably interfered with the Prospective Business Relationships—Gallagher's prospective economic advantage—by inducing breaches of contract, breaches of fiduciary duties, and also inducing Gallagher's employees and clients to leave Gallagher in favor of Alliant.

145.     Gallagher has suffered damages as a result of Alliant's tortious interference with its Prospective Business Relationships and thus its prospective economic advantage.

**Count III**
**(Aiding and Abetting Breach of Fiduciary Duty)**

146.     Gallagher incorporates by reference paragraphs 1-128 as though fully stated herein.

147.     The Resigning Employees were agents and employees of Gallagher, and thus owed fiduciary duties to Gallagher, including the duty of loyalty.

148.     Alliant was aware that the Resigning Employees owed Gallagher fiduciary duties requiring the Resigning Employees, among other things, to devote their full energy, ability, attention, and business time to Gallagher's business and to refrain from engaging in any conduct that conflicted with, interfered with, or in any way compromised Gallagher's best interests.

149.     The Resigning Employees breached their fiduciary duties to Gallagher by, among other things, conspiring with Alliant to solicit their colleagues to join Alliant and to solicit Gallagher's clients to move their business to Alliant, both before and during the Notice Period.

150.    Alliant knowingly and substantially assisted and encouraged these breaches by participating in the unlawful solicitation of Gallagher employees and clients, and, on information and belief, by compensating the Resigning Employees based in part on a percentage of revenue generated from Gallagher clients and indemnifying the Resigning Employees against claims by Gallagher.

151.    Alliant was aware of its role as part of the aiding and abetting the breaches of fiduciary duty because it was aware of the fiduciary duties owed but nevertheless knew that if it facilitated the breaches, such conduct would benefit Alliant.

152.    Gallagher has suffered damages as a result of Alliant's aiding and abetting the Resigning Employees' breaches of their fiduciary duties.

**Count IV**
**(Conspiracy)**

153.    Gallagher incorporates by reference paragraphs 1-128 as though fully stated herein.

154.    As described more fully above, Alliant, acting in concert with the Resigning Employees and other co-conspirators, known and unknown, reached an agreement among themselves to unlawfully interfere with Gallagher's business relations and contracts and for the Resigning Employees to breach their contract obligations and fiduciary duties owed to Gallagher.

155.    Alliant, the Resigning Employees, and other co-conspirators constitute a combination of two or more persons, and they acted in concert for the purpose of harming Gallagher's business to Alliant's benefit.

156.    In furtherance of their conspiracy, each of these co-conspirators, including Alliant, committed overt unlawful and tortious acts, including those described in this Complaint, and were otherwise willful participants in joint activity.

157.    Gallagher has suffered damages as a result of Alliant's conspiratorial conduct.

42

## PRAYER FOR RELIEF

WHEREFORE, Arthur J. Gallagher & Co. respectfully requests that this Court enter judgment in its favor and against Alliant Insurance Services, Inc. as follows:

      a.      Entry of preliminary and permanent injunctive relief;

      b.      Awarding damages, together with pre- and post-judgment interest;

      c.      Awarding punitive damages; and

      d.      Granting such other and further relief as this Court deems just and proper.

DATED:      July 28, 2022

    Respectfully submitted,

    */s/ Ronald S. Safer*
    Ronald S. Safer, ARDC # 6186143
    Eli J. Litoff, ARDC # 6317940
    Matthew A. Blumenreich, ARDC # 6329458
    RILEY SAFER HOLMES & CANCILLA LLP
    70 W. Madison Street, Suite 2900
    Chicago, Illinois 60602
    Phone: 312-471-8700
    Fax: 312-471-8701
    Email: rsafer@rshc-law.com
           elitoff@rshc-law.com
           mblumenreich@rshc-law.com

    *Attorneys for Plaintiff*