**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ARTHUR J. GALLAGHER & CO., | ) | |
| | ) | Case No.: 1:22-cv-03931 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **DEMAND FOR JURY TRIAL** |
| | ) | |
| ALLIANT INSURANCE SERVICES, INC. | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S EMERGENCY MOTION**
**FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

1

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................................. 1

FACTUAL BACKGROUND ............................................................................................... 3

I.      Background Information Regarding Gallagher. ...................................................... 3

II.     Background of Alliant's "Leveraged Hire Strategy." ............................................. 4

III.    Alliant's Unlawful Conduct is Carefully Planned and Coordinated at the Highest Levels
        of the Company. ....................................................................................................... 6

IV.     Substantial Litigation Does Not Deter Alliant. ...................................................... 9

V.      Alliant's Raid of Gallagher's Chicago Office. ..................................................... 10

        A.      Resigning Employees Entered Into Employment Agreements With Gallagher. ... 10

        B.      Resigning Employees Entered Into Mobile Device Agreements With Gallagher. 12

VI.     Alliant Coordinates a Mass Resignation and Induces Breaches. .......................... 13

LEGAL STANDARD ......................................................................................................... 15

ARGUMENT ...................................................................................................................... 15

I.      GALLAGHER HAS A STRONG LIKELIHOOD OF SUCCESS ON THE MERITS. ... 16

        A.      Gallagher is Likely to Succeed on its Tortious Interference Claims. ................... 17

                i.      Tortious Interference With Contract ......................................................... 17

                ii.     Tortious Interference With Prospective Economic Advantage ............... 23

        B.      Gallagher is Likely to Succeed on its Aiding and Abetting Claim. ...................... 24

        C.      Gallagher is Likely to Succeed on its Conspiracy Claim. .................................... 26

II.     GALLAGHER DOES NOT HAVE AN ADEQUATE REMEDY AT LAW AND WILL
        SUFFER IRREPARABLE HARM IF INJUNCTIVE RELIEF IS NOT GRANTED. .... 26

        A.      The Loss of Customer Goodwill. ......................................................................... 29

        B.      Reputational Harm. ............................................................................................. 29

        C.      Harm to Gallagher's Competitive Position. ......................................................... 30

III.     THE BALANCE OF HARDSHIPS AND PUBLC INTEREST FAVOR INJUNCTIVE
         RELIEF. ..................................................................................................................... 30

CONCLUSION .................................................................................................................... 32

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Abbott Labs v. Andrx Phams, Inc.*,
   2005 WL 1273105 (N.D. Ill. May 20, 2005) ........................................................................15

*Abbott Labs v. Mead Johnson & Co.*,
   971 F.2d 6 (7th Cir. 1992) ..........................................................................................15, 30

*Abel v. Fox*,
   274 Ill. App. 3d 811, 819 (4th Dist. 1995)..........................................................................18

*Aitkin v. USI Ins. Servs., LLC*,
   No. 2:21-CV-00267-HZ, 2021 WL 2179254 (D. Or. May 28, 2021) ......................................9

*Anest v. Audino*,
   332 Ill. App. 3d 468 (2d Dist. 2002)...................................................................................25

*Aon Risk Servs. Cos., Inc. v. Alliant Ins. Servs., Inc.*,
   415 F. Supp. 3d 843 (N.D. Ill. 2019) ....................................................................................9

*Aon Risk Servs. v. Cusack*,
   102 A.D.3d 461 (App. Div. 1st Dep't 2013) .......................................................................28

*Aon Risk Servs., v. Cusack*,
   34 Misc.3d 1205(A), 2011 WL 6955890 (N.Y. Sup. Ct. Dec. 20, 2011)................................9

*Arthur J. Gallagher & Co. v. Roi*,
   2015 IL App (1st 140786-U) .......................................................................................17-18

*Collier v. Airtite, Inc.*,
   1988 WL 96363 (N.D. Ill. Sept. 15, 1988) ..........................................................................27

*Diamond Blade Warehouse, Inc. v. Paramount Diamond Tools, Inc.*,
   420 F. Supp. 2d 866 (N.D. Ill. 2006) .....................................................................15, 18, 28-29

*Ent. One UK Ltd. v. 2012Shiliang*,
   384 F. Supp. 3d 941 (N.D. Ill. 2019) ..................................................................................31

*Fritz v. Johnston*,
   209 Ill.2d 302 (2004) .......................................................................................................26

*Hefferman v. Bass*,
   467 F.3d 596 (7th Cir. 2006) ............................................................................................24

*IDS Life Ins. Co. v. SunAmerica, Inc.*,
    958 F. Supp. 1259 (N.D. Ill. 1997), *vacated in part on other grounds*, *IDS Life
    Ins. Co. v. SunAmerica Life Ins. Co.*, 136 F.3d 537 (7th Cir. 1988)......................................31

*James v. Intercontinental Hotels Grp. Res., Inc.*,
    2010 WL 529444 (N.D. Ill. Feb. 10, 2010) .......................................................................23

*Koehler v. Packer Group, Inc.*,
    2016 IL App (1st) 142767...................................................................................................17

*Light v. Zhangyali*,
    2016 WL 4429758 (N.D. Ill. Aug. 22, 2016) ...................................................................31

*Mays v. Dart*,
    974 F.3d 810 (7th Cir. 2020) ............................................................................................15

*Millard Maintenance Service Co. v. Bernero*,
    207 Ill. App. 3d 736 (1st Dist. 1990) ................................................................................18

*Mohanty v. St. John Heart Clinic, S.C.*,
    225 Ill. 2d 52 (2006) .........................................................................................................18

*Morgan Stanley DW Inc. v. Rothe*,
    150 F. Supp. 2d 67 (D.D.C. 2001) ....................................................................................31

*Mountain W. Series of Lockton Cos., LLC v. Alliant Ins. Servs., Inc.*,
    2019 WL 2536104 (Del. Ch. June 20, 2019)......................................5-10, 18-20, 22-23, 27, 31

*OptionsCity Software, Inc. v. Baumann*,
    2015 WL 3855622 (N.D. Ill. June 19, 2015) ....................................................................15

*PepsiCo, Inc. v. Redmond*,
    1996 WL 3965 (N.D. Ill. Jan. 2, 1996) .............................................................................31

*Qualey v. U.S. Metals, Inc.*,
    2009 WL 972612 (N.D. Ill. Apr. 8, 2009) ........................................................................25

*Roland Mach. Co. v. Dresser Indus., Inc.*,
    749 F.2d 380 (7th Cir. 1984) ............................................................................................27

*Scheffel & Co., P.C. v. Fessler*,
    356 Ill. App. 3d 308 (5th Dist. 2005).................................................................................18

*SKF USA, Inc. v. Bjerkness*,
    636 F. Supp. 2d 696 (N.D. Ill. 2009) ................................................................................29

*Stork USA, L.P. v. Farley Candy Co.*,
    14 F.3d 311 (7th Cir. 1994) ..............................................................................................15

*Thornwood, Inc. v. Jenner & Block*,
　344 Ill. App. 3d 15 (1st Dist. 2003) .......................................................................................24

*Woodard v. Victory Records, Inc.*,
　2013 WL 5517926 (N.D. Ill. Oct. 4, 2013)..............................................................................26

Plaintiff Arthur J. Gallagher & Co. ("Gallagher"), hereby respectfully submits this Memorandum of Law in Support of its Emergency Motion for Temporary Restraining Order and Preliminary Injunction against Defendant Alliant Insurance Services, Inc. ("Alliant").

## INTRODUCTION

The insurance brokerage industry is highly competitive. Insurance brokerage firms compete for clients and talent. Successful employees are extremely well-compensated. Because firms like Gallagher invest heavily in client relationships and developing talent, the majority of their client-facing employees sign employment agreements. Those agreements anticipate that employees might want to leave Gallagher as they are free to do. The agreements typically contain provisions where the employee agrees to provide notice to Gallagher if they intend to leave, help in the transition of Gallagher client relationships to remaining Gallagher employees, and, for a period of time, not solicit other Gallagher employees to leave Gallagher and not solicit or service Gallagher clients with whom they had contact at Gallagher.

For nearly a decade, Alliant has been an outlaw in the insurance brokerage industry. Alliant believes that it is far more cost-effective to steal the business by encouraging employees who move from a broker to Alliant to violate the terms of their contracts with competitors. Alliant has calculated that the cost of litigating and then settling the inevitable lawsuits that follow this lawless behavior is less than the cost of legitimately purchasing the business. Alliant obfuscates, conceals documents, abuses the attorney-client privilege and draws out litigation while they work, in direct breach of their new employees' agreements with their prior firm, to steal that firm's business. Alliant's internal documents proves their belief right; because of their abuse of the system, it is far more profitable for them to encourage their new employees to breach their agreements with their former employers and steal clients in violation of those agreements than it would be for Alliant to purchase the business relationships from their prior employer. This scheme has succeeded in part

1

because litigation takes time and money which allows Alliant to steal business while the process drags on. Absent an injunction, that is exactly what will happen here.

Alliant calls this their "leveraged hire strategy." That strategy involves signature corporate "raids," in which it: (1) surreptitiously – over a period of months – recruits entire groups of employees from a competitor's office, (2) induces those employees to breach their contractual obligations and fiduciary duties owed to the competitor, (3) conspires with the employees to prepare for their coordinated exit while the employees pretend to remain loyal to the competitor, (4) directs the employees to resign *en masse* and without notice, in order to handicap the competitor's ability to retain its clients, and (5) undertakes efforts to conceal its unlawful conduct, both before and during litigation.

As the Complaint indicates, Alliant has been sued across the country by numerous competitors for its unlawful conduct. *See* Compl. ¶ 76. Over the last several years, Gallagher has become a primary target of Alliant's unlawful raids. Alliant has raided Gallagher's offices in California, Florida, Massachusetts, and Texas, and it has poached Gallagher's employees, clients, and confidential information, forcing Gallagher to file lawsuits against Alliant in each of those jurisdictions. To date, Gallagher has lost dozens of employees and well more than 100 clients as the result of Alliant's unlawful conduct.

Now, Alliant has set its sights on Gallagher in Illinois, and Gallagher seeks a temporary restraining order and preliminary injunction from this Court to stop Alliant's misconduct and stave off irreparable harm. Over a 48-hour period between July 11 and 13, 2022, eight employees servicing a substantial book of business in Gallagher's Chicago office resigned without notice (a violation of their employment agreements) and began working at Alliant. Simultaneously, Alliant began executing its scheme, contacting Gallagher's clients that had been serviced by the former

Gallagher employees and falsely asserting that Gallagher was unable to service the client accounts due to the mass resignation (which Alliant orchestrated).

The former Gallagher employees, of course, are free to work wherever they would like. But they have contractual obligations, including obligations that survive their departure from Gallagher. If allowed by this Court, Alliant will continue to help those employees breach their contractual duties and benefit from those breaches. In short, absent injunctive relief, Alliant's scheme will prove successful: it will unlawfully poach Gallagher's clients, and simply pay a judgment or settlement amount that will neither make Gallagher whole nor deter Alliant's misconduct in the future. This lawless behavior should stop. Now.

## FACTUAL BACKGROUND

### I. Background Information Regarding Gallagher.

Gallagher is an insurance broker that also provides health and welfare consulting services, including employee benefits insurance, retirement plans, and administrative services. Gallagher operates brokerage offices and business across the United States. Gallagher invests substantial resources into attracting, developing, maintaining, and servicing its clients. *See* Exhibit A (Declaration of Jeffrey Devron), at ¶ 21. Gallagher also invests substantial resources into its personnel, including acquiring business at significant cost and expending substantial resources to develop employees into successful Producers (employees primarily responsible for developing and maintaining client relationships) and members of client-service teams. *See id.* at ¶¶ 23-24. Gallagher's investment in its Producers and other members of its client-service teams enables Gallagher employees to develop significant client-specific knowledge. *See id.* Over a period of years, Gallagher's employees gain experience selling and placing insurance with specific clients, handling claims for specific clients, and developing an understanding of a client's current insurance needs as well as its historical needs and preferences. *See id.*

3

Gallagher has, over many years and at great effort and expense, developed, accumulated, maintained, and refined trade secrets and other confidential information ("Confidential Information"). *See id.* at ¶ 12. Gallagher carefully protects its Confidential Information. *See id.* at ¶¶ 13-16. Gallagher's Confidential Information enables it to maintain the client relationships in which it has invested. If this information was obtained by a competitor, Gallagher's investment in a particular client relationship would be jeopardized. Misappropriation, theft, or use of Gallagher's Confidential Information would allow a competitor to unfairly identify, contact, and divert Gallagher's clients, causing substantial loss of revenue to Gallagher and financial gain to the competitor. *See id.* at ¶ 17. Among other safeguards to protect its Confidential Information, Gallagher requires many of its employees to enter into employment agreements containing restrictive covenants. *See id.* at ¶ 15.

## II.        Background of Alliant's "Leveraged Hire Strategy."

Alliant is Gallagher's direct competitor. As explained above, Alliant has devised a "leveraged hire strategy" that revolves around executing corporate raids throughout the country. While each scheme in which Alliant engages differs slightly, its raids generally bear similar hallmarks. First, Alliant identifies one or two Producers from a competitor who are perceived as important to client relationships. Alliant investigates the Producers' books of business, and then offers significant bonuses and large, inflated compensation packages, contingent upon the Producers violating their contractual obligations and other duties to Alliant's competitors. Alliant not only encourages and induces the breaches of these duties, but it indemnifies the Producers against any claims that might arise from the unlawful strategy.

Second, Alliant engages in a long period of negotiation with the Departing Producers so these persons can act in Alliant's interests—to the detriment of the competitors—while they have access to their employers' system. Third, during that same time period, the Producers obtain

4

confidential and trade secret information for Alliant that belongs to Alliant's competitors, typically emailing it to their personal email accounts. In recent years, the cover story provided by Alliant to the departing employees is that COVID has caused this process. The timing of the emails does not support that cover story. Fifth, during that same time period, the Producers assist Alliant's recruitment of additional members of the competitor's client-service teams, often by using confidential information about their salaries, in violation of the employees' common law as well as contractual obligations and duties. Once recruited to join Alliant, the other members of the client-service teams coordinate with one another and the Producers to provide confidential and trade secret information to Alliant. Sixth, Alliant coordinates with the employees of its competitors to resign their employment abruptly and in coordinated fashion—designed to minimize the competitor's opportunity to retain relationships and revenue streams, while maximizing the benefit of the raids to Alliant. Alliant instructs and at times requires the resigning employees to leave without giving contractually required notice. *See* Exhibit B (Alliant's outside counsel told Alliant's CFO Reshma Dalia ("Dalia") that "we are no longer instructing employees in writing to resign without notice because they may have notice provisions – Alliant will instead instruct them verbally").

Seventh, Alliant attempts to conceal, and in some instances successfully conceals, its unlawful conduct. *See* Exhibit C (Alliant's outside counsel advised Dalia to have Alliant "[b]lock the new hires' Alliant email accounts from being able to receive emails from their personal email accounts for a limited time period after the hire date (during the time period in which new hires are contacting their clients in an effort to obtain business; i.e., during the time period where a TRO/PI is most likely"). Alliant has even destroyed evidence of wrongdoing. *See Mountain W. Series of Lockton Cos., LLC v. Alliant Ins. Servs., Inc.*, 2019 WL 2536104, at \*20 (Del. Ch. June

20, 2019) ("*Lockton*") ("Alliant also took independently wrongful steps such as directing [a departing Producer] to destroy evidence and providing inaccurate affidavits to a court."); *id.* at *17 ("Alliant has engaged in extensive efforts to avoid creating an evidentiary record of its activities, which cross the line on important occasions into the actual destruction of evidence.").

## III. Alliant's Unlawful Conduct is Carefully Planned and Coordinated at the Highest Levels of the Company.

Alliant's carefully choreographed "leveraged hire strategy" is overseen and implemented at the highest levels of Alliant, including its Board of Directors, high-ranking executives, and its outside counsel. With an understanding that Alliant's unlawful conduct will lead to litigation, Alliant aims to "outspend" its victims in litigation, and "hopefully force a settlement." *See* Exhibit D, at 145:10-12. Ultimately, Alliant has decided that it is far less expensive to steal business in violation of law, litigate, and then settle or pay a judgment, rather than compete legitimately or purchase that business. Moreover, and unjustifiably, Alliant pays massive bonuses to its executives who execute the unlawful "leveraged hire strategy" – at times to the tune of tens of millions of dollars.

Alliant's outside counsel plays a significant role in the coordination and execution of the "leveraged hire strategy." The role of Alliant's outside counsel came to light in *Lockton*, where a privilege waiver allowed the plaintiff and the court to peel back the layers of Alliant's scheme.[1] In other jurisdictions, Alliant has successfully shielded similar communications by copying counsel on non-privileged matters and over-designating documents as privileged (discussed below). But Alliant follows a similar playbook as it followed in *Lockton* so an examination of that scheme is

---

[1] Alliant successfully kept these underlying documents under seal and hidden beneath overly broad and improper redactions, until very recently when Gallagher, over Alliant's vigorous objections, obtained Orders—on June 21, 2022 and July 14, 2022—requiring Alliant to disclose the documents in the public record without the baseless redactions that concealed the unlawful conduct.

instructive about its subsequent conduct. Upon reviewing the communications between Alliant and its counsel, the Delaware Chancery Court did not mince words: "It now seems possible that the crime/fraud exception to the attorney-client privilege would provide an independent basis for ordering production of at least some of the entries on Alliant's log." *Lockton*, 2019 WL 2536104 at *10 n.6.

In connection with Alliant's raid of Lockton, Alliant's outside counsel facilitated the breaches of the Lockton employees' notice provisions and coordinated the timing of the raid to steal as many clients as possible. For example, Alliant's outside counsel told Alliant executive Peter Arkley ("Arkley") "[i]f you could encourage the producers to move this along with their lawyers so we can focus on helping them with potential litigation – work we are doing for their benefit – I would appreciate it." *See* Exhibit E. Alliant's outside counsel further requested that Arkley and Dalia "[p]lease confirm we are telling the new hires to resign on Monday morning (March 11), as opposed to Friday afternoon (March 8). *If the resignations happen Friday, Lockton will have all weekend to prepare litigation strategy before the new hires are able to bring in business*…. Please confirm one of you is going to call each of the new hires to tell them when to resign. *Kinder's attorney informed me that Kinder was under the impression he would be resigning on Friday, and we don't want any of these folks resigning earlier than intended*." *See id.* (emphasis in original). In response, Dalia stated that "[t]he transition date is definitely 3/11. I will ask [Arkley] to remind them when he speaks with each of them next. Also, one of us will be calling each of them prior to 3/11 to let them know what time to arrive and our office addresses." *See id.* These communications establish that Alliant strategically identifies when it wants to infiltrate a competitor's office, in part because it does not want to afford its competitors time to prepare for litigation so Alliant has time to steal the business. At times during its nationwide litigation, Alliant

has the resigning employees claim that their simultaneous resignations were a complete surprise. It also makes clear that these employees are expected to bring the clients of their former employer to Alliant, a proposition Alliant incredibly denies.

Moreover, as explained above, Alliant's outside counsel instructed Alliant executives on how to conceal evidence that Alliant was inducing breaches of notice provisions. Specifically, Alliant's outside counsel told Dalia that "[w]e are no longer instructing employees in writing to resign without notice because they may have notice provisions – Alliant will instead instruct them verbally." *See* Exhibit B. This extraordinary conduct is worth a moment's reflection. Alliant's counsel is admitting that Alliant knows of the departing employees' contractual obligation to give notice. Alliant's counsel instructs the departing employees to breach their contractual obligations. That is bad enough, but this conduct is far worse. This member of the bar, a partner at Morgan Lewis & Bockius LLP, who has been counsel of record in many of the cases against Alliant across the country, reports that they have stopped providing this tortious conduct in writing – where it can be proved – and instead provided it verbally – so concerted lies could be told. This is but one aspect of Alliant's brazenly unlawful conduct. The aforementioned member of the bar has even directed the destruction of evidence. *See* Exhibit F (asking Arkley to "please CALL McDaniel and tell him that his attorney (Jeff Springer) emailed to his Lockton email address. The email went to Reshma, Ken, me and Chuck, but not you for some reason, and attached Chuck's Lockton agreements. Whether intentional or unintentional, he obviously should not be emailing Chuck at this work address and Chuck needs to immediately tell his lawyer not to do this. You should also have Chuck delete this and any other emails he has sent or received to/from Springer if on his Lockton email…. CHUCK SHOULD DEAL WITH THIS BY TELEPHONE, NOT BY EMAIL.") (emphasis in original). Obviously, counsel presumed this email would be cloaked in the privilege

and their misconduct would never see the light of day; they were wrong. This conduct has been considered part of "a credibility-impairing pattern of behavior." *See Lockton*, 2019 WL 2536104, at *17-18.

The Delaware Chancery Court found that "[it] is reasonably probable that a trier of fact would find that Alliant induced the Producer Members to breach the notice requirement so that Lockton would not have this opportunity and instead would face immediate competition from the Producer Members. Alliant took other actions to limit Lockton's ability to respond, such as by preparing preemptive litigation and by coordinating the mass resignations for Tuesday, March 12, while the Lockton business leaders would be at a retreat." *Lockton*, 2019 WL 2536104, at *19 n.21.

## IV.     Substantial Litigation Does Not Deter Alliant.

Alliant's competitors have filed lawsuits against Alliant in jurisdictions across the country, with many courts enjoining Alliant's unlawful behavior. *See* Exhibit G, at ¶ 20(a) (the Delaware Chancery Court finding in a lawsuit brought by a competitor of Alliant following a raid, that "Alliant faces at least forty-one lawsuits in at least twenty-five jurisdictions in which competitors have asserted similar claims").[2] Alliant has repeatedly shown widespread litigation and excoriating judicial opinions will not deter it from harming competitors through unlawful means. The

---

[2] *See, e.g., Aitkin v. USI Ins. Servs., LLC*, No. 2:21-cv-00267-HZ, 2021 WL 2179254, at *8 (D. Or. May 28, 2021) (enjoining Alliant and the former employee from soliciting clients that the former employee had serviced or received confidential information about); *Aon Risk Servs. Cos., Inc. v. Alliant Ins. Servs., Inc.*, 415 F. Supp. 3d 843, 853 (N.D. Ill. 2019) (enjoining Alliant and former employees from soliciting business from their former clients and from misappropriating plaintiff's confidential information, stating that under the circumstances, plaintiff should not be forced to accept Alliant's assurances that all possible confidential information was taken away during its onboarding process and that former employees could not access it); *Lockton*, 2019 WL 2536104, at *24-25 (excoriating Alliant for its misconduct and granting motion for preliminary injunction); *Aon Risk Servs., v. Cusack*, 34 Misc.3d 1205(A), 2011 WL 6955890, at *1, 9-10 (N.Y. Sup. Ct. Dec. 20, 2011) (detailing "systemic and coordinated raid" by Alliant on clients and employees of competitor and noting that Alliant "knew it would be sued for its conduct").

Delaware action was unique in that the veil of the attorney-client privilege with which Alliant concealed its unlawful and unethical behavior was lifted. The court found that Alliant waived the privilege by over-designating, a practice that continues today. Once the veil was lifted, Alliant's misconduct was revealed. *See Lockton*, 2019 WL 2536204, at *18 (noting Alliant's "credibility-impairing pattern of behavior"). Moreover, as explained above, Alliant has directed the destruction of evidence and the providing of inaccurate affidavits to a court. *See id.* at *17, 20.

The documents were so devastating to Alliant and the opinion based on those documents so insightful, that Alliant took the extraordinary step of fleeing Delaware; they dissolved their company that had been incorporated in Delaware and reincorporated in California. It then resumed its unlawful conduct undeterred and continued to use an overbroad reading of the attorney-client privilege to conceal its misconduct. Alliant went to great lengths to keep the underlying documents in the Delaware action sealed to hide from the world its misconduct. Those efforts recently failed. The court concluded that "[i]t may be embarrassing for Alliant to have the specifics of its conduct brought to light. But embarrassment is not grounds for confidential treatment." *See* Exhibit G, at ¶ 19. In documents produced in other litigation, Gallagher has discovered that Alliant instructed people to include lawyers on email threads simply to allow a claim of privilege.

While the employees change from raid to raid, Alliant is the common thread in these schemes. Alliant has assumed the role of a "puppet master" and is the driving force that "made the mass departure happen" in each case. *Lockton*, 2019 WL 2536204, at *18. The repeated fact patterns seen in case after case is no accident – it is a *modus operandi*.

## V. Alliant's Raid of Gallagher's Chicago Office.

### A. Resigning Employees Entered Into Employment Agreements With Gallagher.

The Resigning Employees each signed employment agreements with Gallagher (the "Employment Agreements"). *See* Exhibit H1-H8. Under the Employment Agreements, the

10

Resigning Employees explicitly acknowledged that Gallagher's Confidential Information "constitutes valuable property" of Gallagher, promised to safeguard the Confidential Information while employed by Gallagher, and promised not to "divulge such Confidential Information or make use of it for [their] own purposes or the purposes of another." *See id.* at § 2B. The Resigning Employees further agreed to devote their "full energies, abilities, attention and business time to the performance of [their] employment obligations and responsibilities." *See id.* at § 2A. The Resigning Employees also agreed to refrain from engaging "in any activity which conflicts or interferes with, or in any way compromises" performance of their obligations and responsibilities. *See id.*

The Employment Agreements contain restrictive covenants governing the Resigning Employees' obligations once they leave Gallagher's employment. The Resigning Employees agreed to continue to safeguard Gallagher's Confidential Information following their employment. *See id.* at § 7B. They agreed for two years after termination of their Gallagher employment not to "directly or indirectly" solicit any Gallagher client or prospect whom they serviced or solicited on behalf of Gallagher in the previous two years." *See id.* at § 8A(1). The Resigning Employees agreed that "direct or indirect solicitation" included initiating or facilitating communications between their new employer and Gallagher's clients and prospects. *See id.* at § 8B(2)(b)-(c). Similarly, the Resigning Employees agreed that while employed by Gallagher and for two years following the termination of their employment with Gallagher, they would not "directly or indirectly" solicit any of the Gallagher colleagues with whom they worked to leave Gallagher's employment. *See id.* at § 8E.

Resigning Employees also agreed to provide 21 days' written notice prior to terminating their employment with Gallagher (the "Notice Period"). *See id.* at § 5A. During the Notice Period,

the Resigning Employees were required to "cooperate fully with the Company in all matters related to the winding up of any pending work and/or the orderly transfer to other Company employees of the accounts for which he has been responsible." *See id.* at § 5C. The Employment Agreements further provide that the Resigning Employees "specifically covenant[] that during the Notice Period (regardless of whether or not active employment responsibilities are continuing) his duties to [Gallagher], including Employee's fiduciary duty of loyalty, will continue in effect." *See id.* The provision requiring 21 days' written notice prior to terminating employment is referred to herein as the "Notice Provision." The "Notice Period" is critical to maintaining Gallagher's Confidential Information, property, money, goodwill and client relationships. *See* Exhibit A, at ¶ 26. When departing employees comply with the Notice Provision, Gallagher is typically successful in retaining the vast majority of client business affected by the departures. *See id.* at ¶¶ 22, 26.

Resigning Employees also expressly acknowledged that breaches of their restrictive covenants would cause irreparable injury to Gallagher and agreed to injunctive relief as an appropriate remedy. *See* Exhibit H1-H8, at § 6.

Alliant is involved in litigation with Gallagher wherein Gallagher's employment agreements are at issue and have been produced. Moreover, as part of its standard recruiting and onboarding practices, Alliant specifically requests that candidates send Alliant copies of their restrictive covenants. *See* Exhibit I, at 60:22-61:13. This is a common practice in the industry.

### B. Resigning Employees Entered Into Mobile Device Agreements With Gallagher.

As a condition of their employment, Resigning Employees also agreed to comply with the terms set forth Gallagher's Mobile Device Policy ("Mobile Device Agreement"). Pursuant to this agreement, each Resigning Employee agreed that they own their personal mobile devices and use

them to conduct business for Gallagher.[3] Moreover, the Resigning Employees agreed that it was their responsibility to "protect corporate data on my personal mobile device" and that Gallagher "reserves the right to wipe all Gallagher data from the mobile device in the event of employee or contractor separation from [Gallagher]." *See* Exhibit J1-J7, at ¶¶ 1, 6.

In other litigation with Gallagher, Alliant was made aware that Gallager employees were required to enter into the Mobile Device Agreements. Moreover, in post-resignation correspondence from Gallagher, through counsel, to the Resigning Employees, Alliant's Chief Legal Officer was copied on such correspondence which demanded that the Resigning Employees provide Gallagher their mobile devices pursuant to the Mobile Device Agreements. *See* Exhibit K.

## VI.     Alliant Coordinates a Mass Resignation and Induces Breaches.

Kristen Long ("Long"), Jordan Laeyendecker, Taylor Gunnells, Janet Schumacher, Melissa Haggerty, Rosario Zaragoza, Sara Arnold, and Kelly Hogan (collectively the "Resigning Employees") worked for Gallagher in its Chicago, Illinois office. *See* Exhibit A, at ¶ 3. From July 11 to July 13, 2022, the Resigning Employees purported to resign from Gallagher without providing Gallagher the contractually required written notice. *See id.* Rather than providing 21 days' notice of their resignations as required by the Employment Agreements, each of the Resigning Employees stated that they were resigning either "effective immediately" or "effective" the same day as their non-compliant notice to Gallagher. *See id.* Upon submitting their resignations to Gallagher *en masse*, Resigning Employees immediately began working for Alliant.

Mere hours after the first improper resignation, an Alliant executive contacted a Gallagher client to inform the client that Long had joined Alliant. *See id.* at ¶ 9. The Alliant executive further stated that nobody remaining at Gallagher could handle the client's account, a blatant falsehood.

---

[3] Rosario Zaragoza did not agree to the Mobile Device Agreement.

*See id.* Thereafter, Alliant contacted other Gallagher clients to raise the unjustifiable claim that there is nobody at Gallagher who can handle their accounts. *See id.*

Following the resignations by the Resigning Employees, Gallagher, through counsel, emailed a letter to the Resigning Employees—with a copy to Alliant's Chief Legal Officer—to (i) advise the Resigning Employees of their ongoing obligations to Gallagher during their respective Notice Periods (pursuant to the Notice Provision), (ii) remind them of their post-employment obligations (the restrictive covenants), and (iii) demand that they provide Gallagher their mobile devices (pursuant to the Mobile Device Agreements). *See* Exhibit K. To date, none of the Resigning Employees have provided Gallagher their mobile devices. Moreover, the Resigning Employees have not assisted Gallagher with the transitioning of the client accounts, despite their contractual obligation to cooperate fully with Gallagher in the orderly transfer of their accounts. *See* Exhibit A, at ¶ 5; Exhibit H1-H8, at § 5C.

Following the mass resignations, Gallagher also began conducting an investigation, which revealed that the Resigning Employees had been secretly preparing for their departures by forwarding Gallagher Confidential Information to their personal email accounts in the months leading up to their resignations. *See* Compl. ¶¶ 103-114. These documents included some of Gallagher's most sensitive proprietary information, such as detailed proposals for coverage, reflecting Gallagher's analytics and analysis of industry and client-specific factors, client lists, compilations of data such as policy expiration dates and revenue history, and Gallagher's strategic planning documents. *Id.* The documents also included the compensation information for Long and her teammates—information that Alliant often seeks as part of its schemes to ensure it is able to offer inflated compensation packages to the employees it is recruiting. *Id.* at ¶ 106.

## **LEGAL STANDARD**

A temporary restraining order is designed to maintain the *status quo* until a hearing can be held on an application for a preliminary injunction. *See Abbott Labs v. Andrx Phams, Inc.*, 2005 WL 1273105, at *1 (N.D. Ill. May 20, 2005). A party seeking a temporary restraining must make a threshold showing that it (1) has some likelihood of succeeding on the merits; (2) has no adequate remedy at law; and (3) will suffer irreparable harm if preliminary relief is denied. *OptionsCity Software,* Inc. *v. Baumann*, 2015 WL 3855622, at *3 (N.D. Ill. June 19, 2015) (citing *Abbott Labs v. Mead Johnson & Co.*, 971 F.2d 6, 11 (7th Cir. 1992)). If this threshold is met, the court applies a "sliding scale" approach and weighs these considerations, as well as the balance of harm to the parties and the public interest, to determine whether to grant injunctive relief. *Id.* (citing *Stork USA, L.P. v. Farley Candy Co.*, 14 F.3d 311, 314 (7th Cir. 1994)).

"The standard for a preliminary injunction is as follows: (1) the party seeking the injunction has a reasonable likelihood of success on the merits, (2) there is no adequate remedy at law, (3) irreparable harm will occur without the injunction, (4) the harm that will occur to the moving party if no injunction issues outweighs the harm the injunction will cause to the nonmoving party, and (5) the injunction will not harm the public interest." *Diamond Blade Warehouse, Inc. v. Paramount Diamond Tools, Inc.*, 420 F. Supp. 2d 866, 872 (N.D. Ill. 2006) ("*Diamond Blade*").

"A plaintiff must demonstrate that its claim has some likelihood of success on the merits…and what amounts to 'some' depends on the facts of the case at hand because of [the] sliding scale approach." *Mays v. Dart*, 974 F.3d 810, 822 (7th Cir. 2020) (quotation marks and citations omitted).

## **ARGUMENT**

This case is tailor-made for a temporary restraining order and preliminary injunction. Alliant is aware of the terms of Gallagher's employment agreements. Alliant understands that

Gallagher employees, including the Resigning Employees, are contractually required to provide 21 days' written notice prior to terminating their employment with Gallagher and to cooperate with Gallagher during that 21-day period to transition client accounts to other Gallagher employees. Alliant is also well-aware that Gallagher employees, including Resigning Employees, are subject to restrictive covenants. There can be no credible dispute that these provisions are enforceable; they are very similar to the restrictive covenants to which Alliant requires its employees to agree. Moreover, Alliant is aware that Gallagher employees, including the Resigning Employees, agreed to the Mobile Device Agreement, which is intended to prevent the misappropriation of company information after an employee leaves Gallagher's employ, and that the Resigning Employees are otherwise prohibited from using or disclosing Gallagher's Confidential Information. Alliant has willfully induced breaches of these contractual obligations and conspired with the Resigning Employees to infiltrate Gallagher's business.

No one need guess what will follow Alliant's raid. Alliant has a well-known pattern of conduct that it has executed in separate schemes across the industry and across the country except where stopped by courts. Alliant will continue soliciting, and if possible, servicing, Gallagher's clients in violation of the Resigning Employees' contractual and fiduciary obligations to Gallagher. Once those clients are gone, the damage is done and it is difficult or impossible to repair. Alliant must be stopped before it does what it has done scores of times before.

## I.      GALLAGHER HAS A STRONG LIKELIHOOD OF SUCCESS ON THE MERITS.

In the Complaint, Plaintiff alleges claims against Alliant for tortious interference, aiding and abetting breach of fiduciary duty, and conspiracy. As demonstrated below, Plaintiff's high likelihood of success on its claims against Alliant satisfies the "some likelihood of success on the merits" threshold required for injunctive relief.

16

### A.   Gallagher is Likely to Succeed on its Tortious Interference Claims.

#### i.   Tortious Interference With Contract

Alliant has, and continues to, tortiously interfere with Gallagher's contracts. Under Illinois law, a claim for tortious interference with contract requires: "(1) the existence of a valid and enforceable contract between the plaintiff and another; (2) the defendant's awareness of this contractual relation; (3) the defendant's intentional and unjustified inducement of a breach of the contract; (4) a subsequent breach by the other, caused by the defendant's wrongful conduct; and (5) damages." *Koehler v. Packer Group, Inc.*, 2016 IL App (1st) 142767, ¶ 42 (quotation marks and citation omitted). Gallagher has more than met its burden to establish multiple instances of tortious interference in this case.

As an initial matter, the Resigning Employees signed valid, enforceable Employment Agreements which contain provisions requiring them to, among other things, provide 21 days' written notice of their resignations and to cooperate with Gallagher's efforts to maintain client business during that period.

Under the Employment Agreements, the Resigning Employees also agreed to certain restrictive covenants governing their obligations upon leaving Gallagher's employment. Those covenants include a two-year employee non-solicitation agreement, and a two year customer-specific non-solicitation/non-acceptance of business/non-service provision, whereby the employee agrees to refrain from soliciting, accepting business from, and providing insurance-related services to any Gallagher customer that the employee serviced during the two-year period before his or her resignation.[4] Moreover, the Resigning Employees agreed to continue to safeguard Gallagher's

---

[4] These covenants are intentionally narrow. They are not designed to prevent an employee from leaving Gallagher. They are not designed to prevent an employee from working for a Gallagher competitor. They are not designed to prevent an employee from actually competing with

Confidential Information following the termination of their employment with Gallagher. These terms are reasonable and necessary to protect Gallagher's business interests and are, therefore, enforceable. *See, e.g.*, *Scheffel & Co., P.C. v. Fessler*, 356 Ill. App. 3d 308, 313 (5th Dist. 2005) ("[I]f a restrictive covenant has reasonable terms, *i.e.*, it is reasonably necessary to protect the interests of the employer, then the covenant will be enforced."); *see also Diamond Blade*, 420 F. Supp. 2d at 872 (enforcing two-year non-compete and non-solicitation provisions); *Mohanty v. St. John Heart Clinic, S.C.*, 225 Ill. 2d 52, 78 (2006) (holding a five-year non-compete was reasonable); *Arthur J. Gallagher & Co. v. Roi*, 2015 IL App (1st 140786-U), at ¶ 51 ("We find that *the restrictive covenant is reasonably necessary to protect Gallagher's business interests*. To state the obvious, an employer bargains for a restrictive covenant out of a concern that an employee will in the future compete with the employer and capture the employer's traditional business. A restrictive covenant that becomes effective when an employee quits his job may be enforceable as reasonably necessary to protect the employer's good will.") (emphasis added); *Abel v. Fox*, 274 Ill. App. 3d 811, 819 (4th Dist. 1995) ("In Illinois, confidential information and customer relationships can be a protectible interest of an employer."); *Millard Maintenance Service Co. v. Bernero*, 207 Ill. App. 3d 736, 750 (1st Dist. 1990) (holding that a two-year non-compete provision was reasonable and "an employer may have a protectable interest in its customers and bar solicitation of those customers with post-employment covenants not to compete"). Indeed, Alliant requires its own employees to enter into substantially similar restrictive covenants. *See* Exhibit L, at ¶¶ 6(a)(iv), 8(d), 8(e)(i)(B), 8(e)(ii)(B); *see also Lockton*, 2019 WL 2536104, at *7 (noting that Alliant's employment agreements contain "(i) a two-year post-employment non-solicitation

Gallagher. They are designed to protect Gallagher's investment in its employees and client relationships. Those clients cannot be stolen or serviced by the departing employees.

covenant covering customers and employees, (ii) protections for confidential information, (iii) an obligation to provide thirty-days prior notice before resigning, and (iv) an acknowledgment of irreparable harm and entitlement to a preliminary injunction in the event of breach"); *id.* at *23 (finding that Alliant "chose to induce the [Lockton employees] to breach restrictive covenants that…Alliant believed were enforceable and which tracked the restrictions that Alliant demands from its own employees").

Second, Alliant is aware of these agreements. Employment contracts with the types of restrictive covenants in the Employment Agreements are commonplace in the insurance brokerage industry, with Alliant having nearly identical restrictive covenants in its agreements for poached employees. *See* Exhibit L, ¶¶ 6(a)(iv), 8(d), 8(e)(i)(B), 8(e)(ii)(B); *see also Lockton*, 2019 WL 2536104, at *7. Moreover, Alliant specifically requests that candidates send Alliant copies of their restrictive covenants as a standard part of its recruitment and onboarding process. Indeed, Alliant requests the restrictive covenants so that its outside counsel can evaluate the contractual restrictions. Sure enough, its outside counsel has evaluated the restrictive covenants and informed Alliant that "the covenants are potentially enforceable" and that "The Covenants Are Potentially Overbroad, But Could Be Modified so as to Be Enforceable." *See, e.g.* Exhibit M. This analysis did not deter Alliant's execution of the "leveraged hire strategy" as it has targeted employees with such restrictions, their fellow employees, and the clients that they service. In addition to requesting copies of restrictive covenants, Alliant has learned through its extensive litigation with Gallagher that Gallagher requires employees to sign agreements with the restrictive covenants at issue in this litigation. *See* Compl. ¶ 55.

Third, Gallagher has met its burden to show that Alliant intentionally and unjustifiably induced breaches of the Resigning Employees' Employment Agreements and will continue to do

so. Alliant directed the Resigning Employees to breach the Notice Provision in their Employment Agreements and resign "effective immediately." This is evidenced by the coordinated nature of the resignation notices, with Resigning Employees crafting those notices using nearly identical language. *See* Compl. ¶ 86. These abrupt, coordinated, "effective immediately" resignations are a direct play out of Alliant's playbook, utilized dozens of times across the country when raiding competitors, including Gallagher. *See* Compl. ¶¶ 3, 11, 60, 65. Alliant's internal communications confirm that these breaches are induced as part of an intentional strategy to "bring in business" before competitors can seek relief from the courts. *See* Exhibit E (directing that Lockton employees should resign on a Monday rather than a Friday because, "[i]f the resignations happen Friday, Lockton will have all weekend to prepare litigation strategy before the new hires are able to bring in business"). Indeed, as the Court found in *Lockton*:

> Alliant knew about the thirty-day notice requirement, yet instructed the Producer Members to resign without notice. The obvious purpose of the notice obligation was to give Lockton an opportunity to handle the Producer Members' departure in an orderly way, including by communicating with Lockton customers and employees who could be affected. It is reasonably probable that a trier of fact would find that Alliant induced the Producer Members to breach the notice requirement so that Lockton would not have this opportunity and instead would face immediate competition from the Producer Members.

2019 WL 2536104, at *19 n.21.

The abrupt, coordinated nature of the resignations also serves as compelling evidence that Alliant conspired with Long and the other Resigning Employees to breach the employee non-solicit provision of their Employment Agreements by soliciting their Gallagher colleagues to join Alliant. *See* Exhibit N (this Court granting TRO against Alliant and finding that where several employees resigned from Aon and joined Alliant within three days of Aon employee Heffernan's move to Alliant, "the timing and breadth of the exodus from Aon suggests that Plaintiffs have a

20

reasonable likelihood of establishing that [one of the resigning employees], in violation of his contractual commitment, played some role in the moves to Alliant").

Alliant also intentionally and unjustifiably interfered with the customer non-solicit provisions in the Employment Agreements by conspiring with Resigning Employees to solicit Gallagher's clients. *See* Compl. ¶¶ 91-92. The Employment Agreements prevent the Resigning Employees from directly or indirectly soliciting Gallagher clients with whom they worked. *See* Exhibit H1-H8, at § 8(A)(1). Alliant knows which clients to call and knows who to call at those clients because the Resigning Employees tell them. Alliant thus shields the Resigning Employees from being on the front lines. But this artifice is no less of a breach of the Resigning Employees' contracts.

Finally, Gallagher has shown the danger of irreparable injury from these breaches. Gallagher invests heavily in its client relationships. As a result, its retention rate of clients is extremely high. *See* Exhibit A, at ¶ 22. Once a client decides to leave for another brokerage, Gallagher's investment is lost and the process must start anew. The days and weeks after an employee who has been entrusted with that relationship resigns is critical to the retention of those clients. *Id.* at ¶ 26. It is critically important to assure the client that there are qualified people at Gallagher to service their needs and to allow for an introduction of those persons. *Id.* Alliant recognizes this, which is why it arranges for coordinated departures, without notice, and then lies to Gallagher clients by stating that no one at Gallagher can service the clients. Court intervention is necessary to prevent irreparable injury and to stop Alliant from achieving its self-admitted goal to steal as much business as possible before a court can intervene.

Alliant also has tortiously interfered with Gallagher's Mobile Device Agreements. The Resigning Employees agreed that it was their responsibility to protect data on personal devices

and also that Gallagher has the right to wipe Gallagher data from mobile devices upon employee separation from the company. *See* Exhibit J1-J7, at ¶¶ 1, 6. Alliant is aware of the Mobile Device Agreements because of its prior and ongoing litigation with Gallagher, and because Alliant's Chief Legal Officer was copied on correspondence from Gallagher following the resignations, which among other things, demanded that the Resigning Employees' mobile devices be provided to Gallagher pursuant to the agreements. *See* Exhibit K. Each of the Resigning Employees refused to comply with Gallagher's demands, presumably at Alliant's direction. Alliant has constructed a thinly veiled scheme to conceal misconduct that might be found on departing employees' personal devices. Rather than have the employees comply with their agreements with Gallagher, Alliant consistently has caused resigning employees to provide their personal electronic devices to Alliant's own consultant who conducts a sham "remediation" process, searching selectively for limited information and not other critical information. This process is engineered and overseen by the same Alliant lawyers who counseled their client not to describe their actions in writing – so they could lie about it without fear of contradiction – and to destroy relevant documents. *See* Exhibit B ("[W]e are no longer instructing employees in writing to resign without notice because they may have notice provisions – Alliant will instead instruct them verbally[.]"); Exhibit F (Alliant's outside counsel asking Arkley to "please CALL McDaniel and tell him that his attorney (Jeff Springer) emailed to his Lockton email address. The email went to Reshma, Ken, me and Chuck, but not you for some reason, and attached Chuck's Lockton agreements. Whether intentional or unintentional, he obviously should not be emailing Chuck at this work address and Chuck needs to immediately tell his lawyer not to do this. You should also have Chuck delete this and any other emails he has sent or received to/from Springer if on his Lockton email."); *see also Lockton*, 2019 WL 2536104, at *17-18 (finding that Alliant's concealment and destruction of

evidence at its outside counsel's direction was part of "a credibility-impairing pattern of behavior"). Incredibly, in other litigation, Alliant has claimed that counsel's instructions to this consultant who performs this "remediation" is privileged and thus unattainable by Gallagher. This process caused Gallagher, and continues to cause Gallagher, irreparable injury. Once its competitor has Gallagher's Confidential Information, the harm is done and cannot be undone or measured by damages.

### ii.    Tortious Interference With Prospective Economic Advantage

Alliant has, and continues to, tortiously interfere with Gallagher's prospective economic advantage. To prevail on this claim, Gallagher must prove (1) the existence of a valid business relationship or expectancy; (2) Alliant's knowledge of plaintiff's relationship or expectancy; (3) an intentional and unjustified interference by Alliant inducing or causing a breach or termination of the expectancy; (4) damages to Gallagher resulting from such interference. *James v. Intercontinental Hotels Grp. Res., Inc.*, 2010 WL 529444, at *3 (N.D. Ill. Feb. 10, 2010).

First, Gallagher has and had a valid business expectancy with the Resigning Employees. *Id.* at *4 ("[A]n at will employment relationship is sufficient to support an action for tortious interference."). Alliant had knowledge of that expectancy and used inflated compensation packages to induce the Resigning Employees to solicit one another and to then terminate their relationships with Gallagher in a manner that violated their Employment Agreements. *See* Compl. ¶¶ 59, 63-65, 89; *see* Exhibit O (Haggerty stating that "Alliant made me an offer I couldn't refuse and I accepted. I am resigning from my position at Gallagher effective immediately."); Exhibit A, at ¶ 6 (Gallagher put together a significant compensation package to try to keep Hogan who said that the offer was not even close to what Alliant is offering). Gallagher also has and had a valid business expectancy with respect to the clients that Alliant solicited and/or attempted to solicit to

leave Gallagher. Gallagher invests heavily in its relationship with its clients. Gallagher has a very high "retention rate," meaning that once Gallagher is appointed as the broker of record for a particular customer, there is a good chance customer will renew its business with that broker year after year. *See* Exhibit A, at ¶ 22. As a direct competitor in the same industry, Alliant knew of this expectancy. Alliant tortiously interfered with this expectancy by inducing the Resigning Employees to resign without providing the contractually-required notice to Gallagher, something that greatly impacted Gallagher's ability to retain its clients. *See id.* at ¶ 26; Compl. ¶¶ 53, 60, 65, 87. Alliant also interfered with this expectancy by contacting Gallagher clients following the resignations (in a manner designed to try to circumvent the Resigning Employees' non-solicit obligations) and falsely claiming that there is nobody at Gallagher that can service the client accounts. Gallagher has suffered damages as a result of this tortious interference because it has lost at least one client and is in danger of losing more, in addition to suffering other irreparable harm.

**B.    Gallagher is Likely to Succeed on its Aiding and Abetting Claim.**

Alliant aided and abetted, and continues to aid and abet, the Resigning Employees' breaches of fiduciary duties owed to Gallagher. Under Illinois law, a claim for aiding and abetting requires "(1) the party whom the defendant aids performed a wrongful act causing an injury, (2) the defendant was aware of his role when he provided the assistance, and (3) the defendant knowingly and substantially assisted the violation." *See Hefferman v. Bass*, 467 F.3d 596, 601 (7th Cir. 2006) (citing *Thornwood, Inc. v. Jenner & Block*, 344 Ill. App. 3d 15, 27-28 (1st Dist. 2003)).

As agents and employees of Gallagher, the Resigning Employees owed fiduciary duties, including the duty of loyalty. In fact, the Resigning Employees explicitly agreed in the Employment Agreements that, for 21 days after notice of termination of employment, their fiduciary duty of loyalty to Gallagher will continue in effect. *See* Exhibit H1-H8, at § 5(A), (C).

24

The Resigning Employees owed fiduciary to devote their full energy, ability, attention, and business time to Gallagher's business and to refrain from engaging in any conduct that conflicted with, interred with, or in any way compromised their performance of obligations and responsibilities to Gallagher, and to not engage in any activity that is not Gallagher's best interests. *See id.* at § 2(A).

The Resigning Employees breached their fiduciary duties by, among other things, conspiring with Alliant to solicit their colleagues to join Alliant and to solicit Gallagher's clients to move their business to Alliant before the expiration of the Notice Period. *See, e.g., Qualey v. U.S. Metals, Inc.*, 2009 WL 972612, at *2 (N.D. Ill. Apr. 8, 2009) ("[A] fiduciary cannot act inconsistently with his agency or trust by soliciting his employer's customers for himself, or enticing coworkers away from his employer."). Long also breached her fiduciary duties to Gallagher by extending the insurance renewal date for one of her largest clients so that the renewal would occur after her resignation and Alliant could obtain the renewal revenue rather than Gallagher. *See* Compl. ¶ 98. In doing so, Long usurped a corporate opportunity from Gallagher, her then-current employer. *See Anest v. Audino*, 332 Ill. App. 3d 468, 477–78 (2d Dist. 2002) ("[A] fiduciary cannot usurp a business opportunity that was developed through the use of corporate assets.").

Alliant was aware of the fiduciary duties owed by the Resigning Employees, and, on information and belief, the Resigning Employees' refusal to comply with their fiduciary duties was demanded by Alliant as a condition of their employment. *See* Compl. ¶ 89. Alliant knowingly and substantially assisted and encouraged the breaches of fiduciary duty by providing inflated compensation packages based on clients that the Resigning Employees bring to Alliant and promising to indemnify them against any claims by Gallagher, consistent with Alliant's "leveraged

hire strategy" that is employed nationwide. *See* Compl. ¶¶ 89, 150. Gallagher has and will continue to suffer damages proximately caused by the breaches of fiduciary duty that were aided and abetted by Alliant.

      **C.    Gallagher is Likely to Succeed on its Conspiracy Claim.**

Alliant is engaged in an ongoing conspiracy with the purpose of inflicting harm upon Gallagher. A civil conspiracy claim requires (1) a combination of two or more persons; (2) for the purpose of accomplishing by concerted action an unlawful purpose or lawful purpose by unlawful means; (3) in furtherance of one of the conspirators committing an overt tortious or unlawful act. *See Fritz v. Johnston*, 209 Ill.2d 302, 317 (2004).

As described above and in Gallagher's Complaint, Alliant agreed with the Resigning Employees to unlawfully interfere with Gallagher's business relations and contracts. They agreed that the Resigning Employees would breach the Employment Agreements. They agreed that the Resigning Employees would violate and not comply with the Mobile Device Agreement. And they agreed that the Resigning Employees would breach their fiduciary duties owed to Gallagher. In furtherance of the conspiracy, Alliant and the Resigning Employees committed unlawful and tortious acts directed at Gallagher, as described herein. Gallagher has and will continue to suffer damages as a result of Alliant's conspiratorial conduct.

**II.    GALLAGHER DOES NOT HAVE AN ADEQUATE REMEDY AT LAW AND WILL SUFFER IRREPARABLE HARM IF INJUNCTIVE RELIEF IS NOT GRANTED.**

There is no adequate remedy at law for the irreparable harm that Alliant has and will inflict upon Gallagher. To establish irreparable harm, Gallagher must show "that irreparable injury is *likely* in the absence of an injunction." *Woodard v. Victory Records, Inc.*, 2013 WL 5517926, at *3 (N.D. Ill. Oct. 4, 2013) (emphasis in original) (quotation marks and citation omitted). Moreover, "[t]he threat of irreparable injury" must be "real and immediate." *Id.* (quotation marks and citation

omitted). The Court need not determine that monetary damages would be "wholly ineffectual," but rather that money alone would be "seriously deficient as a remedy for the harm suffered." *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 386 (7th Cir. 1984). Gallagher has demonstrated inadequate remedy at law and irreparable harm in numerous ways.

As an initial matter, the Employment Agreements contained provisions in which Resigning Employees agreed that a breach would constitute irreparable harm. *See* Exhibit H1-H8, at § 6. As the Delaware Chancery Court held when it enjoined Alliant in *Lockton*, Alliant's knowledge of those provisions supports injunctive relief:

> Lockton is also entitled to a finding of injunctive relief because the Member Agreements contained stipulations establishing that a breach would give rise to irreparable harm. Alliant obtained copies of the Member Agreements, reviewed them, and understood their terms. Alliant nevertheless proceeded to induce the Producer Members to breach the Member Agreements. Consequently, the provisions addressing irreparable harm that appear in those agreements weigh in favor of finding a threat of irreparable harm sufficient to support injunctive relief.

2019 WL 2536104, at *21 (citation omitted).

Moreover, where numerous employees resign in an abrupt and coordinated fashion as they did here, the threat of additional employee loss justifies injunctive relief. In fact, this Court has previously found that another victim of an Alliant raid did not have an adequate remedy at law for that reason:

> The timing and breadth of the exodus from Aon suggests that Plaintiffs have a reasonable likelihood of establishing that [one of the resigning employees], in violation of his contractual commitment, played some role in the moves to Alliant. Continued employee loss would be an irreparable injury for which damages would be an inadequate remedy.

*See* Exhibit N.

Furthermore, "[t]he potential loss of present and future customers is sufficient to demonstrate irreparable harm." *Collier v. Airtite, Inc.*, 1988 WL 96363, at *1 (N.D. Ill. Sept. 15, 1988). That harm here is immediate. Alliant began contacting Gallagher clients simultaneously

27

with the resignations. One client has already ended its relationship with Gallagher. Once a client leaves, it is unlikely that they will return. Alliant's unlawful conduct directed at Gallagher's Chicago office has only just begun and will not stop—thus causing irreparable harm to Gallagher—unless the Court intervenes. Alliant has already raided other Gallagher offices, taking away a substantial number of employees and clients through unlawful means.

Alliant's unlawful conduct will not stop, and it will continue to harm Gallagher, without judicial intervention. As the New York Appellate Court previously found when enjoining Alliant and Arkley, the Alliant executive will continue to unlawfully solicit competitors' clients and employees "when not subject to formal judicial restraint." *Aon Risk Servs. v. Cusack*, 102 A.D.3d 461, 463 (App. Div. 1st Dep't 2013). Indeed, that is Alliant's self-admitted goal. It carefully plans its raids to inflict as much harm on Gallagher as possible before a court can intervene. *See* Exhibit E (Alliant's outside counsel telling Arkley and Dalia that "[*i*]*f the resignations happen Friday, Lockton will have all weekend to prepare litigation strategy before the new hires are able to bring in business*") (emphasis in original). When Alliant successfully executes this part of its scheme, it typically argues in court that there is no need for injunctive relief because the clients are already gone and money damages will suffice. Once the customers leave Gallagher, it is impossible to un-ring that bell. They will not be returning. The damage will be done. The Court should step in now.

With each passing moment, Gallagher continues to suffer loss of goodwill, reputational harm, and other damages that are difficult to quantify. *See* Exhibit A, at ¶ 30. This Court has recognized that "should [a company] be allowed to continue to pilfer [a competitor]'s customers and employees, [the competitor] will lose goodwill, competitive position, and continuity of business relationships with its customers and employees" and that "[s]uch harm is oftentimes fatal to businesses, and cannot be readily calculated and cured by an award of monetary damages."

*Diamond Blade*, 420 F. Supp. 2d at 872. Gallagher will undoubtedly continue to suffer these types of irreparable harm if Alliant is not enjoined in this case.[5]

### A.     The Loss of Customer Goodwill.

The Employment Agreements acknowledge that client relationships and the associated goodwill are legitimate interests of Gallagher, not its employees. *See* Exhibit H1-H8, at § 8. The goodwill of its customers is one of Gallagher's most important assets. *See* Exhibit A, at ¶ 21. Gallagher has cultivated that asset with the investment of substantial time and resources into the development of proprietary information, training and employment development, data and analytics, office space, marketing support, computer systems, administrative, clerical and sales support, market research, and travel and expense reimbursement. *Id.* at ¶ 23. Now, however, Alliant and the Resigning Employees have used, and will continue to use, for Alliant's benefit, the goodwill that Gallagher developed with its clients. Whether successful or unsuccessful in trying to solicit additional clients and prospective clients, Gallagher is harmed. It is very difficult, if not impossible, to quantify the extent of this harm. *Id.* at ¶ 27.

### B.     Reputational Harm.

The abruptness of the Resigning Employees' departures, coupled with the failure to honor the 21-day Notice Provisions in the Employment Agreements, compromised Gallagher's reputation as a dependable and stable force in the insurance brokerage industry. *See* Exhibit A, at

---

[5] With each passing moment, the Resigning Employees (and, therefore, Alliant) also continue to possess Gallagher's Confidential Information, which the Resigning Employees surreptitiously forwarded to their personal email accounts in the months leading up to the resignations and never returned to Gallagher. *See* Compl. ¶¶ 103-114. "Disclosure of confidential information or trade secrets can constitute irreparable harm." *SKF USA, Inc. v. Bjerkness*, 636 F. Supp. 2d 696, 715 (N.D. Ill. 2009). While Gallagher does not assert an independent claim for theft of its confidential information at this time, the Court should take Alliant's continued possession of Gallagher's Confidential Information into account for purposes of determining whether to grant injunctive relief.

¶ 28. As a result, some existing clients are likely to question whether they will continue to get the same quality of services from Gallagher. *See id.* Likewise, potential new clients are likely to question whether the quality of services that Gallagher's Chicago office is able to provide going forward will be consistent with the level of service they understood Gallagher to have provided in the past. *See id.* Any failure of existing clients to refer new business to Gallagher or any failure of a new client to join Gallagher is nearly impossible to discover, let alone quantify. *See id.*

      **C.**    **Harm to Gallagher's Competitive Position.**

Gallagher is no longer competing with Alliant on a level playing field. *See id.* at ¶ 31. Alliant is now armed with unique competitive knowledge of Gallagher's existing and prospective clients as well as Gallagher's strategies for acquiring and retaining clients. That knowledge gives Alliant an unfair competitive advantage, which is difficult, if not impossible, to quantify. *See id.*

**III.**    **THE BALANCE OF HARDSHIPS AND PUBLC INTEREST FAVOR INJUNCTIVE RELIEF.**

Courts should not reward Alliant's behavior. In balancing hardships, courts apply "the 'sliding scale' approach: the more likely it is the plaintiff will succeed on the merits, the less the balance of irreparable harms need weigh towards its side; the less likely it is the plaintiff will succeed, the more the balance need weigh towards its side." *Abbott Labs*, 971 F.2d at 12. As established above, Gallagher has a strong likelihood of success on the merits on its claims against Alliant. Accordingly, the balance of harms need not decisively weigh in Gallagher's favor.

Notwithstanding, the balance of harms weighs heavily in favor of injunctive relief. Gallagher will be severely harmed if Alliant is allowed to raid Gallagher's Chicago office without constraint as Gallagher will unlawfully lose employees, clients, and suffer loss of goodwill, reputational damage, and other harm. This harm will be the direct result of Alliant's unlawful conduct committed through tortious interference of contracts, aiding and abetting breaches of

fiduciary duties, and conspiratorial acts. Furthermore, there is absolutely no harm to Alliant if the Court enters injunctive relief here; the only thing Alliant would be prohibiting from doing is committing unlawful acts. Indeed, there is no legitimate claim of harm to Alliant for a balancing of hardships as Alliant will merely need to engage in lawful competition moving forward rather than effectuating its scheme to unlawfully harm one of its competitors. As the Delaware Chancery Court reasoned when it enjoined Alliant following Alliant's raid of Lockton:

> The equities also favor Lockton because of substantial evidence that Alliant set out in bad faith on a strategy to induce Lockton's employees to breach their agreements. Alliant is a sophisticated entity and repeat player. It raided Lockton knowing about the risks, and it prepared for litigation from the outset. It cannot now complain about suffering the foreseeable consequences of its actions.

*Lockton*, 2019 WL 2536104, at *25.

Moreover, the public's interest in lawful and fair competition favors injunctive relief. In *PepsiCo, Inc. v. Redmond*, this Court granted a preliminary injunction because, if the injunction was not granted, "the public interests in *fair competition*, business innovation and economic efficiency will suffer." 1996 WL 3965, at *32 (N.D. Ill. Jan. 2, 1996) (emphasis added). This Court has also found that "[t]he public has no interest in…encouraging unethical business behavior." *IDS Life Ins. Co. v. SunAmerica, Inc.*, 958 F. Supp. 1259, 1282 (N.D. Ill. 1997), *vacated in part on other grounds*, *IDS Life Ins. Co. v. SunAmerica Life Ins. Co.*, 136 F.3d 537 (7th Cir. 1988); *see also Morgan Stanley DW Inc. v. Rothe*, 150 F. Supp. 2d 67, 79 (D.D.C. 2001) ("The public has no interest in…encouraging unethical business behavior.") (quoting *IDS Life Ins. Co.*, 958 F. Supp. at 1282) (quotation marks omitted). Furthermore, "[t]here is no harm to the defendant to being enjoined from violating the law." *Light v. Zhangyali*, 2016 WL 4429758, at *4 (N.D. Ill. Aug. 22, 2016) ("There is no harm to the defendant to being enjoined from violating the law[.]"); *see also Ent. One UK Ltd. v. 2012Shiliang*, 384 F. Supp. 3d 941, 955 (N.D. Ill. 2019).

In a recent opinion rejecting Alliant's attempts to maintain the *Lockton* case filings under seal and with widespread redactions, the Delaware Chancery Court found that "[t]here is a plainly a level of public interest in the misconduct in which Alliant engaged" and that "[t]he Business Redactions provide insight into Alliant's *modus operandi*." *See* Exhibit G, at ¶ 20.a.-b. On the other hand, there is no public interest that would be served by a denial of injunctive relief against Alliant. The public interest will be served by stopping Alliant's unlawful, constant, undeterred conduct to harm Gallagher. Enough is enough.

## **CONCLUSION**

Alliant's unlawful conduct will cause Gallagher irreparable harm absent immediate injunctive relief from this Court. Given the highly competitive nature of the insurance brokerage industry as well as Alliant's well-document history of unlawful conduct, including against Gallagher in other jurisdictions, nothing short of a temporary restraining order and an injunction will bar Alliant's illegal raids and protect Gallagher from irreparable harm. Accordingly, Gallagher respectfully requests that this Court enter an Order:

    a.    Temporarily and preliminarily restraining and enjoining Alliant from:

        i.    Soliciting any Gallagher client serviced by the Resigning Employees during the two years preceding the Resigning Employees' resignations;

        ii.    Allowing the Resigning Employees to engage in activities for Alliant's benefit (rather than Gallagher's benefit) for 21 days following entry of an order granting a temporary restraining order and/or preliminary injunction;

        iii.    Using, possessing, or disclosing any of Gallagher's Confidential Information;

      b.      Ordering Alliant to immediately return any Gallagher Confidential Information in its possession, custody, or control of Alliant or its employees;

      c.      Awarding Gallagher its attorneys' fees and costs; and

      d.      Granting such other and further relief as this Court deems just and proper.

DATED:      July 28, 2022      Respectfully submitted,

*/s/ Ronald S. Safer*_____
Ronald S. Safer, ARDC # 6186143
Eli J. Litoff, ARDC # 6317940
Matthew A. Blumenreich, ARDC # 6329458
RILEY SAFER HOLMES & CANCILLA LLP
70 W. Madison Street, Suite 2900
Chicago, Illinois 60602
Phone: 312-471-8700
Fax: 312-471-8701
Email: rsafer@rshc-law.com
       elitoff@rshc-law.com
       mblumenreich@rshc-law.com

*Attorneys for Plaintiff*