# Exhibit A

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ARTHUR J. GALLAGHER & CO., | ) |
| Plaintiff, | ) Case No.: ) |
| v. | ) **DEMAND FOR JURY TRIAL** |
| ALLIANT INSURANCE SERVICES, INC. | ) |
| Defendant. | ) |

## DECLARATION OF JEFFREY DEVRON

I, Jeffrey Devron, declare under the penalties of perjury as follows:

1. I am an employee of Plaintiff Arthur J. Gallagher & Co. ("Gallagher"). I respectfully submit this declaration in support of Gallagher's Emergency Motion for Temporary and Preliminary Injunctive Relief.

2. I am the area president of Gallagher's Chicago office. I have served in that role since approximately June 2015. Before then, I served as managing director at Marsh McLennan for more than fourteen years. Prior to joining Marsh McLennan, I was vice president at Gallagher. In total, I have approximately 28 years of experience in the insurance brokerage industry.

3. I am familiar with the facts underlying this litigation. Kristen Long, Jordan Laeyendecker, Taylor Gunnells, Janet Schumacher, Melissa Haggerty, Rosario Zaragoza, Sara Arnold, and Kelly Hogan (the "Resigning Employees") all worked for Gallagher

supporting its Chicago, Illinois office[1]—up until they each initiated the resignation process from Gallagher on or about July 11, 2022 to July 13, 2022, without 21 days' written notice, resigning either "effective immediately" or "effective" the same day that they notified Gallagher of their resignation. The Resigning Employees, as part of the Chicago office, reported to me in my capacity as area president.

4. Gallagher responded promptly to these actions. It notified the Resigning Employees that they remained Gallagher's employees throughout their 21-day notice period, that Gallagher would continue to pay them as employees during this period, and that they were expected to honor all aspects of their employment agreements with Gallagher—including the restrictive covenants contained therein. Gallagher demanded that the Resigning Employees bring their mobile devices to Gallagher's offices in compliance with Gallagher's Mobile Device Policy that the Resigning Employees signed (the "Mobile Device Agreement"). Gallagher provided the Resigning Employees with copies of their respective employment agreements and also provided copies of the Mobile Device Agreement to which certain Resigning Employees agreed—which is intended to and does protect Gallagher's Confidential Information, property, and money because, when departing employees comply with the Notice Provision, Gallagher is typically successful in retaining the vast majority of client business affected by the departures. Gallagher also notified the Resigning Employees that their duties as an employee—including their fiduciary duties to Gallagher—remain in full force and effect, that they must refrain from any conduct or activity that does not serve Gallagher's best interests, that Gallagher expected them to honor their commitment to help

---

[1] Taylor Gunnells and Sara Arnold were physically located in North Carolina and Las Vegas, respectively, but they reported in to the Chicago office and worked remotely to support Gallagher's team in Chicago.

Gallagher transition their responsibilities—including client representation responsibilities—to other Gallagher personnel (which the Resigning Employees have refused to do) and that retention or use of Confidential Information is a violation of their employment agreements.

5. The Resigning Employees, through their counsel, repudiated the notion that they remained Gallagher employees, demanded that Gallagher not pay them through the contractually-negotiated Notice Period, and refused to comply with their Mobile Device Agreements. Moreover, the Resigning Employees have not assisted Gallagher with the transitioning of client accounts.

6. Gallagher also put together a significant compensation package to try to keep Hogan, but she declined informing Gallagher that the offer was not even close to what Alliant was offering.

7. I am familiar with the clients that the Resigning Employees serviced while they were employed by Gallagher, the nature of the Resigning Employees' relationships with these clients, and the types of Gallagher proprietary information and work-product that the Resigning Employees would have used to service those clients.

8. I am also familiar with the ongoing impact on Gallagher's Chicago office stemming from the Resigning Employees' decision to leave Gallagher and become employees of its competitor, Defendant Alliant Insurance Services, Inc. ("Alliant").

9. On the same day Long and her colleagues began resigning, Alliant immediately began soliciting Gallagher's clients that were serviced by Long and her team. An Alliant executive informed one of the largest clients that Long and her team had joined Alliant and that nobody remaining at Gallagher could handle the client's account. This statement was false. Gallagher has dozens of employees capable of servicing the clients previously serviced

3

by the Resigning Employees. In fact, in the wake of the Resigning Employees' departures, Gallagher has quickly (at great time and expense) put together experienced teams of people to service these accounts and ensure there is no interruption in service. That has not stopped Alliant from continuing to solicit multiple other Gallagher clients previously serviced by the Resigning Employees, asserting the same false claim that there is nobody at Gallagher who can handle their accounts.

10. In the wake of Resigning Employees' mass resignation, I have personally spoken to numerous clients and seen first-hand the harm that the mass resignation has caused. Numerous clients have questioned Gallagher's ability to service their accounts and whether Gallagher has the stability the client desires in a broker. As a result of the abrupt, mass exodus, numerous are considering terminating their relationship with Gallagher and moving their business to Alliant or another broker. Every second that Alliant is allowed to continue soliciting and making false statements to these clients makes Gallagher's efforts to retain the client and partially mitigate its damages all that more difficult.

11. The harm to Gallagher as a result of Alliant's conduct is ongoing and it cannot be fully or adequately addressed with monetary damages. The harm Gallagher has suffered and will suffer extends well beyond lost clients, lost employees, and lost revenue. It includes the loss and ongoing misuse of Gallagher's trade secrets and confidential information, which I believe Alliant and the Resigning Employees already have used or disclosed, and will continue to use or disclose, to solicit and thereafter service Gallagher clients who transfer their business to Alliant as well as prospective clients of Gallagher. The harm to Gallagher also includes the loss of customer goodwill, future revenue, and business expertise; reputational harm, including the ability to retain clients and attract new clients; and the loss of its

competitive position. All of these harms are very difficult, if not impossible, to quantify.

***Gallagher Faces Irreparable Harm Through the Improper Use and Disclosure of Its Confidential Information.***

12. Gallagher has, over many years and at great effort and expense, developed, accumulated, maintained, and refined trade secrets and other confidential information, including among other things, client-specific pricing, key client contacts, client-specific manuals, client-specific marketing and servicing strategies, exposure and rating information in the pricing of clients' insurance/reinsurance products, buying trends, the composition and the unique risks inherent in a clients' operations, details concerning the structure, conditions, and extent of insurance/reinsurance policies, policy expiration dates, premium amounts, commission rates, loss histories, data relating to Gallagher's unique marketing and servicing programs, and the criteria and formulas used by Gallagher in pricing its insurance and benefits, and compensation information for Gallagher employees.

13. Gallagher's trade secrets and confidential information are not generally known to the public. Even Gallagher's clients are not privy to certain of Gallagher's confidential information such as pricing information, tools used in risk assessment, and marketing and servicing strategies, among others.

14. Third parties are not told by Gallagher, for example, internal financial or compensation figures, the details of Gallagher's active or upcoming client insurance and renewals, or the proprietary methods by which Gallagher approaches servicing and maintaining its client relationships.

15. Gallagher takes great care to safeguard its trade secrets and confidential information. Gallagher has in place numerous policies designed to protect its confidential information, and it trains its employees on the importance of maintaining the confidentiality

of Gallagher's work-product. It enters into non-disclosure agreements with clients. It requires Gallagher employees to sign employment agreements containing confidentiality, customer non-solicitation, employee non-solicitation restrictions as well as other restrictions on post-employment conduct, including restrictions to safeguard Confidential Information. It keeps its trade secrets and confidential information on password-protected computers, accessible only on a need-to-know basis through a company-specific intranet server (also using a username and password). Gallagher's Chicago office requires the swiping of a key card to gain entry.

16. Gallagher requires many of its employees to agree to its Mobile Device Agreement which provides that Gallagher employees own their personal mobile devices and use them to conduct business for Gallagher. All but one of the Resigning Employees agreed to the Mobile Device Agreement under which they agree that it was their responsibility to protect corporate data on their personal mobile device and that Gallagher has the right to wipe all Gallagher data from the mobile devices if the Resigning Employees separate from Gallagher. This Mobile Device Agreement is designed to prevent employees such as the Resigning Employees from misappropriating Gallagher's trade secrets and confidential information.

17. Gallagher's trade secrets and confidential information provide it with a significant advantage over competitors like Alliant. Armed with Gallagher's proprietary information, Alliant can unfairly identify, contact, divert, and begin immediately to service Gallagher's clients, thus causing substantial loss of revenue to Gallagher and financial gain to Alliant. Without Gallagher's trade secrets and confidential information, Alliant's ability to solicit, quickly transfer, and begin servicing a Gallagher client would be virtually impossible.

18. The Resigning Employees occupied high-level positions of trust and confidence within Gallagher. They had access to some of Gallagher's most important trade secrets and confidential information, including, among many other things, confidential information about the client's insurance preferences and needs, pricing and coverage requirements, risk appetite, satisfaction, premiums, deductibles, collateral levels, commission arrangements, loss history, and renewal dates.

19. Access to Gallagher's confidential information through the Resigning Employees allows Alliant to solicit Gallagher's customers more effectively. Alliant's producers and employees will know current contract details, historical experience, and client preferences—the type of client information that typically only an incumbent Gallagher broker would know. Even knowing the policy renewal date for a particular Gallagher client is valuable confidential information for Alliant. That information alone allows Alliant to target a potential client at a time of year when that client is most likely to be interested in hearing about insurance-coverage alternatives.

20. Given the speed at which Alliant is soliciting Gallagher employees and clients, it is clear to me that Alliant is relying on Gallagher's trade secrets and confidential information to do so. Indeed, I can think of no explanation for how Alliant was able to contact so many Gallagher clients previously serviced by the Resigning Employees in such a short period of time, unless the Resigning Employees shared Gallagher's confidential client lists and key client contacts with Alliant (whether in writing or orally). In addition to the documents and records reflecting Gallagher's trade secrets and confidential information that was sent to personal email accounts, the Resigning Employees *know* Gallagher's trade secrets and confidential information by virtue of having serviced the clients at issue while at Gallagher.

If they service Gallager clients at Alliant—or indirectly assist other Alliant employees in doing so— the Resigning Employees are necessarily using and disclosing Gallagher's trade secrets and confidential information to Alliant who will then use such information to service those clients.

***Gallagher Faces Irreparable Harm Through the Loss of Customer Goodwill.***

21.  Gallagher's client relationships (and goodwill) take substantial time and resources to maintain and are one of Gallagher's most important assets. Gallagher invests substantial resources into attracting, developing, maintaining, and servicing its clients. Gallagher does not compete with other insurance brokers based on price. Instead, Gallagher wins clients based on its capabilities. Clients choose Gallagher because, as a company, it provides better risk management advice than our competitors.

22.  Because of the quality of Gallagher's services and its heavy investments in its client relationships, Gallagher's clients have historically been loyal to it. Gallagher currently has an extremely high client retention rate of approximately 94 or 95%—meaning that once Gallagher is appointed as the broker of record, there is a good chance the customer will renew its business with Gallagher year after year.

23.  To maintain its extremely high client retention rate, Gallagher heavily invests in its capabilities and practice areas. It equips its employees (who have a need to know) with its trade secrets and confidential information. It invests substantial time and resources into the development of proprietary information, training and employee development, data and analytics. It provides its employees with the necessary resources to do their jobs, including office space, marketing support, computer systems, administrative, clerical and sales support, and market research. It pays for employees' expenses incurred when meeting and entertaining

clients and attending industry events. Gallagher's investments enable Gallagher employees to develop significant client-specific knowledge. Over a period of years, Gallagher's employees gain experience selling and placing insurance with specific clients, handling claims for specific clients, and developing an understanding of a client's current insurance needs as well as its historical needs and preferences.

24. These substantial investments allow Gallagher employees, like the Resigning Employees, to build and sustain client relationships. The Resigning Employees benefited from Gallagher's goodwill with its customers, which it has nurtured over many years, with substantial effort and significant expense.

25. Now, however, the Resigning Employees can and will use the goodwill that Gallagher developed with its clients for Alliant's benefit. Indeed, Alliant, armed with the goodwill can and will solicit clients (both existing and prospective) away from Gallagher and otherwise disrupt Gallagher's relationships with customers. Once a client decides to leave, Gallagher's investment is lost and the process must start anew. Clients do not regularly change their minds and return to Gallagher after executing a Broker of Record letter appointing another broker ("BOR").

26. The 21-day Notice Period in Gallagher's Employment Agreements is critical to maintaining Gallagher's high retention rate as well as maintaining Gallagher's property, money, and goodwill. During that period, the contractually-required cooperation and assistance of the departing employees allows Gallagher to develop a transition plan and to approach the client in a proactive manner that projects stability despite the impending resignation and engenders client confidence. To the contrary, where the Notice Provision is breached, as it was here, Gallagher is unable to proactively apprise the clients of the

resignations. It is important to assure the client that Gallagher has qualified people to service their needs and to allow for an introduction of those persons. However, in this case, Alliant called several of Gallagher's clients before Gallagher was able to inform those clients of the Resigning Employees' departures. When a client is blindsided in this way, the damage to Gallagher's reputation is immeasurable. Unsurprisingly, in my experience, when resigning employees do not comply with their obligations under the Notice Provision, Gallagher's retention rate drops dramatically as compared to when the resigning employees participate in an orderly transition of client accounts.

27. Regardless of whether Alliant is successful in soliciting additional clients and prospective clients, Gallagher is harmed, and it is very difficult, if not impossible, to quantify the extent of the harm through the loss of customer goodwill.

***Gallagher Faces Irreparable Harm in Numerous Other Respects.***

28. Gallagher's Chicago office faces reputational harm as a result of Alliant's actions. The abruptness of the departures of the Resigning Employees, coupled with their failure to honor the 21-day notice provisions in Gallagher's employee agreements, compromised Gallagher's reputation as a dependable and stable force in the insurance brokerage industry. Existing clients, including those clients who were serviced by one of the Resigning Employees, are likely to question (and some have questioned) whether they will continue to get the same quality of services from Gallagher. They may be less likely to refer new business to Gallagher. Potential new clients are likely to question whether the quality of services that Gallagher's Chicago office is able to provide going forward will be consistent with the level of service they understood Gallagher to have provided in the past. Any failure of existing clients to refer new business to Gallagher or any failure of a new client to join

Gallagher is nearly impossible to discover, let alone quantify.

29. Gallagher's Chicago office is also likely to lose future revenue because of the ongoing solicitation of its clients, some of whom have not yet determined whether to move their business to Alliant. It is difficult to quantify those losses at this time because Gallagher does not yet know which additional clients are being, or will be, solicited and diverted by Alliant with the improper assistance of the Resigning Employees. Based on Alliant's ongoing solicitation of clients, I know the harm to Gallagher stemming from Alliant's actions is ongoing. Short of receiving a BOR, Gallagher has no way of knowing which of its clients or prospective clients are Alliant's target, and therefore is unable to take adequate steps to counteract its actions.

30. With each passing moment, Gallagher continues to suffer loss of goodwill, reputational harm, and other damages that are difficult to quantify.

31. Finally, the harm to Gallagher also includes injury to Gallagher's competitive position and growth opportunities. Gallagher is no longer competing with Alliant on a level playing field. Alliant is now armed with unique competitive knowledge of Gallagher's existing and prospective clients and Gallagher's strategies for acquiring and retaining clients. That knowledge gives Alliant an unfair competitive advantage, which is difficult, if not impossible, to quantify.

I declare under penalty of perjury that the foregoing is true and correct. Executed on July 27, 2022.

/s/ *[signature]*
JEFFREY DEVRON

Date: July 27, 2022

11