# Exhibit H

# Exhibit H1

<u>**EMPLOYEE AGREEMENT**</u>

This Employee Agreement ("Agreement") is made and entered into as of the Effective Date (as defined below) by and between ___Kristen J. Long_____
(hereinafter referred to as "Employee") and Arthur J. Gallagher & Co., a Delaware corporation with its principal place of business in Itasca, Illinois and its subsidiaries, divisions and affiliated and related companies (hereinafter referred to collectively as "AJG" or the "Company").

<u>**RECITALS**</u>

**WHEREAS**, Employee has been hired, or is being retained, as a valued key employee who with the execution of this Agreement will be provided and will continue to be provided during his employment with valuable confidential and proprietary and trade secret information of the Company and will have significant managerial, production, administrative, technical and/or account servicing responsibilities; and

**WHEREAS**, the parties hereto acknowledge that the Company has a legitimate interest in retaining the services of Employee and accepting the covenants herein provided in order to protect its confidential and proprietary and trade secret information and to preserve the Company's goodwill, customer relationships, employment relationships and value of the business to be handled by Employee as an employee of the Company;

**NOW THEREFORE**, in consideration of these recitals and the mutual covenants and promises set forth below, and for other good and valuable consideration including, but not limited to, employment with the Company, receipt of the compensation and benefits attendant to such employment, receipt and the ability to utilize the Company's confidential, proprietary and trade secret information, and/or being provided or allowed access to and contact with certain Company accounts, all of which the parties acknowledge as sufficient consideration for this Agreement, the parties agree as follows:

**Section 1.**      <u>**Employment.**</u>

The Company agrees to employ Employee and Employee agrees to serve the Company and perform the duties set forth below beginning on the Effective Date and continuing thereafter until employment is terminated by either party. The Employee's employment is "at will" and is terminable by either party as provided below (except in jurisdictions where "at will" employment is not recognized). The Employee's continued employment with the Company is subject to the terms and conditions of this Agreement.

**Section 2.**      <u>**Duties.**</u>

A.      Employee agrees to devote his full energies, abilities, attention and business time to the performance of his employment obligations and responsibilities. Employee agrees that he will not engage in any activity which conflicts or interferes with, or in any way compromises, his performance of those obligations and responsibilities. Employee will comply with all applicable Company policies and procedures. Employee will not, either during or outside normal business hours, directly or indirectly sell, solicit, service, manage or engage in any aspect of the insurance, benefits or wealth management businesses for or on behalf of any person or entity other than the Company, nor engage in any activity that is not in the best interests of the Company.

B.      Employee recognizes that, by virtue of his employment by the Company and to assist him in the solicitation, production, management, and/or servicing of accounts, he will be provided and granted otherwise prohibited access to certain confidential and proprietary data and trade secret information of the Company which is not known either to its competitors or within the industry generally and which has independent economic value to the Company, and is subject to reasonable efforts that are reasonable under the circumstances to maintain its secrecy. This information (collectively hereinafter "Confidential Information") may include, but is not limited to: data relating to the Company's unique marketing and servicing programs, procedures and techniques; investment, wealth management and retirement plan consulting, variable annuities, and fund investment business and related products and services;

Page **1** of 13

underwriting criteria for general programs; business, management and human resources/personnel strategies and practices; the criteria and formulae used by the Company in pricing its insurance and benefits products and claims management, loss control and information management services; the structure and pricing of special insurance packages negotiated with underwriters; highly sensitive information about the Company's agreements and relationships with underwriters; sales data contained in various tools and resources (including, without limitation, Salesforce.com); lists of prospects; the identity, authority and responsibilities of key contacts at Company accounts and prospects; the composition and organization of Company accounts' businesses; the peculiar risks inherent in the operations of Company accounts; highly sensitive details concerning the structure, conditions and extent of existing insurance coverages of Company accounts; policy expiration dates, premium amounts and commission rates relating to Company accounts; risk management service arrangements relating to Company accounts; loss histories relating to Company accounts; candidate and placement lists relating to Company accounts; the Company's personnel and payroll data including details of salary, bonus, commission and other compensation arrangements; and other data showing the particularized insurance or consulting requirements and preferences of Company accounts. Employee understands that his job duties may include assisting in the development of information and data that is Confidential Information belonging to the Company. Confidential Information may be stored in files, documents, dailies, daily reports, renewal information, customer lists, accounting records, products purchased by customers, customer account and credit data, referral sources, computer programs and software, customer comments, Company written manuals and marketing and financial analysis, plans, research and programs. Employee recognizes that this Confidential Information constitutes valuable property of the Company, developed over a long period of time and at substantial expense and that the Company takes reasonable efforts to keep this Confidential Information confidential and made available only to those employees who need access to such Confidential Information to perform their job functions for the Company. Employee promises to safeguard such Confidential Information, and agrees that he will not, at any time during his employment by the Company, divulge such Confidential Information or make use of it for his own purposes or the purposes of another.

C.     The Company agrees that, during Employee's employment with the Company, it will: (i) provide Employee with certain Confidential Information the Employee did not previously possess including, without limitation, Confidential Information relating to certain of the Company's accounts; (ii) provide Employee with information and access to the Company's proprietary insurance and risk management programs; (iii) provide Employee with access to the Company's specialized business operations relating to particular aspects of the insurance agency and risk management business; (iv) maintain specialized training programs to which Employee will qualify and apply; and (v) provide such other assistance which may reasonably aid Employee in performing sales, management, technical and/or servicing duties.

D.     Employee acknowledges and understands that an essential element of the Company's business is the development and maintenance of personal contacts and relationships with its accounts, and that Employee may be provided and allowed access to certain of the Company's accounts for the purpose of establishing personal contact and relationships with such accounts for the benefit of the Company. The Employee acknowledges that the Company invests considerable time, money, and resources necessary to develop and maintain a relationship between its employees and a client, and in that regard, the Company will pay Employee's salary, reimburse reasonably necessary business expenses, provide Employee with certain Confidential Information, and provide the resources necessary to service the Company accounts managed or serviced by Employee by making available legal advice, accounting support, advertising and other corporate services. Moreover, while the Employee recognizes that some Company accounts may develop greater identification with the Employee than the Company itself, those accounts remain, at all times and for all purposes, accounts of the Company. By entering this Agreement, Employee disclaims any interest in such Company accounts.

Standard Employee Agreement – 1.17.14

**Section 3.**     **Compensation and Benefits.**

Employee will be entitled to the compensation and benefits agreed to by Employee and the Company and as noted from time to time in Employee's official personnel file and records retained in the Company's corporate headquarters, which file is incorporated by reference herein to the extent necessary for evidencing the compensation and benefits to which Employee and the Company have agreed. The compensation and benefits to which Employee is entitled as of the Effective Date is noted in Employee's official personnel file. Employee's compensation and benefits is subject to periodic change at the Company's discretion.

**Section 4.**     **Representations.**

Employee represents and warrants to the Company that:

A.      He is not, and will not become, a party to any agreement, contract, arrangement or understanding, whether of employment or otherwise, that would in any way restrict him from undertaking or performing his duties in accordance with this Agreement or that limits his ability to be employed by the Company under this Agreement;

B.      Employment by the Company will not violate the terms of any policy of any prior employer of Employee regarding competition, solicitation or confidentiality;

C.      His employment by the Company in the position contemplated by this Agreement will not require him to improperly use any trade secrets or confidential or proprietary information of any prior employer, or any other person or entity for whom he has performed services;

D.      He has not misused, and will not misuse, any confidential or proprietary information obtained from any prior employer or any other person or entity;

E.      He has not improperly taken or retained in any form whatsoever, or otherwise retained access to, any confidential or proprietary information of any prior employer or any other person or entity; and

F.      He is in compliance with any non-competition and/or non-solicitation agreements, or other restrictive covenant obligations in place between him and any former employer and will continue to be in compliance, regardless of whether he believes such agreements and/or restrictive covenants are enforceable or not.

**Section 5.**     **Termination of Employment Relationship.**

A.      The Company or the Employee may terminate Employee's employment at any time and for any reason upon twenty-one (21) days' written notice (the "Notice Period") by the party wishing to terminate the employment; provided, however, that notice is not required from the Company for any termination taking place: (1) during the Employee's first ninety (90) days of employment (or other applicable Introductory Period pursuant to Company policy); or (2) during the pendency of any Performance Improvement Plan issued pursuant to the Company's performance management policies.

B.      The Company agrees to continue during the Notice Period the same compensation and benefits Employee was receiving prior to the Notice Period. The parties agree that once the Notice Period expires, the Employee's entitlement to compensation and benefits ends.

C.      Employee agrees that during the Notice Period, he will cooperate fully with the Company in all matters relating to the winding up of any pending work and/or the orderly transfer to other Company employees of the accounts for which he has been responsible. Employee specifically covenants that during the Notice Period (regardless of whether or not active employment responsibilities are continuing) his duties to the Company, including Employee's fiduciary duty of loyalty, will continue in effect. Prior to the expiration of the Notice Period, Employee promises to return to the Company all originals and copies (whether paper, digital copies or otherwise) of literature, correspondence, memoranda, reports, summaries, manuals, proposals, contracts and other documents of any kind which relate in any way to the business of the Company, including specifically all materials which comprise or refer to the Company's Confidential Information. The Employee covenants that he will not retain any copy, facsimile or note intended to memorialize any such data. Employee further understands and agrees that, during or at the expiration of the Notice Period, and as part of his assigned job duties, he will reasonably participate in

Page **3** of **13**

any meeting the Company may convene to: (i) review the status of any projects or work Employee has been assigned; (ii) review the status of accounts for which Employee has been most recently responsible or associated; (iii) ensure that Employee has fully obtained his entitlements under this Agreement and as provided by law; and/or (iv) confirm that Employee understands the nature and scope of his post-employment obligations.

D.     Upon the termination of Employee's employment for any reason, Employee agrees that the Secretary of the Company may, as an irrevocable proxy and in Employee's name and stead, execute all documents and things which the Company deems necessary and desirable to effect Employee's resignation as an officer or director of any company (if applicable) included within the definition of the Company as used in this Agreement.

E.     Before accepting any new employment in the insurance, benefits or wealth management industries, Employee promises to give his prospective new employer a copy of this Agreement. Employee permits the Company to advise any prospective new employer of Employee of the existence and terms of this Agreement and to provide it with a copy.

F.     During employment and after the termination of same Employee agrees to remain available to the Company and its legal counsel, voluntarily upon the Company's request and without the necessity of subpoena or court order, in connection with the Company's investigation, preparation, prosecution and/or defense of any actual or potential legal proceeding, regulatory action, or internal matter. The Employee agrees to cooperate with the Company, to provide any information reasonably within his recollection and to provide truthful testimony as required. If Employee is called upon to provide cooperation after employment has been terminated, the Company will reimburse Employee for reasonable out-of-pocket expenses actually incurred under this section or, at the Company's option, will advance Employee's reasonable expenses or incur them directly.

G.     Employee agrees that while he is employed by the Company, and following the termination of his employment, he will not make any false, defamatory or disparaging statements about the Company, its officers or directors where such statements are calculated to, or reasonably likely to cause material damage to the Company, its officers or directors.

**Section 6.     The Company's Right to Injunctive Relief; Attorneys' Fees.**

The Employee acknowledges that his services to the Company are of a unique character which gives them a special value to the Company, the loss of which cannot reasonably or adequately be compensated in damages in an action at law should the Employee breach, or threaten to breach, any post-employment obligations under this Agreement. The Employee realizes that: (a) it would be difficult to measure precisely the damages to the Company from any breach by Employee of Sections 7 and/or 8 of this Agreement; (b) injury to the Company from any such breach would be incalculable and irremediable; and (c) money damages would therefore be an inadequate remedy for any such breach. Accordingly, in addition to any other remedy the Company may have at law or in equity, the Company will be entitled to enforce this Agreement by obtaining a temporary restraining order and preliminary and permanent injunctive relief to restrain any such breach or further breach by Employee. Employee expressly waives the right to contest whether a breach of Section 7 or 8 of this Agreement would result in irreparable or permanent harm to the Company. In addition, Employee agrees that the Company may seek injunctive relief when and if it elects to do so and any delay in seeking injunctive relief will not prejudice or waive the Company's right to do so. Employee expressly waives the right to assert that the Company is not entitled to injunctive relief because of any delay in seeking such relief. Employee agrees that he will be responsible for and pay the Company its reasonable attorneys' fees and other expenses and costs incurred to enforce this Agreement if the Company is the prevailing party. Employee further agrees that if Employee breaches any covenant contained in Sections 7 and/or 8 of this Agreement, the Company will be entitled, in addition to all other legal or equitable remedies it may have, to offset and withhold against any such loss, cost, liability or expense any amount of any kind that may then be owing or payable by Company to Employee.

**Section 7.**     **Trade Secrets and Confidential Information.**

A.     Employee acknowledges that the Company's business depends to a great degree upon having information which is not generally known to others, and that the profitability of the Company's business requires that this information be kept confidential and proprietary within the Company. Accordingly:

(1)     Employee agrees that all intellectual property, such as computer programs, systems or software, developed during his employment or as a result of his employment is "work for hire" performed by Employee in the scope of his employment. To the extent that any such intellectual property is determined not to constitute "work for hire," or if any rights in any such intellectual property do not accrue to the Company as a "work for hire," Employee's signature on this Agreement constitutes an assignment (without any further consideration) to the Company of any and all copyrights and other rights, title and interest in and to all such intellectual property. The Company will retain all proprietary rights to any and all such intellectual property. Employee agrees to execute any documents necessary to perfect the Company's interest in such intellectual property upon the Company's request.

(2)     Employee has been advised by this writing and understands that the foregoing provisions of Section 7(A)(1) do not apply to an item of intellectual property for which no equipment, supplies, facilities or Confidential Information of the Company was used and which was developed entirely on Employee's own time, unless: (a) the item of intellectual property relates to the business of the Company or to the Company's actual or demonstrably anticipated research and development; or (b) the item of intellectual property results from any work performed by Employee for the Company.

B.     Employee recognizes the highly sensitive nature of the Confidential Information he will be given (and to which he will have access throughout his employment) and acknowledges the Company's legitimate interest in safeguarding it from disclosure. Accordingly, in addition to the restrictions provided in Section 8 below, Employee agrees that:

(1)     after his employment with the Company is terminated, he will not directly or indirectly disclose, use or divulge Confidential Information that constitutes a trade secret of the Company or make use of it for his own purpose or the purpose of another; and

(2)     for a period of two (2) years following the termination of his employment with the Company, he will not divulge Confidential Information that does not constitute a trade secret of the Company or make use of it for his own purpose or the purpose of another.

(3)     not all of the Company's Confidential Information will rise to the level of a trade secret of the Company; even so, all Confidential Information will be entitled to the protections and restrictions provided in this Agreement.

C.     Employee understands and acknowledges that he will benefit significantly from having access to and being given Confidential Information. Employee agrees that but for his promise to safeguard Confidential Information and the further restrictive covenants contained in Section 8 below, the Company would not agree to provide Employee with Confidential Information. Further, Employee acknowledges that his breach of any restrictions provided in Section 8 below will inevitably and necessarily lead to the prohibited disclosure or use of Confidential Information.

**Section 8.**     **Protection of the Company's Protectable Interests.**

To protect the legitimate interests of the Company in, among other things, protecting its Confidential Information, employment relationships, relationships with Company accounts and goodwill, and in consideration for, among other things as provided in this Agreement, the Company's promise to give Employee certain Confidential Information, some of which constitutes trade secrets of the Company which Employee did not previously have, and to enforce Employee's promise not to disclose such Confidential Information, Employee agrees to the following restrictive covenants, which Employee acknowledges and agrees are reasonably necessary and narrowly tailored to protect the Company's legitimate business interests:

A. **In OKLAHOMA only:** Employee and the Company agree that during the period of time, if any, Employee is principally employed in OKLAHOMA, this subsection Section 8(A) will not be considered part of this Agreement and will be replaced in its entirety by the attached Schedule 1, which is incorporated by reference. Employee understands and acknowledges that the use of Schedule 1 is necessitated by the requirements and peculiarities of the laws of Oklahoma. Schedule 1 will apply only if it is attached hereto and initialed by the Company and Employee.

**In ALL OTHER STATES (excluding California):**

(1) For a period of two (2) years following the termination of Employee's employment with the Company for any reason whatsoever, Employee will not, directly or indirectly, solicit, transfer, place, market, accept, aid, counsel or consult in the placement, renewal, discontinuance or replacement of any insurance (including self-insurance) by, or handle self-insurance programs, insurance claims, risk management services, emergency or disaster prevention or management services, or other insurance administrative or service functions ("insurance services") or provide employee benefit brokerage, consulting, or administration services; in the area of group insurance, defined benefit and defined contribution pension plans, individual life, disability and capital accumulation products; investment advisory services, wealth management, or group retirement services; defined benefit and defined contribution pension services; human resources consulting services, including, without limitation, compensation consulting, compensation program design, compensation and benefits surveys, and on-site human resources management; and all other employee benefit areas the Company is involved with ("benefit services"), for: (x) any Account of the Company for which Employee performed any of the foregoing functions during any part of the two-year period immediately preceding such termination (referred to hereinafter as "Protected Accounts"), or (y) any Prospective Account of the Company (as defined below).

(2) The term "Account of the Company" as used in this paragraph will be construed broadly to include all users of insurance services or benefit services, including commercial and individual consumers, risk managers, carriers, agents and other insurance intermediaries who are customers of the Company on the date Employee's employment with the Company terminates, or an insurance carrier offering any custom program for which the Company acts as managing general agent, managing general underwriter, program manager or underwriting agent, regardless of how the relationship is documented or characterized.

(3) If an Account of the Company is part of a group of companies which conducts business through more than one entity, division or operating unit, whether or not separately incorporated (a "Client Group"), the term "Account of the Company" as used herein will include products or services within any entity, division or operating unit of the Client Group where the same management group within the Client Group has the primary decision making authority with respect to contracting for services of the type rendered by the Company. Notwithstanding anything herein to the contrary, the Employee will be free to call on the retail agents of the Company, so long as there is no contact or solicitation of any account, client, or Prospective Account of the Company.

B. For the purposes of the covenants set forth in Sections 7 and 8 of this Agreement, the parties acknowledge and agree that the following will apply:

(1) The term "Prospective Account" of the Company, means any entity (other than a then-current account of the Company but including former Company accounts) with respect to whom, at any time during the one year period preceding the termination of Employee's employment with the Company, Employee: (i) submitted or assisted in the submission of a presentation or proposal of any kind on behalf of the Company, (ii) had material contact or acquired Confidential Information as a result of or in connection with Employee's employment with the Company, or (iii) incurred travel and/or entertainment expenses which were reimbursed by the Company to Employee; but the term Prospective Account does not include an account that is a customer of Employee's new employer (for the same type of insurance and/or benefits services for which such customer was a Prospective Account of the Company) at the time of termination of Employee's employment with the Company.

(2) "Direct or indirect solicitation" of a Protected Account or Prospective Account

will expressly include, but not be limited to, the following (which is not intended to be an exhaustive list of direct or indirect solicitation, but is meant to provide examples of certain reasonably anticipated scenarios):

(a)     The sending of an announcement by Employee or his new employer to any Protected Account or Prospective Account, the purpose of which is to communicate that Employee has either formed his own business enterprise or joined an existing business enterprise that will offer products or services in any way competitive with the Company.

(b)     Initiating a communication or contact by Employee or his new employer with any Protected Account or Prospective Account for the purpose of notifying such Protected Account or Prospective Account that Employee has either formed his own business enterprise or joined an existing business enterprise that will offer products or services in any way competitive with the Company.

(c)     Communication or contact by Employee or his new employer with any Protected Account or Prospective Account (if such new employer's communication with a Prospective Account was facilitated by Employee, directly or indirectly, or if Employee will or is intended to benefit, directly or indirectly, by such communication) if the communication in any way relates to insurance or benefits services; provided, however, nothing herein is intended to limit communications or contacts that are unrelated to insurance and/or benefits services.

(d)     The facilitation by Employee, directly or indirectly, of any Protected Accounts' execution of a broker of record letter replacing the Company as its broker of record.

C.     **In LOUISIANA only:** Employee and the Company agree that during the period of time, if any, Employee is principally employed in Louisiana, this Section 8(C) will not be considered part of this Agreement and will be replaced in its entirety by the attached Schedule 8, which is incorporated by reference. Employee understands and acknowledges that the use of Schedule 2 is necessitated by the requirements and peculiarities of the laws of Louisiana. Schedule 2 will apply only if it is attached and initialed by the Company and Employee.

**In ALL OTHER STATES:**

Employee understands and agrees that many of the accounts for which he will perform insurance and/or benefits services while employed by the Company are national accounts and that Employee will perform insurance and/or benefit services for Company accounts throughout the entire country. Employee agrees and acknowledges that the geographic scope relating to the restrictions provided in this Section 8 will include the entire United States and that since the post-employment restrictions herein provided are tied directly to Accounts of the Company for whom Employee performed insurance and/or benefit services during the two-year period immediately preceding termination of his employment and Prospective Accounts, this geographic limitation is reasonable. Moreover, Employee acknowledges and agrees that the restrictions contained in this Section 8 do not prohibit Employee from competing with the Company or performing insurance or benefits services for potential clients throughout the entire world except for Protected Accounts and Prospective Accounts, and that those restrictions are reasonable and narrowly tailored to further the Company's legitimate interest to protect its Confidential Information, account relationships, and goodwill, and such restrictions will not unduly burden Employee's ability to earn a living after his employment with the Company is terminated.

D.     If, within two (2) years of the termination of Employee's employment the Employee engages in, or joins a company or business enterprise engaged in, providing insurance and/or benefits services, then the Company may advise any Protected Account and/or Prospective Account of the existence and terms of this Agreement and may give them a copy of this Agreement.

E.     Employee recognizes that employees of the Company are a valuable resource of the Company. Accordingly, during Employee's employment with the Company, Employee will not, directly or indirectly solicit, induce, entice or recruit any employee of the Company to leave their employment with the Company. In addition, for a period of two (2) years following the termination of Employee's employment with the Company for any reason whatsoever, Employee will not directly or indirectly, solicit, induce or recruit any employee of the Company who has been provided Confidential Information to leave the employ of the Company.

Standard Employee Agreement – 1.17.14

**Section 9.**     **Assignment.**

Except as provided in Section 10, this Agreement will not be affected by any merger or consolidation or other reorganization of the Company and will be assignable to, binding upon, and will inure to the benefit of the continuing entity or to any successor in interest to the Company including, without limitation, any entity to which the Company sells business, assets and/or accounts of any branch, business unit or profit center in which Employee is primarily employed. This Agreement also will inure to the benefit of every affiliate company included in the definition of "Company" under this Agreement. The Company may assign this Agreement to any affiliate company of AJG in which case, except for purposes of Section 10 hereof, all references to "the Company" and all rights of the Company will include and inure to the benefit of that affiliate. Employee may not assign this Agreement or any obligations hereunder.

**Section 10.**     **Release of Certain Obligations.**

Notwithstanding anything herein to the contrary, the obligations of Employee stated in Section 8 will become null and void and have no further effect immediately upon a Hostile Change in Control of AJG as defined herein. The Company will send written notice to Employee within ten (10) days of a Hostile Change in Control of AJG, notifying Employee that such event has taken place. Failure of the Company to send such notice will not preclude the release of Employee from the obligations contained in Section 8. These definitions apply to Section 10:

A.     The term "Hostile Change in Control" means a transaction, event or election constituting a Change in Control which was not approved by or, in an election, the directors elected were not nominated by, at least two-thirds of the members of the Board of Directors of AJG in office immediately prior to the Change in Control who have not died or become permanently disabled.

B.     The term "Change in Control" of AJG means and includes each and all of the following occurrences:

(1)     A Business Combination, unless:

a)     the Business Combination is approved or authorized by the affirmative vote of the holders of not less than 80% of the outstanding shares of voting stock of AJG and the affirmative vote of the holders of not less than 67% of the outstanding shares of the voting stock held by shareholders other than Related Persons; or

b)     the Continuing Directors of AJG by a two-thirds vote: (i) have expressly approved in advance the acquisition of outstanding shares of voting stock of the corporation that caused the Related Person to become a Related Person; or (ii) have approved the Business Combination prior to the Related Person involved in the Business Combination having become a Related Person; or

c)     the Business Combination is solely between AJG and another corporation, 50% or more of the voting stock of which is owned by AJG and none of which is owned by the Related Person; or

d)     all of the following conditions are satisfied:

I.     The cash or fair market value of the property, securities or "other consideration to be received" per share by holders of common stock in AJG in the Business Combination is not less than the higher of:

i)     the highest per share price (including brokerage commissions, transfer taxes and soliciting dealers' fees) paid by the Related Person in acquiring any of its holdings of AJG's common stock, or

ii)     an amount that bears that same percentage relationship to the market price of AJG's common stock immediately prior to the announcement of such Business Combination as the highest per share price determined in i) above bears to the market price of AJG's common stock immediately prior to the commencement of the acquisition of AJG's voting stock that caused such Related Person to become a Related Person, or

iii)     an amount calculated by multiplying the earnings per share of AJG's common stock for the four fiscal quarters immediately preceding the record date for determination of stockholders entitled to vote on such Business Combination by the price/earnings

multiple of the Related Person as of the record date as customarily computed and reported in the financial press. Appropriate adjustments will be made with respect to these subsections i), ii) and iii) for recapitalizations and for stock splits, stock dividends, and like distributions; and

II.     A timely mailing will have been made to the stockholders of AJG showing in a prominent place: (x) any recommendations as to the advisability (or inadvisability) of the Business Combination that the Continuing Directors or Outside Directors may choose to state, if there are at the time any such directors; and (y) the opinion of a reputable nationally recognized investment banking or financial services firm as to the fairness from the financial point of view of the terms of the Business Combination to the stockholders of AJG other than the Related Person (such firm to be engaged solely on behalf of such other stockholders, to be paid a reasonable fee for its services by AJG upon receipt of such opinion, to be a firm that has not previously been significantly associated with the Related Person and, if there are at the time any such directors, to be selected by a majority of the Continuing Directors and Outside Directors).

(2)     The acquisition of outstanding shares of AJG's voting stock that causes an individual, a corporation, partnership or other person or entity to become a Related Person.

(3)     Individuals who at the beginning of any period of three consecutive years constitute the entire Board of Directors of the Company will for any reason other than death or permanent disability during such period cease to constitute a majority thereof.

(4)     A change in control of a nature that would be required to be reported in response to Item 6(e) of Schedule 14A of Regulation 14A promulgated under the Securities Act of 1934, as amended.

C.     The term "Business Combination" will mean: (i) any merger or consolidation of AJG with or into a Related Person; (ii) any sale, lease, exchange, transfer or other disposition, including without limitation a mortgage or any other security device, of all or any Substantial Part of the assets of the Company to a Related Person; (iii) any merger or consolidation of a Related Person with or into AJG; (iv) any sale, lease, exchange, transfer or other disposition of all or any Substantial Part of the assets of a Related Person to the Company; (v) the issuance of any securities of the Company to a Related Person; (vi) the acquisition by the Company of any securities issued by a Related Person; (vii) any reclassification of securities, recapitalization or other transaction designed to decrease the number of holders of AJG's voting securities remaining, if there is a Related Person; and (viii) any agreement, contract or other arrangement providing for any of the transactions described in this definition of Business Combination.

D.     The term "Related Person" will mean and include any individual, corporation, partnership or other person or entity which, together with their "Affiliates" and "Associates" (as defined as of November 1, 1983, in Rule 12b-2 under the Securities Exchange Act of 1934), "Beneficially Owns" (as defined as of November 1, 1983, in Rule 13d-3 under the Securities Exchange Act of 1934) in the aggregate 20% or more of the outstanding shares of the voting stock of AJG, and any Affiliate or Associate of any such individual, corporation, partnership or other person or entity; provided that Related Person will not include any person who beneficially owned 20% or more of the outstanding shares of the voting stock of AJG on November 1, 1983. Without limitation, any shares of voting stock of AJG that any Related Person has the right to acquire pursuant to any agreement, or upon exercise of conversion rights, warrants or options, or otherwise, will be deemed beneficially owned by the Related Person.

E.     The term "Substantial Part" will mean more than 30% of the fair market value of the total assets of the corporation in question, as of the end of its most recent fiscal year ending prior to the time the determination is being made.

F.     The term "other consideration to be received" will include, without limitation, capital stock of AJG retained by its existing public stockholders in the event of a Business Combination in which AJG is the surviving corporation.

G.     The term "Continuing Director" will mean a director who was a member of the board of directors of AJG immediately prior to the time that the Related Person involved in a Business Combination became a Related Person, and the term "Outside Director" will mean a director who is not: (a) an officer or employee of AJG or any relative of an officer or employee; or (b) a Related Person or an

officer, director, employee, Associate or Affiliate of a Related Person, or a relative of any of the foregoing.

**Section 11.** **General.**

A.      The captions in this Agreement are for reference only and have no independent force or effect. If a caption is inconsistent with any part of the Agreement, the caption will be disregarded.

B.      This Agreement will be governed by and construed in accordance with the laws of the State in which Employee resides, without giving effect to any of its conflict of law principles. The parties agree that the chosen state has a material and significant interest in questions concerning this Agreement and performance thereunder. The parties agree that the sole and exclusive venue of any dispute between the parties with respect to this Agreement, or any matters related thereto, will be a state trial or federal district court located within the federal judicial district in which Employee resides ("Chosen Venue"). Employee agrees that it is neither unfair nor unreasonable for the Chosen Venue to be selected as the exclusive venue for any dispute between the parties with respect to this Agreement or any matter related thereto and that he will suffer no undue burden by having to litigate any such disputes in the Chosen Venue. Moreover, Employee promises not to initiate suit against the Company in any venue other than the above-selected exclusive Chosen Venue with respect to any dispute between the parties relating to this Agreement. Employee waives and agrees not to interpose any argument that the Chosen Venue is an inconvenient forum for litigation.

C.      Waiver of Jury Trial. Because of the time and expense involved in the docketing of, preparation for and participation in a jury trial, the parties desire that any dispute arising hereunder will be decided by a judge rather than a jury. Therefore, the parties hereby knowingly, voluntarily and intentionally waive the right either may have to a trial by jury in respect to any litigation based on this Agreement or arising out of, under or in conjunction with Employee's employment by the Company, this Agreement, or any course of conduct, course of dealing, verbal or written statement or the actions of either party.

D.      If Employee is an existing employee of the Company as of the Effective Date and is subject to any existing employment agreement with the Company, whether an Executive Agreement, Associate Agreement, or otherwise (collectively "Existing Employee Agreement"), this Agreement will be considered an Amended and Restated Employee Agreement of such Existing Employee Agreement. If Employee is an employee of a business enterprise acquired or to be acquired by the Company as of the Effective Date, (the "Acquired Business"), then (i) this Agreement will be considered an Amended and Restated Employment Agreement if Employee is subject to any existing employment agreement with the Acquired Business and Employee's employment agreement with the Acquired Business is assigned to the Company and (ii) the term the "Company" shall be deemed to include the Acquired Business.

E.      This Agreement contains the entire agreement of the parties with respect to the subject matters covered hereby. The parties agree that all prior negotiations and communications are of no force or effect. Further, the parties agree that there are no oral agreements, understandings, undertakings or promises of the parties relating to the subject matters covered by this Agreement.

F.      Subject to Section 11(G) below, this Agreement may not be amended, altered or modified without the prior written consent of both parties, and such instrument will acknowledge that it is an amendment or modification of this Agreement. Waiver of any term or condition of this Agreement will not be construed as a waiver of any subsequent breach or failure of the same term or condition, or any other term or condition. Any waiver must be in writing. No amendment, alteration, modification or waiver may be signed by Employee on behalf of the Company, its assignees, successors or assigns.

G.      To the extent that any of the terms set forth in this Agreement or any word, phrase, clause or sentence is found to be illegal or unenforceable for any reason, it is the intention of the parties that such word, phrase, clause or sentence will be modified or deleted by a court of competent jurisdiction so as to afford the Company the fullest protection commensurate with making this Agreement, as modified, legal and enforceable under applicable laws, and the balance of this Agreement will not be affected thereby, the balance being construed as severable and independent.

H.    All notices given hereunder will be in writing and will be sent by registered or certified mail or delivered by hand and, if intended for the Company, addressed to it or delivered to its principal office to the attention of the Secretary of the Company. If intended for Employee, notices will be delivered personally or addressed (if sent by mail) to Employee's then current residence address as shown on the Company's records, or to such other address as Employee directs in a written notice to the Company. All notices will be deemed to be given on the date received at the address of the addressee or, if delivered personally, on the date delivered.

I.    The use of male pronouns throughout this Agreement includes the female gender. The words "including" or "include" are not to be interpreted as terms of limitation or exclusion, but rather of illustration.

J.    This Agreement may be executed in counterparts, each of which is deemed an original.

**IN WITNESS WHEREOF,** the parties hereto have executed this Agreement as of the day and year provided below their respective signatures. The parties agree that the Effective Date of this Agreement will be 11/13/14, 8:00 AM_____.

**ARTHUR J. GALLAGHER & CO.,**
on behalf of itself and its subsidiaries, divisions and affiliated and related companies

By: _____
Corporate Officer Signature – Itasca

Assistant Secretary & Senior Counsel_____
Title

11/13/14, 8:00 AM
_____
Date

**EMPLOYEE**

_Kristen Long_
_____
Employee E-Signature

Kristen Long
_____
Printed Name

11/5/14
_____
Date:

FOR HUMAN RESOURCES USE ONLY:

Employee ID:__15175_____

Standard Employee Agreement – 1.17.14

## Schedule 1

**The following provision will replace Section 8(A) in its entirety:**

For a period of two (2) years following the termination of Employee's employment with the Company for any reason whatsoever, Employee will not, directly or indirectly, solicit any Protected Accounts or Prospective Accounts of the Company (as such accounts are defined above) for the purpose of providing Insurance Services or Benefit Services. "Insurance Services" is defined as the sale, placing, marketing, counseling or consulting in the placement, renewal, discontinuance or replacement of any insurance (including self-insurance) or handling self-insurance programs, insurance claims, risk management services, emergency or disaster prevention or management services or other insurance administrative service functions. "Benefit Services" is defined as providing employee benefit brokerage, consulting, or administrative services, in the area of group insurance, defined benefit and defined contribution pension plans, human resources and staffing services, individual life, disability and capital accumulation products, and all other employee benefit areas. "Protected Accounts" mean any and all accounts of the Company for which Employee performed any Insurance or Benefit Services during any part of the two-year period immediately preceding termination of Employee's employment with the Company. The term "Account of the Company" as used in this paragraph will be construed broadly to include all users of insurance or benefit services including commercial and individual consumers, risk managers, carriers, agents and other insurance intermediaries who are customers of the Company on the date Employee's employment with the Company terminates. If an Account of the Company is part of a group of companies which conducts business through more than one entity, division or operating unit, whether or not separately incorporated (a "Client Group"), the term "Account of the Company" as used herein will include products or services within any entity, division or operating unit of the Client Group where the same management group in the Client Group has the primary decision making authority to contract for services of the type rendered by the Company.


_____          _____
Employee Signature                               Hiring Manager Signature & Date


**Do not sign this schedule unless the employee is to be principally employed in Oklahoma.**

**Schedule 2**
**The following provision will replace Section 8(C) in its entirety:**
        The obligations set forth in Section 8 above will be effective in the parishes specifically
designated on this Schedule 2, and in which the Company carries on the business of providing insurance
services and/or benefit services. The parties agree that this Schedule 2 may be amended and modified
upon written acknowledgment of the Employee and the Company without the need to modify or amend
any other provision of this Agreement. (Please fully circle designated parishes.) PARISHES LISTED BELOW

| | | | |
|---|---|---|---|
| Abbeville | Acadia | Allen | Ascension |
| Assumption | Avoyelles | Beauregard | Bienville |
| Bossier | Caddo | Calcasieu | Caldwell |
| Cameron | Catahoula | Claiborne | Concordia |
| De Soto | East Baton Rouge | East Carroll | East Feliciana |
| Evangeline | Franklin | Grant | Iberia |
| Iberville | Jackson | Jefferson Davis | Jefferson |
| La Salle | Lafayette | Lafourche | Lincoln |
| Livingston | Madison | Morehouse | Natchitoches |
| Orleans | Ouachita | Plaquemines | Pointe |
| Rapides | Red River | Richland | Sabine |
| Saint Bernard | Saint Charles | Saint Helena | Saint James |
| St. John the Baptist | Saint Landry | Saint Martin | Saint Mary |
| Saint Tammany | Tangipahoa | Tensas | Terrebonne |
| Union | Vermilion | Vernon | Washington |
| Webster | West Baton Rouge | West Carroll | West Feliciana |
| Winn | | | |

_____        _____
Employee Signature                                  Hiring Manager Signature  & Date

        **Do not complete this schedule unless the employee is to be principally employed in Louisiana.**

# Exhibit H2

Revised 03.15.2021
Std. Emp. Agmt.
Not for use in California

## EMPLOYEE AGREEMENT

This Employee Agreement ("Agreement") is made and entered into as of the Effective Date (as defined below) by and between <u>Sara Arnold</u> (hereinafter referred to as "Employee") and Arthur J. Gallagher & Co., a Delaware corporation with its principal place of business in Rolling Meadows, Illinois and its subsidiaries, divisions and affiliated and related companies (hereinafter referred to collectively as "AJG" or the "Company").

## RECITALS

**WHEREAS**, Employee has been hired, or is being retained, as a valued key employee who with the execution of this Agreement will be provided and will continue to be provided during his employment with valuable confidential and proprietary and trade secret information of the Company and will have significant managerial, production, administrative, technical and/or account servicing responsibilities; and

**WHEREAS**, the parties hereto acknowledge that the Company has a legitimate interest in retaining the services of Employee and accepting the covenants herein provided in order to protect its confidential and proprietary and trade secret information and to preserve the Company's goodwill, customer relationships, employment relationships and value of the business to be handled by Employee as an employee of the Company;

**NOW THEREFORE**, in consideration of these recitals and the mutual covenants and promises set forth below, and for other good and valuable consideration including, but not limited to, employment with the Company, receipt of the compensation and benefits attendant to such employment, receipt and the ability to utilize the Company's confidential, proprietary and trade secret information, and/or being provided or allowed access to and contact with certain Company accounts, all of which the parties acknowledge as sufficient consideration for this Agreement, the parties agree as follows:

**Section 1.**     Employment

The Company agrees to employ Employee and Employee agrees to serve the Company and perform the duties set forth below beginning on the Effective Date and continuing thereafter until employment is terminated by either party. The Employee's employment is "at will" and is terminable by either party as provided below (except in jurisdictions where "at will" employment is not recognized). The Employee's continued employment with the Company is subject to the terms and conditions of this Agreement.

**Section 2.**     Duties

A.     Employee agrees to devote his full energies, abilities, attention and business time to the performance of his employment obligations and responsibilities. Employee agrees that he will not engage in any activity which conflicts or interferes with, or in any way compromises, his performance of those obligations and responsibilities. Employee will comply with all applicable Company policies and procedures. Employee will not, either during or outside normal business hours, directly or indirectly sell, solicit, service, manage or engage in any aspect of the insurance,

Revised 03.15.2021
Std. Emp. Agmt.
Not for use in California

benefits or wealth management businesses for or on behalf of any person or entity other than the Company, nor engage in any activity that is not in the best interests of the Company.

        B.     Employee recognizes that, by virtue of his employment by the Company and to assist him in the solicitation, production, management, and/or servicing of accounts, he will be provided and granted otherwise prohibited access to certain confidential and proprietary data and trade secret information of the Company which is not known either to its competitors or within the industry generally and which has independent economic value to the Company, and is subject to reasonable efforts that are reasonable under the circumstances to maintain its secrecy. This information (collectively hereinafter "Confidential Information") may include, but is not limited to: data relating to the Company's unique marketing and servicing programs, procedures and techniques; investment, wealth management and retirement plan consulting, variable annuities, and fund investment business and related products and services; underwriting criteria for general programs; business, management and human resources/personnel strategies and practices; the criteria and formulae used by the Company in pricing its insurance and benefits products and claims management, loss control and information management services; the structure and pricing of special insurance packages negotiated with underwriters; highly sensitive information about the Company's agreements and relationships with underwriters; sales data contained in various tools and resources (including, without limitation, Salesforce.com); lists of prospects; the identity, authority and responsibilities of key contacts at Company accounts and prospects; the composition and organization of Company accounts' businesses; the peculiar risks inherent in the operations of Company accounts; highly sensitive details concerning the structure, conditions and extent of existing insurance coverages of Company accounts; policy expiration dates, premium amounts and commission rates relating to Company accounts; risk management service arrangements relating to Company accounts; loss histories relating to Company accounts; candidate and placement lists relating to Company accounts; the Company's personnel and payroll data including details of salary, bonus, commission and other compensation arrangements; and other data showing the particularized insurance or consulting requirements and preferences of Company accounts. Employee understands that his job duties may include assisting in the development of information and data that is Confidential Information belonging to the Company. Confidential Information may be stored in files, documents, dailies, daily reports, renewal information, customer lists, accounting records, products purchased by customers, customer account and credit data, referral sources, computer programs and software, customer comments, Company written manuals and marketing and financial analysis, plans, research and programs. Employee recognizes that this Confidential Information constitutes valuable property of the Company, developed over a long period of time and at substantial expense and that the Company takes reasonable efforts to keep this Confidential Information confidential and made available only to those employees who need access to such Confidential Information to perform their job functions for the Company. Employee promises to safeguard such Confidential Information, and agrees that he will not, at any time during his employment by the Company, divulge such Confidential Information or make use of it for his own purposes or the purposes of another.

        **Notwithstanding this Section 2, or the generality of any prohibition relating to Confidential Information appearing in this Agreement, Employee acknowledges the following important exceptions under state or federal law:**

        **1.     Employee is not prohibited from reporting possible violations of federal**

Revised 03.15.2021
Std. Emp. Agmt.
Not for use in California

law or regulation to any governmental agency or entity including, without limitation, the Department of Justice, the Securities and Exchange Commission, the Congress, and any agency Inspector General, or making other disclosures that are protected under the whistleblower provisions of federal law or regulation.

2.    **The Federal Defend Trade Secrets Act of 2016 provides the following:**

IMMUNITY FROM LIABILITY FOR CONFIDENTIAL DISCLOSURE OF A TRADE SECRET TO THE GOVERNMENT OR IN A COURT FILING.

(1)    IMMUNITY. An individual shall not be held criminally or civilly liable under any Federal or State trade secret law for the disclosure of a trade secret that:

    (A)    is made

        (i)    in confidence to a Federal, State, or local government official, either directly or indirectly, or to an attorney; and

        (ii)    solely for the purpose of reporting or investigating a suspected violation of law; or

    (B)    is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal.

(2)    USE OF TRADE SECRET INFORMATION IN ANTIRETALIATION LAWSUIT. An individual who files a lawsuit for retaliation by an employer for reporting a suspected violation of law may disclose the trade secret to the attorney of the individual and use the trade secret information in the court proceeding, if the individual:

    (A)    files any document containing the trade secret under seal; and

    (B)    does not disclose the trade secret, except pursuant to court order.

C.    The Company agrees that, during Employee's employment with the Company, it will: (i) provide Employee with certain Confidential Information the Employee did not previously possess including, without limitation, Confidential Information relating to certain of the Company's accounts; (ii) provide Employee with information and access to the Company's proprietary insurance and risk management programs; (iii) provide Employee with access to the Company's specialized business operations relating to particular aspects of the insurance agency and risk management business; (iv) maintain specialized training programs to which Employee will qualify and apply; and (v) provide such other assistance which may reasonably aid Employee in performing sales, management, technical and/or servicing duties.

D.    Employee acknowledges and understands that an essential element of the Company's business is the development and maintenance of personal contacts and relationships with its accounts, and that Employee may be provided and allowed access to certain of the Company's accounts for the purpose of establishing personal contact and relationships with such accounts for the benefit of the Company. The Employee acknowledges that the Company invests considerable time, money, and resources necessary to develop and maintain a relationship

Revised 03.15.2021
Std. Emp. Agmt.
Not for use in California

between its employees and a client, and in that regard, the Company will pay Employee's salary, reimburse reasonably necessary business expenses, provide Employee with certain Confidential Information, and provide the resources necessary to service the Company accounts managed or serviced by Employee by making available legal advice, accounting support, advertising and other corporate services. Moreover, while the Employee recognizes that some Company accounts may develop greater identification with the Employee than the Company itself, those accounts remain, at all times and for all purposes, accounts of the Company. By entering this Agreement, Employee disclaims any interest in such Company accounts.

**Section 3.**     Compensation and Benefits

Employee will be entitled to the compensation and benefits agreed to by Employee and the Company and as noted from time to time in Employee's official personnel file and records retained in the Company's corporate headquarters, which file is incorporated by reference herein to the extent necessary for evidencing the compensation and benefits to which Employee and the Company have agreed. The compensation and benefits to which Employee is entitled as of the Effective Date is noted in Employee's official personnel file. Employee's compensation and benefits is subject to periodic change at the Company's discretion.

**Section 4.**     Representations

Employee represents and warrants to the Company that:

A.     Employee is not, and will not become, a party to any agreement, contract, arrangement or understanding, whether of employment or otherwise, that would in any way restrict him from undertaking or performing his duties in accordance with this Agreement or that limits his ability to be employed by the Company under this Agreement;

B.     Employment by the Company will not violate the terms of any policy of any prior employer of Employee regarding competition, solicitation or confidentiality;

C.     Employment by the Company in the position contemplated by this Agreement will not require him to improperly use any trade secrets or confidential or proprietary information of any prior employer, or any other person or entity for whom he has performed services;

D.     Employee has not misused, and will not misuse, any confidential or proprietary information obtained from any prior employer or any other person or entity;

E.     Employee has not improperly taken or retained in any form whatsoever, or otherwise retained access to, any confidential or proprietary information of any prior employer or any other person or entity; and

F.     Employee is in compliance with any non-competition and/or non-solicitation agreements, or other restrictive covenant obligations in place between him and any former employer and will continue to be in compliance, regardless of whether he believes such agreements and/or restrictive covenants are enforceable or not.

G.     Employee was provided a reasonable period of time, not less than fourteen (14) days, to review and consider this Agreement prior to signing it and accepting employment with the Company. If Employee elects to sign this Agreement sooner than fourteen (14) days prior to the commencement of employment, he represents and acknowledges that he chose to do so

Revised 03.15.2021
Std. Emp. Agmt.
Not for use in California

voluntarily.

H.    Employee gives the Company consent to record, videotape and photograph Employee's image and/or voice to be used for any internal or external business use (including but not limited to the Company's intranet accessible to all employees; on www.ajg.com or any related or affiliated website or social media; in printed or online newsletters, articles, internal or client promotional materials or other business communication; or the Company's annual and periodic reporting documents). Employee acknowledges that no special compensation will be to Employee for such consent or use and that while the Company will take reasonable efforts to do so, Employee may not be informed in advance of any such specific use.

**Section 5.**    Termination of Employment Relationship

A.    The Company or the Employee may terminate Employee's employment at any time and for any reason upon twenty-one (21) days' written notice (the "Notice Period") by the party wishing to terminate the employment; provided, however, that notice is not required from the Company for any termination taking place: (1) during the Employee's first ninety (90) days of employment (or other applicable Introductory Period pursuant to Company policy); (2) during the pendency of any Performance Improvement Plan issued pursuant to the Company's performance management policies; or (3) as a result of Employee's commission of any act that would result in immediate termination under the Company's Performance Improvement and Management policies then in effect.

B.    The Company agrees to continue during the Notice Period the same compensation and benefits Employee was receiving prior to the Notice Period. Alternatively, where termination is initiated by the Company, the Company may elect to terminate employment immediately and provide Employee, in lieu of the Notice Period, a lump sum payment equivalent to Employee's base pay for the Notice Period. The parties agree that once the Notice Period expires, the Employee's entitlement to compensation and benefits ends.

C.    Employee agrees that during the Notice Period, he will cooperate fully with the Company in all matters relating to the winding up of any pending work and/or the orderly transfer to other Company employees of the accounts for which he has been responsible. Employee specifically covenants that during the Notice Period (regardless of whether or not active employment responsibilities are continuing) his duties to the Company, including Employee's fiduciary duty of loyalty, will continue in effect. Prior to the expiration of the Notice Period, Employee promises to return to the Company all originals and copies (whether paper, digital copies or otherwise) of literature, correspondence, memoranda, reports, summaries, manuals, proposals, contracts and other documents of any kind which relate in any way to the business of the Company, including specifically all materials which comprise or refer to the Company's Confidential Information. The Employee covenants that he will not retain any copy, facsimile or note intended to memorialize any such data. Employee further understands and agrees that, during or at the expiration of the Notice Period, and as part of his assigned job duties, he will reasonably participate in any meeting the Company may convene to: (i) review the status of any projects or work Employee has been assigned; (ii) review the status of accounts for which Employee has been most recently responsible or associated; (iii) ensure that Employee has fully obtained his entitlements under this Agreement and as provided by law; and/or (iv) confirm that Employee understands the nature and scope of his post-employment obligations.

D.    Upon the termination of Employee's employment for any reason, Employee agrees

Revised 03.15.2021
Std. Emp. Agmt.
Not for use in California

that the Secretary of the Company may, as an irrevocable proxy and in Employee's name and stead, execute all documents and things which the Company deems necessary and desirable to effect Employee's resignation as an officer or director of any company (if applicable) included within the definition of the Company as used in this Agreement.

      E.      Before accepting any new employment in the insurance, benefits or wealth management industries, Employee promises to give his prospective new employer a copy of this Agreement. Employee permits the Company to advise any prospective new employer of Employee of the existence and terms of this Agreement and to provide it with a copy.

      F.      During employment and after the termination of same Employee agrees to remain available to the Company and its legal counsel, voluntarily upon the Company's request and without the necessity of subpoena or court order, in connection with the Company's investigation, preparation, prosecution and/or defense of any actual or potential legal proceeding, regulatory action, or internal matter. The Employee agrees to cooperate with the Company, to provide any information reasonably within his recollection and to provide truthful testimony as required. If Employee is called upon to provide cooperation after employment has been terminated, the Company will reimburse Employee for reasonable out-of-pocket expenses actually incurred under this section or, at the Company's option, will advance Employee's reasonable expenses or incur them directly.

      G.      Employee agrees that while he is employed by the Company, and following the termination of his employment, he will not make any false, defamatory or disparaging statements about the Company, its officers or directors where such statements are calculated to, or reasonably likely to cause material damage to the Company, its officers or directors.

**Section 6.**      The Company's Right to Injunctive Relief; Attorneys' Fees

      The Employee acknowledges that his services to the Company are of a unique character which gives them a special value to the Company, the loss of which cannot reasonably or adequately be compensated in damages in an action at law should the Employee breach, or threaten to breach, any post-employment obligations under this Agreement. The Employee realizes that: (a) it would be difficult to measure precisely the damages to the Company from any breach by Employee of Sections 7 and/or 8 of this Agreement; (b) injury to the Company from any such breach would be incalculable and irremediable; and (c) money damages would therefore be an inadequate remedy for any such breach. Accordingly, in addition to any other remedy the Company may have at law or in equity, the Company will be entitled to enforce this Agreement by obtaining a temporary restraining order and preliminary and permanent injunctive relief to restrain any such breach or further breach by Employee. Employee expressly waives the right to contest whether a breach of Section 7 or 8 of this Agreement would result in irreparable or permanent harm to the Company. In addition, Employee agrees that the Company may seek injunctive relief when and if it elects to do so and any delay in seeking injunctive relief will not prejudice or waive the Company's right to do so. Employee expressly waives the right to assert that the Company is not entitled to injunctive relief because of any delay in seeking such relief. Employee agrees that he will be responsible for and pay the Company its reasonable attorneys' fees and other expenses and costs incurred to enforce this Agreement if the Company is the prevailing party. Employee further agrees that if Employee breaches any covenant contained in Sections 7 and/or 8 of this Agreement, the Company will be entitled, in addition to all other legal or equitable remedies it may have, to offset and withhold against any such loss, cost, liability or expense any amount of any kind that may then be owing or payable by Company to Employee.

Revised 03.15.2021
Std. Emp. Agmt.
Not for use in California

**Section 7.**     Trade Secrets and Confidential Information

      A.     Employee acknowledges that the Company's business depends to a great degree upon having information which is not generally known to others, and that the profitability of the Company's business requires that this information be kept confidential and proprietary within the Company. Accordingly:

      (1)     Employee agrees that all intellectual property, such as computer programs, systems or software, developed during his employment or as a result of his employment is "work for hire" performed by Employee in the scope of his employment. To the extent that any such intellectual property is determined not to constitute "work for hire," or if any rights in any such intellectual property do not accrue to the Company as a "work for hire," Employee's signature on this Agreement constitutes an assignment (without any further consideration) to the Company of any and all copyrights and other rights, title and interest in and to all such intellectual property. The Company will retain all proprietary rights to any and all such intellectual property. Employee agrees to execute any documents necessary to perfect the Company's interest in such intellectual property upon the Company's request.

      (2)     Employee has been advised by this writing and understands that the foregoing provisions of Section 7(A)(1) do not apply to an item of intellectual property for which no equipment, supplies, facilities or Confidential Information of the Company was used and which was developed entirely on Employee's own time, unless: (a) the item of intellectual property relates to the business of the Company or to the Company's actual or demonstrably anticipated research and development; or (b) the item of intellectual property results from any work performed by Employee for the Company.

      B.     Employee recognizes the highly sensitive nature of the Confidential Information he will be given (and to which he will have access throughout his employment) and acknowledges the Company's legitimate interest in safeguarding it from disclosure. Accordingly, in addition to the restrictions provided in Section 8 below, Employee agrees that:

      (1)     after his employment with the Company is terminated, he will not directly or indirectly disclose, use or divulge Confidential Information that constitutes a trade secret of the Company or make use of it for his own purpose or the purpose of another; and

      (2)     for a period of two (2) years following the termination of his employment with the Company, he will not divulge Confidential Information that does not constitute a trade secret of the Company or make use of it for his own purpose or the purpose of another.

      (3)     not all of the Company's Confidential Information will rise to the level of a trade secret of the Company; even so, all Confidential Information will be entitled to the protections and restrictions provided in this Agreement.

Revised 03.15.2021
Std. Emp. Agmt.
Not for use in California

C.    Employee understands and acknowledges that he will benefit significantly from having access to and being given Confidential Information. Employee agrees that but for his promise to safeguard Confidential Information and the further restrictive covenants contained in Section 8 below, the Company would not agree to provide Employee with Confidential Information. Further, Employee acknowledges that his breach of any restrictions provided in Section 8 below will inevitably and necessarily lead to the prohibited disclosure or use of Confidential Information.

**D.    Notwithstanding the generality of the foregoing restrictions in this Section 7, employee acknowledges having reviewed the federal Defend Trade Secrets Act notice appearing in Section 2, above.**

**Section 8.**    <u>Protection of the Company's Protectable Interests</u>

A.    To protect the legitimate interests of the Company in, among other things, protecting its Confidential Information, employment relationships, relationships with Company accounts and goodwill, and in consideration for, among other things as provided in this Agreement, the Company's promise to give Employee certain Confidential Information, some of which constitutes trade secrets of the Company which Employee did not previously have, and to enforce Employee's promise not to disclose such Confidential Information, Employee agrees to the following restrictive covenants, which Employee acknowledges and agrees are reasonably necessary and narrowly tailored to protect the Company's legitimate business interests:

(1)    For a period of twenty-four (24) months [or, if Employee is principally employed in **OREGON** or **ALABAMA**, for a period of eighteen (18) months] following the termination of Employee's employment with the Company for any reason whatsoever Employee will not, directly or indirectly, solicit, transfer, place, market, accept, aid, counsel or consult in the placement, renewal, discontinuance or replacement of any insurance (including self-insurance) by, or handle self-insurance programs, insurance claims, risk management services, emergency or disaster prevention or management services, or other insurance administrative or service functions ("insurance services") or provide employee benefit brokerage, consulting, or administration services; in the area of group insurance, defined benefit and defined contribution pension plans, individual life, disability and capital accumulation products; investment advisory services, wealth management, or group retirement services; defined benefit and defined contribution pension services; human resources consulting services, including, without limitation, compensation consulting, compensation program design, compensation and benefits surveys, and on-site human resources management; and all other employee benefit areas the Company is involved with ("benefit services"), for: (x) any Account of the Company for which Employee performed any of the foregoing functions during any part of the two-year period immediately preceding such termination (referred to hereinafter as "Protected Accounts"), or (y) any Prospective Account of the Company (as defined below).

(2)    **<u>For UTAH Employees Only.</u>** Employee and Company agree that this paragraph (A)(2) is necessary given the uniqueness of Utah law, and it will apply only for such period of time, if any, Employee is principally employed in **Utah** during which time the following activity restrictions will be substituted for those stated in the foregoing paragraph (A)(1):

Revised 03.15.2021
Std. Emp. Agmt.
Not for use in California

(a)    for a period of one (1) year following the termination of Employee's employment with the Company for any reason whatsoever, provide, service, transfer, place, market, accept, aid, counsel or consult in the placement, renewal, discontinuance or replacement of any insurance services or benefit services for any Protected Accounts (as defined above) or any Prospective Account of the Company (as defined below); and

(b)    for a period of two (2) years following the termination of Employee's employment with the Company for any reason whatsoever, directly or indirectly solicit any insurance services or benefit services for any Protected Accounts (as defined above) or any Prospective Account of the Company (as defined below).

(3)    **For OKLAHOMA Employees Only.** Employee and Company agree that this paragraph (A)(3) is necessary given the uniqueness of Oklahoma law, and it will apply only for such period of time, if any, Employee is principally employed in **Oklahoma** during which time the following activity restrictions will be substituted for those stated in the foregoing paragraph (A)(1): For a period of two (2) years following the termination of Employee's employment with the Company for any reason whatsoever, Employee will not engage in any act of solicitation with respect to any Protected Accounts (as defined above) which are established customers of the Company for the purpose of providing insurance services or benefit services.

(4)    **For LOUISIANA Employees Only.** Employee and Company agree that this paragraph (A)(4) is necessary given the uniqueness of Louisiana law, and it will apply only for such period of time, if any, Employee is principally employed in **Louisiana** during which time the activity restrictions stated in the foregoing paragraph (A)(1) will apply only to activity undertaken by Employee in the following designated parishes, counties, municipalities or territories:

**(Please reference Schedule A)**

(5)    The term "Account of the Company" as used in this paragraph will be construed broadly to include all users of insurance services or benefit services, including commercial and individual consumers, risk managers, carriers, agents and other insurance intermediaries who are customers of the Company on the date Employee's employment with the Company terminates, or an insurance carrier offering any custom program for which the Company acts as managing general agent, managing general underwriter, program manager or underwriting agent, regardless of how the relationship is documented or characterized.

(6)    If an Account of the Company is part of a group of companies which conducts business through more than one entity, division or operating unit, whether or not separately incorporated (a "Client Group"), the term "Account of the Company" as used herein will include products or services within any entity, division or operating unit of the Client Group where the same management group within the Client Group has the primary decision making

Revised 03.15.2021
Std. Emp. Agmt.
Not for use in California

authority with respect to contracting for services of the type rendered by the Company. Notwithstanding anything herein to the contrary, the Employee will be free to call on the retail agents of the Company, so long as there is no contact or solicitation of any account, client, or Prospective Account of the Company.

B.  For the purposes of the covenants set forth in Sections 7 and 8 of this Agreement, the parties acknowledge and agree that the following will apply:

(1)  The term "Prospective Account" of the Company, means any entity (other than a then-current account of the Company but including former Company accounts) with respect to whom, at any time during the one year period preceding the termination of Employee's employment with the Company, Employee: (i) submitted or assisted in the submission of a presentation or proposal of any kind on behalf of the Company, (ii) had material contact or acquired Confidential Information as a result of or in connection with Employee's employment with the Company, or (iii) incurred travel and/or entertainment expenses which were reimbursed by the Company to Employee; but the term Prospective Account does not include an account that is a customer of Employee's new employer (for the same type of insurance and/or benefits services for which such customer was a Prospective Account of the Company) at the time of termination of Employee's employment with the Company.

(2)  "Direct or indirect solicitation" of a Protected Account or Prospective Account will expressly include, but not be limited to, the following (which is not intended to be an exhaustive list of direct or indirect solicitation, but is meant to provide examples of certain reasonably anticipated scenarios):

(a)  The sending of an announcement by Employee or his new employer to any Protected Account or Prospective Account, the purpose of which is to communicate that Employee has either formed his own business enterprise or joined an existing business enterprise that will offer products or services in any way competitive with the Company.

(b)  Initiating a communication or contact by Employee or his new employer with any Protected Account or Prospective Account for the purpose of notifying such Protected Account or Prospective Account that Employee has either formed his own business enterprise or joined an existing business enterprise that will offer products or services in any way competitive with the Company.

(c)  Communication or contact by Employee or his new employer with any Protected Account or Prospective Account (if such new employer's communication with a Prospective Account was facilitated by Employee, directly or indirectly, or if Employee will or is intended to benefit, directly or indirectly, by such communication) if the communication in any way relates to insurance or benefits services; provided, however, nothing herein is intended to limit communications or contacts that are unrelated to insurance and/or benefits services.

Revised 03.15.2021
Std. Emp. Agmt.
Not for use in California

(d)     The facilitation by Employee, directly or indirectly, of any Protected Accounts' execution of a broker of record letter replacing the Company as its broker of record.

C.     Except as otherwise noted above in subparagraph (A)(4), Employee understands and agrees that many of the accounts for which he will perform insurance and/or benefits services while employed by the Company are national accounts and that Employee will perform insurance and/or benefit services for Company accounts throughout the entire country. Employee agrees and acknowledges that the geographic scope relating to the restrictions provided in this Section 8 will include the entire United States and that since the post-employment restrictions herein provided are tied directly to Accounts of the Company for whom Employee performed insurance and/or benefit services during the two-year period immediately preceding termination of his employment and Prospective Accounts, this geographic limitation is reasonable. Moreover, Employee acknowledges and agrees that the applicable restrictions contained throughout this Section 8 do not prohibit Employee from competing generally with the Company or performing insurance services or benefits services for potential clients throughout the entire world except for Protected Accounts and Prospective Accounts, and that those restrictions are reasonable and narrowly tailored to further the Company's legitimate interest to protect its Confidential Information, account relationships, and goodwill, and such restrictions will not unduly burden Employee's ability to earn a living after his employment with the Company is terminated.

D.     If, within two (2) years of the termination of Employee's employment the Employee engages in, or joins a company or business enterprise engaged in, providing insurance and/or benefits services, then the Company may advise any Protected Account and/or Prospective Account of the existence and terms of this Agreement and may give them a copy of this Agreement.

E.     Employee recognizes that employees of the Company are a valuable resource of the Company. Accordingly, during Employee's employment with the Company, Employee will not, directly or indirectly solicit, induce, entice or recruit any employee of the Company to leave their employment with the Company. In addition, for a period of two (2) years following the termination of Employee's employment with the Company for any reason whatsoever, Employee will not directly or indirectly, solicit, induce or recruit any employee of the Company who has been provided Confidential Information to leave the employ of the Company.

## Section 9.     Assignment

Except as provided in Section 10, this Agreement will not be affected by any merger or consolidation or other reorganization of the Company and will be assignable to, binding upon, and will inure to the benefit of the continuing entity or to any successor in interest to the Company including, without limitation, any entity to which the Company sells business, assets and/or accounts of any branch, business unit or profit center in which Employee is primarily employed. This Agreement also will inure to the benefit of every affiliate company included in the definition of "Company" under this Agreement. The Company may assign this Agreement to any affiliate company of AJG in which case, except for purposes of Section 10 hereof, all references to "the Company" and all rights of the Company will include and inure to the benefit of that affiliate. Employee may not assign this Agreement or any obligations hereunder.

## Section 10.     Release of Certain Obligations

Notwithstanding anything herein to the contrary, the obligations of Employee stated in

Revised 03.15.2021
Std. Emp. Agmt.
Not for use in California

Section 8 will become null and void and have no further effect immediately upon a Hostile Change in Control of AJG as defined herein. The Company will send written notice to Employee within ten (10) days of a Hostile Change in Control of AJG, notifying Employee that such event has taken place. Failure of the Company to send such notice will not preclude the release of Employee from the obligations contained in Section 8. These definitions apply to Section 10:

A.      The term "<u>Hostile Change in Control</u>" means a transaction, event or election constituting a Change in Control which was not approved by or, in an election, the directors elected were not nominated by, at least two-thirds of the members of the Board of Directors of AJG in office immediately prior to the Change in Control who have not died or become permanently disabled.

B.      The term "<u>Change in Control</u>" of AJG means and includes each and all of the following occurrences:

(1)      A Business Combination, unless:

(a)      the Business Combination is approved or authorized by the affirmative vote of the holders of not less than 80% of the outstanding shares of voting stock of AJG and the affirmative vote of the holders of not less than 67% of the outstanding shares of the voting stock held by shareholders other than Related Persons; or

(b)      the Continuing Directors of AJG by a two-thirds vote: (i) have expressly approved in advance the acquisition of outstanding shares of voting stock of the corporation that caused the Related Person to become a Related Person; or (ii) have approved the Business Combination prior to the Related Person involved in the Business Combination having become a Related Person; or

(c)      the Business Combination is solely between AJG and another corporation, 50% or more of the voting stock of which is owned by AJG and none of which is owned by the Related Person; or

(d)      all of the following conditions are satisfied:

i.      The cash or fair market value of the property, securities or "other consideration to be received" per share by holders of common stock in AJG in the Business Combination is not less than the higher of:

(A)      the highest per share price (including brokerage commissions, transfer taxes and soliciting dealers' fees) paid by the Related Person in acquiring any of its holdings of AJG's common stock, or

(B)      an amount that bears that same percentage relationship to the market price of AJG's common stock immediately prior to the announcement of such Business Combination as the highest per share price determined in (A) above bears to the market price of AJG's common stock

Revised 03.15.2021
Std. Emp. Agmt.
Not for use in California

immediately prior to the commencement of the acquisition of AJG's voting stock that caused such Related Person to become a Related Person, or

(C)    an amount calculated by multiplying the earnings per share of AJG's common stock for the four fiscal quarters immediately preceding the record date for determination of stockholders entitled to vote on such Business Combination by the price/earnings multiple of the Related Person as of the record date s customarily computed and reported in the financial press. Appropriate adjustments will be made with respect to these subsections (A), (B) and
(C) for recapitalizations and for stock splits, stock dividends, and like distributions; and

ii.    A timely mailing will have been made to the stockholders of AJG showing in a prominent place: (x) any recommendations as to the advisability (or inadvisability) of the Business Combination that the Continuing Directors or Outside Directors may choose to state, if there are at the time any such directors; and (y) the opinion of a reputable nationally recognized investment banking or financial services firm as to the fairness from the financial point of view of the terms of the Business Combination to the stockholders of AJG other than the Related Person (such firm to be engaged solely on behalf of such other stockholders, to be paid a reasonable fee for its services by AJG upon receipt of such opinion, to be a firm that has not previously been significantly associated with the Related Person and, if there are at the time any such directors, to be selected by a majority of the Continuing Directors and Outside Directors).

(2)    The acquisition of outstanding shares of AJG's voting stock that causes an individual, a corporation, partnership or other person or entity to become a Related Person.

(3)    Individuals who at the beginning of any period of three consecutive years constitute the entire Board of Directors of the Company will for any reason other than death or permanent disability during such period cease to constitute a majority thereof.

(4)    A change in control of a nature that would be required to be reported in response to Item 6(e) of Schedule 14A of Regulation 14A promulgated under the Securities Act of 1934, as amended.

C.    The term "<u>Business Combination</u>" will mean: (i) any merger or consolidation of AJG with or into a Related Person; (ii) any sale, lease, exchange, transfer or other disposition, including without limitation a mortgage or any other security device, of all or any Substantial Part of the assets of the Company to a Related Person; (iii) any merger or consolidation of a Related Person with or into AJG; (iv) any sale, lease, exchange, transfer or other disposition of

Revised 03.15.2021
Std. Emp. Agmt.
Not for use in California

all or any Substantial Part of the assets of a Related Person to the Company; (v) the issuance of any securities of the Company to a Related Person; (vi) the acquisition by the Company of any securities issued by a Related Person; (vii) any reclassification of securities, recapitalization or other transaction designed to decrease the number of holders of AJG's voting securities remaining, if there is a Related Person; and (viii) any agreement, contract or other arrangement providing for any of the transactions described in this definition of Business Combination.

D. The term "Related Person" will mean and include any individual, corporation, partnership or other person or entity which, together with their "Affiliates" and "Associates" (as defined as of November 1, 1983, in Rule 12b-2 under the Securities Exchange Act of 1934), "Beneficially Owns" (as defined as of November 1, 1983, in Rule 13d-3 under the Securities Exchange Act of 1934) in the aggregate 20% or more of the outstanding shares of the voting stock of AJG, and any Affiliate or Associate of any such individual, corporation, partnership or other person or entity; provided that Related Person will not include any person who beneficially owned 20% or more of the outstanding shares of the voting stock of AJG on November 1, 1983. Without limitation, any shares of voting stock of AJG that any Related Person has the right to acquire pursuant to any agreement, or upon exercise of conversion rights, warrants or options, or otherwise, will be deemed beneficially owned by the Related Person.

E. The term "Substantial Part" will mean more than 30% of the fair market value of the total assets of the corporation in question, as of the end of its most recent fiscal year ending prior to the time the determination is being made.

F. The term "other consideration to be received" will include, without limitation, capital stock of AJG retained by its existing public stockholders in the event of a Business Combination in which AJG is the surviving corporation.

G. The term "Continuing Director" will mean a director who was a member of the board of directors of AJG immediately prior to the time that the Related Person involved in a Business Combination became a Related Person, and the term "Outside Director" will mean a director who is not: (a) an officer or employee of AJG or any relative of an officer or employee; or (b) a Related Person or an officer, director, employee, Associate or Affiliate of a Related Person, or a relative of any of the foregoing.

## Section 11. General

A. The captions in this Agreement are for reference only and have no independent force or effect. If a caption is inconsistent with any part of the Agreement, the caption will be disregarded.

B. **NOTE: If Employee is also party to an arbitration agreement with the Company, this Subsection B is superseded and replaced entirely by the terms of such arbitration agreement.** This Agreement will be governed by and construed in accordance with the laws of the State in which Employee resides, without giving effect to any of its conflict of law principles. The parties agree that the chosen state has a material and significant interest in questions concerning this Agreement and performance thereunder. The parties agree that the sole and exclusive venue of any dispute between the parties with respect to this Agreement, or any matters related thereto, will be a state trial or federal district court located within the federal judicial district in which Employee resides ("Chosen Venue"). Employee agrees that it is neither unfair nor unreasonable for the Chosen Venue to be selected as the exclusive venue for any dispute

Revised 03.15.2021
Std. Emp. Agmt.
Not for use in California

between the parties with respect to this Agreement or any matter related thereto and that he will suffer no undue burden by having to litigate any such disputes in the Chosen Venue. Moreover, Employee promises not to initiate suit against the Company in any venue other than the above-selected exclusive Chosen Venue with respect to any dispute between the parties relating to this Agreement. Employee waives and agrees not to interpose any argument that the Chosen Venue is an inconvenient forum for litigation.

      C.    **<u>Waiver of Jury Trial</u>**. **<u>NOTE: If Employee is also party to an arbitration agreement with the Company, this Subsection C is superseded and replaced entirely by the terms of such arbitration agreement.</u>** Because of the time and expense involved in the docketing of, preparation for and participation in a jury trial, the parties desire that any dispute arising hereunder will be decided by a judge rather than a jury. Therefore, the parties hereby knowingly, voluntarily and intentionally waive the right either may have to a trial by jury in respect to any litigation based on this Agreement or arising out of, under or in conjunction with Employee's employment by the Company, this Agreement, or any course of conduct, course of dealing, verbal or written statement or the actions of either party.

      D.    If Employee is an existing employee of the Company as of the Effective Date and is subject to any existing employment agreement with the Company, whether an Executive Agreement, Associate Agreement, or otherwise (collectively "Existing Employee Agreement"), this Agreement will be considered an Amended and Restated Employee Agreement of such Existing Employee Agreement. If Employee is an employee of a business enterprise acquired or to be acquired by the Company as of the Effective Date and is subject to any existing employment agreement with the acquired business enterprise, then this Agreement will be considered an Amended and Restated Employment Agreement only if Employee's employment agreement with the acquired business enterprise is assigned to the Company.

      E.    This Agreement contains the entire agreement of the parties with respect to the subject matters covered hereby. The parties agree that all prior negotiations and communications are of no force or effect. Further, the parties agree that there are no oral agreements, understandings, undertakings or promises of the parties relating to the subject matters covered by this Agreement.

      F.    Subject to Section 11(G) below, this Agreement may not be amended, altered or modified without the prior written consent of both parties, and such instrument will acknowledge that it is an amendment or modification of this Agreement. Waiver of any term or condition of this Agreement will not be construed as a waiver of any subsequent breach or failure of the same term or condition, or any other term or condition. Any waiver must be in writing. No amendment, alteration, modification or waiver may be signed by Employee on behalf of the Company, its assignees, successors or assigns.

      G.    To the extent that any of the terms set forth in this Agreement or any word, phrase, clause or sentence is found to be illegal or unenforceable for any reason, it is the intention of the parties that such word, phrase, clause or sentence will be modified or deleted by a court of competent jurisdiction so as to afford the Company the fullest protection commensurate with making this Agreement, as modified, legal and enforceable under applicable laws, and the balance of this Agreement will not be affected thereby, the balance being construed as severable and independent.

      H.    All notices given hereunder will be in writing and will be sent by registered or certified mail or delivered by hand and, if intended for the Company, addressed to it or delivered to

Revised 03.15.2021
Std. Emp. Agmt.
Not for use in California

its principal office to the attention of the Secretary of the Company. If intended for Employee, notices will be delivered personally or addressed (if sent by mail) to Employee's then current residence address as shown on the Company's records, or to such other address as Employee directs in a written notice to the Company. All notices will be deemed to be given on the date received at the address of the addressee or, if delivered personally, on the date delivered.

I.     The use of male pronouns throughout this Agreement includes the female gender. The words "including" or "include" are not to be interpreted as terms of limitation or exclusion, but rather of illustration.

J.     This Agreement may be executed in counterparts, each of which is deemed an original.

**IN WITNESS WHEREOF,** the parties hereto have executed this Agreement as of the day and year provided below their respective signatures. The parties agree that the Effective Date of this Agreement will be 5/17/21 .

**ARTHUR J. GALLAGHER & CO.,** on behalf of itself and its subsidiaries, divisions and affiliated and related companies

By: _____

Authorized Corporate Signature

Corporate Officer Signature
Corporate Vice President and
Title: Chief Human Resources Officer, Human Resources

Date: 5/6/21

**EMPLOYEE**

Sara Arnold
_____
Employee Signature

Sara Arnold
_____
Printed Name

Date: 5/6/21

FOR PAYROLL USE ONLY:

Employee ID: 5079846

Revised 03.15.2021
Std. Emp. Agmt.
Not for use in California

## Schedule A
### For LOUISIANA Employees Only

(FOR **MANAGERS OF LOUISIANA EMPLOYEES ONLY:** Please fully circle designated areas as define in Section 8 (4).)

**Louisiana Parishes:**

| | | | |
|---|---|---|---|
| Acadia | East Baton Rouge | Madison | Saint Landry |
| Allen | East Carroll | Morehouse | Saint Martin |
| Ascension | East Feliciana | Natchitoches | Saint Mary |
| Assumption | Evangeline | Orleans | Saint Tammany |
| Avoyelles | Franklin | Ouachita | Tangipahoa |
| Beauregard | Grant | Plaquemines | Tensas |
| Bienville | Iberia | Pointe Coupee | Terrebonne |
| Bossier | Iberville | Rapides | Union |
| Caddo | Jackson | Red River | Vermilion |
| Calcasieu | Jefferson Davis | Richland | Vernon |
| Caldwell | Jefferson | Sabine | Washington |
| Cameron | La Salle | Saint Bernard | Webster |
| Catahoula | Lafayette | Saint Charles | West Baton Rouge |
| Claiborne | Lafourche | Saint Helena | West Carroll |
| Concordia | Lincoln | Saint James | West Feliciana |
| De Soto | Livingston | St. John the Baptist | Winn |

**Mississippi:**

| | | | |
|---|---|---|---|
| Hancock | Hinds | Madison | Pontotoc |
| Harrison | Jackson | Pearl River | Rankin |

**Texas:**

| | | |
|---|---|---|
| Dallas | Harris | Neuces |
| Hardin | Jefferson | Orange |

**Arkansas:**

| | | | |
|---|---|---|---|
| Blytheville | Fort Smith | Texarkana | West Memphis |
| Forrest City | Jonesboro | Trumann | |

**Tennessee:**

| | | |
|---|---|---|
| Chattanooga | Knoxville | Morristown |
| Jackson | Lafollette | Nashville |
| Kingsport | Lexington | Shelbyville |

**Kentucky:**

| | | | |
|---|---|---|---|
| Bowling Green | Hokinsville | Newport | Pikeville |
| Covington | Lexington | Paducah | Owensboro |

Manager Selected Areas

# Exhibit H3

Revised 03.15.2021
Std. Emp. Agmt.
Not for use in California

**EMPLOYEE AGREEMENT**

This Employee Agreement ("Agreement") is made and entered into as of the Effective Date (as defined below) by and between _Taylor Gunnells_ (hereinafter referred to as "Employee") and Arthur J. Gallagher & Co., a Delaware corporation with its principal place of business in Rolling Meadows, Illinois and its subsidiaries, divisions and affiliated and related companies (hereinafter referred to collectively as "AJG" or the "Company").

RECITALS

**WHEREAS**, Employee has been hired, or is being retained, as a valued key employee who with the execution of this Agreement will be provided and will continue to be provided during his employment with valuable confidential and proprietary and trade secret information of the Company and will have significant managerial, production, administrative, technical and/or account servicing responsibilities; and

**WHEREAS**, the parties hereto acknowledge that the Company has a legitimate interest in retaining the services of Employee and accepting the covenants herein provided in order to protect its confidential and proprietary and trade secret information and to preserve the Company's goodwill, customer relationships, employment relationships and value of the business to be handled by Employee as an employee of the Company;

**NOW THEREFORE**, in consideration of these recitals and the mutual covenants and promises set forth below, and for other good and valuable consideration including, but not limited to, employment with the Company, receipt of the compensation and benefits attendant to such employment, receipt and the ability to utilize the Company's confidential, proprietary and trade secret information, and/or being provided or allowed access to and contact with certain Company accounts, all of which the parties acknowledge as sufficient consideration for this Agreement, the parties agree as follows:

**Section 1.**     Employment

The Company agrees to employ Employee and Employee agrees to serve the Company and perform the duties set forth below beginning on the Effective Date and continuing thereafter until employment is terminated by either party. The Employee's employment is "at will" and is terminable by either party as provided below (except in jurisdictions where "at will" employment is not recognized). The Employee's continued employment with the Company is subject to the terms and conditions of this Agreement.

**Section 2.**     Duties

A.     Employee agrees to devote his full energies, abilities, attention and business time to the performance of his employment obligations and responsibilities. Employee agrees that he will not engage in any activity which conflicts or interferes with, or in any way compromises, his performance of those obligations and responsibilities. Employee will comply with all applicable Company policies and procedures. Employee will not, either during or outside normal business hours, directly or indirectly sell, solicit, service, manage or engage in any aspect of the insurance,

Revised 03.15.2021
Std. Emp. Agmt.
Not for use in California

benefits or wealth management businesses for or on behalf of any person or entity other than the Company, nor engage in any activity that is not in the best interests of the Company.

B.     Employee recognizes that, by virtue of his employment by the Company and to assist him in the solicitation, production, management, and/or servicing of accounts, he will be provided and granted otherwise prohibited access to certain confidential and proprietary data and trade secret information of the Company which is not known either to its competitors or within the industry generally and which has independent economic value to the Company, and is subject to reasonable efforts that are reasonable under the circumstances to maintain its secrecy. This information (collectively hereinafter "Confidential Information") may include, but is not limited to: data relating to the Company's unique marketing and servicing programs, procedures and techniques; investment, wealth management and retirement plan consulting, variable annuities, and fund investment business and related products and services; underwriting criteria for general programs; business, management and human resources/personnel strategies and practices; the criteria and formulae used by the Company in pricing its insurance and benefits products and claims management, loss control and information management services; the structure and pricing of special insurance packages negotiated with underwriters; highly sensitive information about the Company's agreements and relationships with underwriters; sales data contained in various tools and resources (including, without limitation, Salesforce.com); lists of prospects; the identity, authority and responsibilities of key contacts at Company accounts and prospects; the composition and organization of Company accounts' businesses; the peculiar risks inherent in the operations of Company accounts; highly sensitive details concerning the structure, conditions and extent of existing insurance coverages of Company accounts; policy expiration dates, premium amounts and commission rates relating to Company accounts; risk management service arrangements relating to Company accounts; loss histories relating to Company accounts; candidate and placement lists relating to Company accounts; the Company's personnel and payroll data including details of salary, bonus, commission and other compensation arrangements; and other data showing the particularized insurance or consulting requirements and preferences of Company accounts. Employee understands that his job duties may include assisting in the development of information and data that is Confidential Information belonging to the Company. Confidential Information may be stored in files, documents, dailies, daily reports, renewal information, customer lists, accounting records, products purchased by customers, customer account and credit data, referral sources, computer programs and software, customer comments, Company written manuals and marketing and financial analysis, plans, research and programs. Employee recognizes that this Confidential Information constitutes valuable property of the Company, developed over a long period of time and at substantial expense and that the Company takes reasonable efforts to keep this Confidential Information confidential and made available only to those employees who need access to such Confidential Information to perform their job functions for the Company. Employee promises to safeguard such Confidential Information, and agrees that he will not, at any time during his employment by the Company, divulge such Confidential Information or make use of it for his own purposes or the purposes of another.

**Notwithstanding this Section 2, or the generality of any prohibition relating to Confidential Information appearing in this Agreement, Employee acknowledges the following important exceptions under state or federal law:**

**1.     Employee is not prohibited from reporting possible violations of federal**

Revised 03.15.2021
Std. Emp. Agmt.
Not for use in California

law or regulation to any governmental agency or entity including, without limitation, the Department of Justice, the Securities and Exchange Commission, the Congress, and any agency Inspector General, or making other disclosures that are protected under the whistleblower provisions of federal law or regulation.

2.    **The Federal Defend Trade Secrets Act of 2016 provides the following:**

IMMUNITY FROM LIABILITY FOR CONFIDENTIAL DISCLOSURE OF A TRADE SECRET TO THE GOVERNMENT OR IN A COURT FILING.

(1)    IMMUNITY. An individual shall not be held criminally or civilly liable under any Federal or State trade secret law for the disclosure of a trade secret that:

    (A)    is made

        (i)    in confidence to a Federal, State, or local government official, either directly or indirectly, or to an attorney; and

        (ii)    solely for the purpose of reporting or investigating a suspected violation of law; or

    (B)    is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal.

(2)    USE OF TRADE SECRET INFORMATION IN ANTIRETALIATION LAWSUIT. An individual who files a lawsuit for retaliation by an employer for reporting a suspected violation of law may disclose the trade secret to the attorney of the individual and use the trade secret information in the court proceeding, if the individual:

    (A)    files any document containing the trade secret under seal; and

    (B)    does not disclose the trade secret, except pursuant to court order.

C.    The Company agrees that, during Employee's employment with the Company, it will: (i) provide Employee with certain Confidential Information the Employee did not previously possess including, without limitation, Confidential Information relating to certain of the Company's accounts; (ii) provide Employee with information and access to the Company's proprietary insurance and risk management programs; (iii) provide Employee with access to the Company's specialized business operations relating to particular aspects of the insurance agency and risk management business; (iv) maintain specialized training programs to which Employee will qualify and apply; and (v) provide such other assistance which may reasonably aid Employee in performing sales, management, technical and/or servicing duties.

D.    Employee acknowledges and understands that an essential element of the Company's business is the development and maintenance of personal contacts and relationships with its accounts, and that Employee may be provided and allowed access to certain of the Company's accounts for the purpose of establishing personal contact and relationships with such accounts for the benefit of the Company. The Employee acknowledges that the Company invests considerable time, money, and resources necessary to develop and maintain a relationship

Revised 03.15.2021
Std. Emp. Agmt.
Not for use in California

between its employees and a client, and in that regard, the Company will pay Employee's salary, reimburse reasonably necessary business expenses, provide Employee with certain Confidential Information, and provide the resources necessary to service the Company accounts managed or serviced by Employee by making available legal advice, accounting support, advertising and other corporate services. Moreover, while the Employee recognizes that some Company accounts may develop greater identification with the Employee than the Company itself, those accounts remain, at all times and for all purposes, accounts of the Company. By entering this Agreement, Employee disclaims any interest in such Company accounts.

**Section 3.**      <u>Compensation and Benefits</u>

Employee will be entitled to the compensation and benefits agreed to by Employee and the Company and as noted from time to time in Employee's official personnel file and records retained in the Company's corporate headquarters, which file is incorporated by reference herein to the extent necessary for evidencing the compensation and benefits to which Employee and the Company have agreed. The compensation and benefits to which Employee is entitled as of the Effective Date is noted in Employee's official personnel file. Employee's compensation and benefits is subject to periodic change at the Company's discretion.

**Section 4.**      <u>Representations</u>

Employee represents and warrants to the Company that:

A.      Employee is not, and will not become, a party to any agreement, contract, arrangement or understanding, whether of employment or otherwise, that would in any way restrict him from undertaking or performing his duties in accordance with this Agreement or that limits his ability to be employed by the Company under this Agreement;

B.      Employment by the Company will not violate the terms of any policy of any prior employer of Employee regarding competition, solicitation or confidentiality;

C.      Employment by the Company in the position contemplated by this Agreement will not require him to improperly use any trade secrets or confidential or proprietary information of any prior employer, or any other person or entity for whom he has performed services;

D.      Employee has not misused, and will not misuse, any confidential or proprietary information obtained from any prior employer or any other person or entity;

E.      Employee has not improperly taken or retained in any form whatsoever, or otherwise retained access to, any confidential or proprietary information of any prior employer or any other person or entity; and

F.      Employee is in compliance with any non-competition and/or non-solicitation agreements, or other restrictive covenant obligations in place between him and any former employer and will continue to be in compliance, regardless of whether he believes such agreements and/or restrictive covenants are enforceable or not.

G.      Employee was provided a reasonable period of time, not less than fourteen (14) days, to review and consider this Agreement prior to signing it and accepting employment with the Company. If Employee elects to sign this Agreement sooner than fourteen (14) days prior to the commencement of employment, he represents and acknowledges that he chose to do so

Revised 03.15.2021
Std. Emp. Agmt.
Not for use in California

voluntarily.

H.     Employee gives the Company consent to record, videotape and photograph Employee's image and/or voice to be used for any internal or external business use (including but not limited to the Company's intranet accessible to all employees; on www.ajg.com or any related or affiliated website or social media; in printed or online newsletters, articles, internal or client promotional materials or other business communication; or the Company's annual and periodic reporting documents). Employee acknowledges that no special compensation will be to Employee for such consent or use and that while the Company will take reasonable efforts to do so, Employee may not be informed in advance of any such specific use.

**Section 5.**     Termination of Employment Relationship

A.     The Company or the Employee may terminate Employee's employment at any time and for any reason upon twenty-one (21) days' written notice (the "Notice Period") by the party wishing to terminate the employment; provided, however, that notice is not required from the Company for any termination taking place: (1) during the Employee's first ninety (90) days of employment (or other applicable Introductory Period pursuant to Company policy); (2) during the pendency of any Performance Improvement Plan issued pursuant to the Company's performance management policies; or (3) as a result of Employee's commission of any act that would result in immediate termination under the Company's Performance Improvement and Management policies then in effect.

B.     The Company agrees to continue during the Notice Period the same compensation and benefits Employee was receiving prior to the Notice Period. Alternatively, where termination is initiated by the Company, the Company may elect to terminate employment immediately and provide Employee, in lieu of the Notice Period, a lump sum payment equivalent to Employee's base pay for the Notice Period. The parties agree that once the Notice Period expires, the Employee's entitlement to compensation and benefits ends.

C.     Employee agrees that during the Notice Period, he will cooperate fully with the Company in all matters relating to the winding up of any pending work and/or the orderly transfer to other Company employees of the accounts for which he has been responsible. Employee specifically covenants that during the Notice Period (regardless of whether or not active employment responsibilities are continuing) his duties to the Company, including Employee's fiduciary duty of loyalty, will continue in effect. Prior to the expiration of the Notice Period, Employee promises to return to the Company all originals and copies (whether paper, digital copies or otherwise) of literature, correspondence, memoranda, reports, summaries, manuals, proposals, contracts and other documents of any kind which relate in any way to the business of the Company, including specifically all materials which comprise or refer to the Company's Confidential Information. The Employee covenants that he will not retain any copy, facsimile or note intended to memorialize any such data. Employee further understands and agrees that, during or at the expiration of the Notice Period, and as part of his assigned job duties, he will reasonably participate in any meeting the Company may convene to: (i) review the status of any projects or work Employee has been assigned; (ii) review the status of accounts for which Employee has been most recently responsible or associated; (iii) ensure that Employee has fully obtained his entitlements under this Agreement and as provided by law; and/or (iv) confirm that Employee understands the nature and scope of his post-employment obligations.

D.     Upon the termination of Employee's employment for any reason, Employee agrees

Revised 03.15.2021
Std. Emp. Agmt.
Not for use in California

that the Secretary of the Company may, as an irrevocable proxy and in Employee's name and stead, execute all documents and things which the Company deems necessary and desirable to effect Employee's resignation as an officer or director of any company (if applicable) included within the definition of the Company as used in this Agreement.

       E.     Before accepting any new employment in the insurance, benefits or wealth management industries, Employee promises to give his prospective new employer a copy of this Agreement. Employee permits the Company to advise any prospective new employer of Employee of the existence and terms of this Agreement and to provide it with a copy.

       F.     During employment and after the termination of same Employee agrees to remain available to the Company and its legal counsel, voluntarily upon the Company's request and without the necessity of subpoena or court order, in connection with the Company's investigation, preparation, prosecution and/or defense of any actual or potential legal proceeding, regulatory action, or internal matter. The Employee agrees to cooperate with the Company, to provide any information reasonably within his recollection and to provide truthful testimony as required. If Employee is called upon to provide cooperation after employment has been terminated, the Company will reimburse Employee for reasonable out-of-pocket expenses actually incurred under this section or, at the Company's option, will advance Employee's reasonable expenses or incur them directly.

       G.     Employee agrees that while he is employed by the Company, and following the termination of his employment, he will not make any false, defamatory or disparaging statements about the Company, its officers or directors where such statements are calculated to, or reasonably likely to cause material damage to the Company, its officers or directors.

**Section 6.**     The Company's Right to Injunctive Relief; Attorneys' Fees

      The Employee acknowledges that his services to the Company are of a unique character which gives them a special value to the Company, the loss of which cannot reasonably or adequately be compensated in damages in an action at law should the Employee breach, or threaten to breach, any post-employment obligations under this Agreement. The Employee realizes that: (a) it would be difficult to measure precisely the damages to the Company from any breach by Employee of Sections 7 and/or 8 of this Agreement; (b) injury to the Company from any such breach would be incalculable and irremediable; and (c) money damages would therefore be an inadequate remedy for any such breach. Accordingly, in addition to any other remedy the Company may have at law or in equity, the Company will be entitled to enforce this Agreement by obtaining a temporary restraining order and preliminary and permanent injunctive relief to restrain any such breach or further breach by Employee. Employee expressly waives the right to contest whether a breach of Section 7 or 8 of this Agreement would result in irreparable or permanent harm to the Company. In addition, Employee agrees that the Company may seek injunctive relief when and if it elects to do so and any delay in seeking injunctive relief will not prejudice or waive the Company's right to do so. Employee expressly waives the right to assert that the Company is not entitled to injunctive relief because of any delay in seeking such relief. Employee agrees that he will be responsible for and pay the Company its reasonable attorneys' fees and other expenses and costs incurred to enforce this Agreement if the Company is the prevailing party. Employee further agrees that if Employee breaches any covenant contained in Sections 7 and/or 8 of this Agreement, the Company will be entitled, in addition to all other legal or equitable remedies it may have, to offset and withhold against any such loss, cost, liability or expense any amount of any kind that may then be owing or payable by Company to Employee.

Revised 03.15.2021
Std. Emp. Agmt.
Not for use in California

**Section 7.**     Trade Secrets and Confidential  Information

A.     Employee acknowledges that the Company's business depends to a great degree upon having information which is not generally known to others, and that the profitability of the Company's business requires that this information be kept confidential and proprietary within the Company.  Accordingly:

(1)     Employee agrees that all intellectual property, such as computer programs, systems or software, developed during his employment or as a result of his employment is "work for hire" performed by Employee in the scope of his employment. To the extent that any such intellectual property is determined not to constitute "work for hire," or if any rights in any such intellectual property do not accrue to the Company as a "work for hire," Employee's signature on this Agreement constitutes an assignment (without any further consideration) to the Company of any and all copyrights and other rights, title and interest in and to all such intellectual property. The Company will retain all proprietary rights to any and all such intellectual property. Employee agrees to execute any documents necessary to perfect the Company's interest in such intellectual property upon the Company's request.

(2)     Employee has been advised by this writing and understands that the foregoing provisions of Section 7(A)(1) do not apply to an item of intellectual property for which no equipment, supplies, facilities or Confidential Information of the Company was used and which was developed entirely on Employee's own time, unless: (a) the item of intellectual property relates to the business of the Company or to the Company's actual or demonstrably anticipated research and development; or (b) the item of intellectual property results from any work performed by Employee for the Company.

B.     Employee recognizes the highly sensitive nature of the Confidential Information he will be given (and to which he will have access throughout his employment) and acknowledges the Company's legitimate interest in safeguarding it from disclosure.  Accordingly, in addition to the restrictions provided in Section 8 below, Employee agrees that:

(1)     after his employment with the Company is terminated, he will not directly or indirectly disclose, use or divulge Confidential Information that constitutes a trade secret of the Company or make use of it for his own purpose or the purpose of another; and

(2)     for a period of two (2) years following the termination of his employment with the Company, he will not divulge Confidential Information that does not constitute a trade secret of the Company or make use of it for his own purpose or the purpose of another.

(3)     not all of the Company's Confidential Information will rise to the level of a trade secret of the Company; even so, all Confidential Information will be entitled to the protections and restrictions provided in this Agreement.

Revised 03.15.2021
Std. Emp. Agmt.
Not for use in California

C.    Employee understands and acknowledges that he will benefit significantly from having access to and being given Confidential Information. Employee agrees that but for his promise to safeguard Confidential Information and the further restrictive covenants contained in Section 8 below, the Company would not agree to provide Employee with Confidential Information. Further, Employee acknowledges that his breach of any restrictions provided in Section 8 below will inevitably and necessarily lead to the prohibited disclosure or use of Confidential Information.

**D.    Notwithstanding the generality of the foregoing restrictions in this Section 7, employee acknowledges having reviewed the federal Defend Trade Secrets Act notice appearing in Section 2, above.**

**Section 8.**    <u>Protection of the Company's Protectable Interests</u>

A.    To protect the legitimate interests of the Company in, among other things, protecting its Confidential Information, employment relationships, relationships with Company accounts and goodwill, and in consideration for, among other things as provided in this Agreement, the Company's promise to give Employee certain Confidential Information, some of which constitutes trade secrets of the Company which Employee did not previously have, and to enforce Employee's promise not to disclose such Confidential Information, Employee agrees to the following restrictive covenants, which Employee acknowledges and agrees are reasonably necessary and narrowly tailored to protect the Company's legitimate business interests:

(1)    For a period of twenty-four (24) months [or, if Employee is principally employed in **OREGON** or **ALABAMA**, for a period of eighteen (18) months] following the termination of Employee's employment with the Company for any reason whatsoever Employee will not, directly or indirectly, solicit, transfer, place, market, accept, aid, counsel or consult in the placement, renewal, discontinuance or replacement of any insurance (including self-insurance) by, or handle self-insurance programs, insurance claims, risk management services, emergency or disaster prevention or management services, or other insurance administrative or service functions ("insurance services") or provide employee benefit brokerage, consulting, or administration services; in the area of group insurance, defined benefit and defined contribution pension plans, individual life, disability and capital accumulation products; investment advisory services, wealth management, or group retirement services; defined benefit and defined contribution pension services; human resources consulting services, including, without limitation, compensation consulting, compensation program design, compensation and benefits surveys, and on-site human resources management; and all other employee benefit areas the Company is involved with ("benefit services"), for: (x) any Account of the Company for which Employee performed any of the foregoing functions during any part of the two-year period immediately preceding such termination (referred to hereinafter as "Protected Accounts"), or (y) any Prospective Account of the Company (as defined below).

(2)    **For UTAH Employees Only.** Employee and Company agree that this paragraph (A)(2) is necessary given the uniqueness of Utah law, and it will apply only for such period of time, if any, Employee is principally employed in **Utah** during which time the following activity restrictions will be substituted for those stated in the foregoing paragraph (A)(1):

Revised 03.15.2021
Std. Emp. Agmt.
Not for use in California

(a)    for a period of one (1) year following the termination of Employee's employment with the Company for any reason whatsoever, provide, service, transfer, place, market, accept, aid, counsel or consult in the placement, renewal, discontinuance or replacement of any insurance services or benefit services for any Protected Accounts (as defined above) or any Prospective Account of the Company (as defined below); and

(b)    for a period of two (2) years following the termination of Employee's employment with the Company for any reason whatsoever, directly or indirectly solicit any insurance services or benefit services for any Protected Accounts (as defined above) or any Prospective Account of the Company (as defined below).

(3)    **For OKLAHOMA Employees Only.** Employee and Company agree that this paragraph (A)(3) is necessary given the uniqueness of Oklahoma law, and it will apply only for such period of time, if any, Employee is principally employed in **Oklahoma** during which time the following activity restrictions will be substituted for those stated in the foregoing paragraph (A)(1): For a period of two (2) years following the termination of Employee's employment with the Company for any reason whatsoever, Employee will not engage in any act of solicitation with respect to any Protected Accounts (as defined above) which are established customers of the Company for the purpose of providing insurance services or benefit services.

(4)    **For LOUISIANA Employees Only.** Employee and Company agree that this paragraph (A)(4) is necessary given the uniqueness of Louisiana law, and it will apply only for such period of time, if any, Employee is principally employed in **Louisiana** during which time the activity restrictions stated in the foregoing paragraph (A)(1) will apply only to activity undertaken by Employee in the following designated parishes, counties, municipalities or territories:

**(Please reference Schedule A)**

(5)    The term "Account of the Company" as used in this paragraph will be construed broadly to include all users of insurance services or benefit services, including commercial and individual consumers, risk managers, carriers, agents and other insurance intermediaries who are customers of the Company on the date Employee's employment with the Company terminates, or an insurance carrier offering any custom program for which the Company acts as managing general agent, managing general underwriter, program manager or underwriting agent, regardless of how the relationship is documented or characterized.

(6)    If an Account of the Company is part of a group of companies which conducts business through more than one entity, division or operating unit, whether or not separately incorporated (a "Client Group"), the term "Account of the Company" as used herein will include products or services within any entity, division or operating unit of the Client Group where the same management group within the Client Group has the primary decision making

Revised 03.15.2021
Std. Emp. Agmt.
Not for use in California

authority with respect to contracting for services of the type rendered by the Company. Notwithstanding anything herein to the contrary, the Employee will be free to call on the retail agents of the Company, so long as there is no contact or solicitation of any account, client, or Prospective Account of the Company.

B.     For the purposes of the covenants set forth in Sections 7 and 8 of this Agreement, the parties acknowledge and agree that the following will apply:

(1)    The term "Prospective Account" of the Company, means any entity (other than a then-current account of the Company but including former Company accounts) with respect to whom, at any time during the one year period preceding the termination of Employee's employment with the Company, Employee: (i) submitted or assisted in the submission of a presentation or proposal of any kind on behalf of the Company, (ii) had material contact or acquired Confidential Information as a result of or in connection with Employee's employment with the Company, or (iii) incurred travel and/or entertainment expenses which were reimbursed by the Company to Employee; but the term Prospective Account does not include an account that is a customer of Employee's new employer (for the same type of insurance and/or benefits services for which such customer was a Prospective Account of the Company) at the time of termination of Employee's employment with the Company.

(2)    "Direct or indirect solicitation" of a Protected Account or Prospective Account will expressly include, but not be limited to, the following (which is not intended to be an exhaustive list of direct or indirect solicitation, but is meant to provide examples of certain reasonably anticipated scenarios):

(a)    The sending of an announcement by Employee or his new employer to any Protected Account or Prospective Account, the purpose of which is to communicate that Employee has either formed his own business enterprise or joined an existing business enterprise that will offer products or services in any way competitive with the Company.

(b)    Initiating a communication or contact by Employee or his new employer with any Protected Account or Prospective Account for the purpose of notifying such Protected Account or Prospective Account that Employee has either formed his own business enterprise or joined an existing business enterprise that will offer products or services in any way competitive with the Company.

(c)    Communication or contact by Employee or his new employer with any Protected Account or Prospective Account (if such new employer's communication with a Prospective Account was facilitated by Employee, directly or indirectly, or if Employee will or is intended to benefit, directly or indirectly, by such communication) if the communication in any way relates to insurance or benefits services; provided, however, nothing herein is intended to limit communications or contacts that are unrelated to insurance and/or benefits services.

Revised 03.15.2021
Std. Emp. Agmt.
Not for use in California

     (d)    The facilitation by Employee, directly or indirectly, of any Protected Accounts' execution of a broker of record letter replacing the Company as its broker of record.

     C.    Except as otherwise noted above in subparagraph (A)(4), Employee understands and agrees that many of the accounts for which he will perform insurance and/or benefits services while employed by the Company are national accounts and that Employee will perform insurance and/or benefit services for Company accounts throughout the entire country. Employee agrees and acknowledges that the geographic scope relating to the restrictions provided in this Section 8 will include the entire United States and that since the post-employment restrictions herein provided are tied directly to Accounts of the Company for whom Employee performed insurance and/or benefit services during the two-year period immediately preceding termination of his employment and Prospective Accounts, this geographic limitation is reasonable. Moreover, Employee acknowledges and agrees that the applicable restrictions contained throughout this Section 8 do not prohibit Employee from competing generally with the Company or performing insurance services or benefits services for potential clients throughout the entire world except for Protected Accounts and Prospective Accounts, and that those restrictions are reasonable and narrowly tailored to further the Company's legitimate interest to protect its Confidential Information, account relationships, and goodwill, and such restrictions will not unduly burden Employee's ability to earn a living after his employment with the Company is terminated.

     D.    If, within two (2) years of the termination of Employee's employment the Employee engages in, or joins a company or business enterprise engaged in, providing insurance and/or benefits services, then the Company may advise any Protected Account and/or Prospective Account of the existence and terms of this Agreement and may give them a copy of this Agreement.

     E.    Employee recognizes that employees of the Company are a valuable resource of the Company. Accordingly, during Employee's employment with the Company, Employee will not, directly or indirectly solicit, induce, entice or recruit any employee of the Company to leave their employment with the Company. In addition, for a period of two (2) years following the termination of Employee's employment with the Company for any reason whatsoever, Employee will not directly or indirectly, solicit, induce or recruit any employee of the Company who has been provided Confidential Information to leave the employ of the Company.

## Section 9.   <u>Assignment</u>

     Except as provided in Section 10, this Agreement will not be affected by any merger or consolidation or other reorganization of the Company and will be assignable to, binding upon, and will inure to the benefit of the continuing entity or to any successor in interest to the Company including, without limitation, any entity to which the Company sells business, assets and/or accounts of any branch, business unit or profit center in which Employee is primarily employed. This Agreement also will inure to the benefit of every affiliate company included in the definition of "Company" under this Agreement. The Company may assign this Agreement to any affiliate company of AJG in which case, except for purposes of Section 10 hereof, all references to "the Company" and all rights of the Company will include and inure to the benefit of that affiliate. Employee may not assign this Agreement or any obligations hereunder.

## Section 10.   <u>Release of Certain Obligations</u>

     Notwithstanding anything herein to the contrary, the obligations of Employee stated in

Revised 03.15.2021
Std. Emp. Agmt.
Not for use in California

Section 8 will become null and void and have no further effect immediately upon a Hostile Change in Control of AJG as defined herein. The Company will send written notice to Employee within ten (10) days of a Hostile Change in Control of AJG, notifying Employee that such event has taken place. Failure of the Company to send such notice will not preclude the release of Employee from the obligations contained in Section 8. These definitions apply to Section 10:

A.     The term "Hostile Change in Control" means a transaction, event or election constituting a Change in Control which was not approved by or, in an election, the directors elected were not nominated by, at least two-thirds of the members of the Board of Directors of AJG in office immediately prior to the Change in Control who have not died or become permanently disabled.

B.     The term "Change in Control" of AJG means and includes each and all of the following occurrences:

(1)     A Business Combination, unless:

(a)     the Business Combination is approved or authorized by the affirmative vote of the holders of not less than 80% of the outstanding shares of voting stock of AJG and the affirmative vote of the holders of not less than 67% of the outstanding shares of the voting stock held by shareholders other than Related Persons; or

(b)     the Continuing Directors of AJG by a two-thirds vote: (i) have expressly approved in advance the acquisition of outstanding shares of voting stock of the corporation that caused the Related Person to become a Related Person; or (ii) have approved the Business Combination prior to the Related Person involved in the Business Combination having become a Related Person; or

(c)     the Business Combination is solely between AJG and another corporation, 50% or more of the voting stock of which is owned by AJG and none of which is owned by the Related Person; or

(d)     all of the following conditions are satisfied:

i.     The cash or fair market value of the property, securities or "other consideration to be received" per share by holders of common stock in AJG in the Business Combination is not less than the higher of:

(A)     the highest per share price (including brokerage commissions, transfer taxes and soliciting dealers' fees) paid by the Related Person in acquiring any of its holdings of AJG's common stock, or

(B)     an amount that bears that same percentage relationship to the market price of AJG's common stock immediately prior to the announcement of such Business Combination as the highest per share price determined in (A) above bears to the market price of AJG's common stock

Revised 03.15.2021
Std. Emp. Agmt.
Not for use in California

immediately prior to the commencement of the acquisition of AJG's voting stock that caused such Related Person to become a Related Person, or

(C)    an amount calculated by multiplying the earnings per share of AJG's common stock for the four fiscal quarters immediately preceding the record date for determination of stockholders entitled to vote on such Business Combination by the price/earnings multiple of the Related Person as of the record date s customarily computed and reported in the financial press. Appropriate adjustments will be made with respect to these subsections (A), (B) and
(C) for recapitalizations and for stock splits, stock dividends, and like distributions; and

    ii.    A timely mailing will have been made to the stockholders of AJG showing in a prominent place: (x) any recommendations as to the advisability (or inadvisability) of the Business Combination that the Continuing Directors or Outside Directors may choose to state, if there are at the time any such directors; and (y) the opinion of a reputable nationally recognized investment banking or financial services firm as to the fairness from the financial point of view of the terms of the Business Combination to the stockholders of AJG other than the Related Person (such firm to be engaged solely on behalf of such other stockholders, to be paid a reasonable fee for its services by AJG upon receipt of such opinion, to be a firm that has not previously been significantly associated with the Related Person and, if there are at the time any such directors, to be selected by a majority of the Continuing Directors and Outside Directors).

(2)    The acquisition of outstanding shares of AJG's voting stock that causes an individual, a corporation, partnership or other person or entity to become a Related Person.

(3)    Individuals who at the beginning of any period of three consecutive years constitute the entire Board of Directors of the Company will for any reason other than death or permanent disability during such period cease to constitute a majority thereof.

(4)    A change in control of a nature that would be required to be reported in response to Item 6(e) of Schedule 14A of Regulation 14A promulgated under the Securities Act of 1934, as amended.

C.    The term "Business Combination" will mean: (i) any merger or consolidation of AJG with or into a Related Person; (ii) any sale, lease, exchange, transfer or other disposition, including without limitation a mortgage or any other security device, of all or any Substantial Part of the assets of the Company to a Related Person; (iii) any merger or consolidation of a Related Person with or into AJG; (iv) any sale, lease, exchange, transfer or other disposition of

Revised 03.15.2021
Std. Emp. Agmt.
Not for use in California

all or any Substantial Part of the assets of a Related Person to the Company; (v) the issuance of any securities of the Company to a Related Person; (vi) the acquisition by the Company of any securities issued by a Related Person; (vii) any reclassification of securities, recapitalization or other transaction designed to decrease the number of holders of AJG's voting securities remaining, if there is a Related Person; and (viii) any agreement, contract or other arrangement providing for any of the transactions described in this definition of Business Combination.

D.      The term "Related Person" will mean and include any individual, corporation, partnership or other person or entity which, together with their "Affiliates" and "Associates" (as defined as of November 1, 1983, in Rule 12b-2 under the Securities Exchange Act of 1934), "Beneficially Owns" (as defined as of November 1, 1983, in Rule 13d-3 under the Securities Exchange Act of 1934) in the aggregate 20% or more of the outstanding shares of the voting stock of AJG, and any Affiliate or Associate of any such individual, corporation, partnership or other person or entity; provided that Related Person will not include any person who beneficially owned 20% or more of the outstanding shares of the voting stock of AJG on November 1, 1983. Without limitation, any shares of voting stock of AJG that any Related Person has the right to acquire pursuant to any agreement, or upon exercise of conversion rights, warrants or options, or otherwise, will be deemed beneficially owned by the Related Person.

E.      The term "Substantial Part" will mean more than 30% of the fair market value of the total assets of the corporation in question, as of the end of its most recent fiscal year ending prior to the time the determination is being made.

F.      The term "other consideration to be received" will include, without limitation, capital stock of AJG retained by its existing public stockholders in the event of a Business Combination in which AJG is the surviving corporation.

G.      The term "Continuing Director" will mean a director who was a member of the board of directors of AJG immediately prior to the time that the Related Person involved in a Business Combination became a Related Person, and the term "Outside Director" will mean a director who is not: (a) an officer or employee of AJG or any relative of an officer or employee; or (b) a Related Person or an officer, director, employee, Associate or Affiliate of a Related Person, or a relative of any of the foregoing.

**Section 11.**      General

A.      The captions in this Agreement are for reference only and have no independent force or effect. If a caption is inconsistent with any part of the Agreement, the caption will be disregarded.

B.      **NOTE: If Employee is also party to an arbitration agreement with the Company, this Subsection B is superseded and replaced entirely by the terms of such arbitration agreement.** This Agreement will be governed by and construed in accordance with the laws of the State in which Employee resides, without giving effect to any of its conflict of law principles. The parties agree that the chosen state has a material and significant interest in questions concerning this Agreement and performance thereunder. The parties agree that the sole and exclusive venue of any dispute between the parties with respect to this Agreement, or any matters related thereto, will be a state trial or federal district court located within the federal judicial district in which Employee resides ("Chosen Venue"). Employee agrees that it is neither unfair nor unreasonable for the Chosen Venue to be selected as the exclusive venue for any dispute

Revised 03.15.2021
Std. Emp. Agmt.
Not for use in California

between the parties with respect to this Agreement or any matter related thereto and that he will suffer no undue burden by having to litigate any such disputes in the Chosen Venue. Moreover, Employee promises not to initiate suit against the Company in any venue other than the above-selected exclusive Chosen Venue with respect to any dispute between the parties relating to this Agreement. Employee waives and agrees not to interpose any argument that the Chosen Venue is an inconvenient forum for litigation.

C. **Waiver of Jury Trial**. **NOTE: If Employee is also party to an arbitration agreement with the Company, this Subsection C is superseded and replaced entirely by the terms of such arbitration agreement.** Because of the time and expense involved in the docketing of, preparation for and participation in a jury trial, the parties desire that any dispute arising hereunder will be decided by a judge rather than a jury. Therefore, the parties hereby knowingly, voluntarily and intentionally waive the right either may have to a trial by jury in respect to any litigation based on this Agreement or arising out of, under or in conjunction with Employee's employment by the Company, this Agreement, or any course of conduct, course of dealing, verbal or written statement or the actions of either party.

D. If Employee is an existing employee of the Company as of the Effective Date and is subject to any existing employment agreement with the Company, whether an Executive Agreement, Associate Agreement, or otherwise (collectively "Existing Employee Agreement"), this Agreement will be considered an Amended and Restated Employee Agreement of such Existing Employee Agreement. If Employee is an employee of a business enterprise acquired or to be acquired by the Company as of the Effective Date and is subject to any existing employment agreement with the acquired business enterprise, then this Agreement will be considered an Amended and Restated Employment Agreement only if Employee's employment agreement with the acquired business enterprise is assigned to the Company.

E. This Agreement contains the entire agreement of the parties with respect to the subject matters covered hereby. The parties agree that all prior negotiations and communications are of no force or effect. Further, the parties agree that there are no oral agreements, understandings, undertakings or promises of the parties relating to the subject matters covered by this Agreement.

F. Subject to Section 11(G) below, this Agreement may not be amended, altered or modified without the prior written consent of both parties, and such instrument will acknowledge that it is an amendment or modification of this Agreement. Waiver of any term or condition of this Agreement will not be construed as a waiver of any subsequent breach or failure of the same term or condition, or any other term or condition. Any waiver must be in writing. No amendment, alteration, modification or waiver may be signed by Employee on behalf of the Company, its assignees, successors or assigns.

G. To the extent that any of the terms set forth in this Agreement or any word, phrase, clause or sentence is found to be illegal or unenforceable for any reason, it is the intention of the parties that such word, phrase, clause or sentence will be modified or deleted by a court of competent jurisdiction so as to afford the Company the fullest protection commensurate with making this Agreement, as modified, legal and enforceable under applicable laws, and the balance of this Agreement will not be affected thereby, the balance being construed as severable and independent.

H. All notices given hereunder will be in writing and will be sent by registered or certified mail or delivered by hand and, if intended for the Company, addressed to it or delivered to

Revised 03.15.2021
Std. Emp. Agmt.
Not for use in California

its principal office to the attention of the Secretary of the Company. If intended for Employee, notices will be delivered personally or addressed (if sent by mail) to Employee's then current residence address as shown on the Company's records, or to such other address as Employee directs in a written notice to the Company. All notices will be deemed to be given on the date received at the address of the addressee or, if delivered personally, on the date delivered.

     I.     The use of male pronouns throughout this Agreement includes the female gender. The words "including" or "include" are not to be interpreted as terms of limitation or exclusion, but rather of illustration.

     J.     This Agreement may be executed in counterparts, each of which is deemed an original.

     **IN WITNESS WHEREOF,** the parties hereto have executed this Agreement as of the day and year provided below their respective signatures. The parties agree that the Effective Date of this Agreement will be <u>10/11/21</u> .

**ARTHUR J. GALLAGHER & CO.,** on behalf of itself and its subsidiaries, divisions and affiliated and related companies

By: _____
    Authorized Corporate Signature

    Corporate Officer Signature
    Corporate Vice President and
Title: <u>Chief Human Resources Officer, Human Resources</u>

Date: <u>10/7/21</u>

**EMPLOYEE**

Taylor Gunnells
_____
Employee Signature

Taylor Gunnells
_____
Printed Name

Date: <u>10/7/21</u>

FOR PAYROLL USE ONLY:

Employee ID: <u>5093620</u>

Revised 03.15.2021
Std. Emp. Agmt.
Not for use in California

## Schedule A
### For LOUISIANA Employees Only

(FOR **MANAGERS OF LOUISIANA EMPLOYEES ONLY:** Please fully circle designated areas as define in Section 8 (4).)

**Louisiana Parishes:**

| | | | |
|---|---|---|---|
| Acadia | East Baton Rouge | Madison | Saint Landry |
| Allen | East Carroll | Morehouse | Saint Martin |
| Ascension | East Feliciana | Natchitoches | Saint Mary |
| Assumption | Evangeline | Orleans | Saint Tammany |
| Avoyelles | Franklin | Ouachita | Tangipahoa |
| Beauregard | Grant | Plaquemines | Tensas |
| Bienville | Iberia | Pointe Coupee | Terrebonne |
| Bossier | Iberville | Rapides | Union |
| Caddo | Jackson | Red River | Vermilion |
| Calcasieu | Jefferson Davis | Richland | Vernon |
| Caldwell | Jefferson | Sabine | Washington |
| Cameron | La Salle | Saint Bernard | Webster |
| Catahoula | Lafayette | Saint Charles | West Baton Rouge |
| Claiborne | Lafourche | Saint Helena | West Carroll |
| Concordia | Lincoln | Saint James | West Feliciana |
| De Soto | Livingston | St. John the Baptist | Winn |

**Mississippi:**

| | | | |
|---|---|---|---|
| Hancock | Hinds | Madison | Pontotoc |
| Harrison | Jackson | Pearl River | Rankin |

**Texas:**

| | | |
|---|---|---|
| Dallas | Harris | Neuces |
| Hardin | Jefferson | Orange |

**Arkansas:**

| | | | |
|---|---|---|---|
| Blytheville | Fort Smith | Texarkana | West Memphis |
| Forrest City | Jonesboro | Trumann | |

**Tennessee:**

| | | |
|---|---|---|
| Chattanooga | Knoxville | Morristown |
| Jackson | Lafollette | Nashville |
| Kingsport | Lexington | Shelbyville |

**Kentucky:**

| | | | |
|---|---|---|---|
| Bowling Green | Hokinsville | Newport | Pikeville |
| Covington | Lexington | Paducah | Owensboro |

Manager Selected Areas

# Exhibit H4

Revised 11.15.2017
Std. Emp. Agmt.
Not for use in California

## **EMPLOYEE AGREEMENT**

This Employee Agreement ("Agreement") is made and entered into as of the Effective Date (as defined below) by and between <u>Melissa Haggerty</u> (hereinafter referred to as "Employee") and Arthur J. Gallagher & Co., a Delaware corporation with its principal place of business in Rolling Meadows, Illinois and its subsidiaries, divisions and affiliated and related companies (hereinafter referred to collectively as "AJG" or the "Company").

## RECITALS

**WHEREAS**, Employee has been hired, or is being retained, as a valued key employee who with the execution of this Agreement will be provided and will continue to be provided during his employment with valuable confidential and proprietary and trade secret information of the Company and will have significant managerial, production, administrative, technical and/or account servicing responsibilities; and

**WHEREAS**, the parties hereto acknowledge that the Company has a legitimate interest in retaining the services of Employee and accepting the covenants herein provided in order to protect its confidential and proprietary and trade secret information and to preserve the Company's goodwill, customer relationships, employment relationships and value of the business to be handled by Employee as an employee of the Company;

**NOW THEREFORE**, in consideration of these recitals and the mutual covenants and promises set forth below, and for other good and valuable consideration including, but not limited to, employment with the Company, receipt of the compensation and benefits attendant to such employment, receipt and the ability to utilize the Company's confidential, proprietary and trade secret information, and/or being provided or allowed access to and contact with certain Company accounts, all of which the parties acknowledge as sufficient consideration for this Agreement, the parties agree as follows:

**Section 1.**     <u>Employment</u>.

The Company agrees to employ Employee and Employee agrees to serve the Company and perform the duties set forth below beginning on the Effective Date and continuing thereafter until employment is terminated by either party. The Employee's employment is "at will" and is terminable by either party as provided below (except in jurisdictions where "at will" employment is not recognized). The Employee's continued employment with the Company is subject to the terms and conditions of this Agreement.

**Section 2.**     <u>Duties</u>.

A.     Employee agrees to devote his full energies, abilities, attention and business time to the performance of his employment obligations and responsibilities. Employee agrees that he will not engage in any activity which conflicts or interferes with, or in any way compromises, his performance of those obligations and responsibilities. Employee will comply with all applicable Company policies and procedures. Employee will not, either during or outside normal business hours, directly or indirectly sell, solicit, service, manage or engage in any aspect of the insurance,

Revised 11.15.2017
Std. Emp. Agmt.
Not for use in California

benefits or wealth management businesses for or on behalf of any person or entity other than the Company, nor engage in any activity that is not in the best interests of the Company.

B. Employee recognizes that, by virtue of his employment by the Company and to assist him in the solicitation, production, management, and/or servicing of accounts, he will be provided and granted otherwise prohibited access to certain confidential and proprietary data and trade secret information of the Company which is not known either to its competitors or within the industry generally and which has independent economic value to the Company, and is subject to reasonable efforts that are reasonable under the circumstances to maintain its secrecy. This information (collectively hereinafter "Confidential Information") may include, but is not limited to: data relating to the Company's unique marketing and servicing programs, procedures and techniques; investment, wealth management and retirement plan consulting, variable annuities, and fund investment business and related products and services; underwriting criteria for general programs; business, management and human resources/personnel strategies and practices; the criteria and formulae used by the Company in pricing its insurance and benefits products and claims management, loss control and information management services; the structure and pricing of special insurance packages negotiated with underwriters; highly sensitive information about the Company's agreements and relationships with underwriters; sales data contained in various tools and resources (including, without limitation, Salesforce.com); lists of prospects; the identity, authority and responsibilities of key contacts at Company accounts and prospects; the composition and organization of Company accounts' businesses; the peculiar risks inherent in the operations of Company accounts; highly sensitive details concerning the structure, conditions and extent of existing insurance coverages of Company accounts; policy expiration dates, premium amounts and commission rates relating to Company accounts; risk management service arrangements relating to Company accounts; loss histories relating to Company accounts; candidate and placement lists relating to Company accounts; the Company's personnel and payroll data including details of salary, bonus, commission and other compensation arrangements; and other data showing the particularized insurance or consulting requirements and preferences of Company accounts. Employee understands that his job duties may include assisting in the development of information and data that is Confidential Information belonging to the Company. Confidential Information may be stored in files, documents, dailies, daily reports, renewal information, customer lists, accounting records, products purchased by customers, customer account and credit data, referral sources, computer programs and software, customer comments, Company written manuals and marketing and financial analysis, plans, research and programs. Employee recognizes that this Confidential Information constitutes valuable property of the Company, developed over a long period of time and at substantial expense and that the Company takes reasonable efforts to keep this Confidential Information confidential and made available only to those employees who need access to such Confidential Information to perform their job functions for the Company. Employee promises to safeguard such Confidential Information, and agrees that he will not, at any time during his employment by the Company, divulge such Confidential Information or make use of it for his own purposes or the purposes of another.

**Notwithstanding this Section 2** *(NOTE: this varies by agreement – Section 2 (AJG EAs), Paragraph 5 (GB EAs), Section 3 (NDA))***, or the generality of any prohibition relating to Confidential Information appearing in this Agreement, Employee acknowledges the following important exceptions under state or federal law:**

Revised 11.15.2017
Std. Emp. Agmt.
Not for use in California

1.   **Employee is not prohibited from reporting possible violations of federal law or regulation to any governmental agency or entity including, without limitation, the Department of Justice, the Securities and Exchange Commission, the Congress, and any agency Inspector General, or making other disclosures that are protected under the whistleblower provisions of federal law or regulation.**

2.   **The Federal Defend Trade Secrets Act of 2016 provides the following:**

IMMUNITY FROM LIABILITY FOR CONFIDENTIAL DISCLOSURE OF A TRADE SECRET TO THE GOVERNMENT OR IN A COURT FILING.

(1)   IMMUNITY. An individual shall not be held criminally or civilly liable under any Federal or State trade secret law for the disclosure of a trade secret that:

 (A)   is made

  (i)   in confidence to a Federal, State, or local government official, either directly or indirectly, or to an attorney; and

  (ii)   solely for the purpose of reporting or investigating a suspected violation of law; or

 (B)   is made in a complaint or other document filed in a lawsuit or other proceeding, if such filing is made under seal.

(2)   USE OF TRADE SECRET INFORMATION IN ANTIRETALIATION LAWSUIT. An individual who files a lawsuit for retaliation by an employer for reporting a suspected violation of law may disclose the trade secret to the attorney of the individual and use the trade secret information in the court proceeding, if the individual:

 (A)   files any document containing the trade secret under seal; and

 (B)   does not disclose the trade secret, except pursuant to court order.

C.   The Company agrees that, during Employee's employment with the Company, it will: (i) provide Employee with certain Confidential Information the Employee did not previously possess including, without limitation, Confidential Information relating to certain of the Company's accounts; (ii) provide Employee with information and access to the Company's proprietary insurance and risk management programs; (iii) provide Employee with access to the Company's specialized business operations relating to particular aspects of the insurance agency and risk management business; (iv) maintain specialized training programs to which Employee will qualify and apply; and (v) provide such other assistance which may reasonably aid Employee in performing sales, management, technical and/or servicing duties.

D.   Employee acknowledges and understands that an essential element of the Company's business is the development and maintenance of personal contacts and relationships with its accounts, and that Employee may be provided and allowed access to certain of the Company's accounts for the purpose of establishing personal contact and relationships with such accounts for the benefit of the Company. The Employee acknowledges that the Company

Revised 11.15.2017
Std. Emp. Agmt.
Not for use in California

invests considerable time, money, and resources necessary to develop and maintain a relationship between its employees and a client, and in that regard, the Company will pay Employee's salary, reimburse reasonably necessary business expenses, provide Employee with certain Confidential Information, and provide the resources necessary to service the Company accounts managed or serviced by Employee by making available legal advice, accounting support, advertising and other corporate services. Moreover, while the Employee recognizes that some Company accounts may develop greater identification with the Employee than the Company itself, those accounts remain, at all times and for all purposes, accounts of the Company. By entering this Agreement, Employee disclaims any interest in such Company accounts.

**Section 3.**     <u>Compensation and Benefits</u>.

Employee will be entitled to the compensation and benefits agreed to by Employee and the Company and as noted from time to time in Employee's official personnel file and records retained in the Company's corporate headquarters, which file is incorporated by reference herein to the extent necessary for evidencing the compensation and benefits to which Employee and the Company have agreed. The compensation and benefits to which Employee is entitled as of the Effective Date is noted in Employee's official personnel file. Employee's compensation and benefits is subject to periodic change at the Company's discretion.

**Section 4.**     <u>Representations</u>.

Employee represents and warrants to the Company that:

A.     Employee is not, and will not become, a party to any agreement, contract, arrangement or understanding, whether of employment or otherwise, that would in any way restrict him from undertaking or performing his duties in accordance with this Agreement or that limits his ability to be employed by the Company under this Agreement;

Revised 11.15.2017
Std. Emp. Agmt.
Not for use in California

B.      Employment by the Company will not violate the terms of any policy of any prior employer of Employee regarding competition, solicitation or confidentiality;

C.      Employment by the Company in the position contemplated by this Agreement will not require him to improperly use any trade secrets or confidential or proprietary information of any prior employer, or any other person or entity for whom he has performed services;

D.      Employee has not misused, and will not misuse, any confidential or proprietary information obtained from any prior employer or any other person or entity;

E.      Employee has not improperly taken or retained in any form whatsoever, or otherwise retained access to, any confidential or proprietary information of any prior employer or any other person or entity; and

F.      Employee is in compliance with any non-competition and/or non-solicitation agreements, or other restrictive covenant obligations in place between him and any former employer and will continue to be in compliance, regardless of whether he believes such agreements and/or restrictive covenants are enforceable or not.

G.      Employee was provided a reasonable period of time, not less than fourteen (14) days, to review and consider this Agreement prior to signing it and accepting employment with the Company. If Employee elects to sign this Agreement sooner than fourteen (14) days prior to the commencement of employment, he represents and acknowledges that he chose to do so voluntarily.

H.      Employee gives the Company consent to record, videotape and photograph Employee's image and/or voice to be used for any internal or external business use (including but not limited to the Company's intranet accessible to all employees; on www.ajg.com or any related or affiliated website or social media; in printed or online newsletters, articles, internal or client promotional materials or other business communication; or the Company's annual and periodic reporting documents). Employee acknowledges that no special compensation will be to Employee for such consent or use and that while the Company will take reasonable efforts to do so, Employee may not be informed in advance of any such specific use.

**Section 5.**      <u>Termination of Employment Relationship.</u>

A.      The Company or the Employee may terminate Employee's employment at any time and for any reason upon twenty-one (21) days' written notice (the "Notice Period") by the party wishing to terminate the employment; provided, however, that notice is not required from the Company for any termination taking place: (1) during the Employee's first ninety (90) days of employment (or other applicable Introductory Period pursuant to Company policy); (2) during the pendency of any Performance Improvement Plan issued pursuant to the Company's performance management policies; or (3) as a result of Employee's commission of any act that would result in immediate termination under the Company's Performance Improvement and Management policies then in effect.

B.      The Company agrees to continue during the Notice Period the same compensation and benefits Employee was receiving prior to the Notice Period. Alternatively, where

Revised 11.15.2017
Std. Emp. Agmt.
Not for use in California

termination is initiated by the Company, the Company may elect to terminate employment immediately and provide Employee, in lieu of the Notice Period, a lump sum payment equivalent to Employee's base pay for the Notice Period. The parties agree that once the Notice Period expires, the Employee's entitlement to compensation and benefits ends.

C.    Employee agrees that during the Notice Period, he will cooperate fully with the Company in all matters relating to the winding up of any pending work and/or the orderly transfer to other Company employees of the accounts for which he has been responsible. Employee specifically covenants that during the Notice Period (regardless of whether or not active employment responsibilities are continuing) his duties to the Company, including Employee's fiduciary duty of loyalty, will continue in effect. Prior to the expiration of the Notice Period, Employee promises to return to the Company all originals and copies (whether paper, digital copies or otherwise) of literature, correspondence, memoranda, reports, summaries, manuals, proposals, contracts and other documents of any kind which relate in any way to the business of the Company, including specifically all materials which comprise or refer to the Company's Confidential Information. The Employee covenants that he will not retain any copy, facsimile or note intended to memorialize any such data. Employee further understands and agrees that, during or at the expiration of the Notice Period, and as part of his assigned job duties, he will reasonably participate in any meeting the Company may convene to: (i) review the status of any projects or work Employee has been assigned; (ii) review the status of accounts for which Employee has been most recently responsible or associated; (iii) ensure that Employee has fully obtained his entitlements under this Agreement and as provided by law; and/or (iv) confirm that Employee understands the nature and scope of his post-employment obligations.

D.    Upon the termination of Employee's employment for any reason, Employee agrees that the Secretary of the Company may, as an irrevocable proxy and in Employee's name and stead, execute all documents and things which the Company deems necessary and desirable to effect Employee's resignation as an officer or director of any company (if applicable) included within the definition of Company as used in this Agreement.

E.    Before accepting any new employment in the insurance, benefits or wealth management industries, Employee promises to give his prospective new employer a copy of this Agreement. Employee permits the Company to advise any prospective new employer of Employee of the existence and terms of this Agreement and to provide it with a copy.

F.    During employment and after the termination of same Employee agrees to remain available to the Company and its legal counsel, voluntarily upon the Company's request and without the necessity of subpoena or court order, in connection with the Company's investigation, preparation, prosecution and/or defense of any actual or potential legal proceeding, regulatory action, or internal matter. The Employee agrees to cooperate with the Company, to provide any information reasonably within his recollection and to provide truthful testimony as required. If Employee is called upon to provide cooperation after employment has been terminated, the Company will reimburse Employee for reasonable out-of-pocket expenses actually incurred under this section or, at the Company's option, will advance Employee's reasonable expenses or incur them directly.

G.    Employee agrees that while he is employed by the Company, and following the termination of his employment, he will not make any false, defamatory or disparaging statements about the Company, its officers or directors where such statements are calculated to, or reasonably likely to cause material damage to the Company, its officers or directors.

Revised 11.15.2017
Std. Emp. Agmt.
Not for use in California

**Section 6.**     <u>The Company's Right to Injunctive Relief; Attorneys' Fees</u>.

The Employee acknowledges that his services to the Company are of a unique character which gives them a special value to the Company, the loss of which cannot reasonably or adequately be compensated in damages in an action at law should the Employee breach, or threaten to breach, any post-employment obligations under this Agreement.   The Employee realizes that: (a) it would be difficult to measure precisely the damages to the Company from any breach by Employee of Sections 7 and/or 8 of this Agreement; (b) injury to the Company from any such breach would be incalculable and irremediable; and (c) money damages would therefore be an inadequate remedy for any such breach. Accordingly, in addition to any other remedy the Company may have at law or in equity, the Company will be entitled to enforce this Agreement by obtaining a temporary restraining order and preliminary and permanent injunctive relief to restrain any such breach or further breach by Employee. Employee expressly waives the right to contest whether a breach of Section 7 or 8 of this Agreement would result in irreparable or permanent harm to the Company. In addition, Employee agrees that the Company may seek injunctive relief when and if it elects to do so and any delay in seeking injunctive relief will not prejudice or waive the Company's right to do so. Employee expressly waives the right to assert that the Company is not entitled to injunctive relief because of any delay in seeking such relief. Employee agrees that he will be responsible for and pay the Company its reasonable attorneys' fees and other expenses and costs incurred to enforce this Agreement if the Company is the prevailing party. Employee further agrees that if Employee breaches any covenant contained in Sections 7 and/or 8 of this Agreement, the Company will be entitled, in addition to all other legal or equitable remedies it may have, to offset and withhold against any such loss, cost, liability or expense any amount of any kind that may then be owing or payable by Company to Employee.

**Section 7.**     <u>Trade Secrets and Confidential Information</u>.

A.     Employee acknowledges that the Company's business depends to a great degree upon having information which is not generally known to others, and that the profitability of the Company's business requires that this information be kept confidential and proprietary within the Company.  Accordingly:

(1)     Employee agrees that all intellectual property, such as computer programs, systems or software, developed during his employment or as a result of his employment is "work for hire" performed by Employee in the scope of his employment. To the extent that any such intellectual property is determined not to constitute "work for hire," or if any rights in any such intellectual property do not accrue to the Company as a "work for hire," Employee's signature on this Agreement constitutes an assignment (without any further consideration) to the Company of any and all copyrights and other rights, title and interest in and to all such intellectual property. The Company will retain all proprietary rights to any and all such intellectual property. Employee agrees to execute any documents necessary to perfect the Company's interest in such intellectual property upon the Company's request.

(2)     Employee has been advised by this writing and understands that the foregoing provisions of Section 7(A)(1) do not apply to an item of intellectual property for which no equipment, supplies, facilities or

Revised 11.15.2017
Std. Emp. Agmt.
Not for use in California

Confidential Information of the Company was used and which was developed entirely on Employee's own time, unless: (a) the item of intellectual property relates to the business of the Company or to the Company's actual or demonstrably anticipated research and development; or (b) the item of intellectual property results from any work performed by Employee for the Company.

B.    Employee recognizes the highly sensitive nature of the Confidential Information he will be given (and to which he will have access throughout his employment) and acknowledges the Company's legitimate interest in safeguarding it from disclosure. Accordingly, in addition to the restrictions provided in Section 8 below, Employee agrees that:

(1)    after his employment with the Company is terminated, he will not directly or indirectly disclose, use or divulge Confidential Information that constitutes a trade secret of the Company or make use of it for his own purpose or the purpose of another; and

(2)    for a period of two (2) years following the termination of his employment with the Company, he will not divulge Confidential Information that does not constitute a trade secret of the Company or make use of it for his own purpose or the purpose of another.

(3)    not all of the Company's Confidential Information will rise to the level of a trade secret of the Company; even so, all Confidential Information will be entitled to the protections and restrictions provided in this Agreement.

C.    Employee understands and acknowledges that he will benefit significantly from having access to and being given Confidential Information. Employee agrees that but for his promise to safeguard Confidential Information and the further restrictive covenants contained in Section 8 below, the Company would not agree to provide Employee with Confidential Information. Further, Employee acknowledges that his breach of any restrictions provided in Section 8 below will inevitably and necessarily lead to the prohibited disclosure or use of Confidential Information.

**D.    Notwithstanding the generality of the foregoing restrictions in this Section 7, employee acknowledges having reviewed the federal Defend Trade Secrets Act notice appearing in Section 2, above.**

**Section 8.**    <u>Protection of the Company's Protectable Interests.</u>

A.    To protect the legitimate interests of the Company in, among other things, protecting its Confidential Information, employment relationships, relationships with Company accounts and goodwill, and in consideration for, among other things as provided in this Agreement, the Company's promise to give Employee certain Confidential Information, some of which constitutes trade secrets of the Company which Employee did not previously have, and to enforce Employee's promise not to disclose such Confidential Information, Employee agrees to the following restrictive covenants, which Employee acknowledges and agrees are reasonably necessary and narrowly tailored to protect the Company's legitimate business interests:

(1)    For a period of twenty-four (24) months [or, if Employee is principally employed in **OREGON** or **ALABAMA**, for a period of eighteen (18)

Revised 11.15.2017
Std. Emp. Agmt.
Not for use in California

months] following the termination of Employee's employment with the Company for any reason whatsoever Employee will not, directly or indirectly, solicit, transfer, place, market, accept, aid, counsel or consult in the placement, renewal, discontinuance or replacement of any insurance (including self-insurance) by, or handle self-insurance programs, insurance claims, risk management services, emergency or disaster prevention or management services, or other insurance administrative or service functions ("insurance services") or provide employee benefit brokerage, consulting, or administration services; in the area of group insurance, defined benefit and defined contribution pension plans, individual life, disability and capital accumulation products; investment advisory services, wealth management, or group retirement services; defined benefit and defined contribution pension services; human resources consulting services, including, without limitation, compensation consulting, compensation program design, compensation and benefits surveys, and on-site human resources management; and all other employee benefit areas the Company is involved with ("benefit services"), for: (x) any Account of the Company for which Employee performed any of the foregoing functions during any part of the two-year period immediately preceding such termination (referred to hereinafter as "Protected Accounts"), or (y) any Prospective Account of the Company (as defined below).

(2)  **For UTAH Employees Only.**  Employee and Company agree that this paragraph (A)(2) is necessary given the uniqueness of Utah law, and it will apply only for such period of time, if any, Employee is principally employed in **Utah** during which time the following activity restrictions will be substituted for those stated in the foregoing paragraph (A)(1):

    (a)  for a period of one (1) year following the termination of Employee's employment with the Company for any reason whatsoever, provide, service, transfer, place, market, accept, aid, counsel or consult in the placement, renewal, discontinuance or replacement of any insurance services or benefit services for any Protected Accounts (as defined above) or any Prospective Account of the Company (as defined below); and

    (b)  for a period of two (2) years following the termination of Employee's employment with the Company for any reason whatsoever, directly or indirectly solicit any insurance services or benefit services for any Protected Accounts (as defined above) or any Prospective Account of the Company (as defined below).

(3)  **For OKLAHOMA Employees Only.**  Employee and Company agree that this paragraph (A)(3) is necessary given the uniqueness of Oklahoma law, and it will apply only for such period of time, if any, Employee is principally employed in **Oklahoma** during which time the following activity restrictions will be substituted for those stated in the foregoing paragraph (A)(1): For a period of two (2) years following the termination of Employee's employment with the Company for any reason whatsoever, Employee will not engage in any act of solicitation with respect to any Protected Accounts (as defined above) which are established customers of the Company for the purpose of providing insurance services or benefit services.

Revised 11.15.2017
Std. Emp. Agmt.
Not for use in California

(4)    **For LOUISIANA Employees Only.**  Employee and Company agree that this paragraph (A)(4) is necessary given the uniqueness of Louisiana law, and it will apply only for such period of time, if any, Employee is principally employed in **Louisiana** during which time the activity restrictions stated in the foregoing paragraph (A)(1) will apply only to activity undertaken by Employee in the following designated parishes, counties, municipalities or territories:

**(Please reference Schedule A)**

(5)    The term "Account of the Company" as used in this paragraph will be construed broadly to include all users of insurance services or benefit services, including commercial and individual consumers, risk managers, carriers, agents and other insurance intermediaries who are customers of the Company on the date Employee's employment with the Company terminates, or an insurance carrier offering any custom program for which the Company acts as managing general agent, managing general underwriter, program manager or underwriting agent, regardless of how the relationship is documented or characterized.

(6)    If an Account of the Company is part of a group of companies which conducts business through more than one entity, division or operating unit, whether or not separately incorporated (a "Client Group"), the term "Account of the Company" as used herein will include products or services within any entity, division or operating unit of the Client Group where the same management group within the Client Group has the primary decision making authority with respect to contracting for services of the type rendered by the Company. Notwithstanding anything herein to the contrary, the Employee will be free to call on the retail agents of the Company, so long as there is no contact or solicitation of any account, client, or Prospective Account of the Company.

B.    For the purposes of the covenants set forth in Sections 7 and 8 of this Agreement, the parties acknowledge and agree that the following will apply:

(1)    The term "Prospective Account" of the Company, means any entity (other than a then-current account of the Company but including former Company accounts) with respect to whom, at any time during the one year period preceding the termination of Employee's employment with the Company, Employee: (i) submitted or assisted in the submission of a presentation or proposal of any kind on behalf of the Company, (ii) had material contact or acquired Confidential Information as a result of or in connection with Employee's employment with the Company, or (iii) incurred travel and/or entertainment expenses which were reimbursed by the Company to Employee; but the term Prospective Account does not include an account that is a customer of Employee's new employer (for the same type of insurance and/or benefits services for which such customer was a Prospective Account of the Company) at the time of termination of Employee's employment with the Company.

(2)    "Direct or indirect solicitation" of a Protected Account or Prospective

Revised 11.15.2017
Std. Emp. Agmt.
Not for use in California

Account will expressly include, but not be limited to, the following (which is not intended to be an exhaustive list of direct or indirect solicitation, but is meant to provide examples of certain reasonably anticipated scenarios):

(a) The sending of an announcement by Employee or his new employer to any Protected Account or Prospective Account, the purpose of which is to communicate that Employee has either formed his own business enterprise or joined an existing business enterprise that will offer products or services in any way competitive with the Company.

(b) Initiating a communication or contact by Employee or his new employer with any Protected Account or Prospective Account for the purpose of notifying such Protected Account or Prospective Account that Employee has either formed his own business enterprise or joined an existing business enterprise that will offer products or services in any way competitive with the Company.

(c) Communication or contact by Employee or his new employer with any Protected Account or Prospective Account (if such new employer's communication with a Prospective Account was facilitated by Employee, directly or indirectly, or if Employee will or is intended to benefit, directly or indirectly, by such communication) if the communication in any way relates to insurance or benefits services; provided, however, nothing herein is intended to limit communications or contacts that are unrelated to insurance and/or benefits services.

(d) The facilitation by Employee, directly or indirectly, of any Protected Accounts' execution of a broker of record letter replacing the Company as its broker of record.

C. Except as otherwise noted above in subparagraph (A)(4), Employee understands and agrees that many of the accounts for which he will perform insurance and/or benefits services while employed by the Company are national accounts and that Employee will perform insurance and/or benefit services for Company accounts throughout the entire country. Employee agrees and acknowledges that the geographic scope relating to the restrictions provided in this Section 8 will include the entire United States and that since the post-employment restrictions herein provided are tied directly to Accounts of the Company for whom Employee performed insurance and/or benefit services during the two-year period immediately preceding termination of his employment and Prospective Accounts, this geographic limitation is reasonable. Moreover, Employee acknowledges and agrees that the applicable restrictions contained throughout this Section 8 do not prohibit Employee from competing generally with the Company or performing insurance services or benefits services for potential clients throughout the entire world except for Protected Accounts and Prospective Accounts, and that those restrictions are reasonable and narrowly tailored to further the Company's legitimate interest to protect its Confidential Information, account relationships, and goodwill, and such restrictions will not unduly burden Employee's ability to earn a living after his employment with the Company is terminated.

Revised 11.15.2017
Std. Emp. Agmt.
Not for use in California

D.     If, within two (2) years of the termination of Employee's employment the Employee engages in, or joins a company or business enterprise engaged in, providing insurance and/or benefits services, then the Company may advise any Protected Account and/or Prospective Account of the existence and terms of this Agreement and may give them a copy of this Agreement.

E.     Employee recognizes that employees of the Company are a valuable resource of the Company. Accordingly, during Employee's employment with the Company, Employee will not, directly or indirectly solicit, induce, entice or recruit any employee of the Company to leave their employment with the Company. In addition, for a period of two (2) years following the termination of Employee's employment with the Company for any reason whatsoever, Employee will not directly or indirectly, solicit, induce or recruit any employee of the Company who has been provided Confidential Information to leave the employ of the Company.

**Section 9.**     Assignment.

Except as provided in Section 10, this Agreement will not be affected by any merger or consolidation or other reorganization of the Company and will be assignable to, binding upon, and will inure to the benefit of the continuing entity or to any successor in interest to the Company including, without limitation, any entity to which the Company sells business, assets and/or accounts of any branch, business unit or profit center in which Employee is primarily employed. This Agreement also will inure to the benefit of every affiliate company included in the definition of "Company" under this Agreement. The Company may assign this Agreement to any affiliate company of AJG in which case, except for purposes of Section 10 hereof, all references to "the Company" and all rights of the Company will include and inure to the benefit of that affiliate. Employee may not assign this Agreement or any obligations hereunder.

**Section 10.**     Release of Certain Obligations.

Notwithstanding anything herein to the contrary, the obligations of Employee stated in Section 8 will become null and void and have no further effect immediately upon a Hostile Change in Control of AJG as defined herein. The Company will send written notice to Employee within ten (10) days of a Hostile Change in Control of AJG, notifying Employee that such event has taken place. Failure of the Company to send such notice will not preclude the release of Employee from the obligations contained in Section 8. These definitions apply to Section 10:

A.     The term "Hostile Change in Control" means a transaction, event or election constituting a Change in Control which was not approved by or, in an election, the directors elected were not nominated by, at least two-thirds of the members of the Board of Directors of AJG in office immediately prior to the Change in Control who have not died or become permanently disabled.

B.     The term "Change in Control" of AJG means and includes each and all of the following occurrences:

(1)     A Business Combination, unless:

(a)     the Business Combination is approved or authorized by the affirmative vote of the holders of not less than 80% of the outstanding shares of voting stock of AJG and the affirmative vote of the holders of not less than 67% of the outstanding shares of the

Revised 11.15.2017
Std. Emp. Agmt.
Not for use in California

voting stock held by shareholders other than Related Persons; or

(b)    the Continuing Directors of AJG by a two-thirds vote: (i) have expressly approved in advance the acquisition of outstanding shares of voting stock of the corporation that caused the Related Person to become a Related Person; or (ii) have approved the Business Combination prior to the Related Person involved in the Business Combination having become a Related Person; or

(c)    the Business Combination is solely between AJG and another corporation, 50% or more of the voting stock of which is owned by AJG and none of which is owned by the Related Person; or

(d)    all of the following conditions are satisfied:

    i.   The cash or fair market value of the property, securities or "other consideration to be received" per share by holders of common stock in AJG in the Business Combination is not less than the higher of:

    (A)    the highest per share price (including brokerage commissions, transfer taxes and soliciting dealers' fees) paid by the Related Person in acquiring any of its holdings of AJG's common stock, or

    (B)    an amount that bears that same percentage relationship to the market price of AJG's common stock immediately prior to the announcement of such Business Combination as the highest per share price determined in (A) above bears to the market price of AJG's common stock immediately prior to the commencement of the acquisition of AJG's voting stock that caused such Related Person to become a Related Person, or

    (C)    an amount calculated by multiplying the earnings per share of AJG's common stock for the four fiscal quarters immediately preceding the record date for determination of stockholders entitled to vote on such Business Combination by the price/earnings multiple of the Related Person as of the record date s customarily computed and reported in the financial press. Appropriate adjustments will be made with respect to these subsections (A), (B) and
(C) for recapitalizations and for stock splits, stock dividends, and like distributions; and

    ii.   A timely mailing will have been made to the stockholders of AJG showing in a prominent place: (x) any recommendations as to the advisability (or inadvisability) of the Business Combination that the Continuing Directors or Outside Directors may choose to state, if there are at the time any such directors;

Revised 11.15.2017
Std. Emp. Agmt.
Not for use in California

and (y) the opinion of a reputable nationally recognized investment banking or financial services firm as to the fairness from the financial point of view of the terms of the Business Combination to the stockholders of AJG other than the Related Person (such firm to be engaged solely on behalf of such other stockholders, to be paid a reasonable fee for its services by AJG upon receipt of such opinion, to be a firm that has not previously been significantly associated with the Related Person and, if there are at the time any such directors, to be selected by a majority of the Continuing Directors and Outside Directors).

(2) The acquisition of outstanding shares of AJG's voting stock that causes an individual, a corporation, partnership or other person or entity to become a Related Person.

(3) Individuals who at the beginning of any period of three consecutive years constitute the entire Board of Directors of the Company will for any reason other than death or permanent disability during such period cease to constitute a majority thereof.

(4) A change in control of a nature that would be required to be reported in response to Item 6(e) of Schedule 14A of Regulation 14A promulgated under the Securities Act of 1934, as amended.

C. The term "Business Combination" will mean: (i) any merger or consolidation of AJG with or into a Related Person; (ii) any sale, lease, exchange, transfer or other disposition, including without limitation a mortgage or any other security device, of all or any Substantial Part of the assets of the Company to a Related Person; (iii) any merger or consolidation of a Related Person with or into AJG; (iv) any sale, lease, exchange, transfer or other disposition of all or any Substantial Part of the assets of a Related Person to the Company; (v) the issuance of any securities of the Company to a Related Person; (vi) the acquisition by the Company of any securities issued by a Related Person; (vii) any reclassification of securities, recapitalization or other transaction designed to decrease the number of holders of AJG's voting securities remaining, if there is a Related Person; and (viii) any agreement, contract or other arrangement providing for any of the transactions described in this definition of Business Combination.

D. The term "Related Person" will mean and include any individual, corporation, partnership or other person or entity which, together with their "Affiliates" and "Associates" (as defined as of November 1, 1983, in Rule 12b-2 under the Securities Exchange Act of 1934), "Beneficially Owns" (as defined as of November 1, 1983, in Rule 13d-3 under the Securities Exchange Act of 1934) in the aggregate 20% or more of the outstanding shares of the voting stock of AJG, and any Affiliate or Associate of any such individual, corporation, partnership or other person or entity; provided that Related Person will not include any person who beneficially owned 20% or more of the outstanding shares of the voting stock of AJG on November 1, 1983. Without limitation, any shares of voting stock of AJG that any Related Person has the right to acquire pursuant to any agreement, or upon exercise of conversion rights, warrants or options, or otherwise, will be deemed beneficially owned by the Related Person.

E. The term "Substantial Part" will mean more than 30% of the fair market value of

Revised 11.15.2017
Std. Emp. Agmt.
Not for use in California

the total assets of the corporation in question, as of the end of its most recent fiscal year ending prior to the time the determination is being made.

F.     The term "other consideration to be received" will include, without limitation, capital stock of AJG retained by its existing public stockholders in the event of a Business Combination in which AJG is the surviving corporation.

G.     The term "Continuing Director" will mean a director who was a member of the board of directors of AJG immediately prior to the time that the Related Person involved in a Business Combination became a Related Person, and the term "Outside Director" will mean a director who is not: (a) an officer or employee of AJG or any relative of an officer or employee; or (b) a Related Person or an officer, director, employee, Associate or Affiliate of a Related Person, or a relative of any of the foregoing.

**Section 11.**     General.

A.     The captions in this Agreement are for reference only and have no independent force or effect. If a caption is inconsistent with any part of the Agreement, the caption will be disregarded.

B.     This Agreement will be governed by and construed in accordance with the laws of the State in which Employee resides, without giving effect to any of its conflict of law principles. The parties agree that the chosen state has a material and significant interest in questions concerning this Agreement and performance thereunder. The parties agree that the sole and exclusive venue of any dispute between the parties with respect to this Agreement, or any matters related thereto, will be a state trial or federal district court located within the federal judicial district in which Employee resides ("Chosen Venue"). Employee agrees that it is neither unfair nor unreasonable for the Chosen Venue to be selected as the exclusive venue for any dispute between the parties with respect to this Agreement or any matter related thereto and that he will suffer no undue burden by having to litigate any such disputes in the Chosen Venue. Moreover, Employee promises not to initiate suit against the Company in any venue other than the above-selected exclusive Chosen Venue with respect to any dispute between the parties relating to this Agreement. Employee waives and agrees not to interpose any argument that the Chosen Venue is an inconvenient forum for litigation.

C.     **Waiver of Jury Trial**. Because of the time and expense involved in the docketing of, preparation for and participation in a jury trial, the parties desire that any dispute arising hereunder will be decided by a judge rather than a jury. Therefore, the parties hereby knowingly, voluntarily and intentionally waive the right either may have to a trial by jury in respect to any litigation based on this Agreement or arising out of, under or in conjunction with Employee's employment by the Company, this Agreement, or any course of conduct, course of dealing, verbal or written statement or the actions of either party.

D.     If Employee is an existing employee of the Company as of the Effective Date and is subject to any existing employment agreement with the Company, whether an Executive Agreement, Associate Agreement, or otherwise (collectively "Existing Employee Agreement"), this Agreement will be considered an Amended and Restated Employee Agreement of such Existing Employee Agreement. If Employee is an employee of a business enterprise acquired or to be acquired by the Company as of the Effective Date and is subject to any existing employment agreement with the acquired business enterprise, then this Agreement will be considered an Amended and Restated Employment Agreement only if Employee's employment

Revised 11.15.2017
Std. Emp. Agmt.
Not for use in California

agreement with the acquired business enterprise is assigned to the Company.

     E.     This Agreement contains the entire agreement of the parties with respect to the subject matters covered hereby. The parties agree that all prior negotiations and communications are of no force or effect. Further, the parties agree that there are no oral agreements, understandings, undertakings or promises of the parties relating to the subject matters covered by this Agreement.

     F.     Subject to Section 11(G) below, this Agreement may not be amended, altered or modified without the prior written consent of both parties, and such instrument will acknowledge that it is an amendment or modification of this Agreement. Waiver of any term or condition of this Agreement will not be construed as a waiver of any subsequent breach or failure of the same term or condition, or any other term or condition. Any waiver must be in writing. No amendment, alteration, modification or waiver may be signed by Employee on behalf of the Company, its assignees, successors or assigns.

     G.     To the extent that any of the terms set forth in this Agreement or any word, phrase, clause or sentence is found to be illegal or unenforceable for any reason, it is the intention of the parties that such word, phrase, clause or sentence will be modified or deleted by a court of competent jurisdiction so as to afford the Company the fullest protection commensurate with making this Agreement, as modified, legal and enforceable under applicable laws, and the balance of this Agreement will not be affected thereby, the balance being construed as severable and independent.

     H.     All notices given hereunder will be in writing and will be sent by registered or certified mail or delivered by hand and, if intended for the Company, addressed to it or delivered to its principal office to the attention of the Secretary of the Company. If intended for Employee, notices will be delivered personally or addressed (if sent by mail) to Employee's then current residence address as shown on the Company's records, or to such other address as Employee directs in a written notice to the Company. All notices will be deemed to be given on the date received at the address of the addressee or, if delivered personally, on the date delivered.

     I.     The use of male pronouns throughout this Agreement includes the female gender. The words "including" or "include" are not to be interpreted as terms of limitation or exclusion, but rather of illustration.

     J.     This Agreement may be executed in counterparts, each of which is deemed an original.

     **IN WITNESS WHEREOF,** the parties hereto have executed this Agreement as of the day and year provided below their respective signatures. The parties agree that the Effective Date of this Agreement will be ___11/9/20, 8:00 AM___, 20___ .

**ARTHUR J. GALLAGHER & CO.**,
on behalf of itself and its subsidiaries, divisions and affiliated and related companies

By: _____

                            **EMPLOYEE**

                            Melissa Haggerty

                            Employee Signature

                            Melissa Haggerty

Corporate Officer Signature

Corporate Vice President and
Chief Human Resources Officer, Human Resources

Revised 11.15.2017
Std. Emp. Agmt.
Not for use in California

_____
Printed Name

Title:_____

Date: 10/27/20

_____

1310 W Howard St

Chicago        Illinois         60626

Address

Date: 10/27/20

FOR PAYROLL USE ONLY:

Employee ID: 5000872

Revised 11.15.2017
Std. Emp. Agmt.
Not for use in California

**Schedule A**

**For LOUISIANA Employees Only**

**(FOR LOUISIANA EMPLOYEES ONLY: Only applicable designated areas as define in Section 8 (4) will be displayed.)**

# Exhibit H5

## EMPLOYEE AGREEMENT

This Employee Agreement ("Agreement") is made and entered into as of the Effective Date (as defined below) by and between ___Kelly Nicole Hogan_____ (hereinafter referred to as "Employee") and Arthur J. Gallagher & Co., a Delaware corporation with its principal place of business in Itasca, Illinois and its subsidiaries, divisions and affiliated and related companies (hereinafter referred to collectively as "AJG" or the "Company").

## RECITALS

**WHEREAS**, Employee has been hired, or is being retained, as a valued key employee who with the execution of this Agreement will be provided and will continue to be provided during his employment with valuable confidential and proprietary and trade secret information of the Company and will have significant managerial, production, administrative, technical and/or account servicing responsibilities; and

**WHEREAS**, the parties hereto acknowledge that the Company has a legitimate interest in retaining the services of Employee and accepting the covenants herein provided in order to protect its confidential and proprietary and trade secret information and to preserve the Company's goodwill, customer relationships, employment relationships and value of the business to be handled by Employee as an employee of the Company;

**NOW THEREFORE**, in consideration of these recitals and the mutual covenants and promises set forth below, and for other good and valuable consideration including, but not limited to, employment with the Company, receipt of the compensation and benefits attendant to such employment, receipt and the ability to utilize the Company's confidential, proprietary and trade secret information, and/or being provided or allowed access to and contact with certain Company accounts, all of which the parties acknowledge as sufficient consideration for this Agreement, the parties agree as follows:

**Section 1.**      **Employment.**

The Company agrees to employ Employee and Employee agrees to serve the Company and perform the duties set forth below beginning on the Effective Date and continuing thereafter until employment is terminated by either party. The Employee's employment is "at will" and is terminable by either party as provided below (except in jurisdictions where "at will" employment is not recognized). The Employee's continued employment with the Company is subject to the terms and conditions of this Agreement.

**Section 2.**      **Duties.**

A.      Employee agrees to devote his full energies, abilities, attention and business time to the performance of his employment obligations and responsibilities. Employee agrees that he will not engage in any activity which conflicts or interferes with, or in any way compromises, his performance of those obligations and responsibilities. Employee will comply with all applicable Company policies and procedures. Employee will not, either during or outside normal business hours, directly or indirectly sell, solicit, service, manage or engage in any aspect of the insurance, benefits or wealth management businesses for or on behalf of any person or entity other than the Company, nor engage in any activity that is not in the best interests of the Company.

B.      Employee recognizes that, by virtue of his employment by the Company and to assist him in the solicitation, production, management, and/or servicing of accounts, he will be provided and granted otherwise prohibited access to certain confidential and proprietary data and trade secret information of the Company which is not known either to its competitors or within the industry generally and which has independent economic value to the Company, and is subject to reasonable efforts that are reasonable under the circumstances to maintain its secrecy. This information (collectively hereinafter "Confidential Information") may include, but is not limited to: data relating to the Company's unique marketing and servicing programs, procedures and techniques; investment, wealth management and retirement plan consulting, variable annuities, and fund investment business and related products and services;

underwriting criteria for general programs; business, management and human resources/personnel strategies and practices; the criteria and formulae used by the Company in pricing its insurance and benefits products and claims management, loss control and information management services; the structure and pricing of special insurance packages negotiated with underwriters; highly sensitive information about the Company's agreements and relationships with underwriters; sales data contained in various tools and resources (including, without limitation, Salesforce.com); lists of prospects; the identity, authority and responsibilities of key contacts at Company accounts and prospects; the composition and organization of Company accounts' businesses; the peculiar risks inherent in the operations of Company accounts; highly sensitive details concerning the structure, conditions and extent of existing insurance coverages of Company accounts; policy expiration dates, premium amounts and commission rates relating to Company accounts; risk management service arrangements relating to Company accounts; loss histories relating to Company accounts; candidate and placement lists relating to Company accounts; the Company's personnel and payroll data including details of salary, bonus, commission and other compensation arrangements; and other data showing the particularized insurance or consulting requirements and preferences of Company accounts. Employee understands that his job duties may include assisting in the development of information and data that is Confidential Information belonging to the Company. Confidential Information may be stored in files, documents, dailies, daily reports, renewal information, customer lists, accounting records, products purchased by customers, customer account and credit data, referral sources, computer programs and software, customer comments, Company written manuals and marketing and financial analysis, plans, research and programs. Employee recognizes that this Confidential Information constitutes valuable property of the Company, developed over a long period of time and at substantial expense and that the Company takes reasonable efforts to keep this Confidential Information confidential and made available only to those employees who need access to such Confidential Information to perform their job functions for the Company. Employee promises to safeguard such Confidential Information, and agrees that he will not, at any time during his employment by the Company, divulge such Confidential Information or make use of it for his own purposes or the purposes of another.

C.      The Company agrees that, during Employee's employment with the Company, it will: (i) provide Employee with certain Confidential Information the Employee did not previously possess including, without limitation, Confidential Information relating to certain of the Company's accounts; (ii) provide Employee with information and access to the Company's proprietary insurance and risk management programs; (iii) provide Employee with access to the Company's specialized business operations relating to particular aspects of the insurance agency and risk management business; (iv) maintain specialized training programs to which Employee will qualify and apply; and (v) provide such other assistance which may reasonably aid Employee in performing sales, management, technical and/or servicing duties.

D.      Employee acknowledges and understands that an essential element of the Company's business is the development and maintenance of personal contacts and relationships with its accounts, and that Employee may be provided and allowed access to certain of the Company's accounts for the purpose of establishing personal contact and relationships with such accounts for the benefit of the Company. The Employee acknowledges that the Company invests considerable time, money, and resources necessary to develop and maintain a relationship between its employees and a client, and in that regard, the Company will pay Employee's salary, reimburse reasonably necessary business expenses, provide Employee with certain Confidential Information, and provide the resources necessary to service the Company accounts managed or serviced by Employee by making available legal advice, accounting support, advertising and other corporate services. Moreover, while the Employee recognizes that some Company accounts may develop greater identification with the Employee than the Company itself, those accounts remain, at all times and for all purposes, accounts of the Company. By entering this Agreement, Employee disclaims any interest in such Company accounts.

**Section 3.**     **Compensation and Benefits.**

    Employee will be entitled to the compensation and benefits agreed to by Employee and the Company and as noted from time to time in Employee's official personnel file and records retained in the Company's corporate headquarters, which file is incorporated by reference herein to the extent necessary for evidencing the compensation and benefits to which Employee and the Company have agreed. The compensation and benefits to which Employee is entitled as of the Effective Date is noted in Employee's official personnel file. Employee's compensation and benefits is subject to periodic change at the Company's discretion.

**Section 4.**     **Representations.**

    Employee represents and warrants to the Company that:

    A.     He is not, and will not become, a party to any agreement, contract, arrangement or understanding, whether of employment or otherwise, that would in any way restrict him from undertaking or performing his duties in accordance with this Agreement or that limits his ability to be employed by the Company under this Agreement;

    B.     Employment by the Company will not violate the terms of any policy of any prior employer of Employee regarding competition, solicitation or confidentiality;

    C.     His employment by the Company in the position contemplated by this Agreement will not require him to improperly use any trade secrets or confidential or proprietary information of any prior employer, or any other person or entity for whom he has performed services;

    D.     He has not misused, and will not misuse, any confidential or proprietary information obtained from any prior employer or any other person or entity;

    E.     He has not improperly taken or retained in any form whatsoever, or otherwise retained access to, any confidential or proprietary information of any prior employer or any other person or entity; and

    F.     He is in compliance with any non-competition and/or non-solicitation agreements, or other restrictive covenant obligations in place between him and any former employer and will continue to be in compliance, regardless of whether he believes such agreements and/or restrictive covenants are enforceable or not.

**Section 5.**     **Termination of Employment Relationship.**

    A.     The Company or the Employee may terminate Employee's employment at any time and for any reason upon twenty-one (21) days' written notice (the "Notice Period") by the party wishing to terminate the employment; provided, however, that notice is not required from the Company for any termination taking place: (1) during the Employee's first ninety (90) days of employment (or other applicable Introductory Period pursuant to Company policy); or (2) during the pendency of any Performance Improvement Plan issued pursuant to the Company's performance management policies.

    B.     The Company agrees to continue during the Notice Period the same compensation and benefits Employee was receiving prior to the Notice Period. The parties agree that once the Notice Period expires, the Employee's entitlement to compensation and benefits ends.

    C.     Employee agrees that during the Notice Period, he will cooperate fully with the Company in all matters relating to the winding up of any pending work and/or the orderly transfer to other Company employees of the accounts for which he has been responsible. Employee specifically covenants that during the Notice Period (regardless of whether or not active employment responsibilities are continuing) his duties to the Company, including Employee's fiduciary duty of loyalty, will continue in effect. Prior to the expiration of the Notice Period, Employee promises to return to the Company all originals and copies (whether paper, digital copies or otherwise) of literature, correspondence, memoranda, reports, summaries, manuals, proposals, contracts and other documents of any kind which relate in any way to the business of the Company, including specifically all materials which comprise or refer to the Company's Confidential Information. The Employee covenants that he will not retain any copy, facsimile or note intended to memorialize any such data. Employee further understands and agrees that, during or at the expiration of the Notice Period, and as part of his assigned job duties, he will reasonably participate in

any meeting the Company may convene to: (i) review the status of any projects or work Employee has been assigned; (ii) review the status of accounts for which Employee has been most recently responsible or associated; (iii) ensure that Employee has fully obtained his entitlements under this Agreement and as provided by law; and/or (iv) confirm that Employee understands the nature and scope of his post-employment obligations.

       D.      Upon the termination of Employee's employment for any reason, Employee agrees that the Secretary of the Company may, as an irrevocable proxy and in Employee's name and stead, execute all documents and things which the Company deems necessary and desirable to effect Employee's resignation as an officer or director of any company (if applicable) included within the definition of the Company as used in this Agreement.

       E.      Before accepting any new employment in the insurance, benefits or wealth management industries, Employee promises to give his prospective new employer a copy of this Agreement. Employee permits the Company to advise any prospective new employer of Employee of the existence and terms of this Agreement and to provide it with a copy.

       F.      During employment and after the termination of same Employee agrees to remain available to the Company and its legal counsel, voluntarily upon the Company's request and without the necessity of subpoena or court order, in connection with the Company's investigation, preparation, prosecution and/or defense of any actual or potential legal proceeding, regulatory action, or internal matter. The Employee agrees to cooperate with the Company, to provide any information reasonably within his recollection and to provide truthful testimony as required. If Employee is called upon to provide cooperation after employment has been terminated, the Company will reimburse Employee for reasonable out-of-pocket expenses actually incurred under this section or, at the Company's option, will advance Employee's reasonable expenses or incur them directly.

       G.      Employee agrees that while he is employed by the Company, and following the termination of his employment, he will not make any false, defamatory or disparaging statements about the Company, its officers or directors where such statements are calculated to, or reasonably likely to cause material damage to the Company, its officers or directors.

**Section 6.**      **The Company's Right to Injunctive Relief; Attorneys' Fees.**

      The Employee acknowledges that his services to the Company are of a unique character which gives them a special value to the Company, the loss of which cannot reasonably or adequately be compensated in damages in an action at law should the Employee breach, or threaten to breach, any post-employment obligations under this Agreement. The Employee realizes that: (a) it would be difficult to measure precisely the damages to the Company from any breach by Employee of Sections 7 and/or 8 of this Agreement; (b) injury to the Company from any such breach would be incalculable and irremediable; and (c) money damages would therefore be an inadequate remedy for any such breach. Accordingly, in addition to any other remedy the Company may have at law or in equity, the Company will be entitled to enforce this Agreement by obtaining a temporary restraining order and preliminary and permanent injunctive relief to restrain any such breach or further breach by Employee. Employee expressly waives the right to contest whether a breach of Section 7 or 8 of this Agreement would result in irreparable or permanent harm to the Company. In addition, Employee agrees that the Company may seek injunctive relief when and if it elects to do so and any delay in seeking injunctive relief will not prejudice or waive the Company's right to do so. Employee expressly waives the right to assert that the Company is not entitled to injunctive relief because of any delay in seeking such relief. Employee agrees that he will be responsible for and pay the Company its reasonable attorneys' fees and other expenses and costs incurred to enforce this Agreement if the Company is the prevailing party. Employee further agrees that if Employee breaches any covenant contained in Sections 7 and/or 8 of this Agreement, the Company will be entitled, in addition to all other legal or equitable remedies it may have, to offset and withhold against any such loss, cost, liability or expense any amount of any kind that may then be owing or payable by Company to Employee.

**Section 7.**     **Trade Secrets and Confidential Information.**

      A.     Employee acknowledges that the Company's business depends to a great degree upon having information which is not generally known to others, and that the profitability of the Company's business requires that this information be kept confidential and proprietary within the Company. Accordingly:

      (1)     Employee agrees that all intellectual property, such as computer programs, systems or software, developed during his employment or as a result of his employment is "work for hire" performed by Employee in the scope of his employment. To the extent that any such intellectual property is determined not to constitute "work for hire," or if any rights in any such intellectual property do not accrue to the Company as a "work for hire," Employee's signature on this Agreement constitutes an assignment (without any further consideration) to the Company of any and all copyrights and other rights, title and interest in and to all such intellectual property. The Company will retain all proprietary rights to any and all such intellectual property. Employee agrees to execute any documents necessary to perfect the Company's interest in such intellectual property upon the Company's request.

      (2)     Employee has been advised by this writing and understands that the foregoing provisions of Section 7(A)(1) do not apply to an item of intellectual property for which no equipment, supplies, facilities or Confidential Information of the Company was used and which was developed entirely on Employee's own time, unless: (a) the item of intellectual property relates to the business of the Company or to the Company's actual or demonstrably anticipated research and development; or (b) the item of intellectual property results from any work performed by Employee for the Company.

      B.     Employee recognizes the highly sensitive nature of the Confidential Information he will be given (and to which he will have access throughout his employment) and acknowledges the Company's legitimate interest in safeguarding it from disclosure. Accordingly, in addition to the restrictions provided in Section 8 below, Employee agrees that:

      (1)     after his employment with the Company is terminated, he will not directly or indirectly disclose, use or divulge Confidential Information that constitutes a trade secret of the Company or make use of it for his own purpose or the purpose of another; and

      (2)     for a period of two (2) years following the termination of his employment with the Company, he will not divulge Confidential Information that does not constitute a trade secret of the Company or make use of it for his own purpose or the purpose of another.

      (3)     not all of the Company's Confidential Information will rise to the level of a trade secret of the Company; even so, all Confidential Information will be entitled to the protections and restrictions provided in this Agreement.

      C.     Employee understands and acknowledges that he will benefit significantly from having access to and being given Confidential Information. Employee agrees that but for his promise to safeguard Confidential Information and the further restrictive covenants contained in Section 8 below, the Company would not agree to provide Employee with Confidential Information. Further, Employee acknowledges that his breach of any restrictions provided in Section 8 below will inevitably and necessarily lead to the prohibited disclosure or use of Confidential Information.

**Section 8.**     **Protection of the Company's Protectable Interests.**

      To protect the legitimate interests of the Company in, among other things, protecting its Confidential Information, employment relationships, relationships with Company accounts and goodwill, and in consideration for, among other things as provided in this Agreement, the Company's promise to give Employee certain Confidential Information, some of which constitutes trade secrets of the Company which Employee did not previously have, and to enforce Employee's promise not to disclose such Confidential Information, Employee agrees to the following restrictive covenants, which Employee acknowledges and agrees are reasonably necessary and narrowly tailored to protect the Company's legitimate business interests:

A.    **In OKLAHOMA only:** Employee and the Company agree that during the period of time, if any, Employee is principally employed in OKLAHOMA, this subsection Section 8(A) will not be considered part of this Agreement and will be replaced in its entirety by the attached Schedule 1, which is incorporated by reference. Employee understands and acknowledges that the use of Schedule 1 is necessitated by the requirements and peculiarities of the laws of Oklahoma. Schedule 1 will apply only if it is attached hereto and initialed by the Company and Employee.

**In ALL OTHER STATES (excluding California):**

(1)    For a period of two (2) years following the termination of Employee's employment with the Company for any reason whatsoever, Employee will not, directly or indirectly, solicit, transfer, place, market, accept, aid, counsel or consult in the placement, renewal, discontinuance or replacement of any insurance (including self-insurance) by, or handle self-insurance programs, insurance claims, risk management services, emergency or disaster prevention or management services, or other insurance administrative or service functions ("insurance services") or provide employee benefit brokerage, consulting, or administration services; in the area of group insurance, defined benefit and defined contribution pension plans, individual life, disability and capital accumulation products; investment advisory services, wealth management, or group retirement services; defined benefit and defined contribution pension services; human resources consulting services, including, without limitation, compensation consulting, compensation program design, compensation and benefits surveys, and on-site human resources management; and all other employee benefit areas the Company is involved with ("benefit services"), for: (x) any Account of the Company for which Employee performed any of the foregoing functions during any part of the two-year period immediately preceding such termination (referred to hereinafter as "Protected Accounts"), or (y) any Prospective Account of the Company (as defined below).

(2)    The term "Account of the Company" as used in this paragraph will be construed broadly to include all users of insurance services or benefit services, including commercial and individual consumers, risk managers, carriers, agents and other insurance intermediaries who are customers of the Company on the date Employee's employment with the Company terminates, or an insurance carrier offering any custom program for which the Company acts as managing general agent, managing general underwriter, program manager or underwriting agent, regardless of how the relationship is documented or characterized.

(3)    If an Account of the Company is part of a group of companies which conducts business through more than one entity, division or operating unit, whether or not separately incorporated (a "Client Group"), the term "Account of the Company" as used herein will include products or services within any entity, division or operating unit of the Client Group where the same management group within the Client Group has the primary decision making authority with respect to contracting for services of the type rendered by the Company. Notwithstanding anything herein to the contrary, the Employee will be free to call on the retail agents of the Company, so long as there is no contact or solicitation of any account, client, or Prospective Account of the Company.

B.    For the purposes of the covenants set forth in Sections 7 and 8 of this Agreement, the parties acknowledge and agree that the following will apply:

(1)    The term "Prospective Account" of the Company, means any entity (other than a then-current account of the Company but including former Company accounts) with respect to whom, at any time during the one year period preceding the termination of Employee's employment with the Company, Employee: (i) submitted or assisted in the submission of a presentation or proposal of any kind on behalf of the Company, (ii) had material contact or acquired Confidential Information as a result of or in connection with Employee's employment with the Company, or (iii) incurred travel and/or entertainment expenses which were reimbursed by the Company to Employee; but the term Prospective Account does not include an account that is a customer of Employee's new employer (for the same type of insurance and/or benefits services for which such customer was a Prospective Account of the Company) at the time of termination of Employee's employment with the Company.

(2)    "Direct or indirect solicitation" of a Protected Account or Prospective Account

will expressly include, but not be limited to, the following (which is not intended to be an exhaustive list of direct or indirect solicitation, but is meant to provide examples of certain reasonably anticipated scenarios):

(a)     The sending of an announcement by Employee or his new employer to any Protected Account or Prospective Account, the purpose of which is to communicate that Employee has either formed his own business enterprise or joined an existing business enterprise that will offer products or services in any way competitive with the Company.

(b)     Initiating a communication or contact by Employee or his new employer with any Protected Account or Prospective Account for the purpose of notifying such Protected Account or Prospective Account that Employee has either formed his own business enterprise or joined an existing business enterprise that will offer products or services in any way competitive with the Company.

(c)     Communication or contact by Employee or his new employer with any Protected Account or Prospective Account (if such new employer's communication with a Prospective Account was facilitated by Employee, directly or indirectly, or if Employee will or is intended to benefit, directly or indirectly, by such communication) if the communication in any way relates to insurance or benefits services; provided, however, nothing herein is intended to limit communications or contacts that are unrelated to insurance and/or benefits services.

(d)     The facilitation by Employee, directly or indirectly, of any Protected Accounts' execution of a broker of record letter replacing the Company as its broker of record.

C.     **In LOUISIANA only:** Employee and the Company agree that during the period of time, if any, Employee is principally employed in Louisiana, this Section 8(C) will not be considered part of this Agreement and will be replaced in its entirety by the attached Schedule 8, which is incorporated by reference. Employee understands and acknowledges that the use of Schedule 2 is necessitated by the requirements and peculiarities of the laws of Louisiana. Schedule 2 will apply only if it is attached and initialed by the Company and Employee.

**In ALL OTHER STATES:**

Employee understands and agrees that many of the accounts for which he will perform insurance and/or benefits services while employed by the Company are national accounts and that Employee will perform insurance and/or benefit services for Company accounts throughout the entire country. Employee agrees and acknowledges that the geographic scope relating to the restrictions provided in this Section 8 will include the entire United States and that since the post-employment restrictions herein provided are tied directly to Accounts of the Company for whom Employee performed insurance and/or benefit services during the two-year period immediately preceding termination of his employment and Prospective Accounts, this geographic limitation is reasonable. Moreover, Employee acknowledges and agrees that the restrictions contained in this Section 8 do not prohibit Employee from competing with the Company or performing insurance or benefits services for potential clients throughout the entire world except for Protected Accounts and Prospective Accounts, and that those restrictions are reasonable and narrowly tailored to further the Company's legitimate interest to protect its Confidential Information, account relationships, and goodwill, and such restrictions will not unduly burden Employee's ability to earn a living after his employment with the Company is terminated.

D.     If, within two (2) years of the termination of Employee's employment the Employee engages in, or joins a company or business enterprise engaged in, providing insurance and/or benefits services, then the Company may advise any Protected Account and/or Prospective Account of the existence and terms of this Agreement and may give them a copy of this Agreement.

E.     Employee recognizes that employees of the Company are a valuable resource of the Company. Accordingly, during Employee's employment with the Company, Employee will not, directly or indirectly solicit, induce, entice or recruit any employee of the Company to leave their employment with the Company. In addition, for a period of two (2) years following the termination of Employee's employment with the Company for any reason whatsoever, Employee will not directly or indirectly, solicit, induce or recruit any employee of the Company who has been provided Confidential Information to leave the employ of the Company.

**Section 9.**     <u>Assignment.</u>

Except as provided in Section 10, this Agreement will not be affected by any merger or consolidation or other reorganization of the Company and will be assignable to, binding upon, and will inure to the benefit of the continuing entity or to any successor in interest to the Company including, without limitation, any entity to which the Company sells business, assets and/or accounts of any branch, business unit or profit center in which Employee is primarily employed. This Agreement also will inure to the benefit of every affiliate company included in the definition of "Company" under this Agreement. The Company may assign this Agreement to any affiliate company of AJG in which case, except for purposes of Section 10 hereof, all references to "the Company" and all rights of the Company will include and inure to the benefit of that affiliate. Employee may not assign this Agreement or any obligations hereunder.

**Section 10.**     <u>Release of Certain Obligations.</u>

Notwithstanding anything herein to the contrary, the obligations of Employee stated in Section 8 will become null and void and have no further effect immediately upon a Hostile Change in Control of AJG as defined herein. The Company will send written notice to Employee within ten (10) days of a Hostile Change in Control of AJG, notifying Employee that such event has taken place. Failure of the Company to send such notice will not preclude the release of Employee from the obligations contained in Section 8. These definitions apply to Section 10:

A.     The term "Hostile Change in Control" means a transaction, event or election constituting a Change in Control which was not approved by or, in an election, the directors elected were not nominated by, at least two-thirds of the members of the Board of Directors of AJG in office immediately prior to the Change in Control who have not died or become permanently disabled.

B.     The term "Change in Control" of AJG means and includes each and all of the following occurrences:

(1)     A Business Combination, unless:

a)     the Business Combination is approved or authorized by the affirmative vote of the holders of not less than 80% of the outstanding shares of voting stock of AJG and the affirmative vote of the holders of not less than 67% of the outstanding shares of the voting stock held by shareholders other than Related Persons; or

b)     the Continuing Directors of AJG by a two-thirds vote: (i) have expressly approved in advance the acquisition of outstanding shares of voting stock of the corporation that caused the Related Person to become a Related Person; or (ii) have approved the Business Combination prior to the Related Person involved in the Business Combination having become a Related Person; or

c)     the Business Combination is solely between AJG and another corporation, 50% or more of the voting stock of which is owned by AJG and none of which is owned by the Related Person; or

d)     all of the following conditions are satisfied:

I.     The cash or fair market value of the property, securities or "other consideration to be received" per share by holders of common stock in AJG in the Business Combination is not less than the higher of:

i)     the highest per share price (including brokerage commissions, transfer taxes and soliciting dealers' fees) paid by the Related Person in acquiring any of its holdings of AJG's common stock, or

ii)     an amount that bears that same percentage relationship to the market price of AJG's common stock immediately prior to the announcement of such Business Combination as the highest per share price determined in i) above bears to the market price of AJG's common stock immediately prior to the commencement of the acquisition of AJG's voting stock that caused such Related Person to become a Related Person, or

iii)     an amount calculated by multiplying the earnings per share of AJG's common stock for the four fiscal quarters immediately preceding the record date for determination of stockholders entitled to vote on such Business Combination by the price/earnings

multiple of the Related Person as of the record date as customarily computed and reported in the financial press. Appropriate adjustments will be made with respect to these subsections i), ii) and iii) for recapitalizations and for stock splits, stock dividends, and like distributions; and

        II.     A timely mailing will have been made to the stockholders of AJG showing in a prominent place: (x) any recommendations as to the advisability (or inadvisability) of the Business Combination that the Continuing Directors or Outside Directors may choose to state, if there are at the time any such directors; and (y) the opinion of a reputable nationally recognized investment banking or financial services firm as to the fairness from the financial point of view of the terms of the Business Combination to the stockholders of AJG other than the Related Person (such firm to be engaged solely on behalf of such other stockholders, to be paid a reasonable fee for its services by AJG upon receipt of such opinion, to be a firm that has not previously been significantly associated with the Related Person and, if there are at the time any such directors, to be selected by a majority of the Continuing Directors and Outside Directors).

        (2)     The acquisition of outstanding shares of AJG's voting stock that causes an individual, a corporation, partnership or other person or entity to become a Related Person.

        (3)     Individuals who at the beginning of any period of three consecutive years constitute the entire Board of Directors of the Company will for any reason other than death or permanent disability during such period cease to constitute a majority thereof.

        (4)     A change in control of a nature that would be required to be reported in response to Item 6(e) of Schedule 14A of Regulation 14A promulgated under the Securities Act of 1934, as amended.

        C.     The term "Business Combination" will mean: (i) any merger or consolidation of AJG with or into a Related Person; (ii) any sale, lease, exchange, transfer or other disposition, including without limitation a mortgage or any other security device, of all or any Substantial Part of the assets of the Company to a Related Person; (iii) any merger or consolidation of a Related Person with or into AJG; (iv) any sale, lease, exchange, transfer or other disposition of all or any Substantial Part of the assets of a Related Person to the Company; (v) the issuance of any securities of the Company to a Related Person; (vi) the acquisition by the Company of any securities issued by a Related Person; (vii) any reclassification of securities, recapitalization or other transaction designed to decrease the number of holders of AJG's voting securities remaining, if there is a Related Person; and (viii) any agreement, contract or other arrangement providing for any of the transactions described in this definition of Business Combination.

        D.     The term "Related Person" will mean and include any individual, corporation, partnership or other person or entity which, together with their "Affiliates" and "Associates" (as defined as of November 1, 1983, in Rule 12b-2 under the Securities Exchange Act of 1934), "Beneficially Owns" (as defined as of November 1, 1983, in Rule 13d-3 under the Securities Exchange Act of 1934) in the aggregate 20% or more of the outstanding shares of the voting stock of AJG, and any Affiliate or Associate of any such individual, corporation, partnership or other person or entity; provided that Related Person will not include any person who beneficially owned 20% or more of the outstanding shares of the voting stock of AJG on November 1, 1983. Without limitation, any shares of voting stock of AJG that any Related Person has the right to acquire pursuant to any agreement, or upon exercise of conversion rights, warrants or options, or otherwise, will be deemed beneficially owned by the Related Person.

        E.     The term "Substantial Part" will mean more than 30% of the fair market value of the total assets of the corporation in question, as of the end of its most recent fiscal year ending prior to the time the determination is being made.

        F.     The term "other consideration to be received" will include, without limitation, capital stock of AJG retained by its existing public stockholders in the event of a Business Combination in which AJG is the surviving corporation.

        G.     The term "Continuing Director" will mean a director who was a member of the board of directors of AJG immediately prior to the time that the Related Person involved in a Business Combination became a Related Person, and the term "Outside Director" will mean a director who is not: (a) an officer or employee of AJG or any relative of an officer or employee; or (b) a Related Person or an

officer, director, employee, Associate or Affiliate of a Related Person, or a relative of any of the foregoing.

**Section 11.**     **General.**

A.      The captions in this Agreement are for reference only and have no independent force or effect. If a caption is inconsistent with any part of the Agreement, the caption will be disregarded.

B.      This Agreement will be governed by and construed in accordance with the laws of the State in which Employee resides, without giving effect to any of its conflict of law principles. The parties agree that the chosen state has a material and significant interest in questions concerning this Agreement and performance thereunder. The parties agree that the sole and exclusive venue of any dispute between the parties with respect to this Agreement, or any matters related thereto, will be a state trial or federal district court located within the federal judicial district in which Employee resides ("Chosen Venue"). Employee agrees that it is neither unfair nor unreasonable for the Chosen Venue to be selected as the exclusive venue for any dispute between the parties with respect to this Agreement or any matter related thereto and that he will suffer no undue burden by having to litigate any such disputes in the Chosen Venue. Moreover, Employee promises not to initiate suit against the Company in any venue other than the above-selected exclusive Chosen Venue with respect to any dispute between the parties relating to this Agreement. Employee waives and agrees not to interpose any argument that the Chosen Venue is an inconvenient forum for litigation.

C.      Waiver of Jury Trial. Because of the time and expense involved in the docketing of, preparation for and participation in a jury trial, the parties desire that any dispute arising hereunder will be decided by a judge rather than a jury. Therefore, the parties hereby knowingly, voluntarily and intentionally waive the right either may have to a trial by jury in respect to any litigation based on this Agreement or arising out of, under or in conjunction with Employee's employment by the Company, this Agreement, or any course of conduct, course of dealing, verbal or written statement or the actions of either party.

D.      If Employee is an existing employee of the Company as of the Effective Date and is subject to any existing employment agreement with the Company, whether an Executive Agreement, Associate Agreement, or otherwise (collectively "Existing Employee Agreement"), this Agreement will be considered an Amended and Restated Employee Agreement of such Existing Employee Agreement. If Employee is an employee of a business enterprise acquired or to be acquired by the Company as of the Effective Date, (the "Acquired Business"), then (i) this Agreement will be considered an Amended and Restated Employment Agreement if Employee is subject to any existing employment agreement with the Acquired Business and Employee's employment agreement with the Acquired Business is assigned to the Company and (ii) the term the "Company" shall be deemed to include the Acquired Business.

E.      This Agreement contains the entire agreement of the parties with respect to the subject matters covered hereby. The parties agree that all prior negotiations and communications are of no force or effect. Further, the parties agree that there are no oral agreements, understandings, undertakings or promises of the parties relating to the subject matters covered by this Agreement.

F.      Subject to Section 11(G) below, this Agreement may not be amended, altered or modified without the prior written consent of both parties, and such instrument will acknowledge that it is an amendment or modification of this Agreement. Waiver of any term or condition of this Agreement will not be construed as a waiver of any subsequent breach or failure of the same term or condition, or any other term or condition. Any waiver must be in writing. No amendment, alteration, modification or waiver may be signed by Employee on behalf of the Company, its assignees, successors or assigns.

G.      To the extent that any of the terms set forth in this Agreement or any word, phrase, clause or sentence is found to be illegal or unenforceable for any reason, it is the intention of the parties that such word, phrase, clause or sentence will be modified or deleted by a court of competent jurisdiction so as to afford the Company the fullest protection commensurate with making this Agreement, as modified, legal and enforceable under applicable laws, and the balance of this Agreement will not be affected thereby, the balance being construed as severable and independent.

H.      All notices given hereunder will be in writing and will be sent by registered or certified mail or delivered by hand and, if intended for the Company, addressed to it or delivered to its principal office to the attention of the Secretary of the Company. If intended for Employee, notices will be delivered personally or addressed (if sent by mail) to Employee's then current residence address as shown on the Company's records, or to such other address as Employee directs in a written notice to the Company. All notices will be deemed to be given on the date received at the address of the addressee or, if delivered personally, on the date delivered.

I.      The use of male pronouns throughout this Agreement includes the female gender. The words "including" or "include" are not to be interpreted as terms of limitation or exclusion, but rather of illustration.

J.      This Agreement may be executed in counterparts, each of which is deemed an original.

**IN WITNESS WHEREOF,** the parties hereto have executed this Agreement as of the day and year provided below their respective signatures. The parties agree that the Effective Date of this Agreement will be _1/12/15, 9:00 AM_____.

**ARTHUR J. GALLAGHER & CO.,**
on behalf of itself and its subsidiaries, divisions and affiliated and related companies

By: _Kerry S. Whitt_____
_____
        Corporate Officer Signature – Itasca

Assistant Secretary & Senior Counsel_____
Title

1/12/15, 9:00 AM
_____
Date

**EMPLOYEE**

_Kelly Hogan_____
Employee E-Signature

Kelly Hogan
_____
Printed Name

1/11/15
_____
Date:

FOR HUMAN RESOURCES USE ONLY:

Employee ID:_43333_____

**<u>Schedule 1</u>**
**The following provision will replace Section 8(A) in its entirety:**

     For a period of two (2) years following the termination of Employee's employment with the Company for any reason whatsoever, Employee will not, directly or indirectly, solicit any Protected Accounts or Prospective Accounts of the Company (as such accounts are defined above) for the purpose of providing Insurance Services or Benefit Services. "Insurance Services" is defined as the sale, placing, marketing, counseling or consulting in the placement, renewal, discontinuance or replacement of any insurance (including self-insurance) or handling self-insurance programs, insurance claims, risk management services, emergency or disaster prevention or management services or other insurance administrative service functions. "Benefit Services" is defined as providing employee benefit brokerage, consulting, or administrative services, in the area of group insurance, defined benefit and defined contribution pension plans, human resources and staffing services, individual life, disability and capital accumulation products, and all other employee benefit areas. "Protected Accounts" mean any and all accounts of the Company for which Employee performed any Insurance or Benefit Services during any part of the two-year period immediately preceding termination of Employee's employment with the Company. The term "Account of the Company" as used in this paragraph will be construed broadly to include all users of insurance or benefit services including commercial and individual consumers, risk managers, carriers, agents and other insurance intermediaries who are customers of the Company on the date Employee's employment with the Company terminates. If an Account of the Company is part of a group of companies which conducts business through more than one entity, division or operating unit, whether or not separately incorporated (a "Client Group"), the term "Account of the Company" as used herein will include products or services within any entity, division or operating unit of the Client Group where the same management group in the Client Group has the primary decision making authority to contract for services of the type rendered by the Company.


_____      _____
Employee Signature                                                  Hiring Manager Signature & Date


**Do not sign this schedule unless the employee is to be principally employed in Oklahoma.**

**Schedule 2**
**The following provision will replace Section 8(C) in its entirety:**
The obligations set forth in Section 8 above will be effective in the parishes specifically designated on this Schedule 2, and in which the Company carries on the business of providing insurance services and/or benefit services. The parties agree that this Schedule 2 may be amended and modified upon written acknowledgment of the Employee and the Company without the need to modify or amend any other provision of this Agreement. (Please fully circle designated parishes.) PARISHES LISTED BELOW

| | | | |
|---|---|---|---|
| Abbeville | Acadia | Allen | Ascension |
| Assumption | Avoyelles | Beauregard | Bienville |
| Bossier | Caddo | Calcasieu | Caldwell |
| Cameron | Catahoula | Claiborne | Concordia |
| De Soto | East Baton Rouge | East Carroll | East Feliciana |
| Evangeline | Franklin | Grant | Iberia |
| Iberville | Jackson | Jefferson Davis | Jefferson |
| La Salle | Lafayette | Lafourche | Lincoln |
| Livingston | Madison | Morehouse | Natchitoches |
| Orleans | Ouachita | Plaquemines | Pointe |
| Rapides | Red River | Richland | Sabine |
| Saint Bernard | Saint Charles | Saint Helena | Saint James |
| St. John the Baptist | Saint Landry | Saint Martin | Saint Mary |
| Saint Tammany | Tangipahoa | Tensas | Terrebonne |
| Union | Vermilion | Vernon | Washington |
| Webster | West Baton Rouge | West Carroll | West Feliciana |
| Winn | | | |

_____        _____
Employee Signature                              Hiring Manager Signature  & Date

**Do not complete this schedule unless the employee is to be principally employed in Louisiana.**

Standard Employee Agreement – 1.17.14

# Exhibit H6

Revised 8.27.2015

## <u>EMPLOYEE AGREEMENT</u>

This Employee Agreement ("Agreement") is made and entered into as of the Effective Date (as defined below) by and between <u>Jordan Laeyendecker</u> (hereinafter referred to as "Employee") and Arthur J. Gallagher & Co., a Delaware corporation with its principal place of business in Itasca, Illinois and its subsidiaries, divisions and affiliated and related companies (hereinafter referred to collectively as "AJG" or the "Company").

## <u>RECITALS</u>

**WHEREAS**, Employee has been hired, or is being retained, as a valued key employee who with the execution of this Agreement will be provided and will continue to be provided during his employment with valuable confidential and proprietary and trade secret information of the Company and will have significant managerial, production, administrative, technical and/or account servicing responsibilities; and

**WHEREAS**, the parties hereto acknowledge that the Company has a legitimate interest in retaining the services of Employee and accepting the covenants herein provided in order to protect its confidential and proprietary and trade secret information and to preserve the Company's goodwill, customer relationships, employment relationships and value of the business to be handled by Employee as an employee of the Company;

**NOW THEREFORE**, in consideration of these recitals and the mutual covenants and promises set forth below, and for other good and valuable consideration including, but not limited to, employment with the Company, receipt of the compensation and benefits attendant to such employment, receipt and the ability to utilize the Company's confidential, proprietary and trade secret information, and/or being provided or allowed access to and contact with certain Company accounts, all of which the parties acknowledge as sufficient consideration for this Agreement, the parties agree as follows:

**Section 1.**     <u>Employment</u>.

The Company agrees to employ Employee and Employee agrees to serve the Company and perform the duties set forth below beginning on the Effective Date and continuing thereafter until employment is terminated by either party. The Employee's employment is "at will" and is terminable by either party as provided below (except in jurisdictions where "at will" employment is not recognized). The Employee's continued employment with the Company is subject to the terms and conditions of this Agreement.

**Section 2.**     <u>Duties</u>.

A.     Employee agrees to devote his full energies, abilities, attention and business time to the performance of his employment obligations and responsibilities. Employee agrees that he will not engage in any activity which conflicts or interferes with, or in any way compromises, his performance of those obligations and responsibilities. Employee will comply with all applicable Company policies and procedures. Employee will not, either during or outside normal business hours, directly or indirectly sell, solicit, service, manage or engage in any aspect of the insurance,

Revised 8.27.2015

benefits or wealth management businesses for or on behalf of any person or entity other than the Company, nor engage in any activity that is not in the best interests of the Company.

       B.      Employee recognizes that, by virtue of his employment by the Company and to assist him in the solicitation, production, management, and/or servicing of accounts, he will be provided and granted otherwise prohibited access to certain confidential and proprietary data and trade secret information of the Company which is not known either to its competitors or within the industry generally and which has independent economic value to the Company, and is subject to reasonable efforts that are reasonable under the circumstances to maintain its secrecy. This information (collectively hereinafter "Confidential Information") may include, but is not limited to: data relating to the Company's unique marketing and servicing programs, procedures and techniques; investment, wealth management and retirement plan consulting, variable annuities, and fund investment business and related products and services; underwriting criteria for general programs; business, management and human resources/personnel strategies and practices; the criteria and formulae used by the Company in pricing its insurance and benefits products and claims management, loss control and information management services; the structure and pricing of special insurance packages negotiated with underwriters; highly sensitive information about the Company's agreements and relationships with underwriters; sales data contained in various tools and resources (including, without limitation, Salesforce.com); lists of prospects; the identity, authority and responsibilities of key contacts at Company accounts and prospects; the composition and organization of Company accounts' businesses; the peculiar risks inherent in the operations of Company accounts; highly sensitive details concerning the structure, conditions and extent of existing insurance coverages of Company accounts; policy expiration dates, premium amounts and commission rates relating to Company accounts; risk management service arrangements relating to Company accounts; loss histories relating to Company accounts; candidate and placement lists relating to Company accounts; the Company's personnel and payroll data including details of salary, bonus, commission and other compensation arrangements; and other data showing the particularized insurance or consulting requirements and preferences of Company accounts. Employee understands that his job duties may include assisting in the development of information and data that is Confidential Information belonging to the Company. Confidential Information may be stored in files, documents, dailies, daily reports, renewal information, customer lists, accounting records, products purchased by customers, customer account and credit data, referral sources, computer programs and software, customer comments, Company written manuals and marketing and financial analysis, plans, research and programs. Employee recognizes that this Confidential Information constitutes valuable property of the Company, developed over a long period of time and at substantial expense and that the Company takes reasonable efforts to keep this Confidential Information confidential and made available only to those employees who need access to such Confidential Information to perform their job functions for the Company. Employee promises to safeguard such Confidential Information, and agrees that he will not, at any time during his employment by the Company, divulge such Confidential Information or make use of it for his own purposes or the purposes of another.

          **Notwithstanding the generality of these prohibitions relating to Confidential Information, Employee acknowledges that nothing in this Section 2, or in this Agreement, prohibits Employee from reporting possible violations of federal law or regulation to any governmental agency or entity including, without limitation, the Department of Justice, the Securities and Exchange**

**Commission, the Congress, and any agency Inspector General, or making other disclosures that are protected under the whistleblower provisions of federal law or regulation.**

C.     The Company agrees that, during Employee's employment with the Company, it will: (i) provide Employee with certain Confidential Information the Employee did not previously possess including, without limitation, Confidential Information relating to certain of the Company's accounts; (ii) provide Employee with information and access to the Company's proprietary insurance and risk management programs; (iii) provide Employee with access to the Company's specialized business operations relating to particular aspects of the insurance agency and risk management business; (iv) maintain specialized training programs to which Employee will qualify and apply; and (v) provide such other assistance which may reasonably aid Employee in performing sales, management, technical and/or servicing duties.

D.     Employee acknowledges and understands that an essential element of the Company's business is the development and maintenance of personal contacts and relationships with its accounts, and that Employee may be provided and allowed access to certain of the Company's accounts for the purpose of establishing personal contact and relationships with such accounts for the benefit of the Company.  The Employee acknowledges that the Company invests considerable time, money, and resources necessary to develop and maintain a relationship between its employees and a client, and in that regard, the Company will pay Employee's salary, reimburse reasonably necessary business expenses, provide Employee with certain Confidential Information, and provide the resources necessary to service the Company accounts managed or serviced by Employee by making available legal advice, accounting support, advertising and other corporate services.  Moreover, while the Employee recognizes that some Company accounts may develop greater identification with the Employee than the Company itself, those accounts remain, at all times and for all purposes, accounts of the Company.  By entering this Agreement, Employee disclaims any interest in such Company accounts.

**Section 3.**     <u>Compensation and Benefits.</u>

Employee will be entitled to the compensation and benefits agreed to by Employee and the Company and as noted from time to time in Employee's official personnel file and records retained in the Company's corporate headquarters, which file is incorporated by reference herein to the extent necessary for evidencing the compensation and benefits to which Employee and the Company have agreed.  The compensation and benefits to which Employee is entitled as of the Effective Date is noted in Employee's official personnel file.  Employee's compensation and benefits is subject to periodic change at the Company's discretion.

**Section 4.**     <u>Representations.</u>

Employee represents and warrants to the Company that:

A.     Employee is not, and will not become, a party to any agreement, contract, arrangement or understanding, whether of employment or otherwise, that would in any way restrict him from undertaking or performing his duties in accordance with this Agreement or that limits his ability to be employed by the Company under this Agreement;

B.      Employment by the Company will not violate the terms of any policy of any prior employer of Employee regarding competition, solicitation or confidentiality;

C.      Employment by the Company in the position contemplated by this Agreement will not require him to improperly use any trade secrets or confidential or proprietary information of any prior employer, or any other person or entity for whom he has performed services;

D.      Employee has not misused, and will not misuse, any confidential or proprietary information obtained from any prior employer or any other person or entity;

E.      Employee has not improperly taken or retained in any form whatsoever, or otherwise retained access to, any confidential or proprietary information of any prior employer or any other person or entity; and

F.      EMployee is in compliance with any non-competition and/or non-solicitation agreements, or other restrictive covenant obligations in place between him and any former employer and will continue to be in compliance, regardless of whether he believes such agreements and/or restrictive covenants are enforceable or not.

G.      Employee was provided a reasonable period of time, not less than fourteen (14) days, to review and consider this Agreement prior to signing it and accepting employment with the Company.  If Employee elects to sign this Agreement sooner than fourteen (14) days prior to the commencement of employment, he represents and acknowledges that he chose to do so voluntarily.

**Section 5.**      Termination of Employment Relationship.

A.      The Company or the Employee may terminate Employee's employment at any time and for any reason upon twenty-one (21) days' written notice (the "Notice Period") by the party wishing to terminate the employment; provided, however, that notice is not required from the Company for any termination taking place: (1) during the Employee's first ninety (90) days of employment (or other applicable Introductory Period pursuant to Company policy); (2) during the pendency of any Performance Improvement Plan issued pursuant to the Company's performance management policies; or (3) as a result of Employee's commission of any act that would result in immediate termination under the Company's Performance Improvement and Management policies then in effect.

B.      The Company agrees to continue during the Notice Period the same compensation and benefits Employee was receiving prior to the Notice Period.  Alternatively, where termination is initiated by the Company, the Company may elect to terminate employment immediately and provide Employee, in lieu of the Notice Period, a lump sum payment equivalent to Employee's base pay for the Notice Period.  The parties agree that once the Notice Period expires, the Employee's entitlement to compensation and benefits ends.

C.      Employee agrees that during the Notice Period, he will cooperate fully with the Company in all matters relating to the winding up of any pending work and/or the orderly transfer to other Company employees of the accounts for which he has been responsible. Employee specifically covenants that during the Notice Period (regardless of whether or not

Revised 8.27.2015

active employment responsibilities are continuing) his duties to the Company, including Employee's fiduciary duty of loyalty, will continue in effect. Prior to the expiration of the Notice Period, Employee promises to return to the Company all originals and copies (whether paper, digital copies or otherwise) of literature, correspondence, memoranda, reports, summaries, manuals, proposals, contracts and other documents of any kind which relate in any way to the business of the Company, including specifically all materials which comprise or refer to the Company's Confidential Information. The Employee covenants that he will not retain any copy, facsimile or note intended to memorialize any such data. Employee further understands and agrees that, during or at the expiration of the Notice Period, and as part of his assigned job duties, he will reasonably participate in any meeting the Company may convene to: (i) review the status of any projects or work Employee has been assigned; (ii) review the status of accounts for which Employee has been most recently responsible or associated; (iii) ensure that Employee has fully obtained his entitlements under this Agreement and as provided by law; and/or (iv) confirm that Employee understands the nature and scope of his post-employment obligations.

        D.      Upon the termination of Employee's employment for any reason, Employee agrees that the Secretary of the Company may, as an irrevocable proxy and in Employee's name and stead, execute all documents and things which the Company deems necessary and desirable to effect Employee's resignation as an officer or director of any company (if applicable) included within the definition of the Company as used in this Agreement.

        E.      Before accepting any new employment in the insurance, benefits or wealth management industries, Employee promises to give his prospective new employer a copy of this Agreement. Employee permits the Company to advise any prospective new employer of Employee of the existence and terms of this Agreement and to provide it with a copy.

        F.      During employment and after the termination of same Employee agrees to remain available to the Company and its legal counsel, voluntarily upon the Company's request and without the necessity of subpoena or court order, in connection with the Company's investigation, preparation, prosecution and/or defense of any actual or potential legal proceeding, regulatory action, or internal matter. The Employee agrees to cooperate with the Company, to provide any information reasonably within his recollection and to provide truthful testimony as required. If Employee is called upon to provide cooperation after employment has been terminated, the Company will reimburse Employee for reasonable out-of-pocket expenses actually incurred under this section or, at the Company's option, will advance Employee's reasonable expenses or incur them directly.

        G.      Employee agrees that while he is employed by the Company, and following the termination of his employment, he will not make any false, defamatory or disparaging statements about the Company, its officers or directors where such statements are calculated to, or reasonably likely to cause material damage to the Company, its officers or directors.

**Section 6.**    <u>The Company's Right to Injunctive Relief; Attorneys' Fees</u>.

        The Employee acknowledges that his services to the Company are of a unique character which gives them a special value to the Company, the loss of which cannot reasonably or adequately be compensated in damages in an action at law should the Employee breach, or threaten to breach, any post-employment obligations under this Agreement. The Employee

Revised 8.27.2015

realizes that: (a) it would be difficult to measure precisely the damages to the Company from any breach by Employee of Sections 7 and/or 8 of this Agreement; (b) injury to the Company from any such breach would be incalculable and irremediable; and (c) money damages would therefore be an inadequate remedy for any such breach. Accordingly, in addition to any other remedy the Company may have at law or in equity, the Company will be entitled to enforce this Agreement by obtaining a temporary restraining order and preliminary and permanent injunctive relief to restrain any such breach or further breach by Employee. Employee expressly waives the right to contest whether a breach of Section 7 or 8 of this Agreement would result in irreparable or permanent harm to the Company. In addition, Employee agrees that the Company may seek injunctive relief when and if it elects to do so and any delay in seeking injunctive relief will not prejudice or waive the Company's right to do so. Employee expressly waives the right to assert that the Company is not entitled to injunctive relief because of any delay in seeking such relief. Employee agrees that he will be responsible for and pay the Company its reasonable attorneys' fees and other expenses and costs incurred to enforce this Agreement if the Company is the prevailing party. Employee further agrees that if Employee breaches any covenant contained in Sections 7 and/or 8 of this Agreement, the Company will be entitled, in addition to all other legal or equitable remedies it may have, to offset and withhold against any such loss, cost, liability or expense any amount of any kind that may then be owing or payable by Company to Employee.

**Section 7.**   <u>Trade Secrets and Confidential Information</u>.

A.   Employee acknowledges that the Company's business depends to a great degree upon having information which is not generally known to others, and that the profitability of the Company's business requires that this information be kept confidential and proprietary within the Company. Accordingly:

(1)   Employee agrees that all intellectual property, such as computer programs, systems or software, developed during his employment or as a result of his employment is "work for hire" performed by Employee in the scope of his employment. To the extent that any such intellectual property is determined not to constitute "work for hire," or if any rights in any such intellectual property do not accrue to the Company as a "work for hire," Employee's signature on this Agreement constitutes an assignment (without any further consideration) to the Company of any and all copyrights and other rights, title and interest in and to all such intellectual property. The Company will retain all proprietary rights to any and all such intellectual property. Employee agrees to execute any documents necessary to perfect the Company's interest in such intellectual property upon the Company's request.

(2)   Employee has been advised by this writing and understands that the foregoing provisions of Section 7(A)(1) do not apply to an item of intellectual property for which no equipment, supplies, facilities or Confidential Information of the Company was used and which was developed entirely on Employee's own time, unless: (a) the item of intellectual property relates to the business of the Company or to the Company's actual or demonstrably anticipated research and development;

Revised 8.27.2015

or (b) the item of intellectual property results from any work performed by Employee for the Company.

B.     Employee recognizes the highly sensitive nature of the Confidential Information he will be given (and to which he will have access throughout his employment) and acknowledges the Company's legitimate interest in safeguarding it from disclosure. Accordingly, in addition to the restrictions provided in Section 8 below, Employee agrees that:

(1)     after his employment with the Company is terminated, he will not directly or indirectly disclose, use or divulge Confidential Information that constitutes a trade secret of the Company or make use of it for his own purpose or the purpose of another; and

(2)     for a period of two (2) years following the termination of his employment with the Company, he will not divulge Confidential Information that does not constitute a trade secret of the Company or make use of it for his own purpose or the purpose of another.

(3)     not all of the Company's Confidential Information will rise to the level of a trade secret of the Company; even so, all Confidential Information will be entitled to the protections and restrictions provided in this Agreement.

C.     Employee understands and acknowledges that he will benefit significantly from having access to and being given Confidential Information.  Employee agrees that but for his promise to safeguard Confidential Information and the further restrictive covenants contained in Section 8 below, the Company would not agree to provide Employee with Confidential Information.  Further, Employee acknowledges that his breach of any restrictions provided in Section 8 below will inevitably and necessarily lead to the prohibited disclosure or use of Confidential Information.

**Section 8.**     Protection of the Company's Protectable Interests.

To protect the legitimate interests of the Company in, among other things, protecting its Confidential Information, employment relationships, relationships with Company accounts and goodwill, and in consideration for, among other things as provided in this Agreement, the Company's promise to give Employee certain Confidential Information, some of which constitutes trade secrets of the Company which Employee did not previously have, and to enforce Employee's promise not to disclose such Confidential Information, Employee agrees to the following restrictive covenants, which Employee acknowledges and agrees are reasonably necessary and narrowly tailored to protect the Company's legitimate business interests:

A.     **In OKLAHOMA only:**  Employee and the Company agree that during the period of time, if any, Employee is principally employed in OKLAHOMA, this subsection Section 8(A) will <u>not</u> be considered part of this Agreement and will be replaced in its entirety by the attached Schedule 1, which is incorporated by reference.  Employee understands and acknowledges that the use of Schedule 1 is necessitated by the requirements and peculiarities of the laws of Oklahoma.

**<u>In ALL OTHER STATES (excluding California):</u>**

Revised 8.27.2015

(1)     For a period of two (2) years [or, if Employee is principally employed in the State of **OREGON** or the State of **ALABAMA**, for eighteen (18) months] following the termination of Employee's employment with the Company for any reason whatsoever Employee will not, directly or indirectly, solicit, transfer, place, market, accept, aid, counsel or consult in the placement, renewal, discontinuance or replacement of any insurance (including self-insurance) by, or handle self-insurance programs, insurance claims, risk management services, emergency or disaster prevention or management services, or other insurance administrative or service functions ("insurance services") or provide employee benefit brokerage, consulting, or administration services; in the area of group insurance, defined benefit and defined contribution pension plans, individual life, disability and capital accumulation products; investment advisory services, wealth management, or group retirement services; defined benefit and defined contribution pension services; human resources consulting services, including, without limitation, compensation consulting, compensation program design, compensation and benefits surveys, and on-site human resources management; and all other employee benefit areas the Company is involved with ("benefit services"), for: (x) any Account of the Company for which Employee performed any of the foregoing functions during any part of the two-year period immediately preceding such termination (referred to hereinafter as "Protected Accounts"), or (y) any Prospective Account of the Company (as defined below).

(2)     The term "Account of the Company" as used in this paragraph will be construed broadly to include all users of insurance services or benefit services, including commercial and individual consumers, risk managers, carriers, agents and other insurance intermediaries who are customers of the Company on the date Employee's employment with the Company terminates, or an insurance carrier offering any custom program for which the Company acts as managing general agent, managing general underwriter, program manager or underwriting agent, regardless of how the relationship is documented or characterized.

(3)     If an Account of the Company is part of a group of companies which conducts business through more than one entity, division or operating unit, whether or not separately incorporated (a "Client Group"), the term "Account of the Company" as used herein will include products or services within any entity, division or operating unit of the Client Group where the same management group within the Client Group has the primary decision making authority with respect to contracting for services of the type rendered by the Company. Notwithstanding anything herein to the contrary, the Employee will be free to call on the retail agents of the Company, so long as there is no contact or solicitation of any account, client, or Prospective Account of the Company.

Revised 8.27.2015

B.    For the purposes of the covenants set forth in Sections 7 and 8 of this Agreement, the parties acknowledge and agree that the following will apply:

(1)    The term "Prospective Account" of the Company, means any entity (other than a then-current account of the Company but including former Company accounts) with respect to whom, at any time during the one year period preceding the termination of Employee's employment with the Company, Employee: (i) submitted or assisted in the submission of a presentation or proposal of any kind on behalf of the Company, (ii) had material contact or acquired Confidential Information as a result of or in connection with Employee's employment with the Company, or (iii) incurred travel and/or entertainment expenses which were reimbursed by the Company to Employee; but the term Prospective Account does not include an account that is a customer of Employee's new employer (for the same type of insurance and/or benefits services for which such customer was a Prospective Account of the Company) at the time of termination of Employee's employment with the Company.

(2)    "Direct or indirect solicitation" of a Protected Account or Prospective Account will expressly include, but not be limited to, the following (which is not intended to be an exhaustive list of direct or indirect solicitation, but is meant to provide examples of certain reasonably anticipated scenarios):

(a)    The sending of an announcement by Employee or his new employer to any Protected Account or Prospective Account, the purpose of which is to communicate that Employee has either formed his own business enterprise or joined an existing business enterprise that will offer products or services in any way competitive with the Company.

(b)    Initiating a communication or contact by Employee or his new employer with any Protected Account or Prospective Account for the purpose of notifying such Protected Account or Prospective Account that Employee has either formed his own business enterprise or joined an existing business enterprise that will offer products or services in any way competitive with the Company.

(c)    Communication or contact by Employee or his new employer with any Protected Account or Prospective Account (if such new employer's communication with a Prospective Account was facilitated by Employee, directly or indirectly, or if Employee will or is intended to benefit, directly or indirectly, by such communication) if the communication in any way relates to insurance or benefits services; provided, however, nothing herein is intended to limit communications or contacts that are unrelated to insurance and/or benefits services.

Revised 8.27.2015

(d)      The facilitation by Employee, directly or indirectly, of any Protected Accounts' execution of a broker of record letter replacing the Company as its broker of record.

C.      **In LOUISIANA only:** Employee and the Company agree that during the period of time, if any, Employee is principally employed in Louisiana, this Section 8(C) will <u>not</u> be considered part of this Agreement and will be replaced in its entirety by the attached Schedule 2, which is incorporated by reference. Employee understands and acknowledges that the use of Schedule 2 is necessitated by the requirements and peculiarities of the laws of Louisiana.

**In ALL OTHER STATES:** Employee understands and agrees that many of the accounts for which he will perform insurance and/or benefits services while employed by the Company are national accounts and that Employee will perform insurance and/or benefit services for Company accounts throughout the entire country. Employee agrees and acknowledges that the geographic scope relating to the restrictions provided in this Section 8 will include the entire United States and that since the post-employment restrictions herein provided are tied directly to Accounts of the Company for whom Employee performed insurance and/or benefit services during the two-year period immediately preceding termination of his employment and Prospective Accounts, this geographic limitation is reasonable. Moreover, Employee acknowledges and agrees that the restrictions contained in this Section 8 do not prohibit Employee from competing with the Company or performing insurance or benefits services for potential clients throughout the entire world except for Protected Accounts and Prospective Accounts, and that those restrictions are reasonable and narrowly tailored to further the Company's legitimate interest to protect its Confidential Information, account relationships, and goodwill, and such restrictions will not unduly burden Employee's ability to earn a living after his employment with the Company is terminated.

D.      If, within two (2) years of the termination of Employee's employment the Employee engages in, or joins a company or business enterprise engaged in, providing insurance and/or benefits services, then the Company may advise any Protected Account and/or Prospective Account of the existence and terms of this Agreement and may give them a copy of this Agreement.

E.      Employee recognizes that employees of the Company are a valuable resource of the Company. Accordingly, during Employee's employment with the Company, Employee will not, directly or indirectly solicit, induce, entice or recruit any employee of the Company to leave their employment with the Company. In addition, for a period of two (2) years following the termination of Employee's employment with the Company for any reason whatsoever, Employee will not directly or indirectly, solicit, induce or recruit any employee of the Company who has been provided Confidential Information to leave the employ of the Company.

**Section 9.**      <u>Assignment</u>.

Except as provided in Section 10, this Agreement will not be affected by any merger or consolidation or other reorganization of the Company and will be assignable to, binding upon, and will inure to the benefit of the continuing entity or to any successor in interest to the Company including, without limitation, any entity to which the Company sells business, assets and/or accounts of any branch, business unit or profit center in which Employee is primarily

Revised 8.27.2015

employed.  This Agreement also will inure to the benefit of every affiliate company included in the definition of "Company" under this Agreement.  The Company may assign this Agreement to any affiliate company of AJG in which case, except for purposes of Section 10 hereof, all references to "the Company" and all rights of the Company will include and inure to the benefit of that affiliate.  Employee may not assign this Agreement or any obligations hereunder.

**Section 10.**     <u>Release of Certain Obligations</u>.

Notwithstanding anything herein to the contrary, the obligations of Employee stated in Section 8 will become null and void and have no further effect immediately upon a Hostile Change in Control of AJG as defined herein.   The Company will send written notice to Employee within ten (10) days of a Hostile Change in Control of AJG, notifying Employee that such event has taken place.  Failure of the Company to send such notice will not preclude the release of Employee from the obligations contained in Section 8.  These definitions apply to Section 10:

A.     The term "<u>Hostile Change in Control</u>" means a transaction, event or election constituting a Change in Control which was not approved by or, in an election, the directors elected were not nominated by, at least two-thirds of the members of the Board of Directors of AJG in office immediately prior to the Change in Control who have not died or become permanently disabled.

B.     The term "<u>Change in Control</u>" of AJG means and includes each and all of the following occurrences:

(1)     A Business Combination, unless:

(a)     the Business Combination is approved or authorized by the affirmative vote of the holders of not less than 80% of the outstanding shares of voting stock of AJG and the affirmative vote of the holders of not less than 67% of the outstanding shares of the voting stock held by shareholders other than Related Persons; or

(b)     the Continuing Directors of AJG by a two-thirds vote: (i) have expressly approved in advance the acquisition of outstanding shares of voting stock of the corporation that caused the Related Person to become a Related Person; or (ii) have approved the Business Combination prior to the Related Person involved in the Business Combination having become a Related Person; or

(c)     the Business Combination is solely between AJG and another corporation, 50% or more of the voting stock of which is owned by AJG and none of which is owned by the Related Person; or

(d)     all of the following conditions are satisfied:

i.     The cash or fair market value of the property, securities or "other consideration to be received" per share by holders of

Revised 8.27.2015

common stock in AJG in the Business Combination is not less than the higher of:

(A)     the highest per share price (including brokerage commissions, transfer taxes and soliciting dealers' fees) paid by the Related Person in acquiring any of its holdings of AJG's common stock, or

(B)     an amount that bears that same percentage relationship to the market price of AJG's common stock immediately prior to the announcement of such Business Combination as the highest per share price determined in (A) above bears to the market price of AJG's common stock immediately prior to the commencement of the acquisition of AJG's voting stock that caused such Related Person to become a Related Person, or

(C)     an amount calculated by multiplying the earnings per share of AJG's common stock for the four fiscal quarters immediately preceding the record date for determination of stockholders entitled to vote on such Business Combination by the price/earnings multiple of the Related Person as of the record date s customarily computed and reported in the financial press.  Appropriate adjustments will be made with respect to these subsections (A), (B) and (C) for recapitalizations and for stock splits, stock dividends, and like distributions; and

ii.     A timely mailing will have been made to the stockholders of AJG showing in a prominent place: (x) any recommendations as to the advisability (or inadvisability) of the Business Combination that the Continuing Directors or Outside Directors may choose to state, if there are at the time any such directors; and (y) the opinion of a reputable nationally recognized investment banking or financial services firm as to the fairness from the financial point of view of the terms of the Business Combination to the stockholders of AJG other than the Related Person (such firm to be engaged solely on behalf of such other stockholders, to be paid a reasonable fee for its services by AJG upon receipt of such opinion, to be a firm that has not previously been significantly associated with the Related Person and, if there are at the time any such directors, to be selected by a majority of the Continuing Directors and Outside Directors).

Revised 8.27.2015

(2)     The acquisition of outstanding shares of AJG's voting stock that causes an individual, a corporation, partnership or other person or entity to become a Related Person.

(3)     Individuals who at the beginning of any period of three consecutive years constitute the entire Board of Directors of the Company will for any reason other than death or permanent disability during such period cease to constitute a majority thereof.

(4)     A change in control of a nature that would be required to be reported in response to Item 6(e) of Schedule 14A of Regulation 14A promulgated under the Securities Act of 1934, as amended.

C.     The term "Business Combination" will mean: (i) any merger or consolidation of AJG with or into a Related Person; (ii) any sale, lease, exchange, transfer or other disposition, including without limitation a mortgage or any other security device, of all or any Substantial Part of the assets of the Company to a Related Person; (iii) any merger or consolidation of a Related Person with or into AJG; (iv) any sale, lease, exchange, transfer or other disposition of all or any Substantial Part of the assets of a Related Person to the Company; (v) the issuance of any securities of the Company to a Related Person; (vi) the acquisition by the Company of any securities issued by a Related Person; (vii) any reclassification of securities, recapitalization or other transaction designed to decrease the number of holders of AJG's voting securities remaining, if there is a Related Person; and (viii) any agreement, contract or other arrangement providing for any of the transactions described in this definition of Business Combination.

D.     The term "Related Person" will mean and include any individual, corporation, partnership or other person or entity which, together with their "Affiliates" and "Associates" (as defined as of November 1, 1983, in Rule 12b-2 under the Securities Exchange Act of 1934), "Beneficially Owns" (as defined as of November 1, 1983, in Rule 13d-3 under the Securities Exchange Act of 1934) in the aggregate 20% or more of the outstanding shares of the voting stock of AJG, and any Affiliate or Associate of any such individual, corporation, partnership or other person or entity; provided that Related Person will not include any person who beneficially owned 20% or more of the outstanding shares of the voting stock of AJG on November 1, 1983. Without limitation, any shares of voting stock of AJG that any Related Person has the right to acquire pursuant to any agreement, or upon exercise of conversion rights, warrants or options, or otherwise, will be deemed beneficially owned by the Related Person.

E.     The term "Substantial Part" will mean more than 30% of the fair market value of the total assets of the corporation in question, as of the end of its most recent fiscal year ending prior to the time the determination is being made.

F.     The term "other consideration to be received" will include, without limitation, capital stock of AJG retained by its existing public stockholders in the event of a Business Combination in which AJG is the surviving corporation.

G.     The term "Continuing Director" will mean a director who was a member of the board of directors of AJG immediately prior to the time that the Related Person involved in a Business Combination became a Related Person, and the term "Outside Director" will mean a director who is not: (a) an officer or employee of AJG or any relative of an officer or employee;

Revised 8.27.2015

or (b) a Related Person or an officer, director, employee, Associate or Affiliate of a Related Person, or a relative of any of the foregoing.

## Section 11.    General.

A.    The captions in this Agreement are for reference only and have no independent force or effect.  If a caption is inconsistent with any part of the Agreement, the caption will be disregarded.

B.    This Agreement will be governed by and construed in accordance with the laws of the State in which Employee resides, without giving effect to any of its conflict of law principles. The parties agree that the chosen state has a material and significant interest in questions concerning this Agreement and performance thereunder.  The parties agree that the sole and exclusive venue of any dispute between the parties with respect to this Agreement, or any matters related thereto, will be a state trial or federal district court located within the federal judicial district in which Employee resides ("Chosen Venue").  Employee agrees that it is neither unfair nor unreasonable for the Chosen Venue to be selected as the exclusive venue for any dispute between the parties with respect to this Agreement or any matter related thereto and that he will suffer no undue burden by having to litigate any such disputes in the Chosen Venue. Moreover, Employee promises not to initiate suit against the Company in any venue other than the above-selected exclusive Chosen Venue with respect to any dispute between the parties relating to this Agreement.  Employee waives and agrees not to interpose any argument that the Chosen Venue is an inconvenient forum for litigation.

C.    Waiver of Jury Trial.  Because of the time and expense involved in the docketing of, preparation for and participation in a jury trial, the parties desire that any dispute arising hereunder will be decided by a judge rather than a jury.  Therefore, the parties hereby knowingly, voluntarily and intentionally waive the right either may have to a trial by jury in respect to any litigation based on this Agreement or arising out of, under or in conjunction with Employee's employment by the Company, this Agreement, or any course of conduct, course of dealing, verbal or written statement or the actions of either party.

D.    If Employee is an existing employee of the Company as of the Effective Date and is subject to any existing employment agreement with the Company, whether an Executive Agreement, Associate Agreement, or otherwise (collectively "Existing Employee Agreement"), this Agreement will be considered an Amended and Restated Employee Agreement of such Existing Employee Agreement.  If Employee is an employee of a business enterprise acquired or to be acquired by the Company as of the Effective Date and is subject to any existing employment agreement with the acquired business enterprise, then this Agreement will be considered an Amended and Restated Employment Agreement only if Employee's employment agreement with the acquired business enterprise is assigned to the Company.

E.    This Agreement contains the entire agreement of the parties with respect to the subject matters covered hereby.  The parties agree that all prior negotiations and communications are of no force or effect.  Further, the parties agree that there are no oral agreements, understandings, undertakings or promises of the parties relating to the subject matters covered by this Agreement.

Revised 8.27.2015

F.     Subject to Section 11(G) below, this Agreement may not be amended, altered or modified without the prior written consent of both parties, and such instrument will acknowledge that it is an amendment or modification of this Agreement.  Waiver of any term or condition of this Agreement will not be construed as a waiver of any subsequent breach or failure of the same term or condition, or any other term or condition.  Any waiver must be in writing.  No amendment, alteration, modification or waiver may be signed by Employee on behalf of the Company, its assignees, successors or assigns.

G.     To the extent that any of the terms set forth in this Agreement or any word, phrase, clause or sentence is found to be illegal or unenforceable for any reason, it is the intention of the parties that such word, phrase, clause or sentence will be modified or deleted by a court of competent jurisdiction so as to afford the Company the fullest protection commensurate with making this Agreement, as modified, legal and enforceable under applicable laws, and the balance of this Agreement will not be affected thereby, the balance being construed as severable and independent.

H.     All notices given hereunder will be in writing and will be sent by registered or certified mail or delivered by hand and, if intended for the Company, addressed to it or delivered to it's principal office to the attention of the Secretary of the Company.  If intended for Employee, notices will be delivered personally or addressed (if sent by mail) to Employee's then current residence address as shown on the Company's records, or to such other address as Employee directs in a written notice to the Company.  All notices will be deemed to be given on the date received at the address of the addressee or, if delivered personally, on the date delivered.

I.     The use of male pronouns throughout this Agreement includes the female gender. The words "including" or "include" are not to be interpreted as terms of limitation or exclusion, but rather of illustration.

J.     This Agreement may be executed in counterparts, each of which is deemed an original.

**IN WITNESS WHEREOF,** the parties hereto have executed this Agreement as of the day and year provided below their respective signatures.  The parties agree that the Effective Date of this Agreement will be ___1/18/16, 9:00 AM_____.

Revised 8.27.2015

**ARTHUR J. GALLAGHER & CO.,** on behalf of itself and its subsidiaries, divisions and affiliated and related companies

**EMPLOYEE**

Jordan Laeyendecker

Employee Signature

By:

Corporate Officer Signature – Itasca

Jordan Laeyendecker

Printed Name

Title: Corporate Vice President and Chief Human Resources Officer, Human Resources

2970 N. Sheridan Rd

Chicago                    Illinois                    60657

Date: 1/18/16, 9:00 AM

Address

Date: 1/11/16

FOR PAYROLL USE ONLY:

Employee ID: 41465

Revised 8.27.2015

## **Schedule 1**

**The following provision will replace Section 8(A) in its entirety:**

For a period of two (2) years following the termination of Employee's employment with the Company for any reason whatsoever, Employee will not, directly or indirectly, solicit any Protected Accounts or Prospective Accounts of the Company (as such accounts are defined above) for the purpose of providing Insurance Services or Benefit Services. "Insurance Services" is defined as the sale, placing, marketing, counseling or consulting in the placement, renewal, discontinuance or replacement of any insurance (including self-insurance) or handling self-insurance programs, insurance claims, risk management services, emergency or disaster prevention or management services or other insurance administrative service functions. "Benefit Services" is defined as providing employee benefit brokerage, consulting, or administrative services, in the area of group insurance, defined benefit and defined contribution pension plans, human resources and staffing services, individual life, disability and capital accumulation products, and all other employee benefit areas. "Protected Accounts" mean any and all accounts of the Company for which Employee performed any Insurance or Benefit Services during any part of the two-year period immediately preceding termination of Employee's employment with the Company. The term "Account of the Company" as used in this paragraph will be construed broadly to include all users of insurance or benefit services including commercial and individual consumers, risk managers, carriers, agents and other insurance intermediaries who are customers of the Company on the date Employee's employment with the Company terminates. If an Account of the Company is part of a group of companies which conducts business through more than one entity, division or operating unit, whether or not separately incorporated (a "Client Group"), the term "Account of the Company" as used herein will include products or services within any entity, division or operating unit of the Client Group where the same management group in the Client Group has the primary decision making authority to contract for services of the type rendered by the Company.

_____          _____
Employee Signature                       Hiring Manager Signature


**MANAGER:** *Do not complete this schedule* **UNLESS** *the employee is to be principally employed in OKLAHOMA.*

Revised 8.27.2015

### Schedule 2

**The following provision will replace Section 8(C) in its entirety:**

The obligations set forth in Section 8 above will be effective in the parishes specifically designated on this Schedule, and in which the Company carries on the business of providing insurance services and/or benefit services. The parties agree that this Schedule may be amended and modified upon written acknowledgment of the Employee and the Company without the need to modify or amend any other provision of this Agreement. (**MANAGER: Please fully circle designated parishes**.)

| | | | |
|---|---|---|---|
| Abbeville | Acadia | Allen | Ascension |
| Assumption | Avoyelles | Beauregard | Bienville |
| Bossier | Caddo | Calcasieu | Caldwell |
| Cameron | Catahoula | Claiborne | Concordia |
| De Soto | East Baton Rouge | East Carroll | East Feliciana |
| Evangeline | Franklin | Grant | Iberia |
| Iberville | Jackson | Jefferson Davis | Jefferson |
| La Salle | Lafayette | Lafourche | Lincoln |
| Livingston | Madison | Morehouse | Natchitoches |
| Orleans | Ouachita | Plaquemines | Pointe |
| Rapides | Red River | Richland | Sabine |
| Saint Bernard | Saint Charles | Saint Helena | Saint James |
| St. John the Baptist | Saint Landry | Saint Martin | Saint Mary |
| Saint Tammany | Tangipahoa | Tensas | Terrebonne |
| Union | Vermilion | Vernon | Washington |
| Webster | West Baton Rouge | West Carroll | West Feliciana |
| Winn | | | |

_____                    _____
Employee Signature                                         Hiring Manager Signature

**MANAGER:  *Do not complete this schedule* UNLESS *the employee is to be principally employed in LOUISIANA.***

# Exhibit H7

## EMPLOYEE AGREEMENT

This Employee Agreement ("Agreement") is made and entered into as of the Effective Date (as defined below) by and between ___Janet M. Schumacher_____ (hereinafter referred to as "Employee") and Arthur J. Gallagher & Co., a Delaware corporation with its principal place of business in Itasca, Illinois and its subsidiaries, divisions and affiliated and related companies (hereinafter referred to collectively as "AJG" or the "Company").

## RECITALS

**WHEREAS**, Employee has been hired, or is being retained, as a valued key employee who with the execution of this Agreement will be provided and will continue to be provided during his employment with valuable confidential and proprietary and trade secret information of the Company and will have significant managerial, production, administrative, technical and/or account servicing responsibilities; and

**WHEREAS**, the parties hereto acknowledge that the Company has a legitimate interest in retaining the services of Employee and accepting the covenants herein provided in order to protect its confidential and proprietary and trade secret information and to preserve the Company's goodwill, customer relationships, employment relationships and value of the business to be handled by Employee as an employee of the Company;

**NOW THEREFORE**, in consideration of these recitals and the mutual covenants and promises set forth below, and for other good and valuable consideration including, but not limited to, employment with the Company, receipt of the compensation and benefits attendant to such employment, receipt and the ability to utilize the Company's confidential, proprietary and trade secret information, and/or being provided or allowed access to and contact with certain Company accounts, all of which the parties acknowledge as sufficient consideration for this Agreement, the parties agree as follows:

**Section 1.**     **Employment.**

The Company agrees to employ Employee and Employee agrees to serve the Company and perform the duties set forth below beginning on the Effective Date and continuing thereafter until employment is terminated by either party. The Employee's employment is "at will" and is terminable by either party as provided below (except in jurisdictions where "at will" employment is not recognized). The Employee's continued employment with the Company is subject to the terms and conditions of this Agreement.

**Section 2.**     **Duties.**

A.     Employee agrees to devote his full energies, abilities, attention and business time to the performance of his employment obligations and responsibilities. Employee agrees that he will not engage in any activity which conflicts or interferes with, or in any way compromises, his performance of those obligations and responsibilities. Employee will comply with all applicable Company policies and procedures. Employee will not, either during or outside normal business hours, directly or indirectly sell, solicit, service, manage or engage in any aspect of the insurance, benefits or wealth management businesses for or on behalf of any person or entity other than the Company, nor engage in any activity that is not in the best interests of the Company.

B.     Employee recognizes that, by virtue of his employment by the Company and to assist him in the solicitation, production, management, and/or servicing of accounts, he will be provided and granted otherwise prohibited access to certain confidential and proprietary data and trade secret information of the Company which is not known either to its competitors or within the industry generally and which has independent economic value to the Company, and is subject to reasonable efforts that are reasonable under the circumstances to maintain its secrecy. This information (collectively hereinafter "Confidential Information") may include, but is not limited to: data relating to the Company's unique marketing and servicing programs, procedures and techniques; investment, wealth management and retirement plan consulting, variable annuities, and fund investment business and related products and services;

underwriting criteria for general programs; business, management and human resources/personnel strategies and practices; the criteria and formulae used by the Company in pricing its insurance and benefits products and claims management, loss control and information management services; the structure and pricing of special insurance packages negotiated with underwriters; highly sensitive information about the Company's agreements and relationships with underwriters; sales data contained in various tools and resources (including, without limitation, Salesforce.com); lists of prospects; the identity, authority and responsibilities of key contacts at Company accounts and prospects; the composition and organization of Company accounts' businesses; the peculiar risks inherent in the operations of Company accounts; highly sensitive details concerning the structure, conditions and extent of existing insurance coverages of Company accounts; policy expiration dates, premium amounts and commission rates relating to Company accounts; risk management service arrangements relating to Company accounts; loss histories relating to Company accounts; candidate and placement lists relating to Company accounts; the Company's personnel and payroll data including details of salary, bonus, commission and other compensation arrangements; and other data showing the particularized insurance or consulting requirements and preferences of Company accounts. Employee understands that his job duties may include assisting in the development of information and data that is Confidential Information belonging to the Company. Confidential Information may be stored in files, documents, dailies, daily reports, renewal information, customer lists, accounting records, products purchased by customers, customer account and credit data, referral sources, computer programs and software, customer comments, Company written manuals and marketing and financial analysis, plans, research and programs. Employee recognizes that this Confidential Information constitutes valuable property of the Company, developed over a long period of time and at substantial expense and that the Company takes reasonable efforts to keep this Confidential Information confidential and made available only to those employees who need access to such Confidential Information to perform their job functions for the Company. Employee promises to safeguard such Confidential Information, and agrees that he will not, at any time during his employment by the Company, divulge such Confidential Information or make use of it for his own purposes or the purposes of another.

C.      The Company agrees that, during Employee's employment with the Company, it will: (i) provide Employee with certain Confidential Information the Employee did not previously possess including, without limitation, Confidential Information relating to certain of the Company's accounts; (ii) provide Employee with information and access to the Company's proprietary insurance and risk management programs; (iii) provide Employee with access to the Company's specialized business operations relating to particular aspects of the insurance agency and risk management business; (iv) maintain specialized training programs to which Employee will qualify and apply; and (v) provide such other assistance which may reasonably aid Employee in performing sales, management, technical and/or servicing duties.

D.      Employee acknowledges and understands that an essential element of the Company's business is the development and maintenance of personal contacts and relationships with its accounts, and that Employee may be provided and allowed access to certain of the Company's accounts for the purpose of establishing personal contact and relationships with such accounts for the benefit of the Company. The Employee acknowledges that the Company invests considerable time, money, and resources necessary to develop and maintain a relationship between its employees and a client, and in that regard, the Company will pay Employee's salary, reimburse reasonably necessary business expenses, provide Employee with certain Confidential Information, and provide the resources necessary to service the Company accounts managed or serviced by Employee by making available legal advice, accounting support, advertising and other corporate services. Moreover, while the Employee recognizes that some Company accounts may develop greater identification with the Employee than the Company itself, those accounts remain, at all times and for all purposes, accounts of the Company. By entering this Agreement, Employee disclaims any interest in such Company accounts.

**Section 3.    Compensation and Benefits.**

Employee will be entitled to the compensation and benefits agreed to by Employee and the Company and as noted from time to time in Employee's official personnel file and records retained in the Company's corporate headquarters, which file is incorporated by reference herein to the extent necessary for evidencing the compensation and benefits to which Employee and the Company have agreed. The compensation and benefits to which Employee is entitled as of the Effective Date is noted in Employee's official personnel file. Employee's compensation and benefits is subject to periodic change at the Company's discretion.

**Section 4.    Representations.**

Employee represents and warrants to the Company that:

A.    He is not, and will not become, a party to any agreement, contract, arrangement or understanding, whether of employment or otherwise, that would in any way restrict him from undertaking or performing his duties in accordance with this Agreement or that limits his ability to be employed by the Company under this Agreement;

B.    Employment by the Company will not violate the terms of any policy of any prior employer of Employee regarding competition, solicitation or confidentiality;

C.    His employment by the Company in the position contemplated by this Agreement will not require him to improperly use any trade secrets or confidential or proprietary information of any prior employer, or any other person or entity for whom he has performed services;

D.    He has not misused, and will not misuse, any confidential or proprietary information obtained from any prior employer or any other person or entity;

E.    He has not improperly taken or retained in any form whatsoever, or otherwise retained access to, any confidential or proprietary information of any prior employer or any other person or entity; and

F.    He is in compliance with any non-competition and/or non-solicitation agreements, or other restrictive covenant obligations in place between him and any former employer and will continue to be in compliance, regardless of whether he believes such agreements and/or restrictive covenants are enforceable or not.

**Section 5.    Termination of Employment Relationship.**

A.    The Company or the Employee may terminate Employee's employment at any time and for any reason upon twenty-one (21) days' written notice (the "Notice Period") by the party wishing to terminate the employment; provided, however, that notice is not required from the Company for any termination taking place: (1) during the Employee's first ninety (90) days of employment (or other applicable Introductory Period pursuant to Company policy); or (2) during the pendency of any Performance Improvement Plan issued pursuant to the Company's performance management policies.

B.    The Company agrees to continue during the Notice Period the same compensation and benefits Employee was receiving prior to the Notice Period. The parties agree that once the Notice Period expires, the Employee's entitlement to compensation and benefits ends.

C.    Employee agrees that during the Notice Period, he will cooperate fully with the Company in all matters relating to the winding up of any pending work and/or the orderly transfer to other Company employees of the accounts for which he has been responsible. Employee specifically covenants that during the Notice Period (regardless of whether or not active employment responsibilities are continuing) his duties to the Company, including Employee's fiduciary duty of loyalty, will continue in effect. Prior to the expiration of the Notice Period, Employee promises to return to the Company all originals and copies (whether paper, digital copies or otherwise) of literature, correspondence, memoranda, reports, summaries, manuals, proposals, contracts and other documents of any kind which relate in any way to the business of the Company, including specifically all materials which comprise or refer to the Company's Confidential Information. The Employee covenants that he will not retain any copy, facsimile or note intended to memorialize any such data. Employee further understands and agrees that, during or at the expiration of the Notice Period, and as part of his assigned job duties, he will reasonably participate in

any meeting the Company may convene to: (i) review the status of any projects or work Employee has been assigned; (ii) review the status of accounts for which Employee has been most recently responsible or associated; (iii) ensure that Employee has fully obtained his entitlements under this Agreement and as provided by law; and/or (iv) confirm that Employee understands the nature and scope of his post-employment obligations.

       D.      Upon the termination of Employee's employment for any reason, Employee agrees that the Secretary of the Company may, as an irrevocable proxy and in Employee's name and stead, execute all documents and things which the Company deems necessary and desirable to effect Employee's resignation as an officer or director of any company (if applicable) included within the definition of the Company as used in this Agreement.

       E.      Before accepting any new employment in the insurance, benefits or wealth management industries, Employee promises to give his prospective new employer a copy of this Agreement. Employee permits the Company to advise any prospective new employer of Employee of the existence and terms of this Agreement and to provide it with a copy.

       F.      During employment and after the termination of same Employee agrees to remain available to the Company and its legal counsel, voluntarily upon the Company's request and without the necessity of subpoena or court order, in connection with the Company's investigation, preparation, prosecution and/or defense of any actual or potential legal proceeding, regulatory action, or internal matter. The Employee agrees to cooperate with the Company, to provide any information reasonably within his recollection and to provide truthful testimony as required. If Employee is called upon to provide cooperation after employment has been terminated, the Company will reimburse Employee for reasonable out-of-pocket expenses actually incurred under this section or, at the Company's option, will advance Employee's reasonable expenses or incur them directly.

       G.      Employee agrees that while he is employed by the Company, and following the termination of his employment, he will not make any false, defamatory or disparaging statements about the Company, its officers or directors where such statements are calculated to, or reasonably likely to cause material damage to the Company, its officers or directors.

**Section 6.     The Company's Right to Injunctive Relief; Attorneys' Fees.**

       The Employee acknowledges that his services to the Company are of a unique character which gives them a special value to the Company, the loss of which cannot reasonably or adequately be compensated in damages in an action at law should the Employee breach, or threaten to breach, any post-employment obligations under this Agreement. The Employee realizes that: (a) it would be difficult to measure precisely the damages to the Company from any breach by Employee of Sections 7 and/or 8 of this Agreement; (b) injury to the Company from any such breach would be incalculable and irremediable; and (c) money damages would therefore be an inadequate remedy for any such breach. Accordingly, in addition to any other remedy the Company may have at law or in equity, the Company will be entitled to enforce this Agreement by obtaining a temporary restraining order and preliminary and permanent injunctive relief to restrain any such breach or further breach by Employee. Employee expressly waives the right to contest whether a breach of Section 7 or 8 of this Agreement would result in irreparable or permanent harm to the Company. In addition, Employee agrees that the Company may seek injunctive relief when and if it elects to do so and any delay in seeking injunctive relief will not prejudice or waive the Company's right to do so. Employee expressly waives the right to assert that the Company is not entitled to injunctive relief because of any delay in seeking such relief. Employee agrees that he will be responsible for and pay the Company its reasonable attorneys' fees and other expenses and costs incurred to enforce this Agreement if the Company is the prevailing party. Employee further agrees that if Employee breaches any covenant contained in Sections 7 and/or 8 of this Agreement, the Company will be entitled, in addition to all other legal or equitable remedies it may have, to offset and withhold against any such loss, cost, liability or expense any amount of any kind that may then be owing or payable by Company to Employee.

**Section 7.**     **Trade Secrets and Confidential Information.**

      A.    Employee acknowledges that the Company's business depends to a great degree upon having information which is not generally known to others, and that the profitability of the Company's business requires that this information be kept confidential and proprietary within the Company. Accordingly:

      (1)    Employee agrees that all intellectual property, such as computer programs, systems or software, developed during his employment or as a result of his employment is "work for hire" performed by Employee in the scope of his employment. To the extent that any such intellectual property is determined not to constitute "work for hire," or if any rights in any such intellectual property do not accrue to the Company as a "work for hire," Employee's signature on this Agreement constitutes an assignment (without any further consideration) to the Company of any and all copyrights and other rights, title and interest in and to all such intellectual property. The Company will retain all proprietary rights to any and all such intellectual property. Employee agrees to execute any documents necessary to perfect the Company's interest in such intellectual property upon the Company's request.

      (2)    Employee has been advised by this writing and understands that the foregoing provisions of Section 7(A)(1) do not apply to an item of intellectual property for which no equipment, supplies, facilities or Confidential Information of the Company was used and which was developed entirely on Employee's own time, unless: (a) the item of intellectual property relates to the business of the Company or to the Company's actual or demonstrably anticipated research and development; or (b) the item of intellectual property results from any work performed by Employee for the Company.

      B.    Employee recognizes the highly sensitive nature of the Confidential Information he will be given (and to which he will have access throughout his employment) and acknowledges the Company's legitimate interest in safeguarding it from disclosure. Accordingly, in addition to the restrictions provided in Section 8 below, Employee agrees that:

      (1)    after his employment with the Company is terminated, he will not directly or indirectly disclose, use or divulge Confidential Information that constitutes a trade secret of the Company or make use of it for his own purpose or the purpose of another; and

      (2)    for a period of two (2) years following the termination of his employment with the Company, he will not divulge Confidential Information that does not constitute a trade secret of the Company or make use of it for his own purpose or the purpose of another.

      (3)    not all of the Company's Confidential Information will rise to the level of a trade secret of the Company; even so, all Confidential Information will be entitled to the protections and restrictions provided in this Agreement.

      C.    Employee understands and acknowledges that he will benefit significantly from having access to and being given Confidential Information. Employee agrees that but for his promise to safeguard Confidential Information and the further restrictive covenants contained in Section 8 below, the Company would not agree to provide Employee with Confidential Information. Further, Employee acknowledges that his breach of any restrictions provided in Section 8 below will inevitably and necessarily lead to the prohibited disclosure or use of Confidential Information.

**Section 8.**     **Protection of the Company's Protectable Interests.**

      To protect the legitimate interests of the Company in, among other things, protecting its Confidential Information, employment relationships, relationships with Company accounts and goodwill, and in consideration for, among other things as provided in this Agreement, the Company's promise to give Employee certain Confidential Information, some of which constitutes trade secrets of the Company which Employee did not previously have, and to enforce Employee's promise not to disclose such Confidential Information, Employee agrees to the following restrictive covenants, which Employee acknowledges and agrees are reasonably necessary and narrowly tailored to protect the Company's legitimate business interests:

A.      **In OKLAHOMA only:** Employee and the Company agree that during the period of time, if any, Employee is principally employed in OKLAHOMA, this subsection Section 8(A) will not be considered part of this Agreement and will be replaced in its entirety by the attached Schedule 1, which is incorporated by reference. Employee understands and acknowledges that the use of Schedule 1 is necessitated by the requirements and peculiarities of the laws of Oklahoma. Schedule 1 will apply only if it is attached hereto and initialed by the Company and Employee.

**In ALL OTHER STATES (excluding California):**

(1)      For a period of two (2) years following the termination of Employee's employment with the Company for any reason whatsoever, Employee will not, directly or indirectly, solicit, transfer, place, market, accept, aid, counsel or consult in the placement, renewal, discontinuance or replacement of any insurance (including self-insurance) by, or handle self-insurance programs, insurance claims, risk management services, emergency or disaster prevention or management services, or other insurance administrative or service functions ("insurance services") or provide employee benefit brokerage, consulting, or administration services; in the area of group insurance, defined benefit and defined contribution pension plans, individual life, disability and capital accumulation products; investment advisory services, wealth management, or group retirement services; defined benefit and defined contribution pension services; human resources consulting services, including, without limitation, compensation consulting, compensation program design, compensation and benefits surveys, and on-site human resources management; and all other employee benefit areas the Company is involved with ("benefit services"), for: (x) any Account of the Company for which Employee performed any of the foregoing functions during any part of the two-year period immediately preceding such termination (referred to hereinafter as "Protected Accounts"), or (y) any Prospective Account of the Company (as defined below).

(2)      The term "Account of the Company" as used in this paragraph will be construed broadly to include all users of insurance services or benefit services, including commercial and individual consumers, risk managers, carriers, agents and other insurance intermediaries who are customers of the Company on the date Employee's employment with the Company terminates, or an insurance carrier offering any custom program for which the Company acts as managing general agent, managing general underwriter, program manager or underwriting agent, regardless of how the relationship is documented or characterized.

(3)      If an Account of the Company is part of a group of companies which conducts business through more than one entity, division or operating unit, whether or not separately incorporated (a "Client Group"), the term "Account of the Company" as used herein will include products or services within any entity, division or operating unit of the Client Group where the same management group within the Client Group has the primary decision making authority with respect to contracting for services of the type rendered by the Company. Notwithstanding anything herein to the contrary, the Employee will be free to call on the retail agents of the Company, so long as there is no contact or solicitation of any account, client, or Prospective Account of the Company.

B.      For the purposes of the covenants set forth in Sections 7 and 8 of this Agreement, the parties acknowledge and agree that the following will apply:

(1)      The term "Prospective Account" of the Company, means any entity (other than a then-current account of the Company but including former Company accounts) with respect to whom, at any time during the one year period preceding the termination of Employee's employment with the Company, Employee: (i) submitted or assisted in the submission of a presentation or proposal of any kind on behalf of the Company, (ii) had material contact or acquired Confidential Information as a result of or in connection with Employee's employment with the Company, or (iii) incurred travel and/or entertainment expenses which were reimbursed by the Company to Employee; but the term Prospective Account does not include an account that is a customer of Employee's new employer (for the same type of insurance and/or benefits services for which such customer was a Prospective Account of the Company) at the time of termination of Employee's employment with the Company.

(2)      "Direct or indirect solicitation" of a Protected Account or Prospective Account

will expressly include, but not be limited to, the following (which is not intended to be an exhaustive list of direct or indirect solicitation, but is meant to provide examples of certain reasonably anticipated scenarios):

        (a)      The sending of an announcement by Employee or his new employer to any Protected Account or Prospective Account, the purpose of which is to communicate that Employee has either formed his own business enterprise or joined an existing business enterprise that will offer products or services in any way competitive with the Company.

        (b)      Initiating a communication or contact by Employee or his new employer with any Protected Account or Prospective Account for the purpose of notifying such Protected Account or Prospective Account that Employee has either formed his own business enterprise or joined an existing business enterprise that will offer products or services in any way competitive with the Company.

        (c)      Communication or contact by Employee or his new employer with any Protected Account or Prospective Account (if such new employer's communication with a Prospective Account was facilitated by Employee, directly or indirectly, or if Employee will or is intended to benefit, directly or indirectly, by such communication) if the communication in any way relates to insurance or benefits services; provided, however, nothing herein is intended to limit communications or contacts that are unrelated to insurance and/or benefits services.

        (d)      The facilitation by Employee, directly or indirectly, of any Protected Accounts' execution of a broker of record letter replacing the Company as its broker of record.

        C.      **In LOUISIANA only:** Employee and the Company agree that during the period of time, if any, Employee is principally employed in Louisiana, this Section 8(C) will not be considered part of this Agreement and will be replaced in its entirety by the attached Schedule 2, which is incorporated by reference. Employee understands and acknowledges that the use of Schedule 2 is necessitated by the requirements and peculiarities of the laws of Louisiana. Schedule 2 will apply only if it is attached and initialed by the Company and Employee.

        **In ALL OTHER STATES:**

        Employee understands and agrees that many of the accounts for which he will perform insurance and/or benefits services while employed by the Company are national accounts and that Employee will perform insurance and/or benefit services for Company accounts throughout the entire country. Employee agrees and acknowledges that the geographic scope relating to the restrictions provided in this Section 8 will include the entire United States and that since the post-employment restrictions herein provided are tied directly to Accounts of the Company for whom Employee performed insurance and/or benefit services during the two-year period immediately preceding termination of his employment and Prospective Accounts, this geographic limitation is reasonable. Moreover, Employee acknowledges and agrees that the restrictions contained in this Section 8 do not prohibit Employee from competing with the Company or performing insurance or benefits services for potential clients throughout the entire world except for Protected Accounts and Prospective Accounts, and that those restrictions are reasonable and narrowly tailored to further the Company's legitimate interest to protect its Confidential Information, account relationships, and goodwill, and such restrictions will not unduly burden Employee's ability to earn a living after his employment with the Company is terminated.

        D.      If, within two (2) years of the termination of Employee's employment the Employee engages in, or joins a company or business enterprise engaged in, providing insurance and/or benefits services, then the Company may advise any Protected Account and/or Prospective Account of the existence and terms of this Agreement and may give them a copy of this Agreement.

        E.      Employee recognizes that employees of the Company are a valuable resource of the Company. Accordingly, during Employee's employment with the Company, Employee will not, directly or indirectly solicit, induce, entice or recruit any employee of the Company to leave their employment with the Company. In addition, for a period of two (2) years following the termination of Employee's employment with the Company for any reason whatsoever, Employee will not directly or indirectly, solicit, induce or recruit any employee of the Company who has been provided Confidential Information to leave the employ of the Company.

**Section 9.**    **Assignment.**

Except as provided in Section 10, this Agreement will not be affected by any merger or consolidation or other reorganization of the Company and will be assignable to, binding upon, and will inure to the benefit of the continuing entity or to any successor in interest to the Company including, without limitation, any entity to which the Company sells business, assets and/or accounts of any branch, business unit or profit center in which Employee is primarily employed. This Agreement also will inure to the benefit of every affiliate company included in the definition of "Company" under this Agreement. The Company may assign this Agreement to any affiliate company of AJG in which case, except for purposes of Section 10 hereof, all references to "the Company" and all rights of the Company will include and inure to the benefit of that affiliate. Employee may not assign this Agreement or any obligations hereunder.

**Section 10.**    **Release of Certain Obligations.**

Notwithstanding anything herein to the contrary, the obligations of Employee stated in Section 8 will become null and void and have no further effect immediately upon a Hostile Change in Control of AJG as defined herein. The Company will send written notice to Employee within ten (10) days of a Hostile Change in Control of AJG, notifying Employee that such event has taken place. Failure of the Company to send such notice will not preclude the release of Employee from the obligations contained in Section 8. These definitions apply to Section 10:

A.    The term "Hostile Change in Control" means a transaction, event or election constituting a Change in Control which was not approved by or, in an election, the directors elected were not nominated by, at least two-thirds of the members of the Board of Directors of AJG in office immediately prior to the Change in Control who have not died or become permanently disabled.

B.    The term "Change in Control" of AJG means and includes each and all of the following occurrences:

(1)    A Business Combination, unless:

a)    the Business Combination is approved or authorized by the affirmative vote of the holders of not less than 80% of the outstanding shares of voting stock of AJG and the affirmative vote of the holders of not less than 67% of the outstanding shares of the voting stock held by shareholders other than Related Persons; or

b)    the Continuing Directors of AJG by a two-thirds vote: (i) have expressly approved in advance the acquisition of outstanding shares of voting stock of the corporation that caused the Related Person to become a Related Person; or (ii) have approved the Business Combination prior to the Related Person involved in the Business Combination having become a Related Person; or

c)    the Business Combination is solely between AJG and another corporation, 50% or more of the voting stock of which is owned by AJG and none of which is owned by the Related Person; or

d)    all of the following conditions are satisfied:

I.    The cash or fair market value of the property, securities or "other consideration to be received" per share by holders of common stock in AJG in the Business Combination is not less than the higher of:

i)    the highest per share price (including brokerage commissions, transfer taxes and soliciting dealers' fees) paid by the Related Person in acquiring any of its holdings of AJG's common stock, or

ii)    an amount that bears that same percentage relationship to the market price of AJG's common stock immediately prior to the announcement of such Business Combination as the highest per share price determined in i) above bears to the market price of AJG's common stock immediately prior to the commencement of the acquisition of AJG's voting stock that caused such Related Person to become a Related Person, or

iii)    an amount calculated by multiplying the earnings per share of AJG's common stock for the four fiscal quarters immediately preceding the record date for determination of stockholders entitled to vote on such Business Combination by the price/earnings

Page **8** of 13

multiple of the Related Person as of the record date as customarily computed and reported in the financial press. Appropriate adjustments will be made with respect to these subsections i), ii) and iii) for recapitalizations and for stock splits, stock dividends, and like distributions; and

       II.   A timely mailing will have been made to the stockholders of AJG showing in a prominent place: (x) any recommendations as to the advisability (or inadvisability) of the Business Combination that the Continuing Directors or Outside Directors may choose to state, if there are at the time any such directors; and (y) the opinion of a reputable nationally recognized investment banking or financial services firm as to the fairness from the financial point of view of the terms of the Business Combination to the stockholders of AJG other than the Related Person (such firm to be engaged solely on behalf of such other stockholders, to be paid a reasonable fee for its services by AJG upon receipt of such opinion, to be a firm that has not previously been significantly associated with the Related Person and, if there are at the time any such directors, to be selected by a majority of the Continuing Directors and Outside Directors).

    (2)   The acquisition of outstanding shares of AJG's voting stock that causes an individual, a corporation, partnership or other person or entity to become a Related Person.

    (3)   Individuals who at the beginning of any period of three consecutive years constitute the entire Board of Directors of the Company will for any reason other than death or permanent disability during such period cease to constitute a majority thereof.

    (4)   A change in control of a nature that would be required to be reported in response to Item 6(e) of Schedule 14A of Regulation 14A promulgated under the Securities Act of 1934, as amended.

    C.   The term "Business Combination" will mean: (i) any merger or consolidation of AJG with or into a Related Person; (ii) any sale, lease, exchange, transfer or other disposition, including without limitation a mortgage or any other security device, of all or any Substantial Part of the assets of the Company to a Related Person; (iii) any merger or consolidation of a Related Person with or into AJG; (iv) any sale, lease, exchange, transfer or other disposition of all or any Substantial Part of the assets of a Related Person to the Company; (v) the issuance of any securities of the Company to a Related Person; (vi) the acquisition by the Company of any securities issued by a Related Person; (vii) any reclassification of securities, recapitalization or other transaction designed to decrease the number of holders of AJG's voting securities remaining, if there is a Related Person; and (viii) any agreement, contract or other arrangement providing for any of the transactions described in this definition of Business Combination.

    D.   The term "Related Person" will mean and include any individual, corporation, partnership or other person or entity which, together with their "Affiliates" and "Associates" (as defined as of November 1, 1983, in Rule 12b-2 under the Securities Exchange Act of 1934), "Beneficially Owns" (as defined as of November 1, 1983, in Rule 13d-3 under the Securities Exchange Act of 1934) in the aggregate 20% or more of the outstanding shares of the voting stock of AJG, and any Affiliate or Associate of any such individual, corporation, partnership or other person or entity; provided that Related Person will not include any person who beneficially owned 20% or more of the outstanding shares of the voting stock of AJG on November 1, 1983. Without limitation, any shares of voting stock of AJG that any Related Person has the right to acquire pursuant to any agreement, or upon exercise of conversion rights, warrants or options, or otherwise, will be deemed beneficially owned by the Related Person.

    E.   The term "Substantial Part" will mean more than 30% of the fair market value of the total assets of the corporation in question, as of the end of its most recent fiscal year ending prior to the time the determination is being made.

    F.   The term "other consideration to be received" will include, without limitation, capital stock of AJG retained by its existing public stockholders in the event of a Business Combination in which AJG is the surviving corporation.

    G.   The term "Continuing Director" will mean a director who was a member of the board of directors of AJG immediately prior to the time that the Related Person involved in a Business Combination became a Related Person, and the term "Outside Director" will mean a director who is not: (a) an officer or employee of AJG or any relative of an officer or employee; or (b) a Related Person or an

officer, director, employee, Associate or Affiliate of a Related Person, or a relative of any of the foregoing.

**Section 11.     General.**

    A.    The captions in this Agreement are for reference only and have no independent force or effect. If a caption is inconsistent with any part of the Agreement, the caption will be disregarded.

    B.    This Agreement will be governed by and construed in accordance with the laws of the State in which Employee resides, without giving effect to any of its conflict of law principles. The parties agree that the chosen state has a material and significant interest in questions concerning this Agreement and performance thereunder. The parties agree that the sole and exclusive venue of any dispute between the parties with respect to this Agreement, or any matters related thereto, will be a state trial or federal district court located within the federal judicial district in which Employee resides ("Chosen Venue"). Employee agrees that it is neither unfair nor unreasonable for the Chosen Venue to be selected as the exclusive venue for any dispute between the parties with respect to this Agreement or any matter related thereto and that he will suffer no undue burden by having to litigate any such disputes in the Chosen Venue. Moreover, Employee promises not to initiate suit against the Company in any venue other than the above-selected exclusive Chosen Venue with respect to any dispute between the parties relating to this Agreement. Employee waives and agrees not to interpose any argument that the Chosen Venue is an inconvenient forum for litigation.

    C.    Waiver of Jury Trial. Because of the time and expense involved in the docketing of, preparation for and participation in a jury trial, the parties desire that any dispute arising hereunder will be decided by a judge rather than a jury. Therefore, the parties hereby knowingly, voluntarily and intentionally waive the right either may have to a trial by jury in respect to any litigation based on this Agreement or arising out of, under or in conjunction with Employee's employment by the Company, this Agreement, or any course of conduct, course of dealing, verbal or written statement or the actions of either party.

    D.    If Employee is an existing employee of the Company as of the Effective Date and is subject to any existing employment agreement with the Company, whether an Executive Agreement, Associate Agreement, or otherwise (collectively "Existing Employee Agreement"), this Agreement will be considered an Amended and Restated Employee Agreement of such Existing Employee Agreement. If Employee is an employee of a business enterprise acquired or to be acquired by the Company as of the Effective Date, (the "Acquired Business"), then (i) this Agreement will be considered an Amended and Restated Employment Agreement if Employee is subject to any existing employment agreement with the Acquired Business and Employee's employment agreement with the Acquired Business is assigned to the Company and (ii) the term the "Company" shall be deemed to include the Acquired Business.

    E.    This Agreement contains the entire agreement of the parties with respect to the subject matters covered hereby. The parties agree that all prior negotiations and communications are of no force or effect. Further, the parties agree that there are no oral agreements, understandings, undertakings or promises of the parties relating to the subject matters covered by this Agreement.

    F.    Subject to Section 11(G) below, this Agreement may not be amended, altered or modified without the prior written consent of both parties, and such instrument will acknowledge that it is an amendment or modification of this Agreement. Waiver of any term or condition of this Agreement will not be construed as a waiver of any subsequent breach or failure of the same term or condition, or any other term or condition. Any waiver must be in writing. No amendment, alteration, modification or waiver may be signed by Employee on behalf of the Company, its assignees, successors or assigns.

    G.    To the extent that any of the terms set forth in this Agreement or any word, phrase, clause or sentence is found to be illegal or unenforceable for any reason, it is the intention of the parties that such word, phrase, clause or sentence will be modified or deleted by a court of competent jurisdiction so as to afford the Company the fullest protection commensurate with making this Agreement, as modified, legal and enforceable under applicable laws, and the balance of this Agreement will not be affected thereby, the balance being construed as severable and independent.

H.      All notices given hereunder will be in writing and will be sent by registered or certified mail or delivered by hand and, if intended for the Company, addressed to it or delivered to its principal office to the attention of the Secretary of the Company. If intended for Employee, notices will be delivered personally or addressed (if sent by mail) to Employee's then current residence address as shown on the Company's records, or to such other address as Employee directs in a written notice to the Company. All notices will be deemed to be given on the date received at the address of the addressee or, if delivered personally, on the date delivered.

I.      The use of male pronouns throughout this Agreement includes the female gender. The words "including" or "include" are not to be interpreted as terms of limitation or exclusion, but rather of illustration.

J.      This Agreement may be executed in counterparts, each of which is deemed an original.

**IN WITNESS WHEREOF,** the parties hereto have executed this Agreement as of the day and year provided below their respective signatures. The parties agree that the Effective Date of this Agreement will be 12/17/14, 10:00 AM .

**ARTHUR J. GALLAGHER & CO.,**
on behalf of itself and its subsidiaries, divisions
and affiliated and related companies

By: _____

_____
            Corporate Officer Signature – Itasca

Assistant Secretary & Senior Counsel_____
Title

12/17/14, 10:00 AM
_____
Date

**EMPLOYEE**

_Janet Schumacher_____
Employee E-Signature

Janet Schumacher
_____
Printed Name

12/11/14
_____
Date:

FOR HUMAN RESOURCES USE ONLY:

Employee ID: 43053_____

Standard Employee Agreement – 1.17.14

**<u>Schedule 1</u>**
**The following provision will replace Section 8(A) in its entirety:**
        For a period of two (2) years following the termination of Employee's employment with the
Company for any reason whatsoever, Employee will not, directly or indirectly, solicit any Protected
Accounts or Prospective Accounts of the Company (as such accounts are defined above) for the purpose
of providing Insurance Services or Benefit Services. "Insurance Services" is defined as the sale, placing,
marketing, counseling or consulting in the placement, renewal, discontinuance or replacement of any
insurance (including self-insurance) or handling self-insurance programs, insurance claims, risk
management services, emergency or disaster prevention or management services or other insurance
administrative service functions. "Benefit Services" is defined as providing employee benefit brokerage,
consulting, or administrative services, in the area of group insurance, defined benefit and defined
contribution pension plans, human resources and staffing services, individual life, disability and capital
accumulation products, and all other employee benefit areas. "Protected Accounts" mean any and all
accounts of the Company for which Employee performed any Insurance or Benefit Services during any
part of the two-year period immediately preceding termination of Employee's employment with the
Company. The term "Account of the Company" as used in this paragraph will be construed broadly to
include all users of insurance or benefit services including commercial and individual consumers, risk
managers, carriers, agents and other insurance intermediaries who are customers of the Company on the
date Employee's employment with the Company terminates. If an Account of the Company is part of a
group of companies which conducts business through more than one entity, division or operating unit,
whether or not separately incorporated (a "Client Group"), the term "Account of the Company" as used
herein will include products or services within any entity, division or operating unit of the Client Group
where the same management group in the Client Group has the primary decision making authority to
contract for services of the type rendered by the Company.

_____        _____
Employee Signature                                        Hiring Manager Signature & Date

        **Do not sign this schedule unless the employee is to be principally employed in Oklahoma.**

**Schedule 2**
**The following provision will replace Section 8(C) in its entirety:**
      The obligations set forth in Section 8 above will be effective in the parishes specifically designated on this Schedule 2, and in which the Company carries on the business of providing insurance services and/or benefit services. The parties agree that this Schedule 2 may be amended and modified upon written acknowledgment of the Employee and the Company without the need to modify or amend any other provision of this Agreement. (Please fully circle designated parishes.) PARISHES LISTED BELOW

| | | | |
|---|---|---|---|
| Abbeville | Acadia | Allen | Ascension |
| Assumption | Avoyelles | Beauregard | Bienville |
| Bossier | Caddo | Calcasieu | Caldwell |
| Cameron | Catahoula | Claiborne | Concordia |
| De Soto | East Baton Rouge | East Carroll | East Feliciana |
| Evangeline | Franklin | Grant | Iberia |
| Iberville | Jackson | Jefferson Davis | Jefferson |
| La Salle | Lafayette | Lafourche | Lincoln |
| Livingston | Madison | Morehouse | Natchitoches |
| Orleans | Ouachita | Plaquemines | Pointe |
| Rapides | Red River | Richland | Sabine |
| Saint Bernard | Saint Charles | Saint Helena | Saint James |
| St. John the Baptist | Saint Landry | Saint Martin | Saint Mary |
| Saint Tammany | Tangipahoa | Tensas | Terrebonne |
| Union | Vermilion | Vernon | Washington |
| Webster | West Baton Rouge | West Carroll | West Feliciana |
| Winn | | | |

_____      _____

Employee Signature                        Hiring Manager Signature  & Date

**Do not complete this schedule unless the employee is to be principally employed in Louisiana.**

# Exhibit H8

<u>**EMPLOYEE AGREEMENT**</u>

This Employee Agreement ("Agreement") is made and entered into as of the Effective Date (as defined below) by and between ____Rosario Zaragoza_____ (hereinafter referred to as "Employee") and Arthur J. Gallagher & Co., a Delaware corporation with its principal place of business in Itasca, Illinois and its subsidiaries, divisions and affiliated and related companies (hereinafter referred to collectively as "AJG" or the "Company").

<u>**RECITALS**</u>

**WHEREAS**, Employee has been hired, or is being retained, as a valued key employee who with the execution of this Agreement will be provided and will continue to be provided during his employment with valuable confidential and proprietary and trade secret information of the Company and will have significant managerial, production, administrative, technical and/or account servicing responsibilities; and

**WHEREAS**, the parties hereto acknowledge that the Company has a legitimate interest in retaining the services of Employee and accepting the covenants herein provided in order to protect its confidential and proprietary and trade secret information and to preserve the Company's goodwill, customer relationships, employment relationships and value of the business to be handled by Employee as an employee of the Company;

**NOW THEREFORE**, in consideration of these recitals and the mutual covenants and promises set forth below, and for other good and valuable consideration including, but not limited to, employment with the Company, receipt of the compensation and benefits attendant to such employment, receipt and the ability to utilize the Company's confidential, proprietary and trade secret information, and/or being provided or allowed access to and contact with certain Company accounts, all of which the parties acknowledge as sufficient consideration for this Agreement, the parties agree as follows:

**Section 1.**      <u>**Employment.**</u>

The Company agrees to employ Employee and Employee agrees to serve the Company and perform the duties set forth below beginning on the Effective Date and continuing thereafter until employment is terminated by either party. The Employee's employment is "at will" and is terminable by either party as provided below (except in jurisdictions where "at will" employment is not recognized). The Employee's continued employment with the Company is subject to the terms and conditions of this Agreement.

**Section 2.**      <u>**Duties.**</u>

A.      Employee agrees to devote his full energies, abilities, attention and business time to the performance of his employment obligations and responsibilities. Employee agrees that he will not engage in any activity which conflicts or interferes with, or in any way compromises, his performance of those obligations and responsibilities. Employee will comply with all applicable Company policies and procedures. Employee will not, either during or outside normal business hours, directly or indirectly sell, solicit, service, manage or engage in any aspect of the insurance, benefits or wealth management businesses for or on behalf of any person or entity other than the Company, nor engage in any activity that is not in the best interests of the Company.

B.      Employee recognizes that, by virtue of his employment by the Company and to assist him in the solicitation, production, management, and/or servicing of accounts, he will be provided and granted otherwise prohibited access to certain confidential and proprietary data and trade secret information of the Company which is not known either to its competitors or within the industry generally and which has independent economic value to the Company, and is subject to reasonable efforts that are reasonable under the circumstances to maintain its secrecy. This information (collectively hereinafter "Confidential Information") may include, but is not limited to: data relating to the Company's unique marketing and servicing programs, procedures and techniques; investment, wealth management and retirement plan consulting, variable annuities, and fund investment business and related products and services;

underwriting criteria for general programs; business, management and human resources/personnel strategies and practices; the criteria and formulae used by the Company in pricing its insurance and benefits products and claims management, loss control and information management services; the structure and pricing of special insurance packages negotiated with underwriters; highly sensitive information about the Company's agreements and relationships with underwriters; sales data contained in various tools and resources (including, without limitation, Salesforce.com); lists of prospects; the identity, authority and responsibilities of key contacts at Company accounts and prospects; the composition and organization of Company accounts' businesses; the peculiar risks inherent in the operations of Company accounts; highly sensitive details concerning the structure, conditions and extent of existing insurance coverages of Company accounts; policy expiration dates, premium amounts and commission rates relating to Company accounts; risk management service arrangements relating to Company accounts; loss histories relating to Company accounts; candidate and placement lists relating to Company accounts; the Company's personnel and payroll data including details of salary, bonus, commission and other compensation arrangements; and other data showing the particularized insurance or consulting requirements and preferences of Company accounts. Employee understands that his job duties may include assisting in the development of information and data that is Confidential Information belonging to the Company. Confidential Information may be stored in files, documents, dailies, daily reports, renewal information, customer lists, accounting records, products purchased by customers, customer account and credit data, referral sources, computer programs and software, customer comments, Company written manuals and marketing and financial analysis, plans, research and programs. Employee recognizes that this Confidential Information constitutes valuable property of the Company, developed over a long period of time and at substantial expense and that the Company takes reasonable efforts to keep this Confidential Information confidential and made available only to those employees who need access to such Confidential Information to perform their job functions for the Company. Employee promises to safeguard such Confidential Information, and agrees that he will not, at any time during his employment by the Company, divulge such Confidential Information or make use of it for his own purposes or the purposes of another.

        C.      The Company agrees that, during Employee's employment with the Company, it will: (i) provide Employee with certain Confidential Information the Employee did not previously possess including, without limitation, Confidential Information relating to certain of the Company's accounts; (ii) provide Employee with information and access to the Company's proprietary insurance and risk management programs; (iii) provide Employee with access to the Company's specialized business operations relating to particular aspects of the insurance agency and risk management business; (iv) maintain specialized training programs to which Employee will qualify and apply; and (v) provide such other assistance which may reasonably aid Employee in performing sales, management, technical and/or servicing duties.

        D.      Employee acknowledges and understands that an essential element of the Company's business is the development and maintenance of personal contacts and relationships with its accounts, and that Employee may be provided and allowed access to certain of the Company's accounts for the purpose of establishing personal contact and relationships with such accounts for the benefit of the Company. The Employee acknowledges that the Company invests considerable time, money, and resources necessary to develop and maintain a relationship between its employees and a client, and in that regard, the Company will pay Employee's salary, reimburse reasonably necessary business expenses, provide Employee with certain Confidential Information, and provide the resources necessary to service the Company accounts managed or serviced by Employee by making available legal advice, accounting support, advertising and other corporate services. Moreover, while the Employee recognizes that some Company accounts may develop greater identification with the Employee than the Company itself, those accounts remain, at all times and for all purposes, accounts of the Company. By entering this Agreement, Employee disclaims any interest in such Company accounts.

**Section 3.    Compensation and Benefits.**

Employee will be entitled to the compensation and benefits agreed to by Employee and the Company and as noted from time to time in Employee's official personnel file and records retained in the Company's corporate headquarters, which file is incorporated by reference herein to the extent necessary for evidencing the compensation and benefits to which Employee and the Company have agreed. The compensation and benefits to which Employee is entitled as of the Effective Date is noted in Employee's official personnel file. Employee's compensation and benefits is subject to periodic change at the Company's discretion.

**Section 4.    Representations.**

Employee represents and warrants to the Company that:

A.    He is not, and will not become, a party to any agreement, contract, arrangement or understanding, whether of employment or otherwise, that would in any way restrict him from undertaking or performing his duties in accordance with this Agreement or that limits his ability to be employed by the Company under this Agreement;

B.    Employment by the Company will not violate the terms of any policy of any prior employer of Employee regarding competition, solicitation or confidentiality;

C.    His employment by the Company in the position contemplated by this Agreement will not require him to improperly use any trade secrets or confidential or proprietary information of any prior employer, or any other person or entity for whom he has performed services;

D.    He has not misused, and will not misuse, any confidential or proprietary information obtained from any prior employer or any other person or entity;

E.    He has not improperly taken or retained in any form whatsoever, or otherwise retained access to, any confidential or proprietary information of any prior employer or any other person or entity; and

F.    He is in compliance with any non-competition and/or non-solicitation agreements, or other restrictive covenant obligations in place between him and any former employer and will continue to be in compliance, regardless of whether he believes such agreements and/or restrictive covenants are enforceable or not.

**Section 5.    Termination of Employment Relationship.**

A.    The Company or the Employee may terminate Employee's employment at any time and for any reason upon twenty-one (21) days' written notice (the "Notice Period") by the party wishing to terminate the employment; provided, however, that notice is not required from the Company for any termination taking place: (1) during the Employee's first ninety (90) days of employment (or other applicable Introductory Period pursuant to Company policy); or (2) during the pendency of any Performance Improvement Plan issued pursuant to the Company's performance management policies.

B.    The Company agrees to continue during the Notice Period the same compensation and benefits Employee was receiving prior to the Notice Period. The parties agree that once the Notice Period expires, the Employee's entitlement to compensation and benefits ends.

C.    Employee agrees that during the Notice Period, he will cooperate fully with the Company in all matters relating to the winding up of any pending work and/or the orderly transfer to other Company employees of the accounts for which he has been responsible. Employee specifically covenants that during the Notice Period (regardless of whether or not active employment responsibilities are continuing) his duties to the Company, including Employee's fiduciary duty of loyalty, will continue in effect. Prior to the expiration of the Notice Period, Employee promises to return to the Company all originals and copies (whether paper, digital copies or otherwise) of literature, correspondence, memoranda, reports, summaries, manuals, proposals, contracts and other documents of any kind which relate in any way to the business of the Company, including specifically all materials which comprise or refer to the Company's Confidential Information. The Employee covenants that he will not retain any copy, facsimile or note intended to memorialize any such data. Employee further understands and agrees that, during or at the expiration of the Notice Period, and as part of his assigned job duties, he will reasonably participate in

any meeting the Company may convene to: (i) review the status of any projects or work Employee has been assigned; (ii) review the status of accounts for which Employee has been most recently responsible or associated; (iii) ensure that Employee has fully obtained his entitlements under this Agreement and as provided by law; and/or (iv) confirm that Employee understands the nature and scope of his post-employment obligations.

      D.      Upon the termination of Employee's employment for any reason, Employee agrees that the Secretary of the Company may, as an irrevocable proxy and in Employee's name and stead, execute all documents and things which the Company deems necessary and desirable to effect Employee's resignation as an officer or director of any company (if applicable) included within the definition of the Company as used in this Agreement.

      E.      Before accepting any new employment in the insurance, benefits or wealth management industries, Employee promises to give his prospective new employer a copy of this Agreement. Employee permits the Company to advise any prospective new employer of Employee of the existence and terms of this Agreement and to provide it with a copy.

      F.      During employment and after the termination of same Employee agrees to remain available to the Company and its legal counsel, voluntarily upon the Company's request and without the necessity of subpoena or court order, in connection with the Company's investigation, preparation, prosecution and/or defense of any actual or potential legal proceeding, regulatory action, or internal matter. The Employee agrees to cooperate with the Company, to provide any information reasonably within his recollection and to provide truthful testimony as required. If Employee is called upon to provide cooperation after employment has been terminated, the Company will reimburse Employee for reasonable out-of-pocket expenses actually incurred under this section or, at the Company's option, will advance Employee's reasonable expenses or incur them directly.

      G.      Employee agrees that while he is employed by the Company, and following the termination of his employment, he will not make any false, defamatory or disparaging statements about the Company, its officers or directors where such statements are calculated to, or reasonably likely to cause material damage to the Company, its officers or directors.

**Section 6.**      **The Company's Right to Injunctive Relief; Attorneys' Fees.**

      The Employee acknowledges that his services to the Company are of a unique character which gives them a special value to the Company, the loss of which cannot reasonably or adequately be compensated in damages in an action at law should the Employee breach, or threaten to breach, any post-employment obligations under this Agreement. The Employee realizes that: (a) it would be difficult to measure precisely the damages to the Company from any breach by Employee of Sections 7 and/or 8 of this Agreement; (b) injury to the Company from any such breach would be incalculable and irremediable; and (c) money damages would therefore be an inadequate remedy for any such breach. Accordingly, in addition to any other remedy the Company may have at law or in equity, the Company will be entitled to enforce this Agreement by obtaining a temporary restraining order and preliminary and permanent injunctive relief to restrain any such breach or further breach by Employee. Employee expressly waives the right to contest whether a breach of Section 7 or 8 of this Agreement would result in irreparable or permanent harm to the Company. In addition, Employee agrees that the Company may seek injunctive relief when and if it elects to do so and any delay in seeking injunctive relief will not prejudice or waive the Company's right to do so. Employee expressly waives the right to assert that the Company is not entitled to injunctive relief because of any delay in seeking such relief. Employee agrees that he will be responsible for and pay the Company its reasonable attorneys' fees and other expenses and costs incurred to enforce this Agreement if the Company is the prevailing party. Employee further agrees that if Employee breaches any covenant contained in Sections 7 and/or 8 of this Agreement, the Company will be entitled, in addition to all other legal or equitable remedies it may have, to offset and withhold against any such loss, cost, liability or expense any amount of any kind that may then be owing or payable by Company to Employee.

**Section 7.**     **Trade Secrets and Confidential Information.**

A.      Employee acknowledges that the Company's business depends to a great degree upon having information which is not generally known to others, and that the profitability of the Company's business requires that this information be kept confidential and proprietary within the Company. Accordingly:

(1)     Employee agrees that all intellectual property, such as computer programs, systems or software, developed during his employment or as a result of his employment is "work for hire" performed by Employee in the scope of his employment. To the extent that any such intellectual property is determined not to constitute "work for hire," or if any rights in any such intellectual property do not accrue to the Company as a "work for hire," Employee's signature on this Agreement constitutes an assignment (without any further consideration) to the Company of any and all copyrights and other rights, title and interest in and to all such intellectual property. The Company will retain all proprietary rights to any and all such intellectual property. Employee agrees to execute any documents necessary to perfect the Company's interest in such intellectual property upon the Company's request.

(2)     Employee has been advised by this writing and understands that the foregoing provisions of Section 7(A)(1) do not apply to an item of intellectual property for which no equipment, supplies, facilities or Confidential Information of the Company was used and which was developed entirely on Employee's own time, unless: (a) the item of intellectual property relates to the business of the Company or to the Company's actual or demonstrably anticipated research and development; or (b) the item of intellectual property results from any work performed by Employee for the Company.

B.      Employee recognizes the highly sensitive nature of the Confidential Information he will be given (and to which he will have access throughout his employment) and acknowledges the Company's legitimate interest in safeguarding it from disclosure. Accordingly, in addition to the restrictions provided in Section 8 below, Employee agrees that:

(1)     after his employment with the Company is terminated, he will not directly or indirectly disclose, use or divulge Confidential Information that constitutes a trade secret of the Company or make use of it for his own purpose or the purpose of another; and

(2)     for a period of two (2) years following the termination of his employment with the Company, he will not divulge Confidential Information that does not constitute a trade secret of the Company or make use of it for his own purpose or the purpose of another.

(3)     not all of the Company's Confidential Information will rise to the level of a trade secret of the Company; even so, all Confidential Information will be entitled to the protections and restrictions provided in this Agreement.

C.      Employee understands and acknowledges that he will benefit significantly from having access to and being given Confidential Information. Employee agrees that but for his promise to safeguard Confidential Information and the further restrictive covenants contained in Section 8 below, the Company would not agree to provide Employee with Confidential Information. Further, Employee acknowledges that his breach of any restrictions provided in Section 8 below will inevitably and necessarily lead to the prohibited disclosure or use of Confidential Information.

**Section 8.**     **Protection of the Company's Protectable Interests.**

To protect the legitimate interests of the Company in, among other things, protecting its Confidential Information, employment relationships, relationships with Company accounts and goodwill, and in consideration for, among other things as provided in this Agreement, the Company's promise to give Employee certain Confidential Information, some of which constitutes trade secrets of the Company which Employee did not previously have, and to enforce Employee's promise not to disclose such Confidential Information, Employee agrees to the following restrictive covenants, which Employee acknowledges and agrees are reasonably necessary and narrowly tailored to protect the Company's legitimate business interests:

    A.    **In OKLAHOMA only:** Employee and the Company agree that during the period of time, if any, Employee is principally employed in OKLAHOMA, this subsection Section 8(A) will not be considered part of this Agreement and will be replaced in its entirety by the attached Schedule 1, which is incorporated by reference. Employee understands and acknowledges that the use of Schedule 1 is necessitated by the requirements and peculiarities of the laws of Oklahoma. Schedule 1 will apply only if it is attached hereto and initialed by the Company and Employee.

    **In ALL OTHER STATES (excluding California):**

    (1)    For a period of two (2) years following the termination of Employee's employment with the Company for any reason whatsoever, Employee will not, directly or indirectly, solicit, transfer, place, market, accept, aid, counsel or consult in the placement, renewal, discontinuance or replacement of any insurance (including self-insurance) by, or handle self-insurance programs, insurance claims, risk management services, emergency or disaster prevention or management services, or other insurance administrative or service functions ("insurance services") or provide employee benefit brokerage, consulting, or administration services; in the area of group insurance, defined benefit and defined contribution pension plans, individual life, disability and capital accumulation products; investment advisory services, wealth management, or group retirement services; defined benefit and defined contribution pension services; human resources consulting services, including, without limitation, compensation consulting, compensation program design, compensation and benefits surveys, and on-site human resources management; and all other employee benefit areas the Company is involved with ("benefit services"), for: (x) any Account of the Company for which Employee performed any of the foregoing functions during any part of the two-year period immediately preceding such termination (referred to hereinafter as "Protected Accounts"), or (y) any Prospective Account of the Company (as defined below).

    (2)    The term "Account of the Company" as used in this paragraph will be construed broadly to include all users of insurance services or benefit services, including commercial and individual consumers, risk managers, carriers, agents and other insurance intermediaries who are customers of the Company on the date Employee's employment with the Company terminates, or an insurance carrier offering any custom program for which the Company acts as managing general agent, managing general underwriter, program manager or underwriting agent, regardless of how the relationship is documented or characterized.

    (3)    If an Account of the Company is part of a group of companies which conducts business through more than one entity, division or operating unit, whether or not separately incorporated (a "Client Group"), the term "Account of the Company" as used herein will include products or services within any entity, division or operating unit of the Client Group where the same management group within the Client Group has the primary decision making authority with respect to contracting for services of the type rendered by the Company. Notwithstanding anything herein to the contrary, the Employee will be free to call on the retail agents of the Company, so long as there is no contact or solicitation of any account, client, or Prospective Account of the Company.

    B.    For the purposes of the covenants set forth in Sections 7 and 8 of this Agreement, the parties acknowledge and agree that the following will apply:

    (1)    The term "Prospective Account" of the Company, means any entity (other than a then-current account of the Company but including former Company accounts) with respect to whom, at any time during the one year period preceding the termination of Employee's employment with the Company, Employee: (i) submitted or assisted in the submission of a presentation or proposal of any kind on behalf of the Company, (ii) had material contact or acquired Confidential Information as a result of or in connection with Employee's employment with the Company, or (iii) incurred travel and/or entertainment expenses which were reimbursed by the Company to Employee; but the term Prospective Account does not include an account that is a customer of Employee's new employer (for the same type of insurance and/or benefits services for which such customer was a Prospective Account of the Company) at the time of termination of Employee's employment with the Company.

    (2)    "Direct or indirect solicitation" of a Protected Account or Prospective Account will expressly include, but not be limited to, the following (which is not intended to be an exhaustive list of

direct or indirect solicitation, but is meant to provide examples of certain reasonably anticipated scenarios):

    (a) The sending of an announcement by Employee or his new employer to any Protected Account or Prospective Account, the purpose of which is to communicate that Employee has either formed his own business enterprise or joined an existing business enterprise that will offer products or services in any way competitive with the Company.

    (b) Initiating a communication or contact by Employee or his new employer with any Protected Account or Prospective Account for the purpose of notifying such Protected Account or Prospective Account that Employee has either formed his own business enterprise or joined an existing business enterprise that will offer products or services in any way competitive with the Company.

    (c) Communication or contact by Employee or his new employer with any Protected Account or Prospective Account (if such new employer's communication with a Prospective Account was facilitated by Employee, directly or indirectly, or if Employee will or is intended to benefit, directly or indirectly, by such communication) if the communication in any way relates to insurance or benefits services; provided, however, nothing herein is intended to limit communications or contacts that are unrelated to insurance and/or benefits services.

    (d) The facilitation by Employee, directly or indirectly, of any Protected Accounts' execution of a broker of record letter replacing the Company as its broker of record.

    C. **In LOUISIANA only:** Employee and the Company agree that during the period of time, if any, Employee is principally employed in Louisiana, this Section 8(C) will <u>not</u> be considered part of this Agreement and will be replaced in its entirety by the attached Schedule 2, which is incorporated by reference. Employee understands and acknowledges that the use of Schedule 2 is necessitated by the requirements and peculiarities of the laws of Louisiana. Schedule 2 will apply only if it is attached and initialed by the Company and Employee.

    **In ALL OTHER STATES:**

    Employee understands and agrees that many of the accounts for which he will perform insurance and/or benefits services while employed by the Company are national accounts and that Employee will perform insurance and/or benefit services for Company accounts throughout the entire country. Employee agrees and acknowledges that the geographic scope relating to the restrictions provided in this Section 8 will include the entire United States and that since the post-employment restrictions herein provided are tied directly to Accounts of the Company for whom Employee performed insurance and/or benefit services during the two-year period immediately preceding termination of his employment and Prospective Accounts, this geographic limitation is reasonable. Moreover, Employee acknowledges and agrees that the restrictions contained in this Section 8 do not prohibit Employee from competing with the Company or performing insurance or benefits services for potential clients throughout the entire world except for Protected Accounts and Prospective Accounts, and that those restrictions are reasonable and narrowly tailored to further the Company's legitimate interest to protect its Confidential Information, account relationships, and goodwill, and such restrictions will not unduly burden Employee's ability to earn a living after his employment with the Company is terminated.

    D. If, within two (2) years of the termination of Employee's employment the Employee engages in, or joins a company or business enterprise engaged in, providing insurance and/or benefits services, then the Company may advise any Protected Account and/or Prospective Account of the existence and terms of this Agreement and may give them a copy of this Agreement.

    E. Employee recognizes that employees of the Company are a valuable resource of the Company. Accordingly, during Employee's employment with the Company, Employee will not, directly or indirectly solicit, induce, entice or recruit any employee of the Company to leave their employment with the Company. In addition, for a period of two (2) years following the termination of Employee's employment with the Company for any reason whatsoever, Employee will not directly or indirectly, solicit, induce or recruit any employee of the Company who has been provided Confidential Information to leave the employ of the Company.

**Section 9.**      <u>Assignment.</u>

Except as provided in Section 10, this Agreement will not be affected by any merger or consolidation or other reorganization of the Company and will be assignable to, binding upon, and will inure to the benefit of the continuing entity or to any successor in interest to the Company including, without limitation, any entity to which the Company sells business, assets and/or accounts of any branch, business unit or profit center in which Employee is primarily employed. This Agreement also will inure to the benefit of every affiliate company included in the definition of "Company" under this Agreement. The Company may assign this Agreement to any affiliate company of AJG in which case, except for purposes of Section 10 hereof, all references to "the Company" and all rights of the Company will include and inure to the benefit of that affiliate. Employee may not assign this Agreement or any obligations hereunder.

**Section 10.**      <u>Release of Certain Obligations.</u>

Notwithstanding anything herein to the contrary, the obligations of Employee stated in Section 8 will become null and void and have no further effect immediately upon a Hostile Change in Control of AJG as defined herein. The Company will send written notice to Employee within ten (10) days of a Hostile Change in Control of AJG, notifying Employee that such event has taken place. Failure of the Company to send such notice will not preclude the release of Employee from the obligations contained in Section 8. These definitions apply to Section 10:

A.      The term "<u>Hostile Change in Control</u>" means a transaction, event or election constituting a Change in Control which was not approved by or, in an election, the directors elected were not nominated by, at least two-thirds of the members of the Board of Directors of AJG in office immediately prior to the Change in Control who have not died or become permanently disabled.

B.      The term "<u>Change in Control</u>" of AJG means and includes each and all of the following occurrences:

(1)      A Business Combination, unless:

a)      the Business Combination is approved or authorized by the affirmative vote of the holders of not less than 80% of the outstanding shares of voting stock of AJG and the affirmative vote of the holders of not less than 67% of the outstanding shares of the voting stock held by shareholders other than Related Persons; or

b)      the Continuing Directors of AJG by a two-thirds vote: (i) have expressly approved in advance the acquisition of outstanding shares of voting stock of the corporation that caused the Related Person to become a Related Person; or (ii) have approved the Business Combination prior to the Related Person involved in the Business Combination having become a Related Person; or

c)      the Business Combination is solely between AJG and another corporation, 50% or more of the voting stock of which is owned by AJG and none of which is owned by the Related Person; or

d)      all of the following conditions are satisfied:

I.      The cash or fair market value of the property, securities or "other consideration to be received" per share by holders of common stock in AJG in the Business Combination is not less than the higher of:

i)      the highest per share price (including brokerage commissions, transfer taxes and soliciting dealers' fees) paid by the Related Person in acquiring any of its holdings of AJG's common stock, or

ii)      an amount that bears that same percentage relationship to the market price of AJG's common stock immediately prior to the announcement of such Business Combination as the highest per share price determined in i) above bears to the market price of AJG's common stock immediately prior to the commencement of the acquisition of AJG's voting stock that caused such Related Person to become a Related Person, or

iii)      an amount calculated by multiplying the earnings per share of AJG's common stock for the four fiscal quarters immediately preceding the record date for determination of stockholders entitled to vote on such Business Combination by the price/earnings multiple of the

Related Person as of the record date as customarily computed and reported in the financial press. Appropriate adjustments will be made with respect to these subsections i), ii) and iii) for recapitalizations and for stock splits, stock dividends, and like distributions; and

           II.     A timely mailing will have been made to the stockholders of AJG showing in a prominent place: (x) any recommendations as to the advisability (or inadvisability) of the Business Combination that the Continuing Directors or Outside Directors may choose to state, if there are at the time any such directors; and (y) the opinion of a reputable nationally recognized investment banking or financial services firm as to the fairness from the financial point of view of the terms of the Business Combination to the stockholders of AJG other than the Related Person (such firm to be engaged solely on behalf of such other stockholders, to be paid a reasonable fee for its services by AJG upon receipt of such opinion, to be a firm that has not previously been significantly associated with the Related Person and, if there are at the time any such directors, to be selected by a majority of the Continuing Directors and Outside Directors).

        (2)    The acquisition of outstanding shares of AJG's voting stock that causes an individual, a corporation, partnership or other person or entity to become a Related Person.

        (3)    Individuals who at the beginning of any period of three consecutive years constitute the entire Board of Directors of the Company will for any reason other than death or permanent disability during such period cease to constitute a majority thereof.

        (4)    A change in control of a nature that would be required to be reported in response to Item 6(e) of Schedule 14A of Regulation 14A promulgated under the Securities Act of 1934, as amended.

        C.     The term "Business Combination" will mean: (i) any merger or consolidation of AJG with or into a Related Person; (ii) any sale, lease, exchange, transfer or other disposition, including without limitation a mortgage or any other security device, of all or any Substantial Part of the assets of the Company to a Related Person; (iii) any merger or consolidation of a Related Person with or into AJG; (iv) any sale, lease, exchange, transfer or other disposition of all or any Substantial Part of the assets of a Related Person to the Company; (v) the issuance of any securities of the Company to a Related Person; (vi) the acquisition by the Company of any securities issued by a Related Person; (vii) any reclassification of securities, recapitalization or other transaction designed to decrease the number of holders of AJG's voting securities remaining, if there is a Related Person; and (viii) any agreement, contract or other arrangement providing for any of the transactions described in this definition of Business Combination.

        D.     The term "Related Person" will mean and include any individual, corporation, partnership or other person or entity which, together with their "Affiliates" and "Associates" (as defined as of November 1, 1983, in Rule 12b-2 under the Securities Exchange Act of 1934), "Beneficially Owns" (as defined as of November 1, 1983, in Rule 13d-3 under the Securities Exchange Act of 1934) in the aggregate 20% or more of the outstanding shares of the voting stock of AJG, and any Affiliate or Associate of any such individual, corporation, partnership or other person or entity; provided that Related Person will not include any person who beneficially owned 20% or more of the outstanding shares of the voting stock of AJG on November 1, 1983. Without limitation, any shares of voting stock of AJG that any Related Person has the right to acquire pursuant to any agreement, or upon exercise of conversion rights, warrants or options, or otherwise, will be deemed beneficially owned by the Related Person.

        E.     The term "Substantial Part" will mean more than 30% of the fair market value of the total assets of the corporation in question, as of the end of its most recent fiscal year ending prior to the time the determination is being made.

        F.     The term "other consideration to be received" will include, without limitation, capital stock of AJG retained by its existing public stockholders in the event of a Business Combination in which AJG is the surviving corporation.

        G.     The term "Continuing Director" will mean a director who was a member of the board of directors of AJG immediately prior to the time that the Related Person involved in a Business Combination became a Related Person, and the term "Outside Director" will mean a director who is not: (a) an officer or employee of AJG or any relative of an officer or employee; or (b) a Related Person or an officer, director, employee, Associate or Affiliate of a Related Person, or a relative of any of the foregoing.

**Section 11.** **General.**

     A.     The captions in this Agreement are for reference only and have no independent force or effect. If a caption is inconsistent with any part of the Agreement, the caption will be disregarded.

     B.     This Agreement will be governed by and construed in accordance with the laws of the State in which Employee resides, without giving effect to any of its conflict of law principles. The parties agree that the chosen state has a material and significant interest in questions concerning this Agreement and performance thereunder. The parties agree that the sole and exclusive venue of any dispute between the parties with respect to this Agreement, or any matters related thereto, will be a state trial or federal district court located within the federal judicial district in which Employee resides ("Chosen Venue"). Employee agrees that it is neither unfair nor unreasonable for the Chosen Venue to be selected as the exclusive venue for any dispute between the parties with respect to this Agreement or any matter related thereto and that he will suffer no undue burden by having to litigate any such disputes in the Chosen Venue. Moreover, Employee promises not to initiate suit against the Company in any venue other than the above-selected exclusive Chosen Venue with respect to any dispute between the parties relating to this Agreement. Employee waives and agrees not to interpose any argument that the Chosen Venue is an inconvenient forum for litigation.

     C.     Waiver of Jury Trial. Because of the time and expense involved in the docketing of, preparation for and participation in a jury trial, the parties desire that any dispute arising hereunder will be decided by a judge rather than a jury. Therefore, the parties hereby knowingly, voluntarily and intentionally waive the right either may have to a trial by jury in respect to any litigation based on this Agreement or arising out of, under or in conjunction with Employee's employment by the Company, this Agreement, or any course of conduct, course of dealing, verbal or written statement or the actions of either party.

     D.     If Employee is an existing employee of the Company as of the Effective Date and is subject to any existing employment agreement with the Company, whether an Executive Agreement, Associate Agreement, or otherwise (collectively "Existing Employee Agreement"), this Agreement will be considered an Amended and Restated Employee Agreement of such Existing Employee Agreement. If Employee is an employee of a business enterprise acquired or to be acquired by the Company as of the Effective Date, (the "Acquired Business"), then (i) this Agreement will be considered an Amended and Restated Employment Agreement if Employee is subject to any existing employment agreement with the Acquired Business and Employee's employment agreement with the Acquired Business is assigned to the Company and (ii) the term the "Company" shall be deemed to include the Acquired Business.

     E.     This Agreement contains the entire agreement of the parties with respect to the subject matters covered hereby. The parties agree that all prior negotiations and communications are of no force or effect. Further, the parties agree that there are no oral agreements, understandings, undertakings or promises of the parties relating to the subject matters covered by this Agreement.

     F.     Subject to Section 11(G) below, this Agreement may not be amended, altered or modified without the prior written consent of both parties, and such instrument will acknowledge that it is an amendment or modification of this Agreement. Waiver of any term or condition of this Agreement will not be construed as a waiver of any subsequent breach or failure of the same term or condition, or any other term or condition. Any waiver must be in writing. No amendment, alteration, modification or waiver may be signed by Employee on behalf of the Company, its assignees, successors or assigns.

     G.     To the extent that any of the terms set forth in this Agreement or any word, phrase, clause or sentence is found to be illegal or unenforceable for any reason, it is the intention of the parties that such word, phrase, clause or sentence will be modified or deleted by a court of competent jurisdiction so as to afford the Company the fullest protection commensurate with making this Agreement, as modified, legal and enforceable under applicable laws, and the balance of this Agreement will not be affected thereby, the balance being construed as severable and independent.

     H.     All notices given hereunder will be in writing and will be sent by registered or certified mail or delivered by hand and, if intended for the Company, addressed to it or delivered to its principal office to the attention of the Secretary of the Company. If intended for Employee, notices will be delivered personally or addressed (if sent by mail) to Employee's then current residence address as shown

on the Company's records, or to such other address as Employee directs in a written notice to the Company. All notices will be deemed to be given on the date received at the address of the addressee or, if delivered personally, on the date delivered.

       I.      The use of male pronouns throughout this Agreement includes the female gender. The words "including" or "include" are not to be interpreted as terms of limitation or exclusion, but rather of illustration.

       J.      This Agreement may be executed in counterparts, each of which is deemed an original.

    **IN WITNESS WHEREOF**, the parties hereto have executed this Agreement as of the day and year provided below their respective signatures. The parties agree that the Effective Date of this Agreement will be __May 21, 2012.

**ARTHUR J. GALLAGHER & CO.,**
on behalf of itself and its subsidiaries, divisions and affiliated and related companies

By: _____
    Corporate Officer Signature – Itasca

_____
Title

_____
Date

**EMPLOYEE**

_____
Employee Signature

_____
Printed Name

_____
_____
Address

Date: _____

FOR PAYROLL USE ONLY:

Employee ID: 36272

<u>Schedule 1</u>

**The following provision will replace Section 8(A) in its entirety:**

For a period of two (2) years following the termination of Employee's employment with the Company for any reason whatsoever, Employee will not, directly or indirectly, solicit any Protected Accounts or Prospective Accounts of the Company (as such accounts are defined above) for the purpose of providing Insurance Services or Benefit Services. "Insurance Services" is defined as the sale, placing, marketing, counseling or consulting in the placement, renewal, discontinuance or replacement of any insurance (including self-insurance) or handling self-insurance programs, insurance claims, risk management services, emergency or disaster prevention or management services or other insurance administrative service functions. "Benefit Services" is defined as providing employee benefit brokerage, consulting, or administrative services, in the area of group insurance, defined benefit and defined contribution pension plans, human resources and staffing services, individual life, disability and capital accumulation products, and all other employee benefit areas. "Protected Accounts" mean any and all accounts of the Company for which Employee performed any Insurance or Benefit Services during any part of the two-year period immediately preceding termination of Employee's employment with the Company. The term "Account of the Company" as used in this paragraph will be construed broadly to include all users of insurance or benefit services including commercial and individual consumers, risk managers, carriers, agents and other insurance intermediaries who are customers of the Company on the date Employee's employment with the Company terminates. If an Account of the Company is part of a group of companies which conducts business through more than one entity, division or operating unit, whether or not separately incorporated (a "Client Group"), the term "Account of the Company" as used herein will include products or services within any entity, division or operating unit of the Client Group where the same management group in the Client Group has the primary decision making authority to contract for services of the type rendered by the Company.

_____          _____
Employee Signature                                          Hiring Manager Signature

**Do not sign this schedule unless the employee is to be principally employed in Oklahoma.**

## Schedule 2

**The following provision will replace Section 8(C) in its entirety:**

The obligations set forth in Section 8 above will be effective in the parishes specifically designated on this Schedule 2, and in which the Company carries on the business of providing insurance services and/or benefit services. The parties agree that this Schedule 2 may be amended and modified upon written acknowledgment of the Employee and the Company without the need to modify or amend any other provision of this Agreement. (Please fully circle designated parishes.)

| | | | |
|---|---|---|---|
| Abbeville | Acadia | Allen | Ascension |
| Assumption | Avoyelles | Beauregard | Bienville |
| Bossier | Caddo | Calcasieu | Caldwell |
| Cameron | Catahoula | Claiborne | Concordia |
| De Soto | East Baton Rouge | East Carroll | East Feliciana |
| Evangeline | Franklin | Grant | Iberia |
| Iberville | Jackson | Jefferson Davis | Jefferson |
| La Salle | Lafayette | Lafourche | Lincoln |
| Livingston | Madison | Morehouse | Natchitoches |
| Orleans | Ouachita | Plaquemines | Pointe |
| Rapides | Red River | Richland | Sabine |
| Saint Bernard | Saint Charles | Saint Helena | Saint James |
| St. John the Baptist | Saint Landry | Saint Martin | Saint Mary |
| Saint Tammany | Tangipahoa | Tensas | Terrebonne |
| Union | Vermilion | Vernon | Washington |
| Webster | West Baton Rouge | West Carroll | West Feliciana |
| Winn | | | |

_____        _____
Employee Signature                                  Hiring Manager Signature

**Do not complete this schedule unless the employee is to be principally employed in Louisiana.**