# Exhibit M

Message

**From**: Fischer, Debra L. [debra.fischer@morganlewis.com]
**Sent**: 11/26/2018 1:59:25 AM
**To**: Ken Zak [/O=CORPORATE/OU=First Administrative Group/cn=Recipients/cn=kzak]; Peter Arkley [/O=CORPORATE/OU=First Administrative Group/cn=Recipients/cn=parkley]; Reshma Dalia [/O=CORPORATE/OU=First Administrative Group/cn=Recipients/cn=rdalia]; Bledion Dizdari [/O=CORPORATE/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=Bledion Dizdari04e]
**CC**: Peter Carpenter [/O=CORPORATE/OU=First Administrative Group/cn=Recipients/cn=pcarpenter]; Sarah Tighe [/O=CORPORATE/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=Sarah Spatarob0c]; Goitia, Nichele M. [nichele.goitia@morganlewis.com]
**Subject**: Analysis for Charles McDaniel/ Lockton / Missouri/Colorado law
**Attachments**: 111118__35444444v1_Alliant_ Analysis re C. McDaniel _ Lockton _ Missour_Colorado.DOCX

**This message has originated outside the organization.**

---

Folks,
Attached is the more formal analysis for Charles McDaniel. Let us know when you would like to discuss further.

Thanks,
Deb and Ainsley

**Debra L. Fischer**
**Morgan, Lewis & Bockius LLP**
2049 Century Park East | Suite 700 | Los Angeles, CA 90067
Direct: +1.310.907.1111 | Main: +1.310.907.1000 | Fax: +1.310.907.1001
debra.fischer@morganlewis.com | www.morganlewis.com
Assistant: Nichele Goitia | +1.310.907.1047 | nichele.goitia@morganlewis.com

DISCLAIMER
This e-mail message is intended only for the personal use of the recipient(s) named above. This message may be an attorney-client communication and as such privileged and confidential and/or it may include attorney work product. If you are not an intended recipient, you may not review, copy or distribute this message. If you have received this communication in error, please notify us immediately by e-mail and delete the original message.

Morgan Lewis

# MEMORANDUM

**CONFIDENTIAL & ATTORNEY-CLIENT PRIVILEGED**

TO: Ken Zak

FROM: Debra L. Fischer and Ainsley G. Carreno

DATE: November 25, 2018

SUBJECT: Charles McDaniel / Lockton / Missouri/Colorado Law

---

## I. Overview and Executive Summary

We understand that Alliant is considering hiring Charles McDaniel. We understand that McDaniel is a Partner at Lockton, and is based in Englewood, Colorado.

In preparing this analysis, we have reviewed and considered McDaniel's Amended and Restated Member Agreement with the Lockton Affinity Series of Lockton Affinity LLC; Amended and Restated Member Agreement with Lockton Financial Advisors, LLC; and Amended and Restated Member Agreement with the Mountain West Series of Lockton Companies, LLC (collectively, the "Member Agreements"); as well as his Producer Partner Agreement with Lockton Partners, LLC (the "Producer Partner Agreement").

Each agreement references an "Operating Agreement" for the entity that is a party to the agreement. We did not receive these Operating Agreements. Each Member Agreement provides that if McDaniel's interest in Lockton terminates pursuant to certain sections of the Operating Agreements, the prohibitions in the covenant will not apply to Customer Accounts for which McDaniel was the exclusive originating producer at the time of the termination of his interest. **We therefore need to obtain and review the Operating Agreements to determine if any of those sections would apply.**

Each Member Agreement contains a two-year covenant not to solicit, induce, persuade or encourage certain "Customer Accounts" (that qualified as a Customer Account in the six months prior to the sale of McDaniel's Producer Unit) to reduce, terminate or transfer to a competitor any competitive products or services, and prohibits McDaniel for two years from accepting, servicing, or in any way doing business with such accounts. The covenants in each Member Agreement apply to clients and prospective clients of different Lockton entities depending on the party to the agreement, but each covenant includes both clients that McDaniel produced, solicited, or serviced, about which he acquired or had access to "Confidential Information, or with which he had business contact, as well as "any other" client of each entity and certain affiliated entities.

Each Member Agreement also contains a two-year covenant not to solicit or hire employees, members, or consultants of each respective entity and its affiliated entities, and contains protections for "Confidential Information," which is defined to include customer identities and other information concerning customers. Each Member Agreement contains a Missouri choice of law and Missouri forum selection clause.

The Producer Partner Agreement provides that the restrictive covenants in the Member Agreements shall be extended to four years in duration. The Producer Partner Agreement contains a Missouri choice of law provision and forum selection clause.

A Missouri court is likely to uphold the Missouri choice of law clauses in McDaniel's agreements. Although Missouri courts will consider whether application of a choice of law clause is contrary to the fundamental public policy of a state with a materially greater interest in the agreement, Missouri courts generally find that if the employer is based in Missouri, Missouri's interest is at least as great as that of the state where the employee resides.

Under Missouri law, the covenants not to solicit or service clients are likely overbroad to the extent that they include clients with whom McDaniel did not have any contact or about whom he did not obtain confidential information, but are otherwise likely to be enforced as to clients with whom he did have contact or about whom he obtained confidential information. Although the four-year duration of the covenants is potentially subject to challenge, Missouri courts have upheld covenants of up to five years.

As a Colorado resident, McDaniel could file a declaratory relief action in Colorado seeking to have his restrictive covenants declared void and unenforceable pursuant to Colorado law and public policy, which disfavors restraints on trade. Colorado Rule of Civil Procedure 57 provides that courts may order "a speedy hearing of an action for a declaratory judgment and may advance it on the calendar," which could be beneficial in the event of parallel proceedings.

However, there are a number of challenges. First, although Colorado courts apply the Restatement analysis, a Colorado court may determine that the application of Missouri law does not contravene Colorado public policy if the covenants are enforceable pursuant to one of the statutory exceptions to Colorado's general prohibition on noncompetes.

Second, even if a Colorado court determined that the application of Missouri law to the covenants would be contrary to Colorado public policy, courts are still likely to enforce *forum* selection provisions, which may result in the transfer of any declaratory relief action to Missouri.

Finally, even if a court applies Colorado law, the covenants may be enforceable at least in part under Colorado law. Colorado law provides that covenants not to compete are void, unless they fit within one of four statutory exceptions. Those exceptions include agreements for the protection of trade secrets, and covenants entered into by "executive and management personnel and officers." Lockton could likely argue that McDaniel's covenants fit within one of those two exceptions. Although the covenants must still be reasonable and are likely overbroad in several respects, including because they apply to customers with whom McDaniel never had contact and, Colorado courts would likely modify the covenants so as to make them enforceable.

## II. Summary of the Key Terms of the Member Agreements

### A. Confidential Information

Each Member Agreement defines "Confidential Information" as information disclosed to McDaniel and as to which Lockton "take[s] reasonable steps to maintain confidentiality." Confidential Information includes, among other categories of information, "trade secrets" and "the identity of and information concerning former, current or prospective customers . . . ."

The Member Agreements provide that McDaniel shall not use or disclose Confidential Information at any time. They also require McDaniel, upon the sale of his Producer Unit, to return and surrender all copies of Confidential Information and other Lockton documents or property.

The Member Agreements' provisions regarding Confidential Information, which are identical except as to which Lockton entity they apply, are set forth below:

> 4.1 Definitions The following definitions are established for the purposes of this Agreement:
>
> (a) "Confidential Information" means information of or pertaining to any Lockton Entity[1] disclosed to Member or to which Member has or had access

[1] The Lockton Affinity Series of Lockton Affinity LLC Member Agreement defines "Lockton Entities" as the Lockton Affinity Series of Lockton Affinity LLC, the other Series of Lockton Affinity, LLC, the "Affiliates" (which in turn is defined as "Lockton Financial Advisors, LLC, Lockton Investment Advisors, LLC, Lockton Companies, LLC, any series of Lockton Companies, LLC and any other entity which is described in clause (c) in the definition of Related Person under the circumstances in which the Corporate Member is the Specified Person"), Lockton Management, LLC, Lockton Insurance Agency, LLC, Lockton Partners, LLC, LPCM, LLC, Lockton Operating Companies, LLC, Lockton, Inc., and its/their direct and indirect subsidiaries.

The Mountain West Series of Lockton Companies, LLC Member Agreement defines "Lockton Entities" as the Mountain West Series of Lockton Companies, LLC, the other Series of Lockton Companies, LLC, the "Affiliates" (which in turn is defined as "Lockton Financial Advisors, LLC, Lockton Investment Advisors, LLC, Lockton Affinity, LLC, any series of Lockton Affinity, LLC and any other entity identified which is described in clause (c) in the definition of Related Person under the circumstances in which the Corporate Member is the Specified Person"), Lockton Management, LLC, Lockton Insurance Agency, LLC, Lockton Partners, LLC, LPCM, LLC, Lockton Operating Companies, LLC, Lockton, Inc., and its/their direct and indirect subsidiaries.

The Lockton Financial Advisors, LLC Member Agreement defines "Lockton Entities" as Lockton Financial Advisors, LLC, the "Affiliates" (which in turn is defined as Lockton Companies, LLC, any series of Lockton Companies, LLC, Lockton Investment Advisors, LLC,

(whether or not in writing and whether original, duplicated, electronic, memorialized, handwritten or in any other form), that is related to the business of any of the Lockton Entities, and as to which the applicable Lockton Entity has taken reasonable steps to maintain confidentiality. Confidential Information includes, without limitation, trade secrets, non-public proprietary information, formulas, patterns, compilations, programs, devices, methods, techniques, or processes; sales and other business methods or policies, prices or price formulas; procedures; the identity of and information concerning former or current Customer Accounts of [the Company[2] and/or any Affiliate/the Series, the Other Series[3] and/or any Affiliate], including but not limited to Customer Account needs and preferences, levels of satisfaction and the terms of engagement and transactions between [the Company or Affiliates/the Series, the Other Series or Affiliates] and/or its or their Customer Accounts; revenues, expenses, budgeting, finances and other financial information; computer systems, programs and software (including without limitation design, programming techniques, flow charts, source code, object code, and related information and documentation) and other technology; business, marketing and development strategies and plans; [Company and Affiliate/Series, Other Series and Affiliate] member and/or Lockton Entity personnel information, including without limitation, compensation and benefit information; internal operational information related to the structure of any of the Lockton Entities, including without limitation, the Operating Agreement; inventions; and all other confidential information of any kind or character relating to the development, improvement, sale or delivery of products or services by the Company or Affiliates. Confidential Information also includes, without limitation, medical and health information, electronic or otherwise, that is protected by law, including but not limited to state or local privacy laws and/or the federal Health Information Portability and Accountability Act of 1996, as

---

Lockton Affinity, LLC, any series of Lockton Affinity, LLC and any other entity which is described in clause (c) in the definition of Related Person under the circumstances in which the Corporate Member is the Specified Person), Lockton Management, LLC, Lockton Insurance Agency, LLC, Lockton Partners, LLC, LPCM, LLC, Lockton Operating Companies, LLC, Lockton, Inc., and its/their direct and indirect subsidiaries.

[2] The "Company" is defined in the Lockton Financial Advisors, LLC Member Agreement as Lockton Financial Advisors, LLC.

[3] The "Series" is defined in the Lockton Affinity Series of Lockton Affinity, LLC Member Agreement as the Lockton Affinity Series of Lockton Affinity, LLC. "Other Series" is defined in that agreement as the other Series of Lockton Affinity, LLC.

The "Series" is defined in the Mountain West Series of Lockton Companies, LLC Member Agreement as the Mountain West Series of Lockton Companies, LLC. "Other Series" is defined in that agreement as the other Series of Lockton Companies, LLC.

amended, and the regulations enacted pursuant to it and its amendments, including but not limited to 45 C.F.R. § 160.103; personal private information, electronic or otherwise, that is protected by law, including but not limited to federal, state or local privacy laws; and all trade secrets, non-public proprietary information and other confidential information belonging to Customer Accounts of [the Company or Affiliates/the Series, the Other Series or Affiliates]. Notwithstanding the foregoing, Confidential Information does not include information that (1) is or becomes generally available or known to (or is readily ascertainable by use of proper means by) members of the public, competitors, or other Person(s) other than by reason of the fault of Member, or (2) becomes available to Member on a non-confidential basis from a source other than any Lockton Entity, provided that the source is not prohibited from disclosing such information to Member by any contractual or other obligation to such Lockton Entity, which obligation is known, or should reasonably be known, to Member at the time Member makes any further disclosure of such information;

. . .

4.3 Non-Disclosure of Confidential Information. While Member is a Producer Member of the [Company/Series] and at all times thereafter, and except with the prior written consent of the applicable Lockton Entity or as is reasonably necessary for Member to perform Member's responsibilities as a Producer Member of the [Company/Series], Member shall not, directly or indirectly, (a) disclose, or attempt to disclose, Confidential Information to anyone other than the members, officers or authorized employees, attorneys or other agents and fiduciaries of the applicable Lockton Entity, (b) use, or attempt to use, Confidential Information for any unauthorized purpose, or (c) acquire, access, duplicate, copy, remove, download, upload, save, email, transmit or otherwise take, or attempt to do any of the foregoing with respect to, Confidential Information for any unauthorized purpose. Further, if Member anticipates or should reasonably anticipate a judicial, administrative or arbitration process that will require Member to disclose Confidential Information, then Member shall immediately notify (to the extent such notification is permitted by law) the Lockton Entity or Lockton Entities whose Confidential Information is at issue, in writing, pursuant to Section 7.19 below, to allow it/them as much time as possible to object to such disclosure, and Member shall inform such judicial, administrative or arbitration tribunal of Member's non-disclosure obligations under this Agreement. Further, in the event Member knows that any Person is (x) using, disclosing, or attempting to use or disclose Confidential Information or (y) copying, duplicating, reverse engineering, reverse compiling, recording, or otherwise reproducing or analyzing, Confidential Information, or attempting to do any of the foregoing, for an unauthorized purpose, without the prior written consent of the Lockton Entity or Lockton Entities whose Confidential Information is at issue, Member shall immediately notify such Lockton Entity or Lockton Entities in writing pursuant to Section 7.19 below.

4.4 Non-Removal of Confidential Information and Property. Member shall not, other than for proper, authorized, and lawful purposes, directly or indirectly, copy, duplicate, take, save, transmit, email, upload, download, or remove in any manner whatsoever from the premises of the [Company/Series] or of any other Lockton Entity, or destroy or render unusable, in whole or in part, in any manner whatsoever any of the Confidential Information or Property of the [Company/Series] or any other Lockton Entity.

4.5 Return of Confidential Information and Property. Member shall, upon the request of any Lockton Entity whose Confidential Information or Property is at issue, or upon the sale of Member's Producer Unit (which occurs on the Buy-Sell Purchase Date), immediately return and surrender to the [Company/Series] or other applicable Lockton Entity, the Property and the original and all copies of Confidential Information belonging to such Lockton Entity that Member has in Member's possession, custody or control; *provided that* Member shall be permitted access to the Operating Agreement and shall be permitted to retain one copy of this Agreement. The obligation to return and surrender set forth in this Section 4.5 shall apply to Property and Confidential Information in whatever form, electronic or otherwise, and shall include any electronic device containing any such Confidential Information.

**B. Non-Solicitation of Customers**

Each Member Agreement prohibits McDaniel for two years following the "Buy-Sell Purchase Date" of his Producer Unit from soliciting, accepting, or servicing business from certain "Customer Accounts." The covenants exclude Customer Accounts for which McDaniel was the "exclusive originating producer at the time of termination of Member's Interest" if McDaniel's Producer Unit is purchased as a result of the termination of his interest pursuant to certain provisions of the Operating Agreement, which may or may not apply (we will need to review the Operating Agreements).

The customer non-solicitation covenants are set forth in full below:

**Lockton Affinity Series of Lockton Affinity, LLC Member Agreement and Mountain West Series of Lockton Companies, LLC Member Agreement:**

4.1 Definitions The following definitions are established for the purposes of this Agreement:

…

(c) "Customer Accounts" means:

(1) the accounts of all customers of one or more of the Series, the Other Series or any Affiliate, including, but not limited to, a private equity firm, leveraged buyout firm, investment bank, equity sponsor or similar firm in its capacity as a buyer or when it has engaged the Series, the Other Series or any Affiliate to perform due

diligence or other prospecting activities with respect to a potential investment in or the acquisition of another entity; and

(2) prospective customers of either one or more of the Series, the Other Series or any Affiliate in the event:

(a) a proposal has been made by the Series, the Other Series or any Affiliate and such proposal is pending or was pending within the six (6) month period before the Buy-Sell Purchase Date; or

(b) the Series, the Other Series or any Affiliate has been engaged by a private equity firm, leveraged buyout firm, investment bank, equity sponsor or similar firm to perform due diligence or other prospecting activities with respect to potential investment in or acquisition of another entity (the "target entity"), at any time during the six (6) month period preceding the Buy-Sell Purchase Date, in which case such target entity shall be considered a prospective customer.

...

5.4 Non-Solicitation of Customer Accounts. While Member is a Producer Member of the Series and for a period of two (2) years following the sale of Member's Producer Unit (which occurs on the Buy-Sell Purchase Date):

(a) Member shall not, directly or indirectly, for himself or on behalf of any other Person, solicit, induce, persuade or encourage, or attempt to solicit, induce, persuade or encourage, any of the Customer Accounts described below, if any such Customer Account qualified as a Customer Account within the six (6) month period immediately preceding the sale of Member's Producer Unit, to reduce, terminate or transfer to a competitor any products or services that are the same or substantially similar to, or directly competitive with, the products or services provided by the Series, the Other Series or any Affiliate. Member shall not, directly or indirectly, for himself or on behalf of any other Person, (i) accept, service or work on, or attempt or threaten to accept, service, or work on, any such competitive business from any of the Customer Accounts that Member may not solicit, or (ii) in any way do business with any of the Customer Accounts that Member may not solicit to the extent such business is the same or substantially similar to that provided by the Series, the Other Series or any Affiliate. The Customer Accounts to which this restriction applies are:

(1) any of the Customer Accounts of the Series (A) produced by Member, (B) solicited by Member (in the case of prospective Customer Accounts), (C) serviced by Member, (D) for or about which Member acquired or had access to Confidential Information, or (E) with which Member has or had business contact; and,

(2) any of the other Customer Accounts of the Series; and

(3) any of the Customer Accounts of the Other Series (A) produced by Member, (B) solicited by Member (in the case of prospective Customer Accounts), (C) serviced by Member, (D) for or about which Member acquired or had access to Confidential Information, or (E) with which Member has or had business contact; and,

(4) any of the other Customer Accounts of the Other Series; and,

(5) any of the Customer Accounts of any Affiliate (A) produced by Member, (B) solicited by Member (in the case of prospective Customer Accounts), (C) serviced by Member, (D) for or about which Member acquired or had access to Confidential Information, or (E) with which Member has or had business contact.

(b) If the Series purchases the Member's Producer Unit as a result of the termination of Member's Interest in the Series pursuant to Section 5.10(a) of the Operating Agreement[4] with Good Reason, pursuant to Section 5.10(b) of the Operating Agreement without Cause, or pursuant to Section 5.10(d) of the Operating Agreement, then the prohibitions in subsection (a) of this Section 5.4 shall not apply to Customer Accounts for which Member was the exclusive originating producer at the time of the termination of Member's Interest (excluding any period of notice of termination). For purposes of clarification, a Member shall not be recognized as the exclusive originating producer of any Customer Account which is identified on the books and records of the Series, any Other Series or any Affiliate as either (i) a joint venture Customer Account; (ii) an Orphaned Customer Account, or (iii) a Customer Account, the Production Revenue for which is recognized as House Plus 10 Production.

**Lockton Financial Advisors, LLC Member Agreement:**

4.1 Definitions The following definitions are established for the purposes of this Agreement:

…

---

[4] The "Operating Agreement" for the purposes of the Lockton Affinity Series of Lockton Affinity, LLC Agreement is defined as the Second Amended and Restated Operating Agreement of Lockton Affinity, LLC and each of its Series, dated as of January 1, 2013, as amended and restated as of December 31, 2014 and as of May 1, 2016.

The "Operating Agreement" for the purposes of the Mountain West Series of Lockton Companies, LLC is defined as the Second Amended and Restated Operating Agreement of Lockton Companies, LLC and each of its Series, dated as of January 1, 2007, as amended and restated as of April 30, 2010 and as of May 1, 2016.

(c) "Customer Accounts" means:

(1) the accounts of all customers of one or more of the Company or any Affiliate, including, but not limited to, a private equity firm, leveraged buyout firm, investment bank, equity sponsor or similar firm in its capacity as a buyer or when it has engaged the Company or any Affiliate to perform due diligence or other prospecting activities with respect to a potential investment in or the acquisition of another entity; and

(2) prospective customers of either one or more of the Company or any Affiliate in the event:

(a) a proposal has been made by the Company or any Affiliate and such proposal is pending or was pending within the six (6) month period before the Buy-Sell Purchase Date; or

(b) the Company or any Affiliate has been engaged by a private equity firm, leveraged buyout firm, investment bank, equity sponsor or similar firm to perform due diligence or other prospecting activities with respect to potential investment in or acquisition of another entity (the "target entity"), at any time during the six (6) month period preceding the Buy-Sell Purchase Date, in which case such target entity shall be considered a prospective customer.

...

5.4 Non-Solicitation of Customer Accounts. While Member is a Producer Member of the Company and for a period of two (2) years following the sale of Member's Producer Unit (which occurs on the Buy-Sell Purchase Date):

(a) Member shall not, directly or indirectly, for himself or on behalf of any other Person, solicit, induce, persuade or encourage, or attempt to solicit, induce, persuade or encourage, any of the Customer Accounts described below, if any such Customer Account qualified as a Customer Account within the six (6) month period immediately preceding the sale of Member's Producer Unit, to reduce, terminate or transfer to a competitor any products or services that are the same or substantially similar to, or directly competitive with, the products or services provided by the Company or any Affiliate. Member shall not, directly or indirectly, for himself or on behalf of any other Person, (i) accept, service or work on, or attempt or threaten to accept, service, or work on, any such competitive business from any of the Customer Accounts that Member may not solicit, or (ii) in any way do business with any of the Customer Accounts that Member may not solicit to the extent such business is the same or substantially similar to that provided by the Company or any Affiliate. The Customer Accounts to which this restriction applies are:

(1) any of the Customer Accounts of the Company (A) produced by Member, (B) solicited by Member (in the case of prospective Customer Accounts), (C) serviced by Member, (D) for or about which Member acquired or had access to Confidential Information, or (E) with which Member has or had business contact; and,

(2) any of the other Customer Accounts of the Company; and

(3) any of the Customer Accounts of any Affiliate (A) produced by Member, (B) solicited by Member (in the case of prospective Customer Accounts), (C) serviced by Member, (D) for or about which Member acquired or had access to Confidential Information, or (E) with which Member has or had business contact.

(b) If the Company purchases the Member's Producer Unit as a result of the termination of Member's Interest in the Series pursuant to Section 5.10(a) of the Operating Agreement[5] with Good Reason, pursuant to Section 5.10(b) of the Operating Agreement without Cause, or pursuant to Section 5.10(d) of the Operating Agreement, then the prohibitions in subsection (a) of this Section 5.4 shall not apply to Customer Accounts for which Member was the exclusive originating producer at the time of the termination of Member's Interest (excluding any period of notice of termination). For purposes of clarification, a Member shall not be recognized as the exclusive originating producer of any Customer Account which is identified on the books and records of the Series, any Other Series or any Affiliate as either (i) a joint venture Customer Account; (ii) an Orphaned Customer Account, or (iii) a Customer Account, the Production Revenue for which is recognized as House Plus 10 Production.

**C. Non-Solicitation of Employees**

The Member Agreements also prohibit McDaniel for two years following the "Buy-Sell Purchase Date" of his Producer Unit from soliciting certain Lockton employees, members, producers, or consultants, or inducing, persuading, or encouraging such employees, members, producers or consultants to terminate their employment or other relationship with Lockton.

The employee non-solicitation covenant is set forth in full below:

5.3 Non-Solicitation of Producer Members, Employees and Others. While Member is a Producer Member of the [Company/Series], and for a period of two (2) years following the sale of Member's Producer Unit (which occurs on the Buy-Sell Purchase Date), Member shall not, directly or indirectly, for himself or on

[5] The "Operating Agreement" for the purposes of the Lockton Financial Advisors, LLC Member Agreement is defined as the Third Amended and Restated Operating Agreement of Lockton Financial Advisors, LLC, dated as of November 15, 2006, as amended and restated as of May 1, 2008, as of April 30, 2010 and as of May 1, 2016.

behalf of any other Person, solicit, recruit, hire, induce, persuade or encourage, or attempt to solicit, recruit, hire, induce, persuade or encourage, any employee, member, or consultant of [the Company or any Affiliate/Series or any Other Series or Affiliate] (if, with respect to a consultant, substantially all of the services performed by such consultant are on behalf of the [Company or Affiliate/Series or the Other Series or Affiliate]) to terminate his/its employment, membership or consultant relationship with, or to render services for any competitor of [the Company or any Affiliate/Series, or any Other Series or Affiliate], as applicable, and shall not otherwise take any action to interfere with, or attempt to interfere with, any employee's, member's or consultant's relationship with [the Company or Affiliate/Series, or any Other Series or Affiliate], as applicable.

**D. Remedies**

Each Member Agreement provides that in the event of breach Lockton shall be entitled to injunctive relief and money damages. They also provide that the prevailing party in any proceeding in connection with a dispute relating to the agreement shall be entitled to recover costs and attorneys' fees.

The relevant provisions are set forth below:

7.1 Injunctive Relief. Member acknowledges and agrees that strict compliance with this Agreement is necessary to protect the Confidential Information, goodwill and other legitimate protectable business interests of the [Company/Series] and, as applicable, the [Affiliates and other Lockton Entities/Other Series, the Affiliates and other Lockton Entities]; that a breach of this Agreement will result in irreparable harm and continuing damage to the [Company/Series] and, where applicable, any [Affiliate or other Lockton Entity/one or more Other Series, Affiliate or other Lockton Entity]; and that, in the event of a breach of this Agreement by Member, damages would be difficult or impossible to ascertain. Accordingly, in the event of Member's breach, attempted breach, or threatened breach of this Agreement, the [Company/Series] and, if applicable, any [Affiliate and/or another Lockton Entity/of the Other Series, any Affiliate and/or another Lockton Entity], upon application to any court of competent jurisdiction pursuant to Section 7.7, shall be entitled to obtain a temporary restraining order, a preliminary injunction, and an injunction permanently enjoining and prohibiting the breach of this Agreement.

7.2 Money Damages. Member acknowledges, and agrees that strict compliance with this Agreement is necessary to protect the Confidential Information, goodwill and other legitimate protectable business interests of the Company/Series] and, as applicable, the [Affiliates and other Lockton Entities/Other Series, the Affiliates and other Lockton Entities], and that, as described above, a breach of this Agreement will result in irreparable harm and continuing damage to the [Company/Series] and, if applicable, any [Affiliate and/or another Lockton Entity/any of the Other Series, any Affiliate and/or

another Lockton Entity], for which money damages may not provide adequate relief. Nonetheless, it is agreed that in the event of a breach, attempted breach or threatened breach of this Agreement, then in addition to injunctive relief and any other remedies set forth in this Agreement or otherwise available at law or equity, the [Company/Series] and, if applicable, any [Affiliate and/or another Lockton Entity/any of the Other Series, any Affiliate and/or another Lockton Entity], shall also be entitled to recover from Member any money damages that can be determined.

...

7.18 Attorneys' Fees, Costs and Interest. If any Lockton Entity or Member engages counsel in connection with any action involving or seeking to resolve any dispute, claim or issue that in any way pertains to the interpretation, validity or enforceability of, or otherwise arises out of, or relates to, this Agreement, the Operating Agreement and/or Member's membership in the [Company/Series], including, without limitation, any action involving or seeking to resolve any dispute, claim or issue arising out of the rights and interests of [Affiliates and Lockton Entities/the Other Series, Affiliates, and Lockton Entities] as set forth herein, the prevailing party in any such action shall be entitled, in addition to any other remedies set forth in this Agreement or otherwise available at law or equity, to recover any and all reasonable costs and expenses incurred in connection with such action, through all appeals, including reasonable attorneys' fees, reasonable out-of-pocket costs of travel to attend proceedings in the agreed forum set forth in Section 7.7, reasonable expert witness fees and expenses, reasonable deposition transcript and transcription services costs, court costs, and interest on the amount of any judgment at the highest applicable statutory rate. The fact that a party or third-party beneficiary hereto ultimately is granted or otherwise is awarded less than the full scope of any injunctive relief that the party or third-party beneficiary may have sought or that a court reforms or modifies this Agreement and enforces the Agreement as reformed or modified in the given action at issue shall not prevent that party or the third-party beneficiary from being deemed a "prevailing party" for purpose of this Section 7.18 with respect to the part of such action for which the party is granted relief.

**E. Tolling**

Each Member Agreement provides that if Lockton seeks but fails to obtain injunctive relief to enforce the covenants, but a court ultimately finds the challenged term is enforceable, then the time restrictions shall be tolled from the date of the first application for injunctive relief until the date the dispute is finally resolved.

The tolling provision is set forth below:

7.3 Tolling. Member agrees that in the event a dispute arises between the [Company/Series], and, if applicable, any of the [Affiliates and/or any of the

Lockton Entities/Other Series, any of the Affiliates and/or any of the Lockton Entities], on the one hand, and Member, on the other hand, regarding the enforceability against Member of any of the terms of Sections 4 or 5 of this Agreement, and thereafter a court of competent jurisdiction, pursuant to Section 7.7 of this Agreement, finds that the disputed term at issue is enforceable, in whole or in part, against Member with respect to Member's breach, attempted breach, or threatened breach of any such disputed term, then the time period restrictions specified in this Agreement with respect to such disputed term shall be deemed tolled from the date of Member's first breach, attempted breach, or threatened breach of such disputed term (as determined by a court of competent jurisdiction pursuant to Section 7.7 of this Agreement) until the date the dispute is finally resolved and all periods of appeal have expired.

**F. Severability**

Each Member Agreement provides that a court shall be empowered to reform the agreement so as to render it enforceable and that, if any term is determined to be void, voidable, invalid, illegal, or unenforceable, the remaining terms and provisions shall remain in full force and effect and enforced as written.

**G. Missouri Choice of Law and Forum**

Each Member Agreement contains a Missouri choice of law and Missouri forum selection provision, as set forth below:

7.7 <u>Governing Law and Forum Selection.</u>

(a) Member and the [Company/Series] agree that this Agreement shall be deemed to have been made in the State of Missouri. This Agreement and all disputes, claims or issues that in any way pertain to the interpretation, validity or enforceability of, or otherwise arise out of or relate to this Agreement, the Operating Agreement and/or Member's membership in the [Company/Series], including, without limitation, any disputes, claims or issues arising out of the rights and interests of [Affiliates and Lockton Entities/the Other Series, Affiliates and Lockton Entities] as set forth herein, shall be subject to, governed by, and construed in accordance with the laws of the State of Missouri without reference to choice of laws, irrespective of the fact that one or both of the parties now is or may become a resident of a different state. Any action involving any disputes, claims or issues that in any way pertain to the interpretation, validity or enforceability of, or otherwise arise out of or relate to this Agreement, the Operating Agreement and/or Member's membership in the [Company/Series], including, without limitation, any disputes, claims or issues arising out of or relating to the rights and interests of [Affiliates and Lockton Entities/the Other Series, Affiliates and Lockton Entities] as set forth herein, shall be brought exclusively in any Federal Court in Kansas City, Missouri or in the Circuit Court of Jackson County, Missouri; *provided, however,* the [Company/Series] shall pay

promptly, upon demand from time-to-time by Member, reasonable out-of-pocket costs of travel to attend proceedings in such forum. Such courts shall have exclusive jurisdiction over these matters, and Member hereby agrees to be subject to the personal jurisdiction of such courts. The parties hereto agree that the provisions set forth in this Section 7.7 are fair and reasonable.

(b) Member acknowledges and agrees that, in light of the making of this Agreement in Missouri, the Lockton Entities' substantial contacts with Missouri, and the interests of Member and the Lockton Entities in ensuring that disputes, claims or issues that in any way pertain to the interpretation, validity or enforceability of, or otherwise arise out of or relate to this Agreement, the Operating Agreement and/or Member's membership in the [Company/Series], including, without limitation, any disputes, claims or issues arising out of or relating to the rights and interests of [Affiliates and Lockton Entities/the Other Series, Affiliates and Lockton Entities] as set forth herein are resolved on a uniform basis and in accordance with Missouri's organizational laws, pursuant to which the [Company, the Affiliates and certain other Lockton Entities/ the Series, the Other Series, the Affiliates and certain other Lockton Entities] are organized, including but not limited to Missouri's limited liability company laws and its, series limited liability company law (including but not limited to Mo. Rev. Stat. §347.186),[6] Missouri has a substantial relationship to Member, the Lockton Entities and this Agreement, and there is a reasonable basis for the parties' choice of Missouri law and forum in this Section 7.7.

### H. Additional Terms and Conditions for the Member Agreements

Each Member Agreement contains an "Exhibit A" that contains "Additional Terms and Conditions" related to McDaniel's entry into the Producer Partner Agreement. Each of those addendums provides that based on the "new powers and benefits that will accrue to [McDaniel] as a Producer Partner (including without limitation access to more Confidential Information about the other Lockton Entities than is presently available to Producer Member)," the termination of his membership and engagement in competitive activities would present a "materially greater" competitive risk. The addendums therefore provide that the restrictive covenants in the Member Agreements will be extended to four years.

The relevant provisions are set forth below:

4. In consideration of the Producer Member's acquisition as a Producer Partner of a Partner Unit in Lockton Partners and the other consideration described in recitals and other provisions of the Producer Partner Agreement and Lockton Partners Operating Agreement, including but not limited to the Buy-Sell Price payable for the Partner Unit of the Producer Member as a Producer Partner

[6] This language is slightly different in the Lockton Affinity Series of Lockton Affinity, LLC Member Agreement and Mountain West Series of Lockton Companies, LLC Member Agreement, but substantially similar.

in accordance with Section 8.5 of the Lockton Partners Operating Agreement (and also including, where applicable, the Advance Payment and Additional Payment provided for in Section 8.5(e)(iv) thereof):

(a) The Producer Member agrees, for the benefit of the [Company/Series] and also for the benefit of the [Affiliates/Other Series and Affiliates], that the restrictions set forth in Sections 5.3 and 5.4 of this Agreement (disregarding for purposes of this Section 4.a the two (2) year periods referenced therein) shall apply, for a period of four (4) years following the sale of Producer Member's Producer Unit (which occurs on the Buy-Sell Purchase Date), in accordance with all applicable provisions of this Agreement;

(b) The Producer Member agrees that each of the Lockton Entities, jointly and severally, is an intended third party beneficiary of each of the covenants of the Producer Member set forth in Section 4.a immediately above in accordance with the terms of this Agreement, in each case as applicable with respect to the interests of such Lockton Entity; and

(c) The Producer Member agrees that the [Company/Series] shall have the right to assign to any Lockton Entity, in accordance with the terms of this Agreement, all or any portion of the rights to enforce against the Producer Member each of the covenants of the Producer Member set forth in Section 4.a immediately above.

The addendum to the Mountain West Series of Lockton Companies, LLC Member Agreement also modifies the provision regarding the impact of the termination of McDaniel's interest pursuant to certain sections of the Operating Agreement, as set forth below:

5. The following provision shall replace Section 5.4(b) of the foregoing Agreement and shall apply to Member:

(b) If the Series purchases the Member's Producer Unit as a result of the termination of Member's Interest in the Series pursuant to Section 5.10(a) of the Operating Agreement with Good Reason, pursuant to Section 5.10(b) of the Operating Agreement without Cause, or pursuant to Section 5.10(d) of the Operating Agreement, then the prohibitions in subsection (a) of this Section 5.4 shall not apply to Customer Accounts for which, at the time of the termination of Member's Interest (excluding any period of notice of termination): (i) Member was recognized as an originating producer, or (ii) which is a Multi-Family Real Estate Customer Account (as defined herein) for which Member is recognized as a joint venture producer, but which was not originated by Member. For purposes of this Agreement, a "Multi-Family Real Estate Customer Account" shall mean a Customer Account which is predominately engaged in the business of development, ownership and management of multi-family residential real estate and related services. For purposes of clarification, Member shall not be

recognized as the exclusive originating producer of any Customer Account which is identified on the books and records of the Series or any Other Series as either (i) a joint venture Customer Account, other than (A) a joint venture Customer Account for which Member is recognized as an originating producer, or (B) a Multi-Family Real Estate Customer Account; (ii) an Orphaned Customer Account, or (iii) a Customer Account, the Production Revenue for which is recognized as House Plus 10 Production.

## III. Summary of the Key Terms of the Producer Partner Agreement

### A. Restrictive Covenants

The Producer Partner Agreement provides that the restrictive covenants in the Member Agreements shall "remain in full force and effect without amendment or modification," and that in addition as "separate and independent covenants of Producer Partner pursuant to this Agreement," the covenants not to solicit customer and employees shall apply for four years following the Buy-Sell Purchase Date.

The provision is set forth in full below:

> 5. Restrictive Covenants. In order to protect each Lockton Entity's respective interests with respect to the Confidential Information, Customer Accounts, goodwill, relationships with Customer Accounts, customer contacts, employees, members, producers and consultants and other legitimate protectable business interests, and in light of and in exchange for the consideration recited at the beginning of this Agreement and other valuable consideration, the Producer Partner further agrees as set forth below.
>
> > 5.1 Member Agreement Restrictive Covenants. Sections 4, 5 and 7 of the Member Agreement[7] set forth certain covenants of the Producer Partner, in the capacity of the Producer Partner as a Producer Member, regarding Confidential Information, Customer Accounts, goodwill, relationships with Customer Accounts, customer contacts, employees, members, producers and consultants, and other legitimate protectable business interests of the Series, any Other Series and Affiliates (such provisions of each such Member Agreement, the "Member Agreement Restrictive Covenants"). The Producer Partner acknowledges and agrees that the Member Agreement Restrictive Covenants remain in full force and effect without amendment or modification and that, in addition and as separate and independent covenants of Producer Partner pursuant to this Agreement, Sections 5.3 and 5.4 of each such Member Agreement shall

[7] "Member Agreement" is defined as the Amended and Restated Producer Member Agreement(s) that McDaniel entered into with the Mountain West Series of Lockton Companies, LLC, any other Series of Lockton Companies, or any other Affiliate with which McDaniel is affiliated in the capacity of a Producer Member (i.e., the Member Agreements).

apply (disregarding for purposes of this Section 5.1 the two (2) year periods referenced therein) for a period of four (4) years following the sale of the Producer Unit (which occurs on the Buy-Sell Purchase Date) of the Producer Partner in the Primary Series in accordance with all applicable provisions of each such Member Agreement. The covenants of the Producer Partner in this Section 5, together with the Member Agreement Restrictive Covenants, are referred to herein as the "Restrictive Covenants").

**B. Remedies**

Like the Member Agreements, the Producer Partner Agreement provides that in the event of breach Lockton shall be entitled to injunctive relief and money damages. It also provides that the prevailing party in any proceeding in connection with a dispute relating to the agreement shall be entitled to recover costs and attorneys' fees.

The relevant provisions are set forth below:

5.3 Injunctive Relief. Producer Partner acknowledges and agrees that strict compliance with this Agreement is necessary to protect the Confidential Information, goodwill and other legitimate protectable business interests of the Company and the Series, the Other Series, the Affiliates and Lockton Entities; that a breach of this Agreement will result in irreparable harm and continuing damage to the Company and, where applicable, any one or more of the Series, the Other Series, Affiliates or other Lockton Entities; and that, in the event of a breach of this Agreement by Producer Partner, damages would be difficult or impossible to ascertain. Accordingly, in the event of Producer Partner's breach, attempted breach, or threatened breach of this Agreement, the Company, and, if applicable, any of the Series, the Other Series, Affiliates and/or other Lockton Entities, upon application to any court of competent jurisdiction pursuant to Section 5.9, shall be entitled to obtain a temporary restraining order, a preliminary injunction, and an injunction permanently enjoining and prohibiting the breach of this Agreement.

5.4 Money Damages. Producer Partner acknowledges and agrees that strict compliance with this Agreement is necessary to protect the Confidential Information, goodwill and other legitimate protectable business interests of the Company and the Series, the Other Series, the Affiliates and Lockton Entities, and that, as described above, a breach of this Agreement will result in irreparable harm and continuing damage to the Company and, if applicable, any of the Series, the Other Series, Affiliates and/or other Lockton Entities, for which money damages may not provide adequate relief. Nonetheless, it is agreed that in the event of a breach, attempted breach or threatened breach of this Agreement, then in addition to injunctive relief and any other remedies set forth in this Agreement or otherwise available at law or equity, the Company and any of the Series, the

Other Series, Affiliates and/or other Lockton Entities, shall also be entitled to recover from Producer Partner any money damages that can be determined.

...

5.20 Attorneys' Fees, Costs and Interest. If any Lockton Entity or Producer Partner engages counsel in connection with any action involving or seeking to resolve any dispute, claim or issue that in any way pertains to the interpretation, validity or enforceability of, or otherwise arises out of, or relates to this Agreement, the Operating Agreement, the Member Agreement, the Lockton Companies Operating Agreement and/or Producer Partner's membership in the Company and/or in the Series and/or any Other Series or Affiliate, if applicable, including, without limitation, any action involving or seeking to resolve any dispute, claim or issue arising out of the rights and interests of the Series, the Other Series, Affiliates and Lockton Entities as set forth herein, the prevailing party in any such action shall be entitled, in addition to any other remedies set forth in this Agreement or otherwise available at law or equity, to recover any and all reasonable costs and expenses incurred in connection with such action, through all appeals, including reasonable attorneys' fees, reasonable out-of-pocket costs of travel to attend proceedings in the agreed forum set forth in Section 5.9, reasonable expert witness fees and expenses, reasonable deposition transcript and transcription services costs, court costs, and interest on the amount of any judgment at the highest applicable statutory rate. The fact that a party or third-party beneficiary hereto ultimately is granted or otherwise is awarded less than the full scope of any injunctive relief that the party or third-party beneficiary may have sought or that a court reforms or modifies this Agreement and enforces the Agreement as reformed or modified in the given action at issue shall not prevent that party or the third-party beneficiary from being deemed a "prevailing party" for purpose of this Section 5.20 with respect to the part of such action for which the party is granted relief.

**C. Tolling**

The Producer Partner Agreement provides that if Lockton seeks but fails to obtain injunctive relief to enforce the covenants, but a court ultimately finds the challenged term is enforceable, then the time restrictions shall be tolled from the date of the first application for injunctive relief until the date the dispute is finally resolved.

The tolling provision is set forth below:

5.5 Tolling. Producer Partner agrees that in the event a dispute arises between the Company, and, if applicable, any of the Series, the Other Series, the Affiliates and/or the Lockton Entities, on the one hand, and Producer Partner, on the other hand, regarding the enforceability against Producer Partner of any of the terms of the Restrictive Covenants, and thereafter a court of competent jurisdiction, pursuant to Section 5.9 of this Agreement, finds that the disputed term at issue is



Highly Confidential - Attorneys' Eyes Only 

enforceable, in whole or in part, against Producer Partner with respect to Producer Partner's breach, attempted breach, or threatened breach of any such disputed term, then the time period restrictions specified in this Agreement with respect to such disputed term shall be deemed tolled from the date of Producer Partner's first breach, attempted breach, or threatened breach of such disputed term (as determined by a court of competent jurisdiction pursuant to Section 5.9 of this Agreement) until the date the dispute is finally resolved and all periods of appeal have expired.

**D. Severability**

The Producer Partner Agreement provides that a court shall be empowered to reform the agreement so as to render it enforceable and that, if any term is determined to be void, voidable, invalid, illegal, or unenforceable, the remaining terms and provisions shall remain in full force and effect and enforced as written.

**E. Missouri Choice of Law and Forum**

The Producer Partner Agreement contains a Missouri choice of law and Missouri forum selection provision, as set forth below:

5.9 Governing Law and Forum Selection.

(a) Producer Partner and the Company agree that this Agreement shall be deemed to have been made in the State of Missouri. This Agreement and all disputes, claims or issues that in any way pertain to the interpretation, validity or enforceability of, or otherwise arise out of or relate to this Agreement, the Operating Agreement, the Member Agreement, the Lockton Companies Operating Agreement and/or Producer Partner's membership in the Company and/or in the Series and/or any Other Series or Affiliate, if applicable, including, without limitation, any disputes, claims or issues arising out of the rights and interests of the Series, the Other Series, Affiliates and Lockton Entities as set forth herein, shall be subject to, governed by, and construed in accordance with the laws of the State of Missouri without reference to choice of laws, irrespective of the fact that one or both of the parties now is or may become a resident of a different state. Any action involving any disputes, claims or issues that in any way pertain to the interpretation, validity or enforceability of, or otherwise arise out of or relate to this Agreement, the Operating Agreement, the Member Agreement, the Lockton Companies Operating Agreement and/or Producer Partner's membership in the Company and/or in the Series and/or any Other Series or Affiliate, if applicable, including, without limitation, any disputes, claims or issues arising out of or relating to the rights and interests of the Series, the Other Series, Affiliates and Lockton Entities as set forth herein, shall be brought exclusively in any Federal Court in Kansas City, Missouri or in the Circuit Court of Jackson County, Missouri; *provided, however,* the Company shall pay promptly, upon demand from time-to-time by Producer Partner, reasonable out-

of-pocket costs of travel to attend proceedings in such forum. Such courts shall have exclusive jurisdiction over these matters, and Producer Partner hereby agrees to be subject to the personal jurisdiction of such courts. The parties hereto agree that the provisions set forth in this Section 5.9 are fair and reasonable.

(b) Producer Partner acknowledges and agrees that, in light of the making of this Agreement in Missouri, the Lockton Entities' substantial contacts with Missouri, and the interests of Producer Partner and the Lockton Entities in ensuring that disputes, claims or issues that in any way pertain to the interpretation, validity or enforceability of, or otherwise arise out of or relate to this Agreement, the Operating Agreement, the Member Agreement, the Lockton Companies Operating Agreement and/or Producer Partner's membership in the Company and/or in the Series and/or any Other Series or Affiliate, if applicable, including, without limitation, any disputes, claims or issues arising out of or relating to the rights and interests of the Series, the Other Series, Affiliates and Lockton Entities as set forth herein are resolved on a uniform basis and in accordance with Missouri's organizational laws, pursuant to which the Company, the Series, the Other Series, the Affiliates and certain other Lockton Entities are organized, including but not limited to Missouri's limited liability company laws and its series limited liability company law (including but not limited to Mo. Rev. Stat. §347.186), Missouri has a substantial relationship to Producer Partner, the Lockton Entities and this Agreement, and there is a reasonable basis for the parties' choice of Missouri law and forum in this Section 5.9.

## IV. Legal Analysis

### A. Missouri Courts Would Likely Apply Missouri Law to the Member Agreements and Producer Partner Agreement; Colorado Courts May Apply Colorado Law, But Would Likely Enforce the Missouri Forum Selection Clause

Missouri courts rely on section 187 of the Restatement (Second) of Conflict of Laws to determine the validity of a contractual choice of law provision. A Missouri court would therefore follow the following process: "First, the court must determine which state's law would apply in default under section 188 in the absence of an effective choice of law by the parties. Second, the court must decide whether the default state has a materially greater interest in the outcome of the particular issue than the chosen state. Finally, the court must determine whether application of the law of the chosen state would be contrary to a fundamental policy of the default state." *Baxter Intern., Inc. v Morris*, 976 F.2d 1189, 1196 (8th Cir. 1992).

Here, a Missouri court would likely enforce the Missouri choice of law provision in the agreements given that Lockton is based in Missouri. *See TLC Vision (USA) Corp. v. Freeman*, 2012 WL 5398671, at *5 (E.D. Mo. Nov. 2, 2012) (enforcing Missouri choice of law clauses where employer had its principal place of business in Missouri and employees were based in Oklahoma, because "[e]ven assuming that . . . an Oklahoma court would be more likely to find the covenants unenforceable, there is no indication that Missouri lacks all interest in the

transaction or that Oklahoma's interest in the matter is materially greater than Missouri's"); *Emerson Elect. Co. v. Rogers*, 418 F.3d 841, 846 (8th Cir. 2005) (enforcing Missouri choice of law clause in agreement with Georgia employee).

A Colorado court could potentially reach a different result. Colorado has expressly adopted the Restatement analysis for contract actions. *Wood Bros. Homes, Inc. v. Walker Adjustment Bureau,* 198 Colo. 444 (1979). Courts have come out both ways as far as whether Colorado has a more significant interest if the employee is based in Colorado but the employer is based elsewhere. *Compare Newark Elecs. v. Warnimont*, No. CIV.A. 86 F 677, 1987 WL 880813, at *3 (D. Colo. Feb. 12, 1987) (declining to apply Ohio choice of law clause in employment agreement between Colorado resident and Ohio corporation), *with Am. Exp. Fin. Advisors, Inc. v. Topel*, 38 F. Supp. 2d 1233, 1239 (D. Colo. 1999) (upholding Minnesota choice of law clause where employer was headquartered in Minnesota and the employee attended training sessions there).

Here, a Colorado court could potentially apply Colorado law to the agreements based on the fact that McDaniel lives and works in Colorado. However, a court could also find that there is no conflict with Colorado law if the covenants fall within one of the exceptions to Colorado's general prohibition on noncompetes. *See Am. Exp. Fin. Advisors, Inc.*, 38 F. Supp. 2d at 1238-39 (holding application of Minnesota law would not be contrary to a fundamental policy of Colorado where the covenants were concerned with providing protection for confidential and trade secret customer information, because "Colorado specifically enforces contracts for the protection of trade secrets").

Moreover, Colorado courts generally uphold *forum* selection clauses, which may result in the transfer of any declaratory relief action to Missouri. Although courts may decline to enforce a forum selection clause that contravenes Colorado public policy, in a different context (securities) the Supreme Court of Colorado declined to analyze the enforceability of a forum selection clause in connection with the choice of law issue. *Cagle v. Mathers Family Trust*, 295 P.3d 460, 470 (Colo. 2013) (holding that "[r]equiring a court to consider a choice of law clause at the same time as a forum selection clause forces a court to attempt to determine the potential outcome of the case under the chosen law at the outset of the litigation").

**B. Under Missouri Law the Covenant Is Likely Overbroad, But Would Be Modified so as to Be Enforceable**

"Missouri courts generally enforce a non-compete agreement if it is demonstratively reasonable. A non-compete agreement is reasonable if it is no more restrictive than is necessary to protect the legitimate interests of the employer. A non-compete agreement must be narrowly tailored temporally and geographically and must seek to protect legitimate employer interests beyond mere competition by a former employee. Accordingly, a non-compete agreement is enforceable 'only to the extent that the restrictions protect the employer's trade secrets or customer contacts.'" *Whelan Sec. Co. v. Kennebrew*, 379 S.W.3d 835, 841-42 (Mo. 2013).

Missouri courts have enforced customer non-solicits and covenants prohibiting the solicitation or acceptance of business from former clients. *See Systematic Bus. Svcs., Inc. v Bratten*, 162 S.W.3d 41, 49-52 (Mo. Ct. App. 2005) (upholding injunction not to solicit, accept, or divert

business from customers of former employer). However, covenants may be held overbroad to the extent they include customers with whom the former employee did not have any contact or about whom he or she did not obtain any confidential information. *See Whelan*, 379 S.W.3d at 843 (customer nonsolicit was overbroad in that it applied to all customers of nationwide company where there were no facts showing former employees had significant contact with a substantial number of customers throughout the nation).

Here, the covenants purport to apply not only to customers that McDaniel produced, solicited, serviced, or contacted, or for or about which he acquired or had access to Confidential Information, but also any other Customer Accounts of the respective Series or Company and, as applicable, any "Other Series." They are therefore overbroad. However, "when the provisions of a non-compete clause impose a restraint that is unreasonably broad, appellate courts still can give effect to its purpose by refusing to give effect to the unreasonable terms or modifying the terms of the contract to be reasonable." *Whelan*, 379 S.W.2d at 844. If a court were to determine the covenants are overbroad, then, it would likely modify them so as to render them enforceable (*i.e.*, limit the covenants to apply only to "Customer Accounts" with whom McDaniel had any relationship).

The four-year duration of the covenants resulting from McDaniel's entry into the Producer Partner Agreement is also potentially subject to challenge as unreasonable. However, Missouri courts have upheld employee non-compete restrictions of up to five years. *See Superior Gearbox Co. v. Edwards*, 869 S.W.2d 239, 248 (Mo. Ct. App. 1993) (finding that five years was an appropriate duration for noncompete where the former employee had a stake in the success of his former employer, was intimately involved with the day-to-day operation of the business, exercised considerable control, and "embodied [the former employer] in the eyes of the company's customers").

### C. The Covenant Would Potentially Be Upheld Even Under Colorado Law

In Colorado, the enforceability of non-compete agreements is governed by Colorado Revised Statues, section 8-2-113(2), which reads:

> Any covenant not to compete which restricts the rights of any person to receive compensation for performance of skilled or unskilled labor for any employer shall be void, but this subsection (2) shall not apply to:
>
> (a) Any contract for the purchase and sale of a business or the assets of a business;
>
> (b) Any contract for the protection of trade secrets;
>
> (c) Any contractual provision providing for recovery of the expense of educating and training an employee who has served an employer for a period of less than two years;
>
> (d) Executive and management personnel and officers and employees who constitute professional staff to executive and management personnel.

An agreement not to solicit customers is considered a form of covenant not to compete. *Saturn Sys., Inc. v. Militare*, 252 P.3d 516, 526 (Colo. App. 2011). Non-solicitation and non-competition agreements are generally void in Colorado unless they fall into one of the statutory exceptions set forth above. *Cont'l Credit Corp. v. Dragovich*, No. 13-CV-01349-WYD-MJW, 2013 WL 3303976, at *2 (D. Colo. July 1, 2013). "[E]ven if a noncompetition clause is not void under § 8-2-113, C.R.S., to be enforceable it must satisfy the rule of reasonableness as to both duration and geographic scope. *National Graphics Co. v. Dilley*, 681 P.2d 546, 547 (1984).

1. The Covenants Would Likely Fall Within an Exception to the Statute

Here, the covenants are potentially enforceable pursuant to either the trade secrets or executive and management personnel exceptions.

a. *Trade Secret Exception*

"For a covenant not to compete to fit within the trade secret exception to § 8–2–113(2)(b), the purpose of the covenant must be the protection of trade secrets, and the covenant must be reasonably limited in scope to the protection of those trade secrets." *Gold Messenger, Inc. v. McGuay*, 937 P.2d 907, 910 (Colo. App. 1997); *see Harvey Barnett, Inc. v. Shidler*, 338 F.3d 1125, 1133 (10th Cir. 2003).

Colorado courts have looked to the preamble and the substantive provisions of the contract to determine whether a restriction was drafted with the purpose of protecting trade secrets. *See Haggard v. Spine*, 2009 WL 1655030, at *5 (D. Colo. June 12, 2009). If the contract states that the protection of trade secrets is the purpose of the agreement, then the agreement may be enforceable. *Id.* To the contrary, at least one court has held that a non-compete clause that does not mention trade secrets cannot be upheld under the trade secret exemption. *Dresser Indus., Inc. v. Sandvick*, 732 F.2d 783, 788 (1984) ("[T]he section of the standard agreement at issue in this case is a naked covenant not to compete. A naked covenant not to compete is void under the statute and cannot be validated by the insertion of a companion clause dealing with trade secrets.").

Here, the Member Agreements provide that the restrictive covenants are "not greater than reasonably necessary for the protection of the Confidential Information, goodwill and the other legitimate protectable interests" of the various Lockton entities. They also provide that the prohibited activities "would necessarily involve Member's use of Confidential Information." Confidential Information is defined to include trade secrets. Lockton would therefore likely be able to argue that the covenants are designed to protect trade secrets.

Even if a court determines that the noncompetes are designed to fall within this exception, though, the party seeking to enforce the agreement still "must show that it possesses trade secrets that are worth protecting, and that [the employee] had access to these secrets." *Doubleclick Inc. v. Paikin*, 402 F. Supp. 2d 1251, 1257 (D. Colo. 2005).

Customer contact information alone may not be considered "trade secrets" under Colorado law. The Colorado Uniform Trade Secrets Act defines a trade secret as:

> the whole or any portion or phase of any scientific or technical information, design, process, procedure, formula, improvement, confidential business or financial information, listing of names, addresses, or telephone numbers, or other information relating to any business or profession which is secret and of value. To be a "trade secret" the owner thereof must have taken measures to prevent the secret from becoming available to persons other than those selected by the owner to have access thereto for limited purposes.

Colo. Rev. Stat. § 7-74-102(4).

The Colorado Court of Appeals has provided a list of six factors to use to recognize a trade secret:

> (1) the extent to which the information is known outside the business, (2) the extent to which it is known to those inside the business, *i.e.*, by the employees, (3) the precautions taken by the holder of the trade secret to guard the secrecy of the information, (4) the savings effected and the value to the holder in having the information as against competitors, (5) the amount of effort or money expended in obtaining and developing the information, and (6) the amount of time and expense it would take for others to acquire and duplicate the information.

*Porter Industries, Inc. v. Higgins,* 680 P.2d 1339, 1342 (Colo. App. 1984).

Some courts have held that mere customer lists, which information could easily be recreated using public information, cannot constitute a trade secret, so that even if the contract specifies the non-solicitation provision is to protect trade secrets the exception does not apply. *Cont'l Credit Corp*, 2013 WL 3303976, at *4 (holding the trade secret exception did not apply because the "Referral Source List contains information that is readily available to the public at large"); *see also Colorado Supply Co. v. Stewart*, 797 P.2d 1303, 1306 (Colo. App. 1990) ("Here, the trial court concluded that plaintiff's customer lists were not trade secrets because: (1) the information was developed by Stewart, who was an independent contractor, rather than by plaintiff; (2) the names on the list can be obtained fairly easily, by reading through the business section of the telephone directory and by asking prospective customers from whom they purchase certain products; and (3) there was no exclusivity as to customers, in that customers purchased the products from more than one vendor.").

Other courts, however, have held that client lists, which contain more than just contact information, do qualify as trade secrets, and may render a non-solicitation agreement enforceable. *See Saturn Sys., Inc. v. Militare*, 252 P.3d 516, 527 (Colo. App. 2011) (client list containing information "such as a client's number of unused pre-purchased collection accounts, a debtor's personal information, and the percentage of debt recovered per client" constituted a trade secret).

McDaniel could argue that the provision was not intended to protect trade secret information if the information to which he had access was nothing more than customer lists containing information that was available to the public at large. If, however, he had access to information

that was not generally available through his employment with Lockton, a court may find that the provisions were meant to protect trade secrets, and are therefore enforceable if reasonable.

b. *Management Exception*

A restrictive covenant may also be enforceable if falls under the executive and management personnel exception. Colo. Rev. Stat. § 8–2–113(2)(d); *Doubleclick Inc.*, 402 F. Supp. 2d at 1258. The determination of whether an employee is "executive or management personnel" is a question of fact. *Cont'l Credit Corp*, 2013 WL 3303976, at *4. In determining whether the management exception applies, the Court should look beyond an employee's mere title to see what his job actually entails. *DoubleClick Inc.*, 402 F. Supp. 2d at 1258 (citing *Management Recruiters of Boulder, Inc. v. Miller,* 762 P.2d 763 (Colo. App. 1988) and *Atmel Corp. v. Vitesse Semiconductor Corp.*, 30 P.3d 789 (Colo. App. 2001)).

A sales employee who supervises only a couple of people and has no hiring or firing authority does not fall into the management exception. *Cont'l Credit Corp*, 2013 WL 3303976, at *4; *Porter Indus., Inc.*, 680 P.2d at 1342 (employee whose "duties were to negotiate and sell contracts, make sales calls, keep updated contracts filed, and to promote employer's business" was not a management employee); *see also Reed Mill & Lumber Co., Inc. v. Jensen*, 165 P.3d 733, 738 (2006) ("Courts have focused more on an employee's degree of skills, knowledge, or autonomy, rather than on his or her relationships with customers."). But, an employee who supervised fifty people, had various levels of management under her, and was in charge of a significant part of the company's business is a management employee. *See DoubleClick Inc.*, 402 F. Supp. 2d at 1258.

We would require more information about McDaniel's position at Lockton to determine whether this exception would apply.

2. The Covenants Are Potentially Overbroad, But Could Be Modified so as to Be Enforceable

"When a covenant not to compete is statutorily permitted, it is enforceable only if it is reasonable in duration and geographic scope." *Reed Mill & Lumber Co., Inc.*, 165 P.3d 733 at 736. "Covenants not to compete 'for terms of up to five years and within distances of 100 miles' are commonly upheld." *Id.*

Here, the covenant not to solicit or service clients is arguably overbroad on a number of grounds. First, it is likely overbroad to the extent that it includes clients with whom McDaniel had no contact. *See Mgmt. Recruiters of Boulder, Inc. v. Miller*, 762 P.2d, 763, 764-65 (1988) (affirming trial court's narrow construction of agreement prohibiting the contact of "any candidate . . . with whom the [former employee] had contact with or access to" to any candidate with whom the former employee had actual contact); *Wells Fargo Ins. Servs. USA, Inc. v. McQuate*, 276 F. Supp. 3d 1089, 1109-1110 (2016) (limiting customer non-solicitation covenant that applied to all clients to apply only to clients on whose accounts the former employee managed or worked on, or with whom he had actual contact). The covenant should also potentially be limited to prohibit only solicitation, or to prohibit solicitation with the use of trade

secrets. *See Wells Fargo Ins. Servs. USA, Inc.*, 276 F. Supp. 3d at 1109-1110 (holding covenant prohibiting employee from directly or indirectly soliciting, selling, servicing, creating, managing, or implementing any kind of service or product offered by the former employer to former clients fell within trade secrets exception, but limiting prohibited activity to soliciting using former employer's trade secrets).

Courts in Colorado are empowered to "blue pencil" an unreasonable agreement so as to make it enforceable. *See Keller Corp. v. Kelley*, 187 P.3d 1133, 1140 (2008) (court properly limited the reach of its injunction to only the area where franchisee was doing business where covenant prevented competition against all franchises within the state); *Energex Enterprises, Inc. v. Anthony Doors, Inc.*, 250 F. Supp. 2d 1278, 1283 (D. Colo. 2003) ("If the trial court finds a particular non-competition agreement unreasonable in either duration or scope, it also has discretion to modify the terms of the agreement to render it reasonable and enforceable."). Although a trial court has discretion to reform an unreasonable restriction set forth in a covenant not to compete, it is not an abuse of discretion to refuse to do so. *National Graphics Co. v. Dilley*, 681 P.2d 546, 547 (1984).

The restrictive covenants in McDaniel's agreements are unlikely to be stricken down if a court finds that they are overbroad. Instead, a court is likely to reform the covenants so as to make them enforceable.



Highly Confidential - Attorneys' Eyes Only ALLIANT00083701