**STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| Arthur J. Gallagher & Co., | No. 1:22-cv-03931 |
| Plaintiff, | |
| v. | |
| Alliant Insurance Services, Inc., | |
| Defendant. | |

**Alliant's Opposition to Gallagher's Motion for
Temporary Restraining Order
<u>and Preliminary Injunction</u>**

## Table of Contents

I.  Introduction ................................................................................................1

II.  Statement of Facts ....................................................................................3

    A.  Gallagher Subjected the New Hires to a Toxic,
    Sexist Environment ..............................................................................3

    B.  Gallagher's Mistreatment of Long Caused Her to
    Seek a New Job ....................................................................................6

    C.  No New Hire Solicited Other Gallagher Employees
    or Clients ..............................................................................................7

    D.  Gallagher's Brief Contains Numerous False
    Statements ............................................................................................8

III.  Legal Standards: A TRO is a "Drastic Remedy" ....................................10

IV.  Gallagher Cannot Show it is Likely to Succeed on the
Merits ......................................................................................................11

    A.  Gallagher Has Not Shown it is Likely to Succeed
    on Its Tortious Interference with Contract Claim................................12

        1.  The restrictive covenants are unenforceable ............................12

        2.  Gallagher has failed to show it is likely to
        prove a breach ..........................................................................16

        3.  Gallagher has no evidence Alliant induced
        wrongful conduct......................................................................18

    B.  Gallagher Has Not Shown it Is Likely to Succeed
    on Its Tortious Interference with a Business
    Expectancy Claim ................................................................................20

        1.  Gallagher can make no claim for interference
        with clients ................................................................................20

        2.  Gallagher has submitted no evidence showing
        Alliant wrongfully interfered with Gallagher's
        business expectancy ..................................................................21

        3.  Alliant may lawfully contact Gallagher's
        clients or employees ................................................................22

Opposition to Motion for Temporary Restraining Order and Preliminary Injunction

C.  Gallagher Has Not Shown it is Likely to Succeed
on Its Claim for Aiding and Abetting Breach of
Fiduciary Duty ....................................................................... 23

D.  Gallagher Has Not Shown It Has a Plausible
Conspiracy Claim .................................................................. 24

E.  Gallagher's Claims are Preempted by the ITSA ................... 25

V.  No Provisional Relief Should Issue Because Gallagher
Has an Adequate Remedy at Law and Cannot Show
Irreparable Harm ............................................................................ 26

VI.  The Balance of Harms And the Public Interest Tilt
Against Granting Provisional Relief .............................................. 31

A.  The Balance of Harms Tilts Against Granting
Provisional Relief ................................................................. 31

B.  The Proposed Injunction is Not in the Public's
Interest .................................................................................. 32

VII.  Gallagher's Requested Relief is Overbroad ................................. 33

VIII. Conclusion .................................................................................... 34

Opposition to Motion for Temporary Restraining Order and Preliminary Injunction

## Table of Authorities

*Gallagher v. Tarantino,*
498 F. Supp. 3d 1155 (N.D. Cal. 2020) ........................................................................ 8

*Elim Romanian Pentecostal Church v. Pritzker,*
2020 WL 2468194 (N.D. Ill. May 13, 2020) ............................................................. 10

*Aon v. Infinite Equity, Inc.,*
2021 WL 4192072 (N.D. Ill. Sept. 15, 2021) ................................................. 10, 27, 31

*Illinois Republican Party v. Pritzker,*
973 F.3d 760 (7th Cir. 2020) ..................................................................................... 10

*Bowles v. Montgomery Ward & Co.,*
143 F.2d 38 (7th Cir. 1944) ....................................................................................... 11

*Kinney v. Fed. Sec., Inc.,*
2001 WL 219691 (N.D. Ill. Mar. 6, 2001) ................................................................ 11

*Doctor's Data, Inc. v. Barrett,*
170 F. Supp. 3d 1087 (N.D. Ill. 2016) ...................................................................... 12

*Grand Vehicle Works Holdings Corp. v. Frey,*
2005 WL 1139312 (N.D. Ill. May 11, 2005) ............................................................. 12

*Reliable Fire Equip. Co. v. Arredondo,*
358 Ill. Dec. 322 (2011) ............................................................................................. 12

*Office Mates 5, North Shore, Inc. v. Hazen,*
234 Ill. App. 3d 557 (1992) ....................................................................................... 12

*Mercator Risk Servs., Inc. v. Girden,*
2009 WL 466150 (S.D.N.Y. Feb. 23, 2009) .............................................................. 13

*Brown & Brown, Inc. v. Ali,*
592 F. Supp. 2d 1009 (N.D. Ill. 2009)....................................................................... 13

*Abbott-Interfast Corp. v. Harkabus,*
250 Ill. App. 3d 13 (2nd Dist. 1993).................................................................... 14, 33

*Hay Group, Inc. v. Bassick,*
2005 WL 2420415 (N.D. Ill. Sept. 29, 2005) ........................................................... 14

*SKF USA, Inc. v. Bjerkness,*
636 F. Supp. 2d 696 (N.D. Ill. 2009)......................................................................... 15

*Aon Risk Servs. Co. v. Alliant,*
415 F. Supp. 3d 843 (N.D. Ill. 2019) ......................................................................... 15

Opposition to Motion for Temporary Restraining Order and Preliminary Injunction

*Getman v. USI Holdings Corp.,*
     2005 WL 2183159 (Mass. Super. Sept. 1, 2005) ................................................. 15, 16

*Mercer Health & Benefits LLC v. DiGregorio,*
     307 F. Supp. 3d 326 (S.D.N.Y. 2018) ........................................................................15

*Christian v. Veritiv Corp.,*
     2014 WL 6657700 (S.D. Ill. Nov. 24, 2014) .........................................................15, 33

*Kanan, Corbin, Schupak & Aronow, Inc. v. FD Int'l Ltd.,*
     8 Misc. 3d 412 (Sup. Ct. N.Y. Co. 2005) .................................................................. 16

*Bayly, Martin & Fay, Inc. v. Pickard,*
     780 P.2d 1168 (Okla. 1989) ....................................................................................... 16

*New Haven Tobacco Co. v. Perrelli,*
     528 A.2d 865 (Conn. App. Ct. 1987) ........................................................................ 16

*Pampered Chef v. Alexanian,*
     804 F. Supp. 2d 765 (N.D. Ill. 2011) .............................................................18, 23, 27

*Zeigler Auto Grp. II, Inc. v. Chavez,*
     2020 WL 231087 (N.D. Ill. Jan. 15, 2020) ............................................................... 18

*Quantum Foods, LLC v. Progressive Foods, Inc.,*
     2012 WL 5520411 (N.D. Ill. Nov. 14, 2012) ............................................................ 20

*Imperial Apparel, Ltd. v. Cosmo's Designer Direct, Inc.,*
     227 Ill. 2d 381 (2008) .........................................................................................20, 23

*Instant Tech., LLC v. DeFazio,*
     40 F. Supp. 3d 989, 1020 (N.D. Ill. 2014) ................................................................21

*Brinley Holdings Inc. v. RSH Aviation, Inc.,*
     2022 WL 180571 (N.D. Ill. Jan. 20, 2022) ...............................................................21

*Ali v. Shaw,*
     481 F.3d 942 (7th Cir. 2007) ................................................................................... 22

*Holbrook Mfg. LLC v. Rhyno Mfg. Inc.,*
     497 F. Supp. 3d 319 (N.D. Ill. 2020) ...................................................................... 23

*Overwell Harvest Ltd. v. Widerhorn,*
     2019 WL 398700 (N.D. Ill. 2019) ........................................................................... 23

*RSK Enterprises, LLC v. Comcast Spectacor, L.P.,*
     2018 WL 319318 (N.D. Ill. Jan. 8, 2018) ............................................................... 23

*Lewis v. Lead Indus. Ass'n,*
 178 N.E.3d 1046 (Ill. 2020) ................................................................ 25

*Servpro Indus., Inc. v. Schmidt,*
 1997 WL 158316 (N.D. Ill. Mar. 31, 1997)......................................... 25

*American Center for Excellence in Surgical Assisting, Inc.,*
 *v. Common College District 502,* 190 F. Supp. 3d. 812
 (N.D. Ill. 2016) ................................................................................... 25

*Arjo, Inc. v. Handicare USA, Inc.,*
 2018 WL 5298527 (N.D. Ill. 2018) ..................................................... 25

*Inmar, Inc. v. Vargas,*
 2018 WL 6716701 (N.D. Ill 2018) ................................................. 25, 26

*Higher Gear Grp., Inc. v. Rockenbach Chevrolet Sales, Inc.,*
 223 F. Supp. 2d 953 (N.D. Ill. 2002).................................................. 26

*Segerdahl Corp. v. Ferruzza,*
 2019 WL 77426 (N.D. Ill. 2019).......................................................... 26

*Thomas & Betts Corp. v. Panduit Corp.,*
 108 F. Supp. 2d 968 (N.D. Ill. 2000) ................................................. 26

*D.U. v. Rhoades,*
 825 F.3d 331 (7th Cir. 2016) .............................................................. 27

*E. St. Louis Laborers' Local 100 v. Bellon Wrecking &*
 *Salvage Co.,* 414 F.3d 700 (7th Cir. 2005)........................................ 27

*Life Spine, Inc. v. Aegis Spine, Inc.,*
 8 F.4th 531 (7th Cir. 2021)................................................................. 27

*Arthur J. Gallagher & Co. v. Youngdahl,*
 2005 WL 8164161 (D. Minn. Sept. 9, 2005)................................. 29, 30

*Arthur J. Gallagher & Co. v. Reisinger,*
 2007 WL 1877895 (W.D. Pa. June 11, 2007)...................................... 30

*Morgan Stanley Smith Barney LLC v. Sayler,*
 2019 WL 3459237 (D. Or. July 31, 2019) ........................................... 30

*Wells Fargo Insurance Services v. King,*
 2016 WL 299013 (D. Minn. Jan. 25, 2016) ................................... 30, 31

*IKON Office Solutions, Inc. v. Belanger,*
 59 F. Supp. 2d 125 (D. Mass. 1999) ................................................... 31

Opposition to Motion for Temporary Restraining Order and Preliminary Injunction

*JF Acquisition, LLC v. Pedchenko,*
    2018 WL 2988508 (E.D.N.C. Apr. 6, 2018) ............................................................31

*Cress v. Recreation Servs., Inc.,*
    341 Ill. App. 3d 149 (2003) ......................................................................................... 33

Opposition to Motion for Temporary Restraining Order and Preliminary Injunction

## I.    Introduction

Beyond its marketing hype as "One of the World's Most Ethical Companies," Gallagher's rampant sexism, discrimination, and unfair treatment has triggered an exodus of female professionals. This case concerns women who became so fed up with Gallagher's sexist and unfair treatment that they each separately decided to do what countless numbers of unhappy employees in this free country do almost every day: leave for a better opportunity. This Court would hardly know from Gallagher's papers that this case has any connection to these women, because Gallagher barely spends any time talking about them and did not even name them as defendants. This is because Gallagher has no evidence these women did anything wrong.

Instead, to distract from its own corporate misconduct, Gallagher submitted a hit piece fueled by irrelevant and untrue allegations about the employees' new employer—Defendant Alliant—in hopes that if Gallagher smears Alliant (and its lawyers) enough, the Court will not notice that Gallagher's claims are meritless and its request for extraordinary relief is frivolous. Indeed, the only thing Gallagher can prove Alliant did is hire Gallagher's employees and offer them better opportunities. Of course, competing for talented employees who are free to leave is not a tort. It's called capitalism. And although Gallagher may choose to ignore why and how these women left Gallagher, *their* stories are what matters in this case.

Kristen Long was the first of these women to leave Gallagher because she could no longer tolerate Gallagher's sexist and toxic environment. For years, Long had not been given the same credit, recognition, and opportunities as her male colleagues. Gallagher also failed to support and accommodate her after she suffered severe physical injuries in March 2021. When Long raised her concerns, Gallagher executives responded with gendered stereotypes, labeling her as "too emotional" and difficult to manage. They also tried to turn Long's colleagues against her. Long complained about the mistreatment to

Opposition to Motion for Temporary Restraining Order and Preliminary Injunction

Human Resources, but HR did nothing. In the winter of 2022, Long began taking calls from outside recruiters and she listened to one of her former Gallagher colleagues, Chris Mowery, about working for Alliant. Long resigned effective July 11, 2022 to join Alliant.

Seven other women who worked with Long at Gallagher also accepted offers from Alliant. Contrary to Gallagher's papers, these women did not leave because of some conspiracy concocted by Alliant. They left because they had no reason to stay after Long left—in fact, most of them had also experienced sexism and other forms of mistreatment. Thus, it comes as no surprise that Gallagher has **no evidence** that Long and the other departing women (the eight women are hereafter collectively referred to as the "New Hires") recruited each other or any other Gallagher employees, or that any of them solicited Gallagher clients—let alone that Alliant induced them to do so. The facts show the other seven women did not know Long was leaving Gallagher until the day she left or afterwards, and they learned about opportunities at Alliant from Alliant, including from their former coworker Mowery.

Gallagher claims as "evidence" of misappropriation that five of the eight women sent themselves some documents to their personal email. But the facts show they did this in the ordinary course of business in furtherance of their work for Gallagher, including while working remotely due to COVID-19. No evidence shows Alliant induced anyone to send themselves documents or commit any other alleged wrong, and all these documents were sent before any of the New Hires agreed to come to Alliant. In almost all the cases, the New Hires had not yet even talked to Alliant.

Nevertheless, Gallagher broadly seeks to enjoin **everyone** at Alliant from soliciting any client the New Hires serviced over the last two years or using Gallagher's purported confidential information. Gallagher also seeks to enjoin Alliant from allowing the New Hires to continue working for Alliant for 21 days. Gallagher, however, cannot demonstrate the necessary elements for a TRO with these restrictions.

**First**, Gallagher cannot show a likelihood of prevailing on its claims because they

Opposition to Motion for Temporary Restraining Order and Preliminary Injunction

are premised on a false notion that Alliant conspired with the New Hires to solicit each other and Gallagher clients, and to misappropriate Gallagher's confidential information. Gallagher has offered no evidence supporting such allegations. Gallagher instead relies on a smear campaign against Alliant. But even if all of Gallagher's allegations about Alliant's **past** conduct were true (which they are not), such allegations are not evidence of wrongdoing **here** with respect to Alliant's recent hiring of the New Hires.

 **Second**, Gallagher cannot make the required showing of irreparable harm because it has an adequate remedy at law. An expert can quantify any alleged harm Gallagher may suffer from clients switching to Alliant, meaning Gallagher can be compensated through an award of money damages at trial. In fact, Gallagher has previously quantified the monetary value of Long allegedly taking clients and supposed protected information to a new employer. In 2006, when Long first left Gallagher to go to a competitor, the parties agreed to specific dollar amounts to represent the value of four clients.

 **Third**, the balance of harms weighs against Gallagher's requested relief, particularly because it is overbroad. Gallagher's requested TRO seeks to extend the New Hires' non-solicitation agreement to cover thousands of Alliant employees across the globe, the overwhelming majority of whom never worked for Gallagher or do not even know the New Hires. The requested TRO would also harm the New Hires, who are **not** named as parties, by preventing them from working for Alliant for 21 days even though the alleged 21-day notice provisions in their agreements have expired.

 For these reasons, Alliant respectfully requests that the Court deny Gallagher's request for provisional relief in its entirety.

## II. Statement of Facts

## A. Gallagher Subjected the New Hires to a Toxic, Sexist Environment

 Long started at Gallagher in 2000 as an Account Executive. She left Gallagher in 2006 to work for another brokerage firm. In November 2014, she returned to Gallagher

as the Managing Director of the Midwest & Great Lakes Regions Global Construction Practice.[1] As Long grew her book of business and Gallagher failed to recognize her successes, Long began to realize Gallagher did not reward women equally. For example, in 2018, along with coworker Kelly Hogan, Long was the first woman at Gallagher to create an Advantage Program—the Construction Advantage Program. Initially, Gallagher rolled the program out regionally; in 2021, Gallagher expanded the program across the country.[2] However, unlike male colleagues who developed successful Advantage Programs, Long received no bonus.[3] In fact, instead of recognizing Long or Hogan, Gallagher honored a man.[4]

Gallagher also did not reward Long with a national or leadership role. For example, although Long, Peter Doyle, and Mike Pesch were all producers at one time, and even though Long brought in as much business as them, Gallagher awarded Doyle and Pesch with national roles but not Long.[5]

Gallagher mistreated Long in other ways. In March 2021, a dog attack left Long with serious injuries. Long asked Gallagher to help her continue working despite her disabilities by asking for reasonable accommodations, such as speech-to-text software and additional support staff. Gallagher ignored her requests for months. Then Gallagher gave Long software that did not work. And instead of giving her extra staff support, Gallagher's Ryan Isaacs texted Long that she was to blame for making her colleagues feel overworked and undercompensated. Long complained to HR about the situation, but her

---

[1] Ex. A (Long Decl. ¶¶ 2-5).

[2] Ex. A (Long Decl. ¶ 16); Ex. B (Hogan Decl. ¶ 3); Ex. C (Laeyendecker Decl. ¶ 5).

[3] Ex. A (Long Decl. ¶ 16).

[4] Ex. A (Long Decl. ¶ 16); Ex. B (Hogan Decl. ¶ 3); Ex. C (Laeyendecker Decl. ¶ 6). *See also* Ex. A (Long Decl. Ex. 2, 6.22.22 text from Long to Isaacs ["It's always guys over women, even though I have the proven track record of closing deals."]).

[5] Ex. A (Long Decl. ¶ 11).

concerns went unanswered.[6]

In February 2022, Jim McInerney, a Gallagher producer with just two years of insurance experience, tried to steal Long's clients. McInerney falsely represented he had the same high-level title as Long.[7] Long told management about McInerney's stunt, but Gallagher did nothing. Instead, Patrick Gallagher accused Long of being too "emotional."[8]

Things still got worse for Long. In March 2022, Isaacs and Jeff Devron met with Hogan and Jordan Laeyendecker to try to dig up dirt on Long and get them to blame Long for the women feeling overworked and under-supported. Hogan and Laeyendecker were hesitant to talk to Isaacs and Devron because they were worried they would take their words out of context or violate pledges of confidentiality. Their fears were realized when Isaacs and Devron shared an inaccurate version of their comments with Long. This incident fostered further discontent and distrust among Long's colleagues and with Gallagher's male-dominated leadership.[9]

Gallagher also mistreated the other New Hires:

- Patrick Gallagher once called Hogan a "charity case" because she used a wheelchair. He even "bet" Long that Hogan would not be successful as a producer. Isaacs also demeaned Hogan by callously telling her she would never be successful.[10]

- McInerney repeatedly belittled Laeyendecker by telling other employees she was his "administrative assistant." This offended Laeyendecker because she did not even work for McInerney; instead, she was an account executive with

---

[6] Ex. A (Long Decl. ¶¶ 6-10, 12).

[7] Ex. A (Long Decl. ¶ 17).

[8] Ex. A (Long Decl. ¶ 25); Ex. A (Long Decl. Ex. 3, 4.13.22 Gallagher text to Long ["You get emotional"]); Ex. A (Long Decl. Ex. 4, 7.8.22 Gallagher text to Long ("People dislike your *internal emotional politics*")).

[9] Ex. A (Long Decl. ¶¶ 12-14); Ex. B (Hogan Decl. ¶¶ 7-8); Ex. C (Laeyendecker Decl. ¶¶ 6-8).

[10] Ex. B (Hogan Decl. ¶¶ 5-6).

Opposition to Motion for Temporary Restraining Order and Preliminary Injunction

significant responsibilities. Male colleagues also used sexist language in describing Laeyendecker's work.[11]

- Gallagher failed to give Melissa Haggerty, a Client Service Manager, a promised promotion and bonus, apparently because of her pregnancy. Haggerty was doing the work of an Account Executive and repeatedly asked to be recognized for her output with an appropriate promotion and pay raise. Gallagher did not offer her a promotion until after she resigned in a desperate and too-late effort to retain her.[12]

- Even though Janet Schumacher was a part-time employee, she had to work full-time hours, which caused her stress and anxiety.[13]

- Taylor Gunnells has testified Gallagher did not provide the resources and support she needed to "succeed as a young woman and new member of the insurance industry."[14]

- Sara Arnold felt "stressed and overworked" because Gallagher "did not provide my colleagues or me with adequate personnel or resources necessary to be successful."[15]

## B. Gallagher's Mistreatment of Long Caused Her to Seek a New Job

In February 2022, Long decided to start answering calls from headhunters.[16] In February 2022, one recruiter called Long about working for Lockton and another pitched Alliant to her. Long met with people at both Lockton and Alliant. She also began asking Mowery questions about his work experience at Alliant and Mowery encouraged Long to

---

[11] Ex. C (Laeyendecker Decl. ¶ 3).

[12] Ex. D (Haggerty Decl. ¶¶ 4-11).

[13] Ex. E (Schumacher Decl. ¶¶ 3-4).

[14] Ex. F (Gunnells Decl. ¶ 3).

[15] Ex. G (Arnold Decl. ¶ 3).

[16] Ex. A (Long Decl. ¶¶ 19-20).

seriously consider Alliant. In April 2022, Long met with several Alliant employees. At this time, Long was also still in contact with Lockton.[17]

Long received the parameters of a possible offer from Alliant in May 2022. However, after coming down with COVID-19 in June 2022 and reflecting further, Long decided to give Gallagher one more chance. She approached members of Gallagher leadership, including Patrick Gallagher, during the week of July 4 to see if Gallagher would address the serious problems and discrimination she had experienced there. Patrick Gallagher asked Long to articulate what Gallagher needed to do to get her "back in the nest." Among other things, Long responded she wanted "respect for my 30 years experience and historical knowledge." Patrick Gallagher wrote to her that "People respect your talent" but "dislike your internal emotional politics, bedside manner, and constant unhappiness."[18] This insulting and belittling response was the final straw. Long resigned on July 11, 2022 and began working at Alliant the same day.[19]

## C. No New Hire Solicited Other Gallagher Employees or Clients

Before Long resigned, none of the New Hires solicited or encouraged each other to go work at Alliant. Long did not recruit or encourage or solicit any of the other seven women after she started at Alliant.[20]

Mowery was involved in recruiting the New Hires—many of whom were his former colleagues at Gallagher—to join him at Alliant. Mowery talked to Long about Alliant in the spring of 2022. In May, during a social lunch with Laeyendecker and Hogan, after they told him they were unhappy at Gallagher, Mowery suggested they consider a move to Alliant. On July 11, 2022, after learning Long had started at Alliant, Mowery called

---

[17] Ex. A (Long Decl. ¶¶ 21-22); Ex. H (Mowery Decl. ¶¶ 7-8).

[18] Ex. A (Long Decl. Ex. 4, 7.8.22 Gallagher text to Long).

[19] Ex. A (Long Decl. ¶¶ 25-26).

[20] Ex. A (Long Decl. ¶¶ 28-30, 32); Ex. B (Hogan Decl. ¶¶ 11-16, 23-24); Ex. C (Laeyendecker Decl. ¶¶ 9, 12); Ex. D (Haggerty Decl. ¶¶ 12, 14-15); Ex. F (Gunnells Decl. ¶¶ 6-8); Ex. G (Arnold Decl. ¶¶ 6-7); Ex. H (Mowery Decl. ¶¶ 14-16); Ex. I (Zaragoza Decl. ¶¶ 3, 5).

Schumacher, Zaragoza, and Arnold and encouraged them to consider Alliant. He asked if he could provide their names to Alliant's Bled Dizdari, and they all gave him their consent.[21] Alliant then followed up with phone calls that led to them receiving and accepting offers at Alliant.

As instructed by Alliant, none of the New Hires took any confidential information from Gallagher to use at Alliant. Nor have they solicited former Gallagher clients.[22]

## D. Gallagher's Brief Contains Numerous False Statements

Rather than focus on the facts of the New Hires' departures, Gallagher seeks to obtain provisional relief by trying to taint Alliant. But Gallagher's papers are littered with false and misleading statements. For example, Gallagher claims Alliant has "executed unlawful raids" in California, "directed its tortious conduct toward Gallagher in California," and that "[l]itigation commenced by Gallagher against Alliant is ongoing in California."[23] Gallagher omits that Judge Chen of the Northern District of California granted Alliant's Rule 12(b)(6) motion to dismiss, ruling that Gallagher's restrictive covenants at issue were void and unenforceable and that Gallagher's complaint failed to plead plausible claims against Alliant.[24] Gallagher's claims against producer Don Tarantino for breach of contract and misappropriation of trade secrets were also later dismissed, as were Gallagher's conspiracy theories of joint liability.

The other suits Gallagher mentions have no significance here. Gallagher references a lawsuit in Florida, but Gallagher never obtained injunctive relief there. And in the Texas case, Gallagher abandoned its first request for preliminary injunctive relief in 2020 after

---

[21] Ex. H (Mowery Decl. ¶¶ 10-13).

[22] Ex. A (Long Decl. ¶¶ 28-29, 31-36, 39); Ex. B (Hogan Decl. ¶¶ 17-24); Ex. C (Laeyendecker Decl. ¶¶ 14-15, 18-21); Ex. D (Haggerty Decl. ¶¶ 16-19); Ex. E (Schumacher Decl. ¶¶ 8-11); Ex. F (Gunnells Decl. ¶¶ 10-13); Ex. G (Arnold Decl. ¶¶ 8, 10-11); Ex. I (Zaragoza Decl. ¶¶ 8, 11-13).

[23] Complaint ¶¶ 15, 79, 83; Dkt. No. 9 at 8, 25.

[24] *See Gallagher v. Tarantino,* 498 F. Supp. 3d 1155 (N.D. Cal. 2020) (dismissing all claims against Alliant and finding Gallagher's non-competes unenforceable).

its motion to recuse the judge was denied, and its second request in 2021 was denied.[25]

In any event, Gallagher's smear campaign is irrelevant to these injunctive relief proceedings, which require a showing that (1) the New Hires engaged in wrongdoing (such as breaching agreements, fiduciary duties, or trade secret obligations), and (2) that Alliant is responsible for that wrongdoing. Gallagher's soliloquy about other lawsuits involving different employees, different contracts, different facts, and different state laws, and why Alliant is an alleged bad actor in general, cannot substitute for evidence of wrongdoing with respect to Alliant's hiring of the New Hires.

Gallagher repeatedly blasts Alliant's remediation program as a "sham," alleging the remediated materials are stolen and used by Alliant and that remediation is designed to conceal use of stolen information. Gallagher makes these unsupported allegations even though Gallagher knows Alliant never receives the information and that remediation is best practices.[26] Alliant has repeatedly informed Gallagher that its only involvement in the remediation process is to pay and arrange for counsel and a third-party forensic consultant to work with new hires to identify potential prior employer work information on its new hires' personal devices and accounts, so that the consultant can remove located information (while keeping preservation copies).[27] Alliant does not gain custody of its new hires' devices or accounts, or of the deleted materials.[28] Gallagher does not cite a shred of evidence to support its contention that Alliant gains possession of remediated materials.[29]

---

[25] *See* 4.30.21 Order, Ex. 1 (4.30.22 Order Denying Plaintiff's Application for Temporary Injunction, *Gallagher v. Pierce*, Cause No. 471-03866-2020 (Collin County, Texas)).

[26] Complaint ¶¶ 12, 69, 71, 90, 136; Dkt. No. 9 at 22.

[27] *See* Ex. K (*Gallagher v. Tarantino* 30(b)(6) Deposition Letter Regarding Remediation).

[28] Ex. L (Little Decl. ¶¶ 2-4).

[29] Gallagher, on the other hand, has exhibited a disturbing willingness to violate protective orders. In the Texas case, the parties entered into an Agreed Protective and Confidentiality Order (the "Texas Protective Order") that bars the use of any confidential materials disclosed during discovery outside of certain cases existing in 2020. (*See* Section 5.1 of the Texas Protective Order, Ex. 3, issued in *Arthur J. Gallagher v. Steven Pierce*, Cause No. 471-03886-2020 (Dist. Ct. Court of Collin Cnty., Tex.).) Gallagher knowingly and willfully

## III. Legal Standards: A TRO is a "Drastic Remedy"

It is well established that TROs and preliminary injunctions are "extraordinary and drastic remedies that should not be granted unless the movant, 'by a clear showing, carries the burden of persuasion.'"[30] To obtain a TRO, Gallagher must show a likelihood of success on the merits, that it has no adequate remedy at law, and that it will suffer irreparable harm in the absence of relief. To establish likelihood of success, Gallagher must show more than a mere "possibility of success."[31] Rather, Gallagher must

> "make a 'strong showing' of a likelihood of success on the merits ...
> 'A "strong" showing ... does not mean proof by a preponderance ...
> But it normally includes a demonstration of how the applicant
> proposed to prove the key elements of its case.'"[32]

This standard is tougher than the "better than negligible" standard that was "retired by the Supreme Court," and courts must not rely on cases applying that low bar.[33]

If Gallagher makes this showing, the Court must balance the irreparable harm Gallagher will suffer if its motion is denied against the harm Alliant will suffer if a TRO is granted.[34] "Finally, the Court decides whether the proposed injunction is in the public interest, which includes considering the potential impact on non-parties."[35]

---

violated the Texas Protective Order. In its Complaint, Gallagher refers to information disclosed in the Texas litigation and designated as "Attorneys' Eyes Only" by Alliant and therefore subject to the protections and restrictions in the Texas Protective Order. When Alliant demanded that Gallagher withdraw its publicly filed Complaint and remove the AEO information from its pleading, Gallagher's counsel admitted that some allegations in the Complaint were based on information learned from AEO documents produced in the Texas case, but nevertheless maintained Gallagher was entitled to use it in a public filing in this different and unrelated case. (Ex. S (Gerber Decl. Ex. 1. 7.28.22 R. Safer Email).) Alliant reserves all rights to seek appropriate remedies for Gallagher's contemptuous misconduct.

[30] *Elim Romanian Pentecostal Church v. Pritzker*, 2020 WL 2468194, at \*2 (N.D. Ill. May 13, 2020) (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)).

[31] *Aon v. Infinite Equity, Inc.*, 2021 WL 4192072, at \*6 (N.D. Ill. Sept. 15, 2021).

[32] *Aon*, 2021 WL 4192072, at \*6.

[33] *Illinois Republican Party v. Pritzker*, 973 F.3d 760, 763 (7th Cir. 2020).

[34] *Illinois Republican Party*, 973 F.3d at 762-63.

[35] *Aon*, 2021 WL 4192072, at \*6.

Gallagher's papers belie the notion that the instant circumstances require a TRO. For example, despite arguing its confidential information is in grave danger of being misused, Gallagher did not name a single New Hire as a defendant. Gallagher's failure to seek relief against them personally, and to instead attempt to smear Alliant with allegations about Alliant's conduct with respect to ***other hirings***, exposes that Gallagher has no evidence that any New Hire did anything wrong in accepting a job at Alliant, and that Alliant did nothing wrong in hiring them. This is nothing new for Gallagher. Gallagher has developed a reputation for being a "serial litigant that appears to sue to prevent competition in the marketplace nearly every time a professional tries to leave."[36]

## IV. Gallagher Cannot Show it is Likely to Succeed on the Merits

Gallagher's brief focuses on disparaging Alliant and is barren of any actual evidence that the New Hires engaged in misconduct and that Alliant is responsible for it. Nearly all of Gallagher's "evidence" consists of misrepresentations about Alliant's general practices as a company, interlocutory rulings from other lawsuits having nothing to do with this case, and speculative "information and belief" allegations.[37] But Gallagher cannot obtain injunctive relief on "information and belief" alone.[38] As detailed below, Gallagher has not made the required showing that it is likely to succeed at trial on its claims.

---

[36] *See* Ex. M, *ABD Insurance v. Arthur J. Gallagher*, (Suffolk MA., July 25, 2022), (ABD seeking "declaratory relief to prevent [Gallagher] from continuing to engage in a longstanding aggressive anticompetitive and anti-consumer campaign to prevent its professionals from moving between employers and to prevent its clients from choosing to work with the professionals of their choice at other firms").

[37] Complaint ¶¶ 85, 89, 90, 92, 97, 101, 106, 117, 136, 150.

[38] *See Bowles v. Montgomery Ward & Co.,* 143 F.2d 38, 42 (7th Cir. 1944) ("application for a preliminary injunction cannot be based on information and belief"); *Kinney v. Fed. Sec., Inc.,* 2001 WL 219691, at *1 n.2 (N.D. Ill. Mar. 6, 2001) (denying petition for temporary injunction because factual assertions based on information and belief "lack[] probative value on the TRO issues").

## A. Gallagher Has Not Shown it is Likely to Succeed on Its Tortious Interference with Contract Claim

To prevail on its interference with contract count, Gallagher must prove "the existence of a valid and enforceable contract" and Alliant's "intentional and unjustified inducement of a breach."[39] Gallagher cannot prove these elements.

## 1. The restrictive covenants are unenforceable

The customer non-solicit/non-acceptance/non-service provision in the New Hires' agreements appears to be the lynchpin for Gallagher's request for a TRO that would bar Alliant from soliciting Gallagher's customers. But Gallagher is unlikely to establish that this provision is enforceable. Under Illinois law, "courts disfavor and closely scrutinize restrictive covenants because they are 'repugnant to the public policy encouraging an open and competitive marketplace.'"[40] In *Reliable Fire Equip. Co. v. Arredondo,* the Illinois Supreme Court held that restrictive covenants are only enforceable if they are no more restrictive than necessary for the protection of a legitimate business interest of the employer.[41] The court declared that, in analyzing "whether a legitimate business interest exists," a court should consider "the totality of the facts and circumstances of the individual case. Factors to be considered in this analysis include, but are not limited to, the near-permanence of customer relationships … ."[42] To determine whether an employer's customers are "near permanent," Illinois courts typically apply the "nature of the business" test articulated in *Office Mates 5, North Shore, Inc. v. Hazen*.[43] Generally, the near-permanency test turns on the nature of the business involved.[44]

---

[39] *Doctor's Data, Inc. v. Barrett*, 170 F. Supp. 3d 1087, 1156 (N.D. Ill. 2016).

[40] *Grand Vehicle Works Holdings Corp. v. Frey*, 2005 WL 1139312, at *6 (N.D. Ill. May 11, 2005).

[41] *Reliable Fire Equip. Co. v. Arredondo*, 358 Ill. Dec. 322, 326 (2011).

[42] *Reliable Fire*, 358 Ill. Dec. at 332.

[43] *Office Mates 5, North Shore, Inc. v. Hazen*, 234 Ill. App. 3d 557, 568, (1992).

[44] *Office Mates 5*, 234 Ill. App. 3d at 568.

Decisions applying the "near permanent" test to the insurance brokerage industry have found the test not satisfied. In *Mercator Risk Servs., Inc. v. Girden*, a New York District Court applying Illinois law held that Mercator's wholesale insurance brokerage business did not have near-permanent customers. The court based its decision on the fact that the employee was engaged in sales, and on the employer's admission that "Mercator's customers are not loyal because they would move to another wholesale insurance broker if it submitted a lower quote."[45] The court therefore struck down a former employee's non-solicitation clause because it was not necessary to protect a legitimate business interest. In *Brown & Brown, Inc. v. Ali*, this Court found that the plaintiff, a national brokerage like Gallagher, could not show a legitimate interest in a near-permanent relationship with its customers, stating a "near-permanent relationship with customers is generally absent from businesses engaged in sales."[46] The court explained that "the evidence shows that the insurance industry is highly competitive, and that customers often move their business to other entities or even do business with various entities simultaneously when it is to their financial benefit to do so."[47]

Here, Gallagher acknowledges in its Complaint the "highly competitive" nature of the insurance brokerage industry that *Brown & Brown* identified as a dispositive factor.[48] Moreover, Gallagher has not shown that any of the clients which the non-solicitation provision purports to bar the New Hires from soliciting, were "near permanent" relationships. To the contrary, Long previously left and returned to Gallagher, and both times clients followed her, which underscores that the relationships were not "nearly permanent" to Gallagher but were instead "nearly permanent" to Long.[49]

---

[45] *Mercator Risk Servs., Inc. v. Girden*, 2009 WL 466150, at *7 (S.D.N.Y. Feb. 23, 2009).

[46] *Brown & Brown, Inc. v. Ali*, 592 F. Supp. 2d 1009, 1044 (N.D. Ill. 2009) (citing *Appelbaum v. Appelbaum*, 355 Ill. App. 3d 926, 935 (2005)).

[47] *Brown & Brown*, 592 F. Supp. 2d at 1045.

[48] Complaint ¶ 30.

[49] Ex. A (Long Decl. ¶¶ 4-5).

The "non-acceptance of business/non-service provision," which is far broader than a non-solicit, is also unenforceable.[50] Illinois courts have declared that "hardship to the public is one of the factors relevant to whether a restriction on trade is reasonable."[51] Gallagher's asserted covenants impose a hardship on the public by forcing clients to either continue to work with Gallagher with unfamiliar personnel or take their business to a third party with whom they have no prior relationship or experience. Recognizing this, courts applying Illinois law have found restrictions on accepting or servicing business to be injurious to the public interest:

- In *Hay Group, Inc. v. Bassick,* the court held that a restrictive covenant prohibiting a former employee from "soliciting or doing business directly or indirectly with any entity that was a client of [the employer]" was overbroad and unenforceable, noting that "a prohibition on solicitation alone is more likely to be upheld than one prohibiting a former employee from doing any business at all (even at the client's behest) with the employer's clients, as that prohibition would restrict the rights of the client without its consent."[52]

- In *Abbott-Interfast Corp. v. Harkabus*, the court noted that "hardship to the public is one of the factors relevant to whether a restriction on trade is reasonable," and declared "it is more difficult for an employer to justify prohibiting its former employees from accepting orders from the employer's clients than merely prohibiting its employee from soliciting such clients. Prohibiting a former employee from accepting orders or doing business with a customer places restrictions on that customer even though it is not a party

---

[50] Gallagher claims that Alliant's employment agreement has "substantially similar" restrictive covenants is another one of their false statements. Alliant does *not* have a no service or no accept—it only prohibits solicitation. This is because Alliant understands and respects client choice and broker goodwill.

[51] *Abbott-Interfast Corp. v. Harkabus*, 250 Ill. App. 3d 13, 19 (2nd Dist. 1993).

[52] *Hay Group, Inc. v. Bassick,* 2005 WL 2420415, at *6 (N.D. Ill. Sept. 29, 2005).

Opposition to Motion for Temporary Restraining Order and Preliminary Injunction

to the noncompetition agreement."[53]

- In *SKF USA, Inc. v. Bjerkness*, the court found that the plaintiff's "proposed injunction barring Defendants from soliciting or performing services for any of SKF's actual or potential customers for two years sweeps far too broadly." The court held that "such an injunction would be injurious to the public. An injunction that would prevent ERSI from performing services for the customers who have already switched over to ERSI would be unjust to the customers, both because they chose to conduct business with ERSI and because they would then likely be forced to go back to a reliability services provider (SKF) with whom their relationship may now be precarious. Genuine competition within an industry is generally viewed as beneficial to the public as a whole, provided that competition can be achieved through legitimate means and without the violation of trade secret law or the improper use of confidential information."[54]

- In *Aon Risk Servs. Co. v. Alliant*, the court declined to enjoin Alliant and the individual defendants from accepting or servicing business from Aon clients. The court noted "Alliant has a point" that fully enforcing Aon's restrictive covenants would be contrary to the public interest because it denies "clients their free choice of who to work with."[55]

Courts in other jurisdictions have issued similar rulings.[56]

---

[53] *Abbot-Interfast,* 250 Ill. App. 3d at 19-20.

[54] *SKF USA, Inc. v. Bjerkness,* 636 F. Supp. 2d 696, 716 (N.D. Ill. 2009).

[55] *Aon Risk Servs. Co. v. Alliant*, 415 F. Supp. 3d 843, 852-53 (N.D. Ill. 2019).

[56] *See, e.g., Getman v. USI Holdings Corp.*, 2005 WL 2183159 *3 (Mass. Super. Sept. 1, 2005) (denying a TRO very similar to the one requested here, reasoning that TRO would impermissibly burden clients, who "were informed that, should Getman leave USI, they would be barred from continuing to do business with him at his new employ for three years."); *Mercer Health & Benefits LLC v. DiGregorio*, 307 F. Supp. 3d 326, 355 (S.D.N.Y. 2018) (denying in part motion for preliminary injunction, finding "There is no justification for enjoining any of the Individual Defendants or any of the Lockton entities from servicing or soliciting clients who have already chosen to retain their services"); *Christian v. Veritiv Corp.*,

The two-year scope of the restrictive covenants is also not enforceable because it is an unreasonable "time and place" restriction. Insurance policies renew annually, so at most the temporal restriction should last for a year.[57]

## 2. Gallagher has failed to show it is likely to prove a breach

Gallagher has also failed to show it is likely to prove that the New Hires breached their agreements with Gallagher. First, as noted above, Gallagher has offered no evidence showing the New Hires solicited any customer or each other. Gallagher also lacks evidence regarding alleged misuse of Gallagher's purported confidential information:

- Gallagher makes no claim that half of the New Hires—Arnold, Schumacher, Haggerty, and Rosario Zaragoza—ever sent themselves any confidential information. They have testified they have no such information in their possession or have not used any such information at Alliant.[58]

- Despite Gallagher's hyperbolic allegations, Gallagher has no evidence Gunnells sent confidential information to personal email accounts after she

---

[57] 2014 WL 6657700, at *5 (S.D. Ill. Nov. 24, 2014) (court, applying Missouri law, denied motion for preliminary injunction because such relief "would harm the public interest because doing so would suppress competition in the marketplace, thereby harming non-party purchasers and consumers for no lawful reason"); *Kanan, Corbin, Schupak & Aronow, Inc. v. FD Int'l Ltd.*, 8 Misc. 3d 412, 422 (Sup. Ct. N.Y. Co. 2005) (denying motion for preliminary injunction, finding that an "injunction will not serve to retrieve these lost clients, and the court cannot compel these clients to return to [the plaintiff]" and that "an injunction will not serve to prevent [current clients] from exercising their own preference by moving elsewhere"); *Bayly, Martin & Fay, Inc. v. Pickard,* 780 P.2d 1168, 1175 (Okla. 1989) ("Where no active solicitation has occurred, restraint on an insurance agent's dealings with former clients is unenforceable."); *New Haven Tobacco Co. v. Perrelli,* 528 A.2d 865, 867 (Conn. App. Ct. 1987) (noting that "the burden inflicted on the public interest by the use of an 'antisales' clause is greater than the one imposed by an 'antisolicitation' clause" and remanding to the trial court to consider the effect of the asserted covenants on the public interest).

[57] *See, e.g., Getman,* 2005 WL 2183159 *4 (limiting noncompete in similar circumstances to one year because one year "is more than adequate time for [plaintiff] to have a fair opportunity to convince [the broker defendant] clients that the services enjoyed during [the broker defendant's] tenure was more the result" of the plaintiff than the broker).

[58] Ex. D (Haggerty Decl. ¶¶ 16-17); Ex. E (Schumacher Decl. ¶¶ 8-9, 11); Ex. G (Arnold Decl. ¶¶ 8-11); Ex. I (Zaragoza Decl. ¶¶ 8, 10-11).

started talking to Alliant. Gunnells did not talk to Alliant until July 11, 2022, and all of the emails identified by Gallagher predate that. Furthermore, Gunnells has testified that no one ever instructed her to send documents to herself for Alliant's benefit. The evidence indicates Gunnells sent documents to herself in the ordinary course because she works remotely out of a home office and she could not figure out how to print from her computer, so she sent documents to her iPhone. As a new employee at Gallagher (she joined in October 2021), she wanted to do a good job and found it helpful to have hard copies, particularly when her monitors became too crowded.[59]

▪ While Hogan and Laeyendecker did talk to Mowery before they resigned, Gallagher has offered no evidence or even an allegation that they sent suspicious emails to personal accounts after they talked to Mowery, and they have testified they did not do so. Nearly all the documents Gallagher says Long sent to herself were sent when she was still investigating opportunities at Lockton and Alliant. There is no support for the allegation that she sent these documents, or any others, to herself to benefit Alliant. In fact, one of the supposedly confidential documents she sent to herself contained salary information for employees Long paid out of her own earnings.[60]

▪ Gallagher, in accusing the New Hires of acting improperly by sending emails to personal accounts, omits that Gallagher instructed its employees to send emails to personal accounts due to a computer hack of its systems in September 2020—and did not withdraw that instruction until June 2022..

▪ The New Hires have returned all Gallagher-issued devices and their personal

---

[59] Ex. F (Gunnells Decl. ¶¶ 6, 11, 14-15).

[60] Ex. A (Long Decl. ¶¶ 34-35); Ex. B (Hogan Decl. ¶¶ 17-20, 22); Ex. C (Laeyendecker Decl. ¶¶ 14-16, 18-19).

Opposition to Motion for Temporary Restraining Order and Preliminary Injunction

devices and electronic accounts have been subjected to remediation.[61]

### 3. Gallagher has no evidence Alliant induced wrongful conduct

Gallagher also failed to submit evidence that **_Alliant_** induced any of the New Hires to breach any agreement. "'[I]nducement' in the context of a claim for intentional interference with contractual relations requires more than the knowledge that one's conduct is substantially certain to result in one party breaking its contract with another."[62] "[I]nducement must be shown through some active persuasion or encouragement."[63] Thus, inducement cannot be established by showing that a defendant "'merely created a condition that opened the way for the [the employees] to breach their contracts.'"[64]

Before addressing Gallagher's meritless accusations against Alliant, it is important to consider the steps Alliant **_did take_** to **_prevent_** the New Hires from breaching any obligation or duty purportedly owed to Gallagher. For example, during its recruitment of the New Hires, required the New Hires to review and execute Alliant's Prospective Employee Departure Protocols. These protocols instructed them, among other things: not to improperly take, disclose, use, or otherwise misappropriate any trade secret, proprietary, or confidential information of Gallagher; not to transfer Gallagher's trade secret, proprietary, or confidential information through any means; and not to bring or transfer any Gallagher trade secret, proprietary, or confidential information to Alliant.

---

[61] Ex. A (Long Decl. ¶¶ 37-39, 41); Ex. B (Hogan Decl. ¶¶ 22, 24); Ex. C (Laeyendecker Decl. ¶¶ 18-19, 21); Ex. D (Haggerty Decl. ¶¶ 16-17, 19); Ex. E (Schumacher Decl. ¶¶ 8-9, 11); Ex. F (Gunnells Decl. ¶¶ 10-13); Ex. G (Arnold Decl. ¶¶ 8, 11); Ex. I (Zaragoza Decl. ¶¶ 9, 11, 13); Ex. L (Little Decl. ¶¶ 4-5).

[62] _Pampered Chef v. Alexanian_, 804 F. Supp. 2d 765, 802 (N.D. Ill. 2011).

[63] _Zeigler Auto Grp. II, Inc. v. Chavez_, 2020 WL 231087, at *9 (N.D. Ill. Jan. 15, 2020) (citation omitted).

[64] _Pampered Chef_, 804 F. Supp. 2d at 802 (citation and quotation omitted).

The New Hires agreed to these protocols and abided by them.[65] Before the New Hires started at Alliant, Alliant arranged to have them work with counsel and a forensics consultant to analyze the contents of the New Hires' devices and electronic accounts and to permanently remove files found to contain sensitive Gallagher information (after the forensics consultant created a preservation image).[66] Alliant also implemented IT safeguards to prevent the transfer of any materials to Alliant's systems through emails, portable storage devices, etc.[67]

Given Alliant's "best practices" efforts to avoid misappropriation by its New Hires, it is not surprising that Gallagher has not submitted any evidence that Alliant induced the New Hires to do anything more than leave Gallagher—which is not a breach of any agreement. Gallagher suggests (without proof) that Alliant induced the New Hires to breach their 21-day notice provision because the New Hires submitted "nearly identical" resignation notices, but this ignores the reasons the women gave in their notices for leaving—that they wanted to get out of Gallagher as soon as possible because the workplace was toxic.[68]

Gallagher only offers unsupported speculation that Alliant induced the New Hires to solicit each other to leave Gallagher. The evidence of record indicates that is not the case. As previously discussed, none of the New Hires spoke to Long about moving to Alliant, and all of them have testified that Alliant did not encourage any of them to solicit each other. They left on their own accord to escape a toxic environment, not because of any grand conspiracy among themselves and people at Alliant.

---

[65] Ex. A (Long Decl. ¶ 41); Ex. B (Hogan Decl. ¶¶ 22, 24); Ex. C (Laeyendecker Decl. ¶ 21); Ex. D (Haggerty Decl. ¶ 19); Ex. E (Schumacher Decl. ¶ 11); Ex. F (Gunnells Decl. ¶ 13); Ex. G (Arnold Decl. ¶¶ 8, 10-11); Ex. I (Zaragoza Decl. ¶¶ 11-13).

[66] Ex. L (Little Decl. ¶¶ 2-5).

[67] Ex. R (Andrada Decl. ¶¶ 3-6).

[68] Ex. A (Long Decl. ¶¶ 6-18, 24-25); Ex. B (Hogan Decl. ¶¶ 3-9, 13); Ex. C (Laeyendecker Decl. ¶¶ 3-8); Ex. D (Haggerty Decl. ¶¶ 5-11, 13); Ex. E (Schumacher Decl. ¶¶ 3-4); Ex. F (Gunnells Decl. ¶¶ 3-5); Ex. G (Arnold Decl. ¶ 3).

Similarly, Gallagher's allegations of client solicitation are also founded on Gallagher's imaginative speculation. The New Hires have not solicited clients. The evidence shows that Mowery, who started working at Alliant in 2018 after spending several years at Gallagher, solicited Gallagher clients he knew from his previous experience working with Long at Gallagher, or that Alliant's Matt Walsh contacted clients he knew (none of which have come to Alliant).[69]

Finally, Gallagher's allegation that Alliant directed the New Hires to breach a "Mobile Device Agreement" by failing to provide Gallagher with unfettered access to their **personal** mobile devices is unsupported. Although it would be entirely reasonable for the New Hires to refuse to provide Gallagher with **direct** access to their personal mobile devices, Gallagher has no evidence that Alliant even knew of any "Mobile Device Agreement," let alone directed anyone to ignore it.

## B. Gallagher Has Not Shown it Is Likely to Succeed on Its Tortious Interference with a Business Expectancy Claim

To succeed on its claim for tortious interference with prospective economic advantage, Gallagher must establish Alliant's "purposeful interference" that "prevents the plaintiff's legitimate expectancy from ripening into a valid business relationship."[70] For this "purposeful interference" element, liability attaches only if Alliant utilized "improper competitive strategies that employ fraud, deceit, intimidation, or deliberate disparagement."[71]

## 1. Gallagher can make no claim for interference with clients

"To satisfy the first element of tortious interference, a plaintiff must specifically

---

[69] Ex. H (Mowery Decl. ¶¶ 4, 15-18).

[70] *Quantum Foods, LLC v. Progressive Foods, Inc.*, 2012 WL 5520411, at *2 (N.D. Ill. Nov. 14, 2012) (citations and quotations omitted).

[71] *Imperial Apparel, Ltd. v. Cosmo's Designer Direct, Inc.*, 227 Ill. 2d 381, 392, (2008).

identify the customers" with whom plaintiff alleges a business expectancy.[72] "Merely providing proof of a past customer relationship is not sufficient to prove a 'reasonable expectation' of a business relationship in the future."[73] Here, Gallagher has failed to identify the clients with whom it allegedly had a business expectancy.

## 2. Gallagher has submitted no evidence showing Alliant wrongfully interfered with Gallagher's business expectancy

The only "facts" Gallagher alleges in support of its tortious interference claim is that Alliant allegedly offered the New Hires "inflated compensation." Of course, there is nothing "improper" about offering a competitor's at-will employees more money—even "inflated compensation"—to leave for another job. As one court stated: "offering a better deal isn't a tort. It's capitalism."[74] Had Gallagher paid its female employees a fair wage, this would not have been an issue for Gallagher. It chose not to do so.

Nor did Gallagher submit any evidence establishing that the compensation was "inflated." As so-called "evidence," Gallagher references Haggerty's resignation note in which she wrote that "Alliant made me an offer I couldn't refuse and I accepted it."[75] But Gallagher offered Haggerty the ***same compensation*** that Alliant had offered her when she resigned, and then after she declined, Gallagher offered her even ***more compensation*** than Alliant offered.[76] If anyone was offering "inflated" compensation, it was Gallagher. But Haggerty rejected Gallagher's "inflated" offer because even inflated compensation does not overcome pregnancy discrimination.

Gallagher has also failed to establish it had an expectancy that the New Hires would

---

[72] *Instant Tech., LLC v. DeFazio*, 40 F. Supp. 3d 989, 1020 (N.D. Ill. 2014) (finding plaintiff failed to prove a requisite element of tortious interference with a business expectancy where plaintiff did not name a "specific client" from who they expected future business).

[73] *Instant Tech.*, 40 F. Supp. 3d at 1020.

[74] *See Brinley Holdings Inc. v. RSH Aviation, Inc.*, 2022 WL 180571, at *32 (N.D. Ill. Jan. 20, 2022).

[75] Dkt. No. 9-15 at p. 2.

[76] Ex. D (Haggerty Decl. ¶ 20).

remain with Gallagher. To state a tortious interference claim as applied to an employment relationship, Gallagher must show that "both parties would have been willing and desirous of continuing the employment relationship for an indefinite period of time."[77] As previously discussed, several of the New Hires were disgruntled because Gallagher had discriminated against them and mistreated them, and these complaints evidence that those employees were justifiably not "desirous" of continuing the employment relationship for an indefinite period of time.[78] Moreover, several of the New Hires were seeking employment outside of Gallagher even before Alliant contacted them.[79] And Gallagher's alleged expectation that Long and Haggerty would stay at Gallagher is unreasonable given that both had a history of leaving one company for another.[80]

### 3.  Alliant may lawfully contact Gallagher's clients or employees

As to Alliant soliciting Gallagher clients, Gallagher submits only **one** piece of "evidence": that an unnamed client told someone at Gallagher that someone at Alliant supposedly contacted them and said Gallagher could not support them.[81] This apparently concerns calls made by Walsh or Mowery to clients. Both have testified they did not tell any Gallagher clients that Gallagher was no longer capable of servicing their accounts.[82] In any event, this allegation does not support Gallagher's claim. No principle of law prohibited Alliant from soliciting clients serviced by Gallagher; both companies are entitled to, and do, solicit each other's clients. Indeed, under Illinois law, it is settled that

---

[77] *Gaynor v. Am. Ass'n of Nurse Anesthetists*, 2015 IL App (1st) 150557-U, ¶ 76.

[78] *See Ali v. Shaw*, 481 F.3d 942, 946 (7th Cir. 2007) (affirming district court's grant of summary judgment for defendant employer where plaintiff claimed that a third party had tortiously interfered with her employment relationship when she was fired by her employer, evidencing that employer was no longer "willing and desirous" of a continued employment relationship, and her employer had a legitimate justification for firing her).

[79] Ex. A (Long Decl. ¶¶ 19-20); Ex. B (Hogan Decl. ¶ 10); Ex. C (Laeyendecker Decl. ¶ 8).

[80] Ex. A (Long Decl. ¶¶3-5); Ex. D (Haggerty Decl. ¶ 2).

[81] Dkt. No. 9 at p. 30.

[82] Ex. H (Mowery Decl. ¶ 18); Ex. Q (Walsh Decl. ¶¶ 3-6).

"commercial competitors are privileged to interfere with one another's prospective business relationships provided their intent is, at least in part, to further their businesses and is not solely motivated by spite or ill will."[83] Thus, because Gallagher has "not submitted any evidence of improper or unlawful conduct in [Alliant's] interference with" Gallagher's business relationships, which is "the key element of a tortious interference with a prospective economic advantage claim, it follows that [Gallagher has] not shown the requisite likelihood of success on the merits of this cause of action."[84]

## C. Gallagher Has Not Shown it is Likely to Succeed on Its Claim for Aiding and Abetting Breach of Fiduciary Duty

To establish its claim for aiding and abetting, Gallagher must show the New Hires breached their fiduciary duty to Gallagher, that Alliant knew such conduct "constitute[d] a breach of duty," and that Alliant gave "substantial assistance or encouragement" to the New Hires in breaching a fiduciary duty.[85] This claim fails for multiple reasons.

First, Gallagher has not demonstrated it is likely to establish the New Hires were fiduciaries. Gallagher offers no case law for the proposition that because the New Hires were "agents and employees of Gallagher," they owed Gallagher a fiduciary duty. Indeed, "A contractual relationship. . . on its own does not establish a fiduciary relationship."[86]

Second, Gallagher has no evidence the New Hires breached a supposed fiduciary duty. The alleged breaches are that the New Hires "solicit[ed] Gallagher's clients" and "their colleagues to join Alliant."[87] But Gallagher has provided no evidence showing the

---

[83] *Imperial Apparel,* 227 Ill. 2d at 392. *See also Pampered Chef*, 804 F. Supp. 2d 808 ("[T]he process known as competition, which though painful, fierce, frequently ruthless, sometimes Darwinian in its pitilessness, is the cornerstone of our highly successful economic system." (citations and quotations omitted)).

[84] *Holbrook Mfg. LLC v. Rhyno Mfg. Inc.*, 497 F. Supp. 3d 319, 341 (N.D. Ill. 2020).

[85] *Overwell Harvest Ltd. v. Widerhorn*, 2019 WL 398700, at *6 (N.D. Ill. 2019) (quoting *McMahan v. Deutsche Bank AG*, 938 F. Supp. 2d 795, 809 (N.D. Ill. 2013)) (emphasis added).

[86] *RSK Enterprises, LLC v. Comcast Spectacor, L.P.*, 2018 WL 319318, at *6 (N.D. Ill. Jan. 8, 2018).

[87] Dkt. No. 9 at 31.

New Hires solicited Gallagher's clients or each other, let alone while the alleged solicitor was employed by Gallagher. At most, Gallagher has alleged some Alliant employees other than the New Hires solicited Gallagher clients, but those employees, of course, owed no fiduciary duties to Gallagher.

The other alleged breach of a fiduciary duty is the allegation that Long extended the renewal date for one of her clients.[88] Gallagher's allegation is baseless. Long extended the insurance renewal without obtaining any compensation for Gallagher, not because she was acting for Alliant, but because the client could not pay for the renewal due to a financial hardship. Long did what she could to address the client's needs.[89]

Third, Gallagher has not provided any facts that ***Alliant*** substantially assisted or encouraged the New Hires in any purported breach. Gallagher's only assertion against Alliant is that Alliant paid the New Hires more and, on information and belief, offered to indemnify them. Gallagher offers no support that such actions, either as a factual matter or as a matter of law, amounted to "substantial assistance or encouragement" to the New Hires in breaching fiduciary duties. Indeed, Gallagher's theory of aiding and abetting liability would expose any employer who offered an employee greater compensation to an aiding and abetting claim.

Finally, if anything, the evidence, as previously discussed, indicates Alliant actively sought to ***prevent*** any possible breach of duty, including by advising the New Hires to continue to serve Gallagher's best interests while working for Gallagher, to not take Gallagher information in anticipation of departure, and to not solicit either fellow employees or clients.

## D. Gallagher Has Not Shown It Has a Plausible Conspiracy Claim

"To state a claim for civil conspiracy, a plaintiff must allege an agreement and a

---

[88] Dkt. No. 9 at 31 (citing Complaint ¶ 98).

[89] Ex. A (Long Decl. ¶ 33).

tortious act committed in furtherance of that agreement."[90] A "claim for civil conspiracy only exists where one of the parties to the conspiracy commits some act in furtherance of the agreement which is itself a tort."[91]

As a threshold matter, Gallagher's conspiracy claim fails because its tort claims fail. Moreover, Gallagher has not offered any evidence that Alliant conspired with the New Hires to do anything wrong. Gallagher's vague conspiracy cause of action appears to assert Alliant was part of some multipronged conspiracy with not only the eight New Hires, but other unidentified "co-conspirators, known and unknown." The Complaint, however, does not identify what role each of these many parties, both identified and not, played in the conspiracy, how they reached a meeting of the minds, and the particular acts taken in furtherance of the conspiracy. Alliant is not responsible for creating the hostile work environment at Gallagher that caused the New Hires to leave.

## E. Gallagher's Claims are Preempted by ITSA

Common law claims are preempted by the Illinois Trade Secrets Act when they rest on conduct that is said to misappropriate trade secrets ***or confidential information***.[92] This is true "even when the alleged 'trade secret' does not fall within the Act's definition."[93] The key consideration in evaluating whether a tortious interference claim is preempted is whether the claim is dependent on the existence of the allegedly misappropriated trade secret.[94] In fact, "ITSA preempts claims of misappropriation of confidential information even if that information does not rise to the level of a trade secret."[95]

---

[90] *Lewis v. Lead Indus. Ass'n*, 178 N.E.3d 1046, 1053 (Ill. 2020).

[91] *Servpro Indus., Inc. v. Schmidt*, 1997 WL 158316, at *15 (N.D. Ill. Mar. 31, 1997).

[92] *American Center for Excellence in Surgical Assisting, Inc., v. Common College District 502*, 190 F. Supp. 3d. 812, 822 (N.D. Ill. 2016).

[93] *American Center,* 190 F. Supp. 3d at 823 (quoting *Spitz v. Proven Winners North America, LLC*, 759 F.3d 724, 733 (7th Cir. 2014)).

[94] *Arjo, Inc. v. Handicare USA, Inc.*, 2018 WL 5298527, *8 (N.D. Ill. 2018).

[95] *Inmar, Inc. v. Vargas*, 2018 WL 6716701, *10 (N.D. Ill 2018).

The central thrust of Gallagher's complaint is that Alliant encouraged the New Hires to take Gallagher's trade secrets and confidential information and use it for Alliant's benefit. Of the few allegations Gallagher makes specific to the New Hires, almost all of them involve the New Hires sending allegedly confidential information to themselves.[96] The Complaint further alleges "the only logical inference is that the Resigning Employees forwarded the aforementioned Confidential Information with Alliant's encouragement and for Alliant's benefit."[97] That Gallagher strategically refrains from alleging the New Hires misappropriated trade secrets has no bearing on this issue. Indeed, the only logical inference is Gallagher is alleging tortious and fiduciary breaches premised on the New Hires' alleged misappropriation of trade secrets and confidential information. Thus, as a matter of law, ITSA preempts Gallagher's common law claims.[98]

ITSA also preempts Gallagher's conspiracy claim. As Gallagher well knows, in *Gallagher v. Tarantino*, Judge Chen ruled that the California Uniform Trade Secrets Act, California's version of the UTSA (just as ITSA is Illinois's version of the UTSA), preempts allegations of a conspiracy.[99]

## V.  No Provisional Relief Should Issue Because Gallagher Has an Adequate Remedy at Law and Cannot Show Irreparable Harm

"Irreparable harm is harm that is 'not fully compensated or avoidable by the issuance of a final judgment (whether a damages judgment or a permanent injunction, or both) in

---

[96] Complaint ¶¶ 96, 97, 101, 103-115.

[97] Complaint ¶ 116.

[98] *See Inmar,* 2018 WL 6716701, *10 (holding that tortious interference and civil conspiracy claims premised on the misappropriation of trade secrets were preempted by the ITSA); *Higher Gear Grp., Inc. v. Rockenbach Chevrolet Sales, Inc.*, 223 F. Supp. 2d 953, 960 (N.D. Ill. 2002) (same); *Segerdahl Corp. v. Ferruzza*, 2019 WL 77426, *7 (N.D. Ill. 2019) (where a conspiracy claim is in conjunction with the alleged misappropriation of trade secrets, the conspiracy claim is preempted); *Thomas & Betts Corp. v. Panduit Corp.*, 108 F. Supp. 2d 968, 974 (N.D. Ill. 2000) (same).

[99] Ex. N, Amended Order Granting in Part and Denying in Part Defendants' Motion for Partial Summary Judgment at 22-25, Dkt. No. 110, *Gallagher v. Tarantino*, No. 20-5505 (N.D. Cal. July 27, 2022).

Opposition to Motion for Temporary Restraining Order and Preliminary Injunction

the plaintiff's favor.'"[100] The "possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm."[101] Gallagher "cannot obtain a preliminary injunction by speculating about hypothetical future injuries."[102]

Here, Gallagher has an adequate remedy at law in the form of a money damages award at trial. It is well settled that alleged harms are not irreparable if they are fully compensable by money damages. The value of the business Gallagher has lost or may lose to Alliant (including any associated goodwill) as a purported consequence of Alliant's hiring of the New Hires can be calculated to a reasonable degree of certainty.[103]

As proof positive, Long and Gallagher previously were involved in a lawsuit alleging Long breached her restrictive covenants by soliciting Gallagher clients when she left Gallagher in 2006—and the parties settled that case for a specific dollar amount, assigning specific values to particular clients.[104] Gallagher makes the same allegations here—and the same remedy—money damages—can compensate Gallagher if Gallagher establishes liability at trial.

Further proof of this can be found in Gallagher's acquisition activities. According to Gallagher's 10-K for 2021, Gallagher completed 38 acquisitions in 2021, at a total cost of $4.67 billion.[105] In deciding what to pay for each acquisition, Gallagher had to value the

---

[100] *Aon*, 2021 WL 4192072, at *25 (quoting *Kraft Foods Group Brands LLC v. Cracker Barrel Old Country Store, Inc.*, 735 F.3d 735, 740 (7th Cir. 2013)).

[101] *D.U. v. Rhoades*, 825 F.3d 331, 338-39 (7th Cir. 2016).

[102] *E. St. Louis Laborers' Local 100 v. Bellon Wrecking & Salvage Co.*, 414 F.3d 700, 705-06 (7th Cir. 2005).

[103] *Life Spine, Inc. v. Aegis Spine, Inc.*, 8 F.4th 531, 546 (7th Cir. 2021) ("harm stemming from lost customers or contracts may be quantifiable if the lost customers or contracts are identifiable"); *Pampered Chef*, 804 F. Supp. 2d at 806 (lost sales "can be quantifiable and remedied with an award of damages").

[104] Ex. O, Plaintiffs' Original Complaint ¶¶ 7-12, *Arthur J. Gallagher & Co. v. Long*, No. 2008L011088 (Cook Cnty, Ill. Cir. Ct.).

[105] Gallagher 10-K at 80, Ex. P.

firm it was acquiring, including the value of its book of business and its associated goodwill. In doing these valuations, Gallagher used established valuation methodologies. Gallagher published a table in its 2021 10-K, reproduced below, that itemizes values for, among other things, "Goodwill," "Expiration lists," and "Non-compete agreements."[106]

| | AGH | BWG | LDG | EDW | MUA | WRE | Thirty-two Other Acquisitions | Total |
|---|---|---|---|---|---|---|---|---|
| Cash and restricted cash | $ 32.8 | $ 24.9 | $ 0.7 | $ 2.7 | $ 5.8 | $ 748.7 | $ 24.5 | $ 840.1 |
| Premiums and fees receivable | 111.4 | 8.7 | 7.8 | 8.2 | 4.0 | 5,410.8 | 68.4 | 5,619.3 |
| Other current assets | 0.6 | 6.6 | 8.0 | 3.7 | 2.4 | 41.4 | 4.4 | 67.1 |
| Fixed assets | 7.4 | 3.8 | — | 0.3 | 0.3 | 51.5 | 0.3 | 63.6 |
| Noncurrent assets | 1.2 | 5.3 | 0.2 | 3.1 | 0.5 | 14.6 | 8.3 | 33.2 |
| Goodwill | 45.9 | 257.1 | 25.7 | 40.3 | 32.1 | 1,930.8 | 229.6 | 2,561.5 |
| Expiration lists | 39.7 | 81.6 | 25.4 | 24.3 | 17.5 | 1,588.2 | 251.1 | 2,027.8 |
| Non-compete agreements | 0.3 | 1.2 | 0.2 | 0.5 | 1.5 | — | 3.6 | 7.3 |
| Trade names | — | 3.4 | 0.2 | — | 0.3 | — | 1.3 | 5.2 |
| Total assets acquired | 239.3 | 392.6 | 68.2 | 83.1 | 64.4 | 9,786.0 | 591.5 | 11,225.1 |
| Premiums payables to underwriting enterprises | 125.2 | 18.5 | 6.4 | 2.9 | 1.5 | 5,936.4 | 63.8 | 6,154.7 |
| Other current liabilities | 4.6 | 21.1 | 1.6 | 3.5 | 2.4 | 197.8 | 16.5 | 247.5 |
| Noncurrent liabilities | 0.2 | 23.6 | 0.1 | 27.2 | 5.7 | 72.9 | 21.7 | 151.4 |
| Total liabilities assumed | 130.0 | 63.2 | 8.1 | 33.6 | 9.6 | 6,207.1 | 102.0 | 6,553.6 |
| Total net assets acquired | $ 109.3 | $ 329.4 | $ 60.1 | $ 49.5 | $ 54.8 | $ 3,578.9 | $ 489.5 | $ 4,671.5 |

For example, for Willis Reinsurance (WRE), the table shows Gallagher valued goodwill at $45.9 million (out of a total acquisition price of $3.58 billion), expiration lists at $39.7 million, and non-compete agreements at $300,000.[107] In explaining the line item for "Expiration lists," the 10-K states:

> "the fair value of expiration lists was established using the excess earnings method, which is an income approach based on estimated financial projections developed by management for each acquired entity using market participant assumptions."[108]

The 10-K further explains that the "fair value of non-compete agreements was established

---

[106] Gallagher 10-K at 81, Ex. P.

[107] Gallagher 10-K at 81, Ex. P.

[108] Gallagher 10-K at 82, Ex. P.

using the profit differential method, which is an income approach based on estimated financial projections developed by management for the acquired company using market participant assumptions and various non-compete scenarios."[109]

Given Gallagher's admissions in its 10-K that goodwill and other intangible assets can be valued according to generally accepted accounting principles and Gallagher's prior experience in settling a dispute with Long over the same conduct for money damages, Gallagher cannot credibly argue that any purported damages arising from Long and the other New Hires joining Alliant cannot be quantified.

Numerous courts have denied provisional relief on the ground the alleged harms are quantifiable and therefore not irreparable in cases with similar fact patterns, including cases involving Gallagher. For example, in *Arthur J. Gallagher & Co. v. Youngdahl*, Gallagher had acquired defendant Youngdahl's brokerage firm in 2000. In 2005, Gallagher sued Youngdahl to enforce a noncompete clause after Youngdahl went to work for a competing firm. The court denied Gallagher's motion for a TRO because it found Gallagher's claimed harm to be quantifiable because Gallagher had previously valued the client accounts at issue when it purchased Youngdahl's firm. The court explained:

> "Although plaintiffs allege that they are suffering [irreparable] harm, that claim is belied by the history of transactions between the parties and the common practice of selling client accounts to employees leaving Gallagher. In 2000, Gallagher purchased from Youngdahl many of the client accounts that Gallagher now claims Youngdahl has wrongfully accepted in his new employment position. The parties were able to determine the monetary value of those accounts in the past, and Gallagher has provided no reason why a monetary value could not be assigned to them today. Further, Gallagher does not dispute that it regularly sells client accounts to former employees like Youngdahl. Such a practice demonstrates that Gallagher can establish the monetary value of accounts that Youngdahl may have wrongfully diverted or received.

---

[109] Gallagher 10-K at 82, Ex. P.

> Therefore, as Gallagher has adequate legal remedies in the form of damages to address its injury, injunctive relief is inappropriate."[110]

Similarly, in *Arthur J. Gallagher & Co. v. Reisinger*, Gallagher moved for a preliminary injunction to enforce restrictive covenants against a former employee and argued it was suffering irreparable harm in "the form of cancelled policies and other products, and loss of its customer goodwill." The court found there was no irreparable injury because "[e]conomic loss does not constitute irreparable harm," and "a loss of customers to a competitor could be quantified and compensated by money damages."[111] The same conclusion follows here.

In *Morgan Stanley Smith Barney LLC v. Sayler*, the court declined to issue a preliminary injunction against a financial advisor who previously worked for Morgan Stanley because Morgan Stanley failed to show irreparable harm. Like Gallagher here, Morgan Stanley argued it was suffering irreparable injury through the loss of client accounts and associated goodwill. The court found Morgan Stanley had "failed to explain why any harm will be irreparable or why money damages would be insufficient." Indeed, the court said the evidence indicated "Morgan Stanley is perfectly capable of calculating damages resulting from a violation of the non-solicitation and confidentiality clauses."[112]

*Wells Fargo Insurance Services v. King* is also instructive. In that case, the defendant worked for an insurance brokerage—Wells Fargo Insurance (WFI). After leaving WFI, the defendant began soliciting WFI clients in apparent violation of his "Employment and Non-Piracy Agreement," and many clients terminated their relationship with WFI. The court denied WFI's request for preliminary relief on the ground WFI could not show irreparable harm, explaining:

---

[110] *Arthur J. Gallagher & Co. v. Youngdahl*, 2005 WL 8164161, at *2 (D. Minn. Sept. 9, 2005).

[111] *Arthur J. Gallagher & Co. v. Reisinger*, 2007 WL 1877895, at *18, 24 (W.D. Pa. June 11, 2007).

[112] *Morgan Stanley Smith Barney LLC v. Sayler*, 2019 WL 3459237, at *5 (D. Or. July 31, 2019).

> "***this case is about money***. No historic building is going to be destroyed. No toxins are going to be released into the environment. No ship is going to leave port, never to return. King stole clients away from WFI, and the main harm that WFI suffered is lost profits on the business of those clients. By definition, lost profits are 'reparable' through money damages."[113]

Numerous other courts have applied the same reasoning in denying provisional relief.[114]

## VI. The Balance of Harms And the Public Interest Tilt Against Granting Provisional Relief

Not only must Gallagher demonstrate a strong likelihood of success on the merits and irreparable harm, it also must show (1) the "harm the denial of a preliminary injunction would cause the plaintiff" is greater than the "harm to the defendant if the court were to grant it" and (2) "the proposed injunction is in the public interest, which includes considering the potential impact on non-parties."[115] Gallagher can do neither.

## A. The Balance of Harms Tilts Against Granting Provisional Relief

The balancing of harms "involves a 'sliding scale' approach: the more likely the plaintiff is to win on the merits, the less the balance of harms needs to weigh in his favor, and vice versa."[116] No matter what the Court determines about the merits of Gallagher's

---

[113] *Wells Fargo Insurance Services v. King*, 2016 WL 299013, at *1-2, 8-9 (D. Minn. Jan. 25, 2016) (emphasis added).

[114] *See, e.g., IKON Office Solutions, Inc. v. Belanger*, 59 F. Supp. 2d 125, 132 (D. Mass. 1999) (denying IKON's motion for preliminary injunction because "the loss of customer goodwill is not necessarily irreparable," and the "possible loss of customers through improper solicitation may not constitute irreparable injury," given that "IKON's loss of revenue is calculable through evidence of past earnings" and "through the use of expert testimony"); *JF Acquisition, LLC v. Pedchenko*, 2018 WL 2988508, at *2 (E.D.N.C. Apr. 6, 2018) (denying preliminary injunction against defendant who joined competitor because the "possible reputational damage Jones & Frank alleges is directly tied to their allegations of potential customer loss. The loss of customer accounts is an economic injury. . . is not irreparable harm for the purposes of injunctive relief" and the inducing of other employees to leave the company").

[115] *Aon*, 2021 WL 4192072, at *6.

[116] *Aon*, 2021 WL 4192072, at *6.

claim, the balance of harms is so disproportionally in Alliant's favor that provisional relief should not be granted.

Gallagher is one of the largest and most profitable insurance brokerages in the world. According to public reports, Gallagher's 2021 revenue topped $9 billion.[117] Even if **all** of Long's estimated $2.6 million book of business moves over, Gallagher will lose only 0.03% of its annual revenue.[118]

On the other hand, granting Gallagher's motion would cause immediate and irreparable injury to Alliant and the New Hires. It would punish the New Hires for leaving a discriminatory environment and deny them gainful employment for three weeks, all while not even being named a party to the case.[119] Further, the alleged notice periods in their agreement have already expired and are not subject to any tolling provision. Gallagher's entire discussion of the balance of the harms and the public interest does not even mention the New Hires who would be most harmed by the requested TRO.[120]

Gallagher also seeks to enjoin **everyone** at Alliant from soliciting any of the New Hires' former clients for two years, irrespective of any involvement by the New Hires and despite none of these individuals having a non-solicit with Gallagher. This harms Alliant employees like Mowery—whose non-solicit with Gallagher expired long ago—by denying him the opportunity to freely compete for Gallagher clients.

## B. The Proposed Injunction is Not in the Public's Interest

As discussed at length above, a TRO that would deny companies of the freedom to work with the New Hires or anyone else at Alliant would harm the public interest. This is especially so when these clients are seeking advice regarding insurance risks and want to

---

[117] Gallagher 10-K at 82, Ex. P.

[118] Ex. A (Long Decl. ¶ 42).

[119] Dkt. No. 9 at 38 (requesting to enjoin the New Hires from "engag[ing] in activities for Alliant's benefit. ... for 21 days").

[120] Dkt. No. 9 at 30-32.

ensure they adequately cover losses that may impact members of the public.[121]

## VII. Gallagher's Requested Relief is Overbroad

Gallagher's requested relief is inappropriately overbroad. First, Gallagher's request that the Court enjoin ***Alliant*** from soliciting any client serviced by the New Hires at Gallagher is entirely overbroad as it would handcuff potentially thousands of Alliant employees from soliciting those customers for business even if the New Hires are not involved.

Second, Gallagher cites no legal authority to support Gallagher's request that the Court enjoin Alliant from "allowing" the New Hires to engage in activities for Alliant's benefit for 21 days merely because the New Hires may have left Gallagher early. The alleged notice periods in their agreement have already expired and are not subject to any tolling provision, and courts cannot rewrite or insert contractual terms for which the parties did not negotiate.[122] Gallagher cites no authority—and Alliant is aware of none— in which a court has relied on an expired notice provision to justify injunctive relief. And for good reason—as Gallagher argues, the "obvious purpose" of its notice obligations was to require the New Hires to assist Gallagher with the transition of work related to their departures during that notice period.[123] With the expiration of each New Hires' notice period, whatever transition Gallagher wanted to effectuate in those 21 days is no longer available no matter what injunction Gallagher seeks, thus rendering it impossible that the

---

[121] *Christian*, 2014 WL 6657700, at *5; *Abbott-Interfast Corp.*, 250 Ill. App. 3d at 20 ("it is more difficult for an employer to justify prohibiting its former employees from accepting orders from the employer's clients than merely prohibiting its employee from soliciting such clients").

[122] *See, e.g., Cress v. Recreation Servs., Inc.*, 341 Ill. App. 3d 149, 185 (2003) ("A court will not rewrite a contract to suit one of the parties, but will enforce the terms as written [and t]here is a strong presumption against provisions that easily could have been included in the contract but were not.").

[123] Dkt. No. 9 at pp. 11, 20.

Opposition to Motion for Temporary Restraining Order and Preliminary Injunction

TRO could "maintain the status quo."[124]

Tellingly, in likely recognition that notice periods are not enforceable via injunctions, the section of the New Hires' employment agreements governing Gallagher's "right to injunctive relief" omits any reference to the notice period as grounds for such relief.[125] Gallagher's request that the New Hires, who were at-will employees and not subject to a noncompete agreement, be enjoined from working for 21 days after the Court rules on its Motion due to a purported breach of the notice requirement has no grounding in the applicable employment agreements themselves or the law, and further betrays Gallagher's true intent here, namely, to punish the New Hires rather than protect its legitimate business interests.

Third, Gallagher's request that the Court broadly prohibit Alliant from using, possessing, or disclosing any of Gallagher's purported confidential information and return such information—even though there's no evidence Alliant possesses any such information—is overbroad because it is untethered from the confidential information Gallagher alleges the New Hires took upon their departure (though there is no such evidence).

## VIII. Conclusion

For the foregoing reasons, the Court should deny Gallagher's motion.


Dated: August 3, 2022                                 Respectfully submitted,


                                                      /s/ Tinos Diamantatos
                                                      _____

---

[124] Dkt. No. 9 at p. 15.

[125] *See, e.g.,* Dkt. No. 9-8 at p. 22 (referencing only the sections governing Gallagher's trade secrets and confidential information and restrictive covenants as giving rise to Gallagher's purported right to injunctive relief).

Tinos Diamantatos, Bar No. 6281728
tinos.diamantatos@morganlewis.com
Sari M. Alamuddin, Bar No. 6215689
sari.alamuddin@morganlewis.com
Samuel D. Block, Bar No. 6323648
samuel.block@morganlewis.com

MORGAN, LEWIS & BOCKIUS LLP
110 North Wacker Drive
Chicago, IL 60606-1511
Telephone:   +1.312.324.1000

Firm ID No. 40417

*Counsel for Alliant Insurance Services, Inc.*

Opposition to Motion for Temporary Restraining Order and Preliminary Injunction

## Certificate of Service

I hereby certify that, on August 3, 2022, the foregoing document entitled "**Defendants' Opposition to Gallagher's Motion for Temporary Restraining Order and Preliminary Injunction**" was filed via the Case Management/Electronic Case Filing (CM/ECF) system, with service to be made on all parties deemed to have consented to electronic service via the automated generation and e-mailing of a Notice of Electronic Filing (NEF) by the CM/ECF system.

Dated:  August 3, 2022                    /s/ Tinos Diamantatos
                                          Tinos Diamantatos