**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ARTHUR J. GALLAGHER & CO., | ) | |
| | ) | Case No.: 1:22-cv-03931 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **DEMAND FOR JURY TRIAL** |
| | ) | |
| ALLIANT INSURANCE SERVICES, INC. | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**PLAINTIFF ARTHUR J. GALLAGHER'S REPLY**
**IN SUPPORT OF ITS EMERGENCY MOTION FOR TEMPORARY RESTRAINING**
**ORDER AND PRELIMINARY INJUNCTION**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................................ 1

ARGUMENT ...................................................................................................................... 2

I.      GALLAGHER DEMONSTRATED A STRONG LIKELIHOOD OF SUCCESS ON
THE MERITS .............................................................................................................. 2

      A.      Gallagher is Likely to Succeed on its Tortious Interference with Contract Claim. 2

            i.      Alliant Knowingly Induced Multiple Breaches of the Employment
Agreements. ................................................................................................ 2

            ii.      Gallagher's Restrictive Covenants are Enforceable. ................................. 5

                  a.    The Customer Non-Solicitation Provision is Enforceable. ................. 6

                  b.    The Customer Non-Service Provision is Enforceable......................... 7

           iii.     Alliant Knowingly Induced Breaches of the Mobile Device Agreements. 9

      B.      Gallagher is Likely to Succeed on its Tortious Interference with Prospective
Economic Advantage Claim. ................................................................................ 9

      C.      Gallagher is Likely to Succeed on its Aiding and Abetting Claim...................... 11

      D.      Gallagher is Likely to Succeed on its Conspiracy Claim. ................................... 12

      E.      Gallagher's Claims Are Not Preempted. ............................................................. 13

II.     GALLAGHER DOES NOT HAVE AN ADEQUATE REMEDY AT LAW AND WILL
SUFFER IRREPARABLE HARM ABSENT INJUNCTIVE RELIEF. .......................... 13

III.    THE BALANCE OF HARDSHIPS AND PUBLC INTEREST FAVOR INJUNCTIVE
RELIEF, AND THE REQUESTED RELIEF IS NOT OVERBROAD. .......................... 14

CONCLUSION .................................................................................................................. 16

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Abbott-Interfast Corp. v. Harkabus*,
  250 Ill. App. 3d 13 (2d Dist. 1993).................................................................8

*Aon Risk Servs. Cos., Inc. v. Alliant Ins. Servs., Inc.*,
  415 F. Supp. 3d 843 (N.D. Ill. 2019).............................................................3

*Aon Risk Servs. v. Cusack*,
  2011 WL 6955890 (2011)................................................................................3

*Arthur J. Gallagher & Co. v. Reisigner*,
  2007 WL 1877895 (W.D. Penn. Jun. 29, 2007).........................................14

*Arthur J. Gallagher & Co. v. Youngdahl*,
  2005 WL 8164161 (D. Minn. Sept. 9, 2005)..............................................14

*Bankers Life & Cas. Co. v. Miller*,
  2015 WL 515965 (N.D. Ill. Feb. 6, 2015)..................................................13

*Brown & Brown, Inc. v. Ali*,
  592 F. Supp. 2d 1009 (N.D. Ill. 2009).....................................................6, 7

*Crown Packaging Intern., Inc. v. Brown*,
  2014 IL App (1st) 140284-U.........................................................................11

*Diamond Blade Warehouse, Inc. v. Paramount Diamond Tools, Inc.*,
  420 F. Supp. 2d 866 (N.D. Ill. 2006)...........................................................7

*ExactLogix, Inc. v. JobProgress, LLC*,
  508 F. Supp. 3d 254 (N.D. Ill. 2020).........................................................13

*Hay Group, Inc. v. Bassick*,
  2005 WL 2420415 (N.D. Ill. Sept. 29, 2005)...............................................8

*Instant Tech., LLC v. DeFazio*,
  40 F. Supp. 3d 989 (N.D. Ill. 2014).............................................................9

*Lawlor v. North Am. Corp. of Ill.*,
  2012 IL 112530...............................................................................................11

*Lawrence and Allen, Inc. v. Cambridge Human Resource Grp.*, Inc.,
  292 Ill. App. 3d 131 (2d Dist. 1997).............................................................8

*Life Spine, Inc. v. Aegis Spine, Inc.*,
    8 F.4th 531 (7th Cir. 2021) .................................................................14

*Mercator Risk Servs., Inc. v. Girden*,
    2009 WL 466150 (S.D.N.Y. Feb. 23, 2009)..........................................7

*Millard Maintenance Service Co. v. Bernero*,
    2017 Ill. App. 3d 736 (1st Dist. 1990) ..................................................7

*Morgan Stanley Smith Barney LLC v. Sayler*,
    2019 WL 3459237 (D. Or. July 31, 2019)............................................14

*Mountain W. Series of Lockton Cos., LLC v. Alliant Ins. Servs., Inc.*,
    2019 WL 2536104 (Del. Ch. June 20, 2019)...............................2, 3, 4, 5, 8, 12, 15

*Pampered Chef v. Alexanian*,
    804 F. Supp. 2d 765 (N.D. Ill. 2011) ...................................................14

*Regal-Beloit Corp. v. Drecoll*,
    955 F. Supp. 849 (N.D. Ill. 1996) ........................................................15

*Reliable Fire Equipment Co. v. Arredondo*,
    2011 IL 111871...................................................................................6

*Scheffel & Co., P.C. v. Fessler*,
    356 Ill. App. 38 308 (5th Dist. 2005)....................................................8

*SKF USA, Inc. v. Bjerkness*,
    636 F. Supp. 2d 696 (N.D. Ill. 2009) ....................................................8

*Wells Fargo Ins. Servs. v. King*,
    2016 WL 299013 (D. Minn. Jan. 25, 2016)..........................................14

*Westinghouse Elec. Corp. v. Free Sewing Mach. Co.*,
    256 F.2d 806 (7th Cir. 1958) ...............................................................15

Plaintiff Arthur J. Gallagher & Co. ("Gallagher") respectfully submits this Reply in Support of its Emergency Motion for Temporary Restraining Order and Preliminary Injunction against Defendant Alliant Insurance Services, Inc. ("Alliant").

## INTRODUCTION

Alliant's Opposition is a masterclass in deflection. Rather than grapple with Gallagher's allegations or Alliant's established pattern of misconduct (which it repeated in this case), Alliant leads with accusations of sexism and discrimination. Setting aside the falsity of those accusations, they are completely irrelevant. Inducing breaches of an employee's contractual and fiduciary obligations is not somehow excused if that employee is unhappy with their current employer. Alliant fails to meaningfully address the evidence of its longstanding pattern of misconduct, which was laid bare in the *Lockton* litigation when it was forced to turn over the communications it had attempted to cloak in privilege. Rather, in a single sentence, Alliant asserts that its "***past* conduct**" is "not evidence of wrongdoing ***here***." Opp. at 3 (emphasis in original). That could not be further from the truth. The *Lockton* documents and other evidence cited in Gallagher's Complaint and its Memorandum of Law make clear that the mass resignations plaguing this industry do not occur by happenstance—they are part of a concerted effort by Alliant to induce breaches of contractually-mandated notice requirements and steal as much business as possible before courts can intervene. Alliant's past conduct demonstrates knowledge, intent, as well as a clear pattern and *modus operandi*, all of which is highly probative here.

In case after case and jurisdiction after jurisdiction, large groups of employees of Alliant's competitors resign simultaneously, violate contractual notice provisions, show up at an Alliant office on the same day to immediately begin working for Alliant—after forwarding confidential information to personal email accounts in the preceding months—all while Alliant solicits the clients they serviced at their former employer. What is more likely? That this is a coincidence,

repeated dozens of times in dozens of jurisdictions, without any non-solicit violations by employees or inducement and encouragement from Alliant? Or, that Alliant is the "puppet master" that tortiously "made the mass departure[s] happen"? *See Mountain W. Series of Lockton Cos., LLC v. Alliant Ins. Servs., Inc.* ("*Lockton*"), 2019 WL 2536104, at *18 (Del. Ch. June 20, 2019). Alliant hopes this Court will leave its common sense at the door in answering these questions.

The harm to Gallagher is ongoing and irreparable. Indeed, just ***hours*** after Alliant filed its Opposition proclaiming that "none of [Gallagher's clients] have come to Alliant," Opp. at 20, Gallagher learned that one of the largest clients serviced by Kristen Long and her team ***was*** taking a portion of its business away from Gallagher, presumably to Alliant. *See* Ex. A. Court intervention is required to prevent Alliant from accomplishing what it has achieved in so many cases: stealing enough business to more than cover its litigation costs and realize a return on its investment.

## **ARGUMENT**

## I.   **GALLAGHER DEMONSTRATED A STRONG LIKELIHOOD OF SUCCESS ON THE MERITS**

### A.   **Gallagher is Likely to Succeed on its Tortious Interference with Contract Claim.**

#### i.   Alliant Knowingly Induced Multiple Breaches of the Employment Agreements.

As an initial matter, Alliant does not dispute that it was aware of the Employment Agreements,[1] and for good reason. *See* Mem. at 18-19. As to the Resigning Employees' breaches and Alliant's inducement thereof, Alliant conspicuously glosses over the 21-day Notice Provision. *See* Opp. at 16-20. Alliant does not dispute that the Notice Provisions were breached but contends that the breaches were not caused by Alliant; rather, the Resigning Employees simply "wanted to

---

[1] Unless otherwise noted, capitalized terms have the definition set forth in Gallagher's Complaint and Memorandum of Law.

get out of Gallagher as soon as possible." *Id.* at 19. Alliant hopes the Court will look at this case in a silo and ignore Alliant's pattern of misconduct and *modus operandi*. In case after case, Alliant coordinates mass departures. *See, e.g.*, Ex. B, at 2 (75 Aon employees resigned within one week and joined Alliant); *Aon Risk Servs. v. Cusack*, 2011 WL 6955890, at *1 (N.Y. Sup. Ct. 2011) (after Peter Arkley resigned to join Alliant, 38 Aon employees followed the same day); Mem. Ex. N. at 4 (26 Aon employees resigned to join Alliant within 3 days); *Lockton* 2019 WL 2536104, at *1 (20 employees resigned to join Alliant in a single day, with 6 more shortly thereafter); Ex. C, at ¶ 68 (17 Gallagher employees resigned to join Alliant within 3 days of one another, with more following shortly thereafter); Ex. D, at ¶ 2 (10 Gallagher employees resigned to join Alliant within 5 days of one another); *Aon Risk Servs. Cos., Inc. v. Alliant Ins. Servs., Inc.*, 415 F. Supp. 3d 843, 845-46 (N.D. Ill. 2019) (7 Aon employees resigned to join Alliant in "late October 2019"); Ex. E, at ¶¶ 18, 20, 21, 22 (4 Gallagher employees resigned to join Alliant on the same day).

What is more likely? That all of the employees in each of these cases simply "wanted to get out of [their employer] as soon as possible"? Opp. at 19. Or that Alliant coordinates—and demands—immediate resignations when executing these raids? The Court does not have to guess. Alliant's outside counsel, Morgan Lewis & Bockius LLP, confirmed that Alliant instructs new hires "to resign without notice," even where those new hires "may have notice provisions." *See* Mem. at 5, 8 & Ex. B. The Court also need not guess *why* Alliant induces breaches of employees' notice provisions by demanding abrupt resignations—the admitted purpose is to time the resignations so that "the new hires are able to bring in business," in violation of their non-solicit agreements, before Alliant's competitors can "prepare litigation strategy." *See* Mem. at 7, 20, 28, & Ex. B; *see also Lockton*, 2019 WL 2536104, at *19 n.21. That these stunning admissions came in the context of a different raid makes them no less probative here. Gallagher has easily met its

3

burden to show that the Resigning Employees breached their Notice Provisions when they each resigned "effective immediately" within 48 hours of one another and that Alliant directed those breaches, consistent with its longstanding pattern.

Gallagher has also met its burden to show a strong likelihood that Alliant induced the Resigning Employees to breach their obligations not to solicit one another. As set forth in the Memorandum of Law, this district has recognized that "the timing and breadth" of the mass resignation alone suggests a strong probability that the Resigning Employees solicited one another. *See* Mem. at 20-21 & Ex. N. It does not take a logical leap to infer that Alliant also played a role in the non-solicit violations, especially given its history. *See e.g., Lockton*, 2019 WL 2536104, at *7, *13 (where "Alliant coordinated the mass resignation of twenty Former Employees," it was "also reasonably probable that a trier of fact would find that Alliant intentionally acted to induce the Producer Members' breaches of…the Employee Non-Solicit").

The record also demonstrates a likelihood of proving that Alliant induced breaches of the customer non-solicit provisions in the Employment Agreements. Alliant cannot evade responsibility by using straw men to carry out the solicitation, because Alliant knows that the Employment Agreements prohibit the Resigning Employees from soliciting the clients they serviced at Gallagher either "directly or indirectly." Included in the definition of "indirect solicitation" are communications by Alliant with Gallagher clients that were initiated or facilitated by the Resigning Employees, or which will benefit the Resigning Employees, either directly or indirectly. *See* Compl. at Ex. A1-A8, at § 8(B)(2).

All Alliant offers in response is self-serving declarations, which incredibly assert that the Resigning Employees, all of whom worked closely with one another, apparently did not know that the others were resigning to join Alliant, yet they all left in an abrupt, coordinated fashion within

hours of one another. As set forth in the Complaint, this is another play directly out of Alliant's playbook. Compl. ¶ 68. In granting the preliminary injunction in *Lockton*, the court repeatedly described the affidavits submitted in Alliant's response brief as "problematic" "lawyer-drafted submissions" and ultimately found that the "affidavits made expansive, absolutist representations about the absence of any solicitation efforts, which discovery revealed to be inaccurate." *Lockton*, 2019 WL 2536104, at *2, 20, & n.11-12. In recent litigation against Gallagher, Alliant has taken the same approach. For example, in the Massachusetts litigation, resigning employee Richard Leavitt submitted a declaration unequivocally stating that he never solicited his Gallagher colleagues and clients, only to later admit that he used the same straw-man approach alleged here to indirectly solicit one colleague, and directly encouraged another to join Alliant. *Compare* Ex. F, at ¶ 22 *with* Ex. G, at 65:24-66:5; 67:8-15; 72:15-73:21. At this stage, before Gallagher has had the benefit of discovery, the Court should discount Alliant's declarations significantly.[2]

      ii.      Gallagher's Restrictive Covenants are Enforceable.

As an initial matter, Alliant does not contest the enforceability of Gallagher's 21-day Notice Provision. Such an argument would be futile, as courts routinely uphold such provisions, and indeed, Alliant requires its employees to provide ***30 days'*** notice of an impending resignation.

---

[2] Alliant also spends much of its Opposition describing its purported efforts to ensure that the Resigning Employees did not provide Gallagher's Confidential Information to Alliant, namely Alliant's remediation program and Prospective Employee Departure Protocol ("PEDP"). *See, e.g.*, Opp. at 18-19. As alleged in the Complaint, however, these are sham processes designed to create a façade of compliance and conceal Alliant's tortious conduct. *See, e.g.*, Compl. ¶¶ 69-72. The declaration of Doris Little confirms the sham nature of the remediation process. She purports to have remediated all Gallagher information merely by searching "ajg.com" in the Resigning Employees' emails. Opp. at Ex. L, at ¶ 4. This search barely qualifies as "going through the motions"—it would not even identify documents including the term "Gallagher," let alone identify pictures, screenshots, or other documents containing proprietary information that were not sent from an ajg.com email address. In any event, Gallagher need not address Alliant's assertions at length because Gallagher does not assert an independent claim for the theft of its Confidential Information. *See* Mem. at 29, n.5. The Resigning Employees' highly suspicious conduct, however, is relevant for many reasons, including to show the planning and preparation that went into Alliant's unlawful raid.

*See* Mem. at 18-19 & Exhibit L, at ¶ 6(b)(i)(A). Instead, Alliant focuses on the non-solicit and non-service provisions in Gallagher's Employment Agreements. Opp. at 12-16.

Under Illinois law, a restrictive covenant is enforceable if it is a "reasonable restraint." *See Reliable Fire Equipment Co. v. Arredondo*, 2011 IL 111871, ¶ 16. A restrictive covenant is reasonable if it "(1) is no greater than is required for the protection of a legitimate business interest of the employer-promisee; (2) does not impose undue hardship on the employee-promisor[;] and (3) is not injurious to the public." *Id.* at ¶ 17.

    a.    <u>*The Customer Non-Solicitation Provision is Enforceable.*</u>

With respect to Gallagher's customer non-solicitation provision, Alliant's argument focuses entirely on the "near-permanence" analysis. *See* Opp. at 12-13. Alliant's extraordinarily narrow focus is telling. To be clear, the near-permanence analysis relates only to the first of the three prongs outlined above—whether the restriction is greater than necessary to protect a legitimate business interest. *Arredondo*, 2011 IL 111871, ¶ 16. Moreover, the near-permanence factor is only one of the innumerable factors used to analyze that first prong. *Id.* at ¶ 43 ("Factors to be considered in this analysis **include, but are not limited to**, the near-permanence of customer relationships, ***the employee's acquisition of confidential information through his employment, and time and place restrictions***.") (emphasis added). Alliant's argument is a tacit admission that the other prongs of the test, as well as the other factors analyzed under the first prong, all weigh in favor of enforceability. This should be unsurprising because, as Alliant admits, it also requires its employees to sign nearly identical restrictive covenants prohibiting customer solicitation. Opp. at 14, n.50; *see also* Mem. at 18-19 & Ex. L. A two-year restrictive covenant prohibiting employees from soliciting customers ***with whom they worked*** at their former employer—exactly what Alliant has in its employment agreements—is plainly enforceable under Illinois law. *See e.g., Brown & Brown, Inc. v. Ali*, 592 F. Supp. 2d 1009, 1046 (N.D. Ill. 2009) (finding that two-years for non-

solicitation is reasonable) (collecting cases); *see also Diamond Blade Warehouse, Inc. v. Paramount Diamond Tools, Inc.*, 420 F. Supp. 2d 866, 872 (N.D. Ill. 2006); *Millard Maintenance Service Co. v. Bernero*, 2017 Ill. App. 3d 736, 750 (1st Dist. 1990).

Even if this Court wishes to engage in the near-permanence analysis, Alliant's cited authority supports Gallagher's position. In *Mercator Risk Servs., Inc. v. Girden*, the court's decision was based on the employer's admission that "Mercator's customers are not loyal because they would move to another wholesale insurance broker if it submitted a lower quote." 2009 WL 466150, at *7 (S.D.N.Y. Feb. 23, 2009). The record here reflects that, completely on the other end of the spectrum, Gallagher's clients are loyal to Gallagher and the company has an extremely high retention rate of well over 90%. *See* Mem. at Ex. A, at ¶ 22.

In *Brown & Brown, Inc.*, while the court did not find the near-permanence standard satisfied, it also considered the other prongs of the analysis and ultimately enforced a modified restrictive covenant "to prohibit Ali's solicitation of Brown customers with whom he had direct contact during his employment at Brown." 592 F. Supp. 2d at 1045. In other words, the court modified the restrictive covenant to match Gallagher's requirement. Gallagher's two-year customer non-solicitation provision (just like Alliant's) is plainly enforceable.

b.    *The Customer Non-Service Provision is Enforceable.*

The restrictive covenant prohibiting the Resigning Employees from servicing clients on behalf of Alliant if they serviced those same clients at Gallagher is also enforceable. Alliant's argument to the contrary focuses on hardship to the public. Opp. at 14-15. According to Alliant, the non-service provision places an undue hardship on customers by prohibiting them from working with the brokerage employees of their choosing. *Id.* The pretense of "customer choice" is another play out of Alliant's playbook. When Alliant made this same argument in Lockton, it was soundly rejected: "Notwithstanding Alliant's indecorous attempt to cloak its misconduct in the

mantle of customer choice, I have considered the effect of an injunction on the customers.… [T]he record indicates that the insurance brokerage industry is highly competitive, and there appear to be multiple firms that can provide the necessary services. If customers are upset, they can blame Alliant, which chose to induce the Producer Members to breach restrictive covenants that both they and Alliant believed were enforceable and which tracked the restrictions that Alliant demands from its own employees." *Lockton*, 2019 WL 2536104, at *23.

Gallagher's non-service provision is narrowly tailored. It does not prevent Gallagher employees from working for competitors. It does not even prevent Gallagher employees from servicing Gallagher clients on behalf of a competitor. The employees are merely prohibited from servicing the specific clients they serviced on behalf of Gallagher. Alliant's cited authority involved broad non-competes that are materially distinguishable from the provision at issue here.[3] On the contrary, narrowly tailored non-compete provisions such as Gallagher's non-service provision are enforceable. *See, e.g.*, *Scheffel & Co., P.C. v. Fessler*, 356 Ill. App. 3d 308, 313 (5th Dist. 2005) ("[I]f a restrictive covenant has reasonable terms, *i.e.* it is reasonably necessary to protect the interests of the employer, then the covenant will be enforced."); *Lawrence and Allen, Inc. v. Cambridge Human Resource Grp.*, Inc., 292 Ill. App. 3d 131, 140 (2d Dist. 1997) ("restrictions on competing" are enforceable when "narrowly tailored").

---

[3] *See Abbott-Interfast Corp. v. Harkabus*, 250 Ill. App. 3d 13, 18 (2d Dist. 1993) (prohibiting employee from "engag[ing] in the business (or any part thereof) of manufacturing, producing, marketing or selling shrink-packaging machinery in the United States"); *SKF USA, Inc. v. Bjerkness*, 636 F. Supp. 2d 696, 716 (N.D. Ill. 2009) (prohibiting employee from "performing services for any of SKF's actual or potential customers"); *Hay Group, Inc. v. Bassick*, 2005 WL 2420415, at *5 (N.D. Ill. Sept. 29, 2005) (prohibiting employee from "doing business directly or indirectly with any person or entity that was a client of [the employer]").

iii.   Alliant Knowingly Induced Breaches of the Mobile Device Agreements.

Alliant devotes a single paragraph to the Mobile Device Agreements, asserting that "Gallagher has no evidence that Alliant even knew of any 'Mobile Device Agreement,' let alone directed anyone to ignore it." *See* Opp. at 20. Both of those assertions are demonstrably false. First, Alliant unquestionably knew that Gallagher required employees to sign Mobile Device Agreements because Gallagher has produced those agreements to Alliant and its counsel in four separate lawsuits. *See* Ex. H. And if that weren't enough, Alliant's General Counsel was copied on correspondence demanding that the Resigning Employees comply with their obligations under the Mobile Device Agreements. Mem. Ex. K at 3 (copying Alliant's General Counsel, Jennifer Baumann). Second, while asserting that it did not direct the Resigning Employees to ignore the Mobile Device Agreements, Alliant simultaneously ***admits*** that it directed the Resigning Employees to provide their mobile devices to its consultant and outside counsel. Opp. at 9 & Ex. L. In other words, Alliant ***did*** direct the Resigning Employees on what to do with their devices, and that direction did not include providing the devices to Gallagher as required by the Mobile Device Agreements. Alliant knew of the agreements and intentionally induced the breaches.

**B.      Gallagher is Likely to Succeed on its Tortious Interference with Prospective Economic Advantage Claim.**

Alliant contends that Gallagher lacks a substantial likelihood of success on the merits because "Gallagher has failed to identify the clients with whom it allegedly had a business expectancy." Opp. at 20-21 (citing *Instant Tech., LLC v. DeFazio*, 40 F. Supp. 3d 989, 1020 (N.D. Ill. 2014)). Alliant fails to mention that *DeFazio* was an opinion containing findings of fact and conclusions of law following a bench trial in which the plaintiff called 12 witnesses. 40 F. Supp. 3d at 995. Of course, after a trial where the record is fully developed, a plaintiff must identify the specific clients with which the defendant interfered. But here, without the benefit of discovery,

9

Gallagher faces no such hurdle. In any event, the Complaint does identify one client specifically—Client A (*see* Compl. ¶¶ 91-93)—and Alliant obviously knows which clients Walsh and Mowery solicited from the $2.6 million dollar book of business managed by Long. Opp. at 22, 32.

Alliant also asserts that "no principle of law prohibited Alliant from soliciting clients serviced by Gallagher." *Id.* at 22. But as Alliant acknowledges, it is tortious to solicit Gallagher's clients using "improper competitive strategies" such as fraud, deceit, or deliberate disparagement. *Id.* at 20. That is exactly what Alliant did here—it deliberately used Walsh and Mowery as straw men to circumvent the Resigning Employees' non-solicit obligations and made false and disparaging statements to clients during the solicitation efforts. *See* Mem. at 24; Compl. ¶¶ 91-94.

With respect to Gallagher's expectation in continued employment relationships, Alliant asserts Gallagher proffered no evidence of inflated compensation packages and that there is nothing improper about offering inflated compensation to lure the Gallagher employees to Alliant. *See* Opp. at 21. This argument ignores that Long surreptitiously forwarded compensation information for her team to her personal email account during Alliant's recruitment. This is a common fact pattern in Alliant's raids, which is critical because obtaining such information allows Alliant to gain an unfair competitive advantage that allows it to outbid its competitors. *See* Mem. at 14; Compl. ¶ 106. Notably, Alliant recently acknowledged this principle when it sought to keep its compensation information under seal in *Lockton*. *See* Ex. I, at ¶ 15 ("Armed with this compensation information, Alliant's competitors would gain a competitive market advantage over Alliant in pre-emptively matching or exceeding financial terms in hiring certain employees and using this information to solicit current Alliant employees."). Lest there be any doubt about the

nefarious intent behind the forwarding of this compensation information, Long attempted to delete this email from Gallagher's system just hours before she resigned. *See* Ex. J, at ¶ 6.c.[4]

### C. Gallagher is Likely to Succeed on its Aiding and Abetting Claim.

None of Alliant's arguments in opposition to Gallagher's aiding and abetting claim have merit. First, Alliant argues that Gallagher failed to show that the Resigning Employees owed fiduciary duties to Gallagher because "[a] contractual relationship … on its own does not establish a fiduciary relationship." *See* Opp. at 23. This argument is specious. It is well-established in Illinois that employees owe a fiduciary duty to their employer. *See, e.g.*, *Crown Packaging Intern., Inc. v. Brown*, 2014 IL App (1st) 140284-U, ¶ 21 ("Employees owe fiduciary duties to their employers."); *Lawlor v. North Am. Corp. of Ill.*, 2012 IL 112530, ¶ 69 ("Employees as well as officers and directors owe a duty of loyalty to their employer.").

Second, Alliant contends that the Resigning Employees did not breach their fiduciary duties because there is no evidence that they solicited clients or each other while employed at Gallagher. Opp. at 23-24. But as explained in the Memorandum of Law and again above, "the timing and breadth" of the mass resignation alone suggests a strong probability that the Resigning Employees solicited one another. *See* Mem. at 20-21 & Ex. N, at ¶ 4. Alliant also argues that Long's extension of a renewal date for a client—admittedly "without obtaining any compensation for Gallagher"—was not a breach of fiduciary duty because she provided the extension to help the client, not Alliant. *See* Opp. at 24. In light of Alliant's history of submitting false declarations and the other nefarious steps Long took to further the scheme in this case—including deleting over

---

[4] Alliant also argues that ***some*** of the Resigning Employees would have left Gallagher without Alliant's involvement. *See* Opp. at 22. These *post-hoc*, self-serving declarations should be given little weight.

11

7,000 emails from her Gallagher email account the night before she resigned—the Court should afford little weight into Long's dubious and self-serving assertion. *See* Ex. J, at ¶ 5.[5]

Moreover, Alliant ignores that the Resigning Employees explicitly agreed that, during the 21-day Notice Period following their notices of resignation, their fiduciary duty of loyalty to Gallagher would continue in effect. *See* Compl. at Exhibit A1-A8, at § 5(A), (C). It is undisputed that the Resigning Employees began working for Alliant during that 21-day period and thus were exercising loyalty to Alliant (not Gallagher) and acting in Alliant's interests (not Gallagher's). This is a blatant, and apparently undisputed, breach of fiduciary duty.

Gallagher has a strong likelihood of proving that Alliant aided and abetted these breaches. As explained above, Alliant was aware of the 21-day Notice Provision, and nonetheless instructed the Resigning Employees to resign "effective immediately" and begin their employment at Alliant, in direct conflict with the duty of loyalty the Resigning Employees owed to Gallagher. *See supra*, at § I.A.i. Alliant also encouraged the breaches through inflated compensation packages and indemnification agreements. *See, e.g.*, *Lockton*, 2019 WL 2536104, at *3 ("Alliant took responsibility for the raid by committing to indemnify McDaniel against any claims that might arise from soliciting his Lockton customers."); *id.* ("Alliant offered McDaniel this massive compensation package because Arkley and Alliant expected McDaniel to solicit his Lockton customers and bring them over to Alliant.").

### D. Gallagher is Likely to Succeed on its Conspiracy Claim.

Alliant asserts that Gallagher's conspiracy claim fails because its tort claims fail. Opp. at 25. For the reasons explained above, that assertion is misguided. Alliant's assertion that Gallagher

---

[5] Conspicuously absent from Alliant's Opposition is any explanation for Long's massive, eleventh-hour, email deletion.

has alleged nothing more than a "vague conspiracy" is belied by Gallagher's 157-paragraph Complaint, explaining in detail the history of Alliant's leveraged hire strategy, the similar steps that Alliant repeats to execute the strategy across the country, the role of the various parties, and dozens of overt acts taken in furtherance of the conspiracy. Gallagher has easily met its burden.

### E. Gallagher's Claims Are Not Preempted.

The Illinois Trade Secrets Act does not preempt any of Gallagher's claims. As Alliant acknowledges, a common law claim is preempted only when it is "dependent on" the misappropriation of a trade secret. *See* Opp. at 25. But where "the plaintiff seek[s] redress 'for wrongs beyond the mere misappropriation,'" the claim is not preempted. *See ExactLogix, Inc. v. JobProgress, LLC*, 508 F. Supp. 3d 254, 269 (N.D. Ill. 2020). In this case, Gallagher's claims are based upon a scheme to induce a mass resignation in violation of contractual notice obligations, contractual non-solicit obligations, and fiduciary duties of loyalty, among other things. That Gallagher's Confidential Information was misused as part of the scheme is of no consequence, because the "claims would stand even if the [information] was not alleged to be a trade secret." *Id.* As Judge Shah explained, common law claims alleging a scheme of this nature are not preempted:

> Here, Bankers Life alleges more than the mere taking of trade secrets. It alleges that while [defendants] worked for Bankers Life, they improperly took confidential information and induced other employees to quit, as part of a scheme to compete; and they continued using the improperly acquired information once they began competing. Based on the precedent cited above, their breach-of-loyalty claim is not preempted by the Illinois Trade Secrets Act.

*Bankers Life & Cas. Co. v. Miller*, 2015 WL 515965, at *8 (N.D. Ill. Feb. 6, 2015).

## II. GALLAGHER DOES NOT HAVE AN ADEQUATE REMEDY AT LAW AND WILL SUFFER IRREPARABLE HARM ABSENT INJUNCTIVE RELIEF.

Alliant contends that Gallagher can be fully compensated for the loss of clients through money damages. Opp. at 26-31. As support, Alliant notes that Gallagher settled with Long when she previously resigned from Gallagher. Opp. at 27. A settlement, of course, is a compromise

where a plaintiff typically is not compensated for all of its alleged damages. Alliant cites no case law supporting the notion that settlement agreements undercut claims of irreparable harm.

Similarly, Alliant cites Gallagher's 10-K, arguing there is no irreparable harm because Gallagher is able to value intangible assets when purchasing businesses. *Id.* at 27-29. However, a mutual agreement to purchase or sell business is in no way comparable to being victimized by a corporate raid. The purchase or sale of a business does not involve abrupt losses of large employee groups, which cause substantial reputational harm and cause clients and potential clients to question whether Gallagher is able to service their business. *See* Mem. at 27-30 & Ex. A, at ¶¶ 28-30. Moreover, as to the customers, Alliant's authority recognizes that harm from lost customers **may** be quantifiable if the lost customers are identifiable, but in a situation like a corporate raid, "it is precisely the difficulty of pinning down what business has been or will be lost that make an injury 'irreparable.'" *Life Spine, Inc. v. Aegis Spine, Inc.*, 8 F.4th 531, 546 (7th Cir. 2021).[6]

## III.     THE BALANCE OF HARDSHIPS AND PUBLC INTEREST FAVOR INJUNCTIVE RELIEF, AND THE REQUESTED RELIEF IS NOT OVERBROAD.

Alliant argues that that an injunction would pose an undue hardship on the Resigning Employees because it would restrain them from acting for Alliant's benefit (and against

---

[6] Alliant's other cited authority is almost entirely from different jurisdictions—for obvious reasons, given the clear state of Illinois law. *See* Mem. at 27. In any event, Alliant's cases do not support its position. *See, e.g.*, *Morgan Stanley Smith Barney LLC v. Sayler*, 2019 WL 3459237, at *5 (D. Or. July 31, 2019) (the agreements under which plaintiff sued specifically provided that damages would be calculated at "250% of the total amount of commissions and fees generated from the relevant client assets during the preceding 12-month period"); *Wells Fargo Ins. Servs. v. King*, 2016 WL 299013, at *9 (D. Minn. Jan. 25, 2016) (unlike here, where Gallagher is attempting to prevent future harm, the court ruled that the harm "already occurred" and it could not order the stolen clients to return to the plaintiff); *Pampered Chef v. Alexanian*, 804 F. Supp. 2d 765, 804 (N.D. Ill. 2011) ("Park Lane is not a competitor of Pampered Chef, and there is no competitive position to be lost."); *Arthur J. Gallagher & Co. v. Youngdahl*, 2005 WL 8164161, at *1 (D. Minn. Sept. 9, 2005) (involving a single employee whose book of business had been acquired by Gallagher); *Arthur J. Gallagher & Co. v. Reisinger*, 2007 WL 1877895, at *18 (W.D. Penn. Jun. 29, 2007) (unlike here, there was no evidence that the competitor "was actively soliciting its other customers or actually obtained broker-dealer of record authorizations from other customers").

Gallagher's interests) for three weeks, even though the 21-day Notice Period has expired and contains no tolling provision. *Id.* at 33. Alliant argues that the requested relief is overbroad for the same reason, *id.*, ignoring the purpose of injunctive relief—which is to preserve the status quo. *See, e.g.*, *Westinghouse Elec. Corp. v. Free Sewing Mach. Co.*, 256 F.2d 806, 808 (7th Cir. 1958). "Status quo" does not mean the current state of affairs—it means "the last uncontested status which preceded the pending controversy." *Id.* "In simplest terms, injunctive relief should be fashioned in such a way as to put the parties back to ***where they would have been*** but for Defendants' alleged wrongdoing and to assure that no further damage is done." *Regal-Beloit Corp. v. Drecoll*, 955 F. Supp. 849, 868 (N.D. Ill. 1996) (emphasis added). Contrary to Alliant's argument, Gallagher is not asking this court to "rewrite" the Employment Agreements. Opp. at 33. Since Gallagher never received the benefit of the 21-day transition period it bargained for, it merely asks this Court to restore it to the position it would have been in absent Alliant's tortious conduct.

Alliant also ignores the public's substantial interest in injunctive relief, *see* Mem. at 31-32, and conclusory states that clients will be harmed by not being permitted to work with the Resigning Employees at Alliant. Opp. at 32-33. But "the insurance brokerage industry is highly competitive, and there appear to be multiple firms that can provide the necessary services. If customers are upset, they can blame Alliant, which chose to induce the [Resigning Employees] to breach restrictive covenants that both they and Alliant believed were enforceable and which tracked the restrictions that Alliant demands from its own employees." *Lockton,* 2019 WL 2536104, at *23.

"Alliant is a sophisticated entity and repeat player. It raided [Gallagher] knowing about the risks, and it prepared for litigation from the outset. It cannot now complain about suffering the foreseeable consequences of its actions." *Id.* at *25.

15

## <u>CONCLUSION</u>

WHEREFORE, for the foregoing reasons, Gallagher respectfully requests that the Court enter an Order temporarily restraining Alliant, as set forth in Gallagher's Emergency Motion for Temporary Restraining Order, and granting any other relief as the Court deems just and proper.

DATED:      August 5, 2022                Respectfully submitted,

                                          */s/ Ronald S. Safer*
                                          Ronald S. Safer, ARDC # 6186143
                                          Eli J. Litoff, ARDC # 6317940
                                          Matthew A. Blumenreich, ARDC # 6329458
                                          RILEY SAFER HOLMES & CANCILLA LLP
                                          70 W. Madison Street, Suite 2900
                                          Chicago, Illinois 60602
                                          Phone: 312-471-8700
                                          Fax: 312-471-8701
                                          Email: rsafer@rshc-law.com
                                                 elitoff@rshc-law.com
                                                 mblumenreich@rshc-law.com

                                          *Attorneys for Plaintiff*

## **CERTIFICATE OF SERVICE**

I hereby certify that on August 5, 2022, I filed a copy of the foregoing document using the

Court's CM/ECF filing system, which will automatically send notice of the filing to all counsel of

record.

*/s/ Eli J. Litoff*